## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| RUTH C. HERBEL & RONALD D. HERBEL, )<br><br>*Plaintiffs*, )<br><br>v. )<br><br>CITY OF MARION, KANSAS; )<br><br>FORMER MARION MAYOR DAVID MAYFIELD,<br>  officially and individually; )<br><br>FORMER MARION POLICE CHIEF<br>GIDEON CODY,<br>  officially and individually; )<br><br>ACTING MARION POLICE CHIEF<br>ZACH HUDLIN,<br>  officially and individually; )<br><br>MARION COUNTY SHERIFF JEFF SOYEZ,<br>  officially and individually; )<br><br>MARION COUNTY SHERIFF'S DETECTIVE<br>AARON CHRISTNER,<br>  individually; )<br><br>MARION COUNTY SHERIFF'S DETECTIVE<br>STEVE JANZEN,<br>  individually, )<br><br>MARION MAYOR MICHAEL POWERS,<br>  officially, )<br><br>  & )<br><br>MARION BOARD OF COUNTY COMMISSIONERS; )<br><br>*Defendants.* )<br> | Case No. _____<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

## INTRODUCTION

1.      Officials in Marion, Kansas, conducted an illegal search of Vice Mayor Ruth Herbel's home because they wanted to ensure she could never criticize them again.

2.      Ruth ran for city council in Marion at age 76 because she was tired of her local government's dishonesty and lack of transparency.  She quickly learned, though, that the men with the power in Marion were resistant to change, and public scrutiny.

3.      Not long after Ruth joined city council, Marion Mayor David Mayfield grew tired of Ruth researching the legal limits on his authority and questioning his policies.  After Ruth led a successful campaign against Mayor Mayfield's referendum to amend the city charter in December 2022, the mayor decided to retaliate.

4.      Mayor Mayfield began enlisting his political allies into a conspiracy to remove Ruth from office.  Their first attempts failed—a wildly unsuccessful recall attempt and a half-baked scheme to trick Ruth into agreeing she was an at-will employee.  Finally, Mayor Mayfield decided that charging Ruth with a crime was the only way to get rid of her.

5.      The problem for Mayor Mayfield and his co-conspirators was that Ruth hadn't done anything wrong.  So, they decided to make up something to get a warrant to search her home, computer, and phone.  The search would provide cover for Ruth's arrest.

6.      On the first Friday of August 2023, Ruth saw on Facebook that a local restaurateur had been driving around without a license for years due to a DUI.  Because the restaurateur was applying for a catering license to sell liquor, Ruth asked the city administrator to help determine if the DUI impacted her eligibility for the license.  The city council was due to vote that coming Monday, so Ruth reached out to the woman who posted about the DUI on

Facebook to verify her claim. The Facebook poster sent Ruth a screenshot of a letter from a Kansas agency confirming the suspended license, and Ruth took her own screenshot of the screenshot to send the city manager.

7.     A local newspaper, the *Marion County Record*, also got a picture of the letter from the same Facebook poster. Around the same time Ruth sent the letter to the city manager, the *Record* told the Marion Police Department and County Sheriff's Office that a tipster sent them a letter confirming a local restaurateur was driving without a license due to a DUI. Mayor Mayfield and his allies saw it as an opportunity that Ruth and the *Record*—two of the administration's loudest critics—both received a copy of the same official letter.

8.     When they went back to work that Monday, Mayor Mayfield and his allies hatched a plan to use the letter as pretext to punish Ruth and the *Record*. The theory they came up with was that, because the letter listed the restaurateur's driver's license number, simply possessing the letter was illegal and that someone "obviously" stole the restaurateur's identity to get the letter.

9.     The conspirators didn't bother with a real investigation. Instead, Mayor Mayfield worked with the Marion Police Chief and County Sheriff to maliciously procure baseless warrants to search Ruth's home, the *Record*'s offices, and its publisher's home and to seize all their phones and computers.

10.     The warrants were based on lies and omissions rather than probable cause. No one even swore the allegations were true. To make things worse, the warrants were also absurdly overbroad. But that hardly mattered because the police just took every phone and computer,

without bothering to limit their searches to the terms of the overbroad warrants they drafted. The warrants, after all, were just a means to punish their critics.

11.     The unprecedented raids on Marion's vice mayor and local newspaper inspired national outrage at the Mayfield Administration's belligerence.  The media's spotlight was all that saved Ruth from arrest.

12.     Even though the Mayfield Administration could not complete its plan, their search of the Herbels' home still took its toll on Ruth and her husband, Ronald, who has dementia.  Ruth and Ronald suffered a great deal of stress and anxiety.  The police knowingly left the Herbels without a phone to contact their children or doctors.  It took months of trips to see specialists before Ronald's condition began to improve.  He and Ruth are both still recovering.

13.     The Mayfield Administration's retaliation against Ruth's political speech violated the First Amendment, and its procurement and execution of a facially invalid warrant to search the Herbels' home and seize their phone and computer violated the Fourth Amendment.  This lawsuit seeks to remedy the harm that Ruth and Ronald have suffered because Mayor Mayfield and his allies conspired to violate their civil rights.

## PARTIES

14.     Plaintiff Ruth C. Herbel was Vice Mayor of Marion, Kansas, in August 2023 when the mayor, police chief, and county sheriff conspired to have her arrested and removed from office, in retaliation for her political speech.  Ruth is an adult citizen of the United States and has been a resident of Marion County, Kansas, for the past 63 years.

15.     Plaintiff Ronald D. Herbel is Ruth's husband.  He is also an adult citizen of the United States and a resident of Marion County, Kansas.  Ronald has dementia and suffered

severe trauma when Marion police officers and sheriff's deputies conducted an illegal raid on his home, interrogated his wife in front of him, and then seized their computer and only phone.

16.     Defendant the City of Marion is a home-rule city in Kansas.  Marion is a small town, spanning less than three square miles with a population under 2,000 residents.  At all times relevant to this case, the City of Marion, its officers, agents, and employees acted under color of law.  The actions that give rise to Plaintiffs' claims are, unless otherwise indicated, committed pursuant to the policies, practice, and customs of the City of Marion, and at the direction of, with the knowledge of, and through the actions of its former and current policymakers, including its mayor and police chief.

17.     Defendant David Mayfield was the Mayor of Marion when he engaged in the illegal conduct alleged in this complaint.  Marion law makes the mayor a policymaker by vesting the office with superintending control of all officers and affairs of the city.  Mayor Mayfield used that authority to orchestrate a scheme of political retaliation against his vice mayor, Ruth Herbel. He is sued in his individual and official capacity.

18.     Defendant Gideon Cody was the Police Chief in Marion when he engaged in the illegal conduct alleged in this complaint.  Marion law also makes the police chief a policymaker. The police chief is authorized to make rules and regulations that he deems necessary for the proper and efficient conduct of the department.  He is sued in his individual and official capacity.

19.     Defendant Zach Hudlin is currently the Acting Police Chief in Marion.  The City of Marion appointed him to that role after Gideon Cody resigned due to the illegal conduct alleged in this complaint.  Up until his appointment as acting police chief, Hudlin was an officer with the Marion Police Department working alongside then-Chief Cody in the commission of the

4

conspiracy to deprive Ruth and Ronald of their civil rights.  He is sued in his individual and official capacity.

20.     Defendant Jeff Soyez is the elected Sheriff of Marion County.  In Kansas, sheriffs must keep and preserve the peace and must serve and execute all process, writs, precepts, and orders.  The City of Marion's Police Department consulted and collaborated with Sheriff Soyez's County Sheriff's Office as the two municipal governments planned and executed the illegal scheme described in this complaint.  Under Sheriff Soyez's command, the Marion County Sheriff's Office conspired with the Marion Police Department to deprive Ruth and Ronald of their civil rights.  He is sued in his individual and official capacity.

21.     Defendant Aaron Christner is a detective with the Marion County Sheriff's Office.  Detective Christner drafted the facially invalid warrant, participated in the search and seizure of Ruth's electronic devices, and drafted an arrest warrant for Ruth following the illegal raids even though he acknowledged it lacked a legitimate basis.  He is sued in his individual capacity.

22.     Defendant Steve Janzen is a detective with the Marion County Sheriff's Office.  Detective Janzen led the illegal raid of the Herbel home and seized their computer and their only phone based on a facially invalid warrant.

23.     Defendant Michael Powers is the current Mayor of Marion, Kansas.  The mayor is sued in his official capacity only, as Mayor Powers was not in office at the time of the illegal conduct alleged in this complaint.

24.     Defendant Marion County's Board of County Commissioners is the governing body of Marion County.  The Board is a proper party in a suit against Marion County, pursuant to K.S.A. 19-105.

## JURISDICTION & VENUE

25.     Plaintiffs bring this civil-rights lawsuit pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, for violations of rights, privileges, or immunities secured by the United States Constitution.

26.     This Court has jurisdiction under 28 U.S.C. §§ 1331 & 1333.

27.     Venue is proper in the District of Kansas under 28 U.S.C. § 1391.

## BACKGROUND

28.     Ruth Herbel moved to Marion County after she graduated high school in 1961. She took the civil-service exam and accepted a job in Marion with the Kansas Department of Transportation.

29.     Ruth met her husband, Ronald, while they were both working at KDOT.

30.     The two got married and started a family, eventually having three children.

31.     Following the birth of their second child, Ruth left her job at KDOT to focus on the couple's children.

32.     Ruth eventually went to work for the United States Department of Agriculture, where she was a program specialist for 22 years.

33.     The couple was fortunate to retire relatively young, with Ronald retiring in 1993 and Ruth just three years later.  Retirement freed up time for them to spend with their family and travel a bit.

34.     But even in retirement, they stayed busy.  Ruth and Ronald worked refurbishing antiques for a local antique store.

35.     In early 2021, Ronald had dementia set in, and Ruth became his primary caregiver.

36.     The couple still live in the same home where they raised their three children. They always found Marion to be a great place to live and raise their family.

**Ruth Runs for City Council to Make Change**

37.     Ruth remained politically active during retirement.

38.     Each year, Ruth and Ronald distributed a $1,000 charitable grant to the local community.  Among other things, they used grant funds to cater lunches for the police and fire departments, purchase food for the local food bank, support fundraisers for the Marion Senior and Marion Library, and fund congregational dinners for their church.

39.     Ruth also served on the Marion County Planning and Zoning Commission for several years.

40.     During her time as a zoning commissioner, Ruth's frustrations with the City of Marion's government eventually inspired her run for city council in November 2019.

41.     Ruth told the *Marion County Record* that she was running for office because she was "tired of the dishonesty in the city administration."

42.     In explaining her frustrations to the newspaper, Ruth recounted an incident when the city administrator told her a document that he was holding in his hand did not exist.  "That's when I decided that my name would be on the ballot for city council," Ruth concluded.

43.     Ruth campaigned alongside David Mayfield, who was running for mayor—also on a platform of change and transparency:



44.     After they won their election, Ruth stayed true to her word.   And that commitment to honesty, integrity, and transparency, caused her to clash with Mayor Mayfield.

45.     As the *Record* described in 2021, Ruth and Mayor Mayfield disagreed over "what a city council meeting is supposed to be."   Mayor Mayfield, the article explained, "seem[s] to want the city council to be mainly a rubber stamp for issues completely pre-digested for members like so many worms chewed up by a mother bird feeding her young."   Ruth, by contrast, "see[s] freewheeling discussion, dissent, and debate as cornerstones of another big 'D'—democracy."[1]

**Ruth and Mayor Mayfield Take Opposing Views of Governance**

46.     Ruth's disputes with Mayor Mayfield started small.   For example, when the mayor tried to raze the memorial fountain in Marion's Central Park, Ruth contacted the family the fountain honored, and together—to the mayor's dismay—they were able to save the fountain.

---

[1] Questions and answers on city dysfunction, *Marion County Record* (Dec. 2, 2021), *available at* https://bit.ly/4bAMqvM.

47.     Ruth's insistence on researching issues and ensuring that the city government followed the law were frequent points of contention between her and the Mayfield Administration.

48.     Mayor Mayfield and his allies in government became openly hostile to Ruth. Mayor Mayfield once called her a "bitch" during an executive session.  And Councilmember Zach Collett, one of Mayor Mayfield's closest allies, told Ruth that "if [former City Administrator] Roger [Holter] was still here, you would not be sitting in that God damn seat."

49.     To silence Ruth's voice on council, Mayor Mayfield began trying to control who Ruth could speak to, how much she could speak, and what topics she could address.

50.     For instance, in November 2021, Mayor Mayfield told Ruth that she had to raise any concerns with the city administrator before she could bring them up at city council meetings.

51.     Just a few days later, Mayor Mayfield expanded the limitation: He told Ruth that she had to give the city administrator advanced notice of any city ordinances or policies that she planned to mention—that way Mayfield's administration would not seem so unprepared whenever Ruth spoke.

52.     Mayor Mayfield also had the city attorney send Ruth a threatening letter that warned her that it could be illegal for her to speak to anyone interested in dealing with the city unless she had full council approval.  The letter concluded, "If you continue to put the city of Marion at risk, your actions could result in the Mayor admonishing you before the entire council. If you have any questions, please contact Mayor Mayfield or [City Administrator] Roger Holter."

53.     Mayor Mayfield forbade Ruth from contacting the Kansas League of Municipalities, an organization that exists to assist municipal governments.

9

54.     Eventually, Mayor Mayfield even forbade Ruth from contacting the city attorney.

55.     The mayor did not try to restrict the speech of any other city councilmembers.

56.     Mayor Mayfield's attempts to silence Ruth did not, however, stop Ruth from criticizing Mayor Mayfield in the press.  She frequently relayed her criticisms in the local paper of record: the *Marion County Record*.

57.     Ruth repeatedly spoke out when she believed Mayor Mayfield was violating the city charter, handing out city funds without authorization, giving unauthorized raises to his favored employees, holding illegal meetings, and disregarding procedures that were in place to check his authority.

58.     A small sampling of the dozens of stories in the *Record* captures how tension developed between Ruth and Mayor Mayfield during their first term in office:

a. An article from April 21, 2021, entitled, "Keeping everyone in the dark," described how Mayor Mayfield backtracked on a campaign promise to oust then-City Administrator Roger Holter.  The article details what Ruth had to endure to do her job, such as the city administrator refusing to provide Ruth city data unless she filed a Kansas Open Records Act request.

b. An article from March 24, 2021, entitled, "Herbel, Mayfield continue to clash," described the "terse exchanges" between Ruth and Mayor Mayfield.

c. An article from December 1, 2021, entitled, "Questions and answers on city dysfunction," detailed Ruth's objections to Mayor Mayfield's illegal attempts to suspend the city code.  The article began by explaining that Mayor Mayfield and his "protégé," Councilmember Zach Collett, "pilloried council member Ruth

10

Herbel in not-so-subtle tones" at a council meeting that Monday.  The article then described how "Mayfield's attempt to gag [Ruth] and insist in condescending tones that she clear any concerns she might have with administrator Roger Holter before bringing them to a council meeting [wa]s yet another action revealing Mayfield to be concerned less about having robust democratic debate and more about making sure trains run on time – his time or Holter's."

d.  And on August 2, 2023, midweek of the conspiracy to arrest Ruth, she published a letter in the *Record*, explaining that she "felt it necessary to answer Mayor David Mayfield's questions with a letter to the editor because he never lets me finish a sentence in council meetings."

59.     Many of Ruth's comments to the *Record* upset Mayor Mayfield.  But one incident in December 2022 really stands out: At the behest of the Marion Police Chief, Mayor Mayfield fired the city administrator without following the proper processes based on secret complaints that Mayor Mayfield refused to share with three of the five councilmembers.  After consulting with an attorney about her ability to discuss closed sessions, Ruth shared Mayor Mayfield's shady ploy with the *Record*.

### Ruth Embarrasses Mayor Mayfield by Leading a Voter Referendum to Defeat Mayfield's Proposed Amendment to the City Charter

60.     Mayor Mayfield's attempts to silence Ruth further escalated in July 2022 after he and his allies passed Charter Ordinance 22-02 over Ruth's dissent.

61.     The ordinance would have made it dramatically easier for the city to issue bonds to fund the mayor's projects.  Specifically, the ordinance increased the types of projects that the

city could fund through debt, and it removed the requirements that an engineer must first approve the projects, that a super-majority of the city council approve the issuance of bonds, and that the city hold referenda to accrue more debt.

62.     Ruth objected to the ordinance, in large part, because it removed the citizenry's power over the city's accumulation of debt.

63.     To restore the voters to the process, Ruth organized a campaign against the referendum that Mayor Mayfield needed to authorize his charter amendment.

64.     Ruth spent her own money on signs and advertising to let the public know that Mayor Mayfield planned to strip them of their rights:

 

65.     In a special election held on December 20, 2022, voters rejected the referendum by an overwhelming 10:1 margin.  Just 25 of the 294 votes cast were in favor of Mayor Mayfield's proposed amendment.

66.     The *Record* described the referendum as a personal defeat for Mayor Mayfield: "The defeat is a blow to Mayor David Mayfield and other council officials who passed Charter Ordinance 22 in July. ... Ruth Herbel, who voted against the ordinance, was thrilled with the results of the special election."

### Mayor Mayfield Retaliates by Trying to Recall Ruth from Office

67.     Ruth's successful campaign to defeat Mayor Mayfield's charter amendment was the final straw for the mayor.  Mayor Mayfield decided he had to get Ruth off the city council.

68.     Mayor Mayfield's first attempt to oust Ruth was a petition to recall her from office.  His wife, Jami Mayfield, filed the petition on January 30, 2023, just one month after the failed referendum.  Mayor Mayfield was one of the petition's six sponsors:

SPONSORS FOR COLLECTING SIGNATURES FOR RECALL PETITION ON RUTH HERBEL:

1.  Jami Mayfield, 515 S Lincoln, Marion, KS 66861
2.  Kathern Swan, 313 S 4th, Marion, KS 66861
3.  Margaret Wilson, 425 Elm, Marion, KS 66861
4.  David Mayfield, 515 S Lincoln, Marion, KS 66861
5.  Morgan Makovec Looney, 220 Garfield, Marion, KS 66861
6.  Steve Hart, 548 Santa Fe, Marion, KS 66861

69.     The petition set out two (illegitimate) grounds for Ruth's removal: (1) Ruth violated the Kansas Open Meetings Act by replying all to a message that included a quorum of city council members with the simple message, "Thanks."; and (2) Ruth violated her oath of office by revealing information from an executive session "via Eric Meyer with the Marion County Record."

70.     Jami Mayfield took to Facebook on February 8, 2023, to promote her removal petition.  Her post, which Mayor Mayfield reposted, said their petition would not merely recall Ruth but also silence the *Record*:



71.     Ten days later, on February 18, she posted another call to action, which Mayor Mayfield reposted.  Again, the post linked the Mayfields' opposition to Ruth with the *Record*: "If you are not intimidated by Herbel and the MCR and want to put a stop to the insanity, please let one of use know so we can get this process finalized."



72.     Both posts ended with Jami Mayfield warning that the Mayfields would remember "the silence of our friends!!"

73.     Unsurprisingly, the Mayfields were unable to collect enough signatures to support their bogus recall petition, and their effort failed.

### Mayor Mayfield Tries to Find a Backdoor to Push Ruth Out

74.     After his recall effort failed, Mayor Mayfield hatched another harebrained scheme to remove Ruth from office.  In June 2023, Mayor Mayfield ordered City Administrator Brogan Jones to make all city council members sign an acknowledgement that they held their office on an "at will" basis, even though they were duly elected by the public.

75.     Wise to Mayor Mayfield's antics, Ruth simply crossed out the offending language before she signed the acknowledgement:



76.     Because Ruth refused to acknowledge that Mayor Mayfield could fire her at will, City Administrator Jones refused to even accept Ruth's signed form.  Another plan foiled.

### Mayor Mayfield Hires Gideon Cody as Police Chief

77.     Marion's police chief quit at the end of 2022, leading the city to begin interviews for a new chief in early 2023.

78.     Mayor Mayfield, a former law-enforcement officer himself, consulted with Marion County Sheriff Jeff Soyez about who to hire.

79.     Sheriff Soyez recommended his friend Gideon Cody who was, at the time, a captain with the Kansas City, Missouri, Police Department.

80.     After Cody's candidacy was announced, tipsters began reaching out to the *Record* with information about the toxic end to Cody's tenure in Kansas City.

81.     Many tipsters shared troubling details, like how Cody ran over a dead body at a crime scene, made inappropriate sexual remarks to his colleagues, and was an egomaniac who was difficult to work with.

82.     The *Record* also learned that Chief Cody was going to be demoted from his rank of captain in Kansas City.  Leaving the Kansas City Police Department while he was still a captain allowed Cody to keep his pension intact.

83.     The ability to keep his full pension helps explain Cody's willingness to accept a nearly 50% pay cut to take the job with the Marion Police Department.

84.     Cody's problematic behavior in Kansas City was not enough to deter Sheriff Soyez or Mayor Mayfield, who jumped at the chance to hire Gideon Cody.

85.     Mayor Mayfield hired Cody as police chief on May 1, 2023, before any vote by the council to formally approve his appointment.

86.     Cody took the oath of office later in May 2023, again before there was ever a formal vote to hire him as police chief.

87.     Once Chief Cody took office, he immediately showed hostility toward the media.

88.     Chief Cody denied multiple interview requests and stopped the Marion Police Department's longstanding practice of providing weekly activity reports to the newspaper.

89.     The *Record* responded by publishing, on a weekly basis, the following statement where the city's police activity should have gone, "Newly appointed chief Gideon Cody has discontinued providing a weekly report of Marion police activities."

90.     Chief Cody also instructed City Administrator Jones not to provide the *Record* with a copy of the new pay scale for police officers that he proposed at a city council meeting because he "d[idn't] want to have our pay scale on the Daily Record[]."

91.     Chief Cody's hostility toward the media was shared throughout the Mayfield Administration.

92.     At the end of July 2023, for instance, City Administrator Jones told Mayor Mayfield, "I believe we should cease all contact with the Record due to the threat of legal issues."

17

93.    Mayor Mayfield, for his part, shared a post on Facebook on July 25, 2023, that identified journalists among the "real villains in America" who "do nothing but sow division between the American people."



94.    The week after this post, Mayor Mayfield began orchestrating a conspiracy among his allies in government to silence political dissent.

95.    Mayor Mayfield used this conspiracy to silence the *Record*, along with his loudest critic: Vice Mayor Ruth Herbel.

96.    The Defendants, acting individually and collectively, knowingly conspired to carry out a plan to violate the civil rights of Ruth and, by extension, her husband Ronald.

**The Kari Newell Affair**

97.    Two months after Chief Cody took office, on August 1, 2023, U.S. Congressman Jake LaTurner visited Marion for a meet-and-greet called "Coffee with Your Congressman."

98.    A local restauranteur, Kari Newell, hosted the event at her coffee shop, which sat across the street from an upscale restaurant that she owned at the time.

99.     The restaurant, Chef's Plate at Parlour 1883, is in the Historic Elgin Hotel, which is run by Tammy Ensey, the sister-in-law of Marion County Attorney Joel Ensey.

100.    The narrative in the warrants that the conspirators maliciously procured to forward their illegal scheme in this case began at Kari Newell's coffee shop and ended with a licensing dispute for her restaurant.

101.    The week before the warrants, Kari Newell inserted herself into the story by having Chief Cody remove the *Record*'s editor and publisher, Eric Meyer, along with his journalist, Phyllis Zorn, from Rep. LaTurner's event at her coffee shop.

102.    Newell told them, "I will not have members of the media in my establishment."

103.    Chief Cody dutifully obliged and removed Meyer and Zorn.

104.    Newell later bragged that people were "high fiving her" for kicking its reporters out of her business.

### The Newell Letter

105.    On Friday, August 4, just a few days after Coffee with Your Congressman, Ruth was home preparing for the city council meeting that coming Monday.

106.    Ruth emailed City Administrator Jones with questions and observations as she worked her way through the meeting's agenda.

107.    One item on that Monday's agenda was a request that the council approve a catering license for Chef's Plate at Parlour 1883, in the name of Kari Newell.  The license would let Newell sell liquor, even off-premises.

108.    The restaurant to that point was selling liquor under the Elgin Hotel's license, which was in Tammy Ensey's name.

109.    Ruth's first question for Jones was whether Newell planned to serve liquor at her coffee shop or only at catering events elsewhere because the city had an ordinance preventing the sale of liquor so close to a church (and Newell's coffee shop sat across the street from a church).

110.    Ruth noted that the city had previously given special permission to the Elgin Hotel to sell liquor by the church, but she thought the exception had something to do with the percentage of the restaurant's sales that came from food rather than liquor.

111.    City Administrator Jones did not respond directly to Ruth's question about the legality of the license or the exception for the Elgin Hotel.  Instead, he minimized her concerns, saying, "This is the exact same venue.  It is merely changing the name from the Elgin to Chef's Plate at Parlour 1883."

112.    Jones was correct that the catering license would allow the continued sale of liquor at the restaurant inside the Elgin Hotel.  But the new license would also be issued to Kari Newell instead of Tammy Ensey.

113.    Ruth thought this change in licensee might be an issue given something she just saw on Facebook about Newell's criminal history.

114.    Ruth explained in her response to Jones: "Okay, you do know that she has been supposedly convicted of DUI.  Maybe Cody could check this out.  This information was put on Facebook Wednesday by one of her close friends, Pam Maag, who I think is the wife of Roger Maag, who was or is a highway patrolman.  I sent Pam [a personal message] to see if I could find out more."

115.    Jones assured Ruth that he would inform the city attorney but would otherwise table the issue "until I hear from [City Attorney] Bina and all the legal side."

116.     There's no record that Jones ever raised Ruth's concerns with the city attorney.

117.     Instead, Jones forwarded Ruth's email to Mayor Mayfield.

118.     In his email to the mayor, Jones revealed that he had already spoken to Chief Cody about Newell's suspended license and that the police did not plan to do anything about it, nor did Jones think the city council should do anything:



119.     While Ruth waited for Jones to follow up, Ruth messaged Pam Maag on Facebook to verify her claims.

120.     Maag sent Ruth a picture of a letter dated August 1, 2023, addressed to Newell from the Kansas Department of Revenue's ("KDOR") Division of Vehicles.

121.     The letter described several requirements Newell needed to meet before Kansas would restore her driving privileges following the suspension of her license for a DUI.  One such requirement was installing a device on her car that would not allow her to start the ignition with alcohol in her bloodstream.

122.    At the top of the letter, along with Newell's address, the letter included her date

of birth and driver's license number (redacted for this complaint):



123.    Maag got a copy of the letter from Newell's soon-to-be-ex-husband.

124.    Ruth took a screenshot of the screenshot of the letter and sent it to Jones:



125.    The Newell letter became the pretext for Mayor Mayfield and his allies to violate

the civil rights of Ruth, Ronald, and the journalists at the *Marion County Record*.

126.    Shortly after Ruth sent Jones a copy of the Newell letter, the *Record* emailed the

Marion Police Department and Marion County Sheriff's Office to alert police that they received

a letter from the KDOR outlining steps that "a Marion businesswoman" needed to take to get her driver's license back after suspension.

127.    The email informed police that the *Record*'s lawyer confirmed the letter was a public record that was legal for the paper to possess.  The *Record* also checked with the KDOR to confirm that anyone who possesses someone's name, date of birth, and Kansas identification-card number can access the record legally.

128.    Although someone could possibly obtain such a letter by misusing law-enforcement credentials, the email explained, the *Record* had a good reason to believe that "the soon-to-be-former spouse of the businesswoman" gave the letter to their source.

129.    The *Record* noted that it was newsworthy that "someone could escape detection" while driving without a valid license "for nearly a quarter century," but explained that the paper would likely "pass on writing that story," because it had "no desire to invade the privacy of any individual, especially if this is merely squabbling during a divorce."

130.    Although unsubstantiated at that point, the *Record* also raised its concern "that local law enforcement officers are fully aware that she—and, perhaps, her son—have been driving for some time without active, valid licenses."

131.    The *Record*'s email concluded by telling the two police departments that the paper would "not feel comfortable sharing additional information" unless the police "have cause to believe that some crime or misbehavior might have occurred."

132.    Before emailing the police, the *Record* had already confirmed the Newell letter's authenticity using the Kansas Driver's License Status Check function on KDOR's website.

133.    The website and its license-status-check function are publicly accessible.

134.   As explained in the *Record*'s email to the police, the website allows anyone with a driver's name, license number, and date of birth to check the status of that driver's license.

135.   Because the KDOR letter included Newell's name, license number, and date of birth, the *Record*—and anyone else who saw the letter—had all the information needed to confirm the status of Newell's license and the letter's authenticity.

136.   The *Record*'s use of KDOR's license-status-check function was entirely legal.

137.   Indeed, KDOR later publicly confirmed the legality after the *Record*'s search became part of the pretext for the Defendants' illegal conduct that followed, confirming, "[t]hat's legal" and "this information is public record and available online."

138.   Ruth, for her part, never used the KDOR website or any other government database to input Newell's personal information or check the status of Newell's driver's license or the letter's authenticity.

139.   Ruth was not even aware there was a website on which she could have obtained the letter or checked its authenticity.

140.   First thing on the morning of Monday, August 7, City Administrator Jones forwarded Ruth's screenshot of the Newell letter to Mayor Mayfield, including a BCC to the rest of city council (but not Ruth).  He said, "Just a heads up to what Ruth sent me this weekend."

141.   Mayfield instructed Jones to send all of Ruth's emails to the rest of city council, "so they can see what she is doing."

142.   Some of Ruth's emails to Jones questioned Newell's eligibility for her catering license while others dealt with separate matters like the city budget and errors in the minutes from a prior council meeting.  For instance, Ruth sent a few state laws restricting who can obtain

a caterer's license to sell liquor and said, "More information on caterer's license and liquor license.  We should probably approach this with caution.  The way I read the Statutes is, if we issue the caterer's license, she will be able to sell liquor anywhere including the coffee shop.  I sent what I received from Pam Maag last night."

143.    A few hours later Ruth told Jones that she was "still concerned about issuing a Liquor/Cater License to Chef's Parlor 1886" and included a list of city ordinances and state laws she thought the license might violate.  She concluded, however, by asking Jones, "Let me know if you think I am heading in the wrong direction."

144.    Jones continued to forward Ruth's emails to the mayor and city council as they came in, but Jones answered Ruth only when she asked questions about something other than Kari Newell's license application and DUI.

145.    While Ruth was emailing Jones, Chief Cody also reached out to the city administrator about the Newell letter.

146.    Chief Cody sent Jones a copy of Eric Meyer's email from that past Friday evening about the *Record*'s receipt of the letter.  Chief Cody told Jones, "We should talk about this after our meeting today."

147.    Jones responded to Chief Cody by sharing the name and contact information of the Marion City Attorney.

### The Mayfield Administration Snaps into Action: Searching for Ways to Punish Political Dissent

148.    Upon learning that Ruth and the *Record* had separately received evidence that someone friendly to the Mayfield Administration was driving illegally, the mayor and his allies jumped into action—but not to address the police's selective enforcement of the law.

149.    Instead, the Mayfield Administration's immediate reaction was to punsih Ruth and the *Record*.

150.    Mayor Mayfield instructed Chief Cody to open an investigation into the administration's critics.

151.    Chief Cody reached out to plan a meeting with KDOR and the Kansas Bureau of Investigation ("KBI").

152.    Chief Cody also reached out to Kari Newell.  And he wasn't the only city official to do so.  Mayor Mayfield, Chief Cody, and Councilman Zach Collett all messaged Kari Newell separately to warn her that Ruth knew about Newell's suspended license.

153.    All three men claimed that Ruth planned to oppose Newell's application because of the DUI, even though Ruth had only asked that the city council investigate whether Newell was even eligible.  To conclude that Ruth would vote against Newell's license, the men either agreed that Newell's DUI made her ineligible or they purposefully misled Newell.

154.    The city officials' conversations with Newell involved more than just a warning— they also fed Newell a fake story that would form the predicate for their investigation into Ruth and the *Record*.

155.    Chief Cody told Newell, without any factual basis, that someone had stolen a letter from her mailbox.

156.    When Newell told Chief Cody he was wrong, Chief Cody told her—again, without any factual basis (considering a minute prior he thought someone stole her mail)—that someone had stolen her identity, then.

157.   Chief Cody also told Newell that someone at the *Record* shared her driving record with Ruth.

158.   Chief Cody knew this detail was false.  He knew that Pam Maag had given the Newell letter to both *The Record* and Ruth.

159.   The three city officials left Newell with the false impression that Ruth had (1) illegally obtained a copy of her driving record; (2) posted the letter on Facebook; and (3) planned to use the letter to oppose Newell's catering license.

160.   Beyond those false statements, Mayor Mayfield told Newell that the only way to stop Ruth and get her off the city council was to have her arrested and charged with a crime.

161.   To accomplish that goal, Mayor Mayfield and Chief Cody decided it could be a crime for Ruth to merely possess a screenshot of a screenshot of a letter detailing information posted publicly to Facebook.

**Newell Publicizes Chief Cody's Lies, but the *Record* Corrects the Record**

162.   Based on the lies that Marion officials fed her, Newell showed up to the August 7 city council meeting and accused Ruth of posting her personal information on Facebook—something that Ruth had not done.

163.   Newell also amplified Chief Cody's lie that the *Record* had "illegally" given Ruth a copy of Newell's driving record.

164.   Newell publicly accused Ruth of acting "negligently and recklessly" by sharing her personal information online—something, again, Ruth had not done.

165.   Newell said she wanted Ruth's colleagues to know "how vile" Ruth is.

166.    By the end of the meeting, the city council voted 4-1 to endorse Newell's catering license.  Ruth was the only dissenting vote.

167.    As Newell warned during her public comments, however, the vote to approve her catering license would not be the end of the issue: "This is going to become a case."

168.    Eric Meyer then stood up to set the record straight.  He told Newell, Mayor Mayfield, the council, and everyone else watching that Ruth did not give the *Record* the Newell letter.

169.    The mayor and his associates already knew that; they just didn't let it stop them.

### The Sham Investigation

170.    The morning after the city council meeting, Tuesday, August 8, Marion Police officially opened an investigation into Ruth, Eric Meyer, Phyllis Zorn, and Pam Maag.

171.    Chief Cody met with Sheriff Soyez to recruit him into the conspiracy.

172.    Like Mayor Mayfield and Chief Cody, Sheriff Soyez held animus toward the *Record* and stood to lose credibility if the paper reported that his office had knowingly allowed Newell to drive around without a license for a decade.

173.    Whatever his personal motivations, Sheriff Soyez willfully joined the mayor and police chief's conspiracy when he knew or should have known that they planned to violate their critics' civil rights.

174.    Under Sheriff Soyez's direction, the Marion County Sheriff's Office began working with the Marion Police Department on a joint investigation into Ruth and the *Record*.

175.    Calling what transpired for the next three days an "investigation," however, is a bit too generous to the conspiring lawmen of Marion County—they didn't do much investigating.

176.    The main investigative step Chief Cody took was to have City Administrator Jones forward him the emails that Ruth sent as she prepared for the August 7 city council meeting.

177.    Chief Cody also had Kari Newell provide a written statement.

178.    Rather than revealing any new information, though, Newell's statement repeated Chief Cody's own misinformation about the legality of the *Record* verifying her driving record.

179.    Newell's statement also confirmed, once again, that the *Record* learned about the letter because someone connected to Newell's soon-to-be-ex-husband posted it on Facebook.

180.    The only new information that Newell's statement revealed increased the conspirators' urgency: The *Record* was conducting two separate investigations—one into Chief Cody's unceremonious exit from the Kansas City Police Department and the other into how the Mayfield Administration was violating the law.

181.    Chief Cody also tried to investigate Ruth's emails.  He reached out to the city's IT contractor about Ruth's use of her personal email address to communicate with City Administrator Jones.  "I know we are missing something," he said.

182.    Ruth's use of a personal email address was not unusual for a Marion official and was by no means a criminal matter.

183.    Several other councilmembers also used their personal email addresses to communicate with other city officials.  In fact, two other councilmembers (Jerry Kline and Zach Collett) received the Newell letter from Jones on their personal email accounts.

184.    But Chief Cody did not investigate Jerry Kline or Zach Collet for using their personal email addresses because Chief Cody was motivated by his intent to retaliate against Ruth, which led him to grasp at any pretense to arrest her—just as Mayor Mayfield desired.

185.    In addition to reaching out to the IT contractor, Chief Cody asked one of Sheriff Soyez's deputies, Detective Aaron Christner, to issue warrants to preserve the email accounts of Ruth, Eric Meyers, and Phyllis Zorn, as well as City Administrator Jones' work email.

186.    Det. Christner preserved Ruth's email account despite acknowledging that "there [wa]s no legal authority" behind Chief Cody's preservation requests.

187.    Det. Christner also cautioned Chief Cody that the company that hosts the *Record*'s emails was small enough that the company may notify the newspaper if the police sent a preservation request for the *Record*.

188.    Det. Christner proposed an alternative plan: "My advice is if you have the [probable cause] for a search warrant is that we just write that and skip a preservation."

189.    Heeding Det. Christner's advice, Chief Cody had Det. Christner draw up the warrant applications.

190.    Det. Christner had the warrant applications ready to go the next day.  His email to Chief Cody shows he did no investigation to establish probable cause: "I attached a draft for a [search warrant].  I am not comfortable swearing to an affidavit that I did not do the investigation

on.  I left my training and experience in red so you can change it to yours.  Let me know what you think."

191.    Due to the lack of any real investigation by Det. Christner or his co-conspirators, the warrant application and supporting affidavit contained several statements that were based completely on conjecture and verifiably false statements, if anything at all.

192.    For example, the warrant application claims, without any factual basis, that the Newell letter Ruth received from Pam Maag "was downloaded directly from the Department of Revenue."

193.    Chief Cody's team had no reason to believe that Pam Maag downloaded the Newell letter.  On the contrary, Ruth and the *Record* each separately told the Mayfield Administration that Kari Newell's estranged husband gave the letter to Pam Maag.

194.    Additionally, the warrant application insinuates the falsity that "someone obviously stole [Newell's] identity" because Newell did not authorize anyone to download her driving record from KDOR.

195.    Chief Cody's team knew or should have known that identity theft was not a reasonable conclusion—let alone the obvious one.  Again, all evidence suggested that Newell's estranged husband gave the letter to Pam Maag.  There was no reason for the officers to doubt that explanation.  And even a cursory investigation would have revealed the many other legal ways to obtain Newell's driving record.

196.    The false conclusion that "someone obviously stole [Newell's] identity" follows from a similar false claim in the warrant application for the *Record*'s offices.  That application, which the conspirators submitted alongside the warrant for the Herbel's home, states falsely that

the only way to obtain the Newell letter from KDOR was by "either impersonating the victim or lying about the reasons why the record was being sought."

197.    Once again, Chief Cody's team knew or should have known that this assertion was false.   Had they considered the basic facts before them and conducted even a cursory investigation into the KDOR website, the officers would have known that anyone who had a copy of the Newell letter could access Newell's records legally from a publicly accessible website.

198.    In addition to the falsehoods, the warrant application and affidavit omitted key context that would have led any neutral magistrate to realize Ruth had not committed a crime.

199.    For example, the warrant application and affidavit omitted all the following:

a.  Ruth obtained the Newell letter from Pam Maag—not a government database.

b.  Ruth never accessed a government database.

c.  The information contained in the Newell letter (aside from her driver's license number) was posted publicly on Facebook before Ruth obtained the letter.

d.  The Defendants had no reason to believe that Pam Maag obtained the Newell letter from a government database.  Indeed, they had every reason to believe that Kari Newell's soon-to-be-ex-husband gave her a copy of the letter.

e.  The status of a Kansas driver's license is an open record available for public inspection on a state website.

f.  Ruth obtained and shared a copy of the letter in her role as city councilor, as she prepared to vote on Newell's application for a license to sell liquor.

g.  Ruth did not rely on any confidential or personal information when she voted against Kari Newell's catering license.

h.   Ruth and the *Record* told the Marion Police Department and Sheriff's Office that they knew that the police were knowingly allowing Kari Newell to drive with a suspended license.

i.   Ruth asked City Administrator Jones to ask Chief Cody and the Marion Police Department to investigate Kari Newell's suspended license.

200.   Even with these materially false statements and omissions, the warrant application still did not contain evidence amounting to probable cause to believe Ruth committed a crime.

201.   Yet, the warrant accuses Ruth of committing two crimes.

202.   The first crime was "Identity Theft," under K.S.A. 21-6107, which the warrant described as "obtain[ing] and possess[ing] personal identifying information and document containing the same belonging to another person with the intent to subject that person to economic or bodily harm."

203.   The warrant's description of the crime, however, knowingly, intentionally, or recklessly omits a vital portion of the elements of identity theft, which apply only when a person intends to "misrepresent that person."

204.   Ruth never misrepresented Kari Newell or intended to do so, and the warrant application did not include any suggestion to the contrary—which explains why the conspirators omitted that material element of the crime they alleged.

205.   The second crime listed on the warrant is "Official Misconduct," under K.S.A. 21-6002, which the warrant describes as "[u]sing confidential information acquired in the course of and related to the office to intentionally cause harm to another."

206.     Once again, Ruth's conduct, even as described in the warrant, did not satisfy the elements of official misconduct.

207.     The Newell letter was not "confidential information" that Ruth acquired by virtue of her position on city council—it was a publicly available document that Ruth acquired on Facebook.

208.     Nor did the warrant application include any evidence suggesting that Ruth intended to cause Kari Newell harm.  The only harm that the warrant alleged was Ruth planned to vote against Newell's catering license—but that was not based on anything confidential.

209.     Ruth's emails to Brogan Jones, which Chief Cody had obtained, showed that Ruth simply asked that the city council proceed with caution and wanted the city council to review liquor-license laws to ensure Kari Newell was eligible for a catering license.

210.     The law does not require elected officials to vote against their conscience or misapply legal standards even if their reasoning derives from confidential information—otherwise government officials could never vote based on information they learned in executive sessions or from classified documents.

211.     Nonetheless, the warrant application asserted that police corroborated that "Ruth Herbel obtained protected Kansas Department of Revenue information via social networking."

212.     Simply obtaining a copy of a KDOR record on social media is not a crime.  The warrant application's theory of the law was completely wrong.

213.     Oddly, the crimes listed on the three-page warrant that police submitted along with the warrant application did not match the crimes on the warrant application—most likely

because the police copied-and-pasted from the *Record*'s warrant and forgot to change the crimes to match the warrant application for Ruth's house.

214.    While the warrant application promised evidence of identity theft and official misconduct, the accompanying warrant authorized the police to search for evidence of identity theft and unlawful acts concerning computers under K.S.A. 21-5839.

> Having evidence under oath before me from which I find there is probable cause to believe that an offense against the laws of the State of Kansas, including but not limited to violations of K.S.A. 21-6107 – Identity theft and K.S.A. 21-5839 – Unlawful acts concerning computers, has been committed and that certain contraband, fruits, instrumentalities and evidence of such offense, to-wit:

215.    Like with the other two crimes, the warrant also failed to allege probable cause to believe Ruth committed unlawful acts concerning computers.

216.    Ruth did not know the KDOR website existed, let alone access it improperly.  And there was no evidence to suggest she did.  She also did not improperly access any other computer, exceed her authorization to access a computer, attempt to defraud anyone, or disclose anyone's passwords—as K.S.A. 21-5839 requires.

217.    It should have been obvious to any objectively reasonable officers that the warrant to search Ruth's house and seize her electronic devices was not supported by probable cause to believe she committed any of the three crimes listed.

218.    And had it not been for the warrant application's materially false statements and omissions, the lack probable cause would have been even more obvious.

219.    But the lack of probable cause didn't stop the conspirators.  Within a day, Chief Cody began sharing with his co-conspirators a final warrant application and affidavit for Ruth's home and electronic devices.

220.   Chief Cody's final versions were virtually identical to Det. Christner's drafts, including all the false statements and omissions.

221.   As Chief Cody finalized the warrant applications and supporting affidavits, he consulted with Sheriff Soyez and Officer Zach Hudlin.

222.   Chief Cody, Sheriff Soyez, and the joint task force they created all knew or should have known that statements in the warrant application and affidavit were false.

223.   They also knew or should have known that the supposed evidence listed in these documents did not amount to probable cause to believe Ruth committed a crime.

224.   Despite the lack of probable cause, Chief Cody sent Officer Hudlin the finalized warrant applications on Thursday, August 10, just two days after opening the "investigation."

225.   The conspirators still half-heartedly continued their investigation after the warrants were drawn up, but they were unable to uncover any evidence of wrongdoing.

226.   Officer Hudlin, for instance, tried unsuccessfully to get ahold of someone in KDOR's investigations unit.

227.   Officer Hudlin also spoke to the KBI on Thursday, August 10.  His conversation reveals how little the conspirators investigated the already-finished warrant applications.  Officer Hudlin asked the KBI for help getting in touch with someone at KDOR because he "called multiple times but can't get anyone with investigations on the phone."  The KBI agent responded, "Ya, I had the same problem.  I got bounced around a phone tree for about an hour yesterday."

228.   It was not until Friday, August 11—after Marion police already obtained and began executing their illegal search warrants—that KDOR's investigators finally responded that

they would help Marion police with their investigation but warned that their website does not track IP addresses for incoming searches on the Driver's License Status page.

229.    Despite the records showing that Officer Hudlin was unable to connect with anyone at the KDOR, he provided a written statement in support of the conspirators' investigation that told a different story.  In this version of events, Officer Hudlin spoke with someone at the KDOR who told him that there was a loophole in their system that "would allow someone to access another person's private data" and that Kari Newell's data was accessed on Friday, August 4, by Phyllis Zorn and then by Kari Newell three minutes later.

230.    Even if this alternative recounting were true, Phyllis Zorn obtaining Kari Newell's public records on a public-facing website in no way violated the law and—vitally—did not implicate Ruth in any way.

231.    But Chief Cody and his team were either unable or unwilling to confirm even the most basic facts about how the KDOR's web search worked, how Pam Maag got the letter, and how Phyllis Zorn was able to use the letter to legally access Kari Newell's driving record.

232.    All the conspirators had to do was enter Kari Newell's information into the same website that Phyllis Zorn did.  Had they done so, they would have known immediately that their theory of identity fraud and misuse of computers made no sense.

233.    Nevertheless, just two days after opening an investigation that uncovered no evidence of wrongdoing, the conspirators were ready for the next phase of their plan: a search of Ruth's home, the *Record*'s offices, and Pam Maag's home.

234.     Then, Sheriff Soyez added one more target to the list.  Sheriff Soyez recalled that the *Record*'s publisher, Eric Meyer, often works from home, so he suggested that the search team raid the Meyers' home as well.

235.     Sheriff Soyez's idea would prove fatal, as the conspirators' search of the Meyers' home caused Eric's mother, Joan Meyer, to die from a stress-induced heart attack the day after the illegal raid.

236.     Ready to move forward with the four warrants, the conspirators sent copies to County Attorney Ensey's office.

237.     County Attorney Ensey was out of the office on Thursday, August 10, however, so the conspirators delayed their search until the next day to wait for County Attorney Ensey's approval.

**The Malicious Procurement of Warrants**

238.     The conspirators obtained warrants for Ruth but not the other city officials who also received a copy of the Newell letter because their intent was to punish Ruth for her political opposition of the Mayfield Administration generally and Kari Newell's license application specifically.

239.     Their investigation was malicious, abusive, and retaliatory, and the "crimes" the conspirators investigated were merely pretext to punish Ruth's protected speech and political viewpoints.  The warrants were an official tool that the conspirators abused to achieve that political end.

240.   The conspiracy started with the defined goal of silencing Ruth Herbel and Eric Meyer, and the conspirators worked backward from there to find the closest thing to a crime that would let them achieve that goal.

241.   There was not a real investigation, and the conspirators never seriously considered how the law might apply to the facts they knew or should have known.

242.   The conspirators' ends-based process is illustrated by an email Chief Cody sent to Marion County Attorney Ensey with the subject line, "Crimes?"

243.   That email sought County Attorney Ensey's input on five possible crimes with which Chief Cody thought he could charge Ruth:

> Ruth Herbel obtained and possessed personal identifying information and document containing the same belonging to another person with the intent to to subject that person to economic or bodily harm. KSA 21-6107
>
> Ruth Herbel used confidential information acquired in the course of and related to her official position to intentionally cause harm to another; KSA 21-6002
>
> Ruth Herbel performed an unathorized official act and without lawful authority certifying an acknowledgment of the a document which by law may be recorded.  KSA 21-5919
>
> Ruth Herbel knowingly obtained and disclosed personal information, from a motor vehicle record. 18 U. S Code 2722 A
>
> Ruth Herbel in an official capacity impeded the victim in the exercise or enjoyment of her rights:  U.S Code 11.448

244.   These descriptions of Ruth's "crimes?" betray Chief Cody's willful and malicious misunderstanding or disregard of the law.

245.   Ruth's purported crime was possessing a third-hand image of a letter that discussed someone's driving record.

246.   The conspirators were quite literally investigating Ruth for casting a vote they didn't like.

247.   Everyone else on city council, including Mayor Mayfield, also possessed the same letter.

248.    City Administrator Jones sent the letter to the city clerk and Mayor Mayfield, and Mayor Mayfield then instructed Jones to share it with the rest of city council.

249.    The conspirators did not investigate Jones, or Mayfield, or anyone else on city council for the "crime" of possessing the letter.

250.    Nor did they investigate Jones for sending the letter to other city employees.

251.    No objectively reasonable officer would believe that possessing or sharing an image containing someone's driver's license number is a crime.

252.    Nor would any objectively reasonable officer believe that a public official is forbidden from voting against someone's permit application based on information contained in a document just because that document also lists someone's "personal identifying information."

253.    No objectively reasonable officer would believe that a picture obtained from a private citizen's Facebook account would qualify as "confidential information acquired in the course of and related to her official position."

254.    No objectively reasonable officer would believe that a public official voting against someone's permit application qualifies as "intentionally caus[ing] harm to another" within the meaning of K.S.A. 21-6002.

255.    Nor would any objectively reasonable officer believe that doing so "impeded the victim in the exercise or enjoyment of her rights."

256.    No objectively reasonable officer would believe that by receiving and forwarding the Newell letter Ruth "performed an unauthorized official act" or "without lawful authority certif[ied] an acknowledgement of the document which by law may be recorded."

257. There was no probable cause to believe that Ruth committed any crime, including any of those that the conspirators identified.

258. The conspirators recklessly, maliciously, and in bad faith accused Ruth of committing crimes that did not fit the facts. They made no attempt to match Ruth's conduct to the elements of those crimes.

### The Defendants Procure an Unsworn Warrant

259. Officer Hudlin worked with County Attorney Ensey's office to get the warrant applications signed by a magistrate.

260. Although Chief Cody (supposedly) signed the affidavits supporting the warrant applications, the affidavits' contents were drafted by Det. Christner, who admitted he did not investigate the charges.

261. To the extent Det. Christner drafted the documents based off Chief Cody's instructions, Chief Cody did not investigate the charges, either.

262. Because Chief Cody did not possess knowledge of evidence amounting to probable and neither he nor his team investigated the basic facts alleged, Chief Cody was in no position to swear to the warrant's contents under oath or affirmation.

263. To make matters worse, neither Chief Cody nor any other officer signed the affidavits under oath or affirmation, as required by the Fourth Amendment to the United States Constitution and Kansas law.

264. No one signed the warrants in front of a notary, and Chief Cody could not have signed them in front of the magistrate because he did not appear before the magistrate himself.

265.     Indeed, it's unclear if Chief Cody signed the warrant applications at all or, if he did, which ones he signed.

266.     Four different signatures—two of which are markedly different—appear on the four different applications.  (The signature in blue ink is the one from the warrant application for Ruth's house.)



267.     Even though it appears Chief Cody did not sign all four affidavits, it is unclear which ones—if any—he signed himself because he did not sign them before an official witness.

268.     The oath-and-affirmation is supposed to ensure that someone with personal knowledge swears under penalty of perjury to the truthfulness of the allegations supporting a warrant application.  But no one swore to the contents of these four applications.

269.     Maybe no one felt comfortable swearing to the truth of these warrant applications, considering the material lies and omissions contained within and the complete lack of probable cause.  Or maybe no one cared to follow even basic procedures.

## The Conspirators Go Judge-Shopping

270.    The facial deficiencies with the warrant applications likely also explain why Officer Hudlin and County Attorney Ensey's office went judge-shopping for a magistrate who would sign off on the bogus warrants.

271.    Rather than bringing the warrant applications to the District Judge for Marion County, the Honorable Susan Robson, the Defendants found a more favorable judge: Morris County Magistrate Judge Laura Viar.

272.    Magistrate Viar was the ideal candidate for the conspirators.  She and Kari Newell shared a similar criminal history and benefited from a similar lack of criminal enforcement.

273.    While serving as the prosecutor for Morris County, Magistrate Viar was arrested twice for driving under the influence.

274.    Then-prosecutor Viar entered a diversion program after her first DUI.

275.    While in that diversion program, Magistrate Viar was arrested for her second DUI after she crashed her vehicle into a school.

276.    There is, however, no record of Magistrate Viar's second DUI—which should have been a violation of the diversion program—because much like with Kari Newell, local law enforcement chose not to enforce the law against her.

277.    By just reviewing the warrant applications, it should have been clear to Magistrate Viar that Ruth and the *Record* were investigating Kari Newell's DUI to bring accountability to Newell and her allies.

278.    Magistrate Viar also knew or should have known that the warrant was overbroad.

279.   The warrant allowed police to search and seize any items from this (paraphrased) list:

   a.   Any computer or digital device used to communicate protected KDOR information.

   b.   Any records, correspondence, or other documents pertaining to Kari Newell.

   c.   Any digital storage media and the digital content that have been used to store "documents and items of personal information as defined by K.S.A. 21-6107." Section 21-6107(e)(2) defines personal information to include any "[n]ame," "birth date," "address," "telephone number," "mother's maiden name," or "place of employment."

   d.   Computer software, hardware, or contents "related to the sharing of Internet access."

   e.   Any items containing Ruth's passwords, access codes, or usernames.

280.   It should have been obvious that almost anyone's electronic devices will contain information that qualifies as "personal information as defined by K.S.A. 21-6107," which includes anyone's name, address, telephone number, or credit card information.  None of those things makes the device particularly related to the supposed identity theft of Kari Newell.

281.   There were also no temporal limits on the scope of the data or devices that police could search and seize.  So, a device that accessed the KDOR website 10 years ago would be subject to seizure.

282. The warrants did, however, include one limiting feature: They required police conduct a "preview search" on any devices before conducting a full search or seizing the device "to exclude from seizure those which have not been involved in the identify theft."

283. The purpose of the preview search was, ostensibly, to ensure that police could search and seize only those devices that had evidence of the alleged wrongdoing (*i.e.*, "to exclude from the seizure those which have not been involved in the identify theft").

284. As it would turn out, however, Det. Christner and the search team chose terms so broad that the preview search would not exclude from the seizure any electronic devices in the State of Kansas—let alone any that were not "involved in the identity theft."

285. Aside from the overbreadth and lack of probable cause, there was also an obvious error with the signature on the document purporting to be an "affidavit." It should have been obvious to Magistrate Viar (and everyone else involved) that Chief Cody did not swear to the facts supporting the warrant under oath or affirmation because he did not sign before a notary or the magistrate.

286. Kansas law and the Fourth Amendment to the United States Constitution both require that a warrant only issue if it is supported by an oath or affirmation.

287. Despite this unambiguous legal requirement and an obvious lack of probable cause, Magistrate Viar signed the unsworn warrants for Ruth, Eric Meyer, and the *Record* by 9:00 a.m. on August 11.

288. Magistrate Viar did not, however, approve the warrant for Pam Maag's home.

289.    For the three warrants that Magistrate Viar signed, she crossed out the line for the notary's signature and signed in the notary's place—even though the "affiant," Chief Cody, was not present to swear to the application's truthfulness.



290.    Because Chief Cody did not appear before Magistrate Viar, her statement that the applications were "subscribed and sworn to **before me**" was obviously false.

291.    It was clearly established at the time that a warrant must be sworn under oath or affirmation.

292.    The Fourth Amendment requires that an officer must swear to the truthfulness of a warrant's contents.  And Kansas law requires that when someone executes a notarial act, as Magistrate Viar was here, "the individual making the statement or executing the signature shall appear personally before the notarial officer."  K.S.A. 53-5a06(a).

293.    But again, the "affiant" was not present when Magistrate Viar signed in the notary's place.

294.    Given all these errors, the search warrants were invalid and void.

295.    Months after Magistrate Viar signed off on these illegal warrants, the Kansas Commission on Judicial Conduct admonished her to "research appropriate federal and state laws before issuing a search warrant" in the future.

296.     Although the Commission found there was not sufficient evidence to conclude that Magistrate Viar's actions "crossed the line of incompetence," it also cautioned that "is not to say" that issuing the warrants "was reasonable or legally appropriate."

297.     The Commission has since received a second complaint about Magistrate Viar's disregard for the oath-and-affirmation requirement.  That complaint is still under consideration at the time the Plaintiffs filed this complaint on Tuesday, May 28, 2024.

### The Retaliatory Raids

298.     Around 9:00 a.m. on Friday, August 11, Officer Zach Hudlin forwarded scanned copies of the approved warrants to Chief Cody.

299.     The search team began with the *Record*'s offices.

300.     Det. Christner started the first preview search at 11:11 a.m. on Phyllis Zorn's computer.

301.     The first preview search would take over an hour and 20 minutes to complete.

302.     In the meantime, Chief Cody dispatched Sheriff's Detective Steve Janzen to secure the Herbels' home.

303.     Those members of the city and county's joint search team who remained at the *Record*'s offices quickly grew bored while they waited for the preview search on Phyllis' computer.

304.     Officer Hudlin lamented that the search team would have to work "all freakin' day" if they took the time to comply with the warrants' requirements.

305.    The time-consuming process should not have come as any surprise to the search team, though, as the warrant—which the police themselves drafted—stated explicitly that "[t]his acquisition may take several hours depending on the volume."

306.    Nevertheless, Chief Cody told his search team before he left the *Record*'s offices, "If you find this too tedious like, 'holy shit, Cody, this is going to take hours upon hours,' we have the right to seize them.  And then, if you just make a command decision, just go, 'Cody, this is going to take forever.'"

307.    As Chief Cody was leaving the *Record*'s offices to go interrogate Ruth, he told his team they could seize any computer they thought might have been used to access the KDOR website without running a preview search to confirm.

308.    According to Chief Cody, it would be more disruptive to the *Record*'s business for police to perform the required preview searches instead of just taking all the newspaper's computers because "they can always just go ahead and slam some more computers in here."

309.    He also instructed his team that they could seize Eric Meyer's computer because Chief Cody personally believed that Eric "had a copy of the thing as well."

310.    Chief Cody reasoned that the search team "obviously" had enough evidence to seize Eric's computer "because he says he verified the information.  'We' is a co-conspirator, and we'll take them that way.  You make the command decision; I'm going to go talk to Ruth."

311.    Chief Cody's instructions to take devices without conducting a preview search exceeded the clear limitations of the already overbroad warrants.

312.    Eventually, Chief Cody called Sheriff Soyez, apparently looking for confirmation that the conspirators should ignore the warrants' preview-search requirement.

313.    After the two men spoke, Chief Cody turned to Det. Christner and Officer Hudlin and said, "Let's get the fuck out of here."

314.    Free from the constraints of the law, Officer Hudlin began removing electronic equipment from the *Record*'s offices without conducting preview searches.

315.    The officers also gathered the cell phones from the *Record* employees on site and took those, too.

316.    Once again, the conspirators prioritized the speed and abusiveness of their retaliatory searches over what the law demanded.  They made a conscious choice to ignore the preview-search requirement after they finished just one search, on Phyllis Zorn's computer.

317.    Even if the search team had conducted the required preview searches, the searches still would have been overbroad.

318.    The terms that the conspirators chose for the preview searches were always likely to produce false positives on nearly any device.

319.    Det. Christner used broad terms for the search of Phyllis Zorn's computer like "vehicle," "DOR," "Ruth," "Pam," "Kari," and "Kansas."

320.    It should have been obvious to any reasonable officer that the keywords that the conspirators chose would produce false "hits" on the electronic devices of almost anyone in Kansas, rather than narrowing the seizure to only those devices that accessed the KDOR website or were used to commit identity theft, like the warrant required.

321.    The term "Kansas," for example, would appear on the devices of any journalist or elected representative who lived in the state—regardless of whether those devices were used to commit the crimes alleged.

322.   As expected, the preview search of Phyllis Zorn's revealed plenty of laughably irrelevant false positives like an advertisement for the movie Find Dory and a story about a haunted house in Arkansas.

323.   The only "hit" for the term "Ruth" was for Eric Meyer's grandmother Ruth, who worked for the *Record* back in the 1960s.

324.   No reasonable officer would believe these results satisfied the warrant's preview-search requirement.

325.   Whether the inclusion of absurdly overbroad preview-search terms was intentional or just the product of more recklessness and incompetence, the conspirators designed a preview search that exceeded the warrant's scope.

### The Illegal Search of the Herbel Home

326.   While the search team waited for the preview search on Phyllis Zorn's computer, Det. Janzen arrived at the Herbel home.  He found Ronald—who has dementia—sitting on the front porch.

327.   When Ronald saw Det. Janzen, he went inside to try to find Ruth.

328.   Ruth was in the bathroom, though, so Ronald couldn't find her.  He walked in a circle through the house frantically calling out "honey" over and over.

329.   When Ruth came out and found Det. Janzen, Ronald was still looking for her and still calling out "honey" from the back of the house.

330.   Det. Janzen began to tell Ruth why he was there, but she stopped him, explaining that her husband had dementia and she needed to assure him that everything was okay.

331.    Once Ronald was safely on the couch, Det. Janzen told Ruth that he was there to secure her house.

332.    Ruth tried to remain as calm and compliant as possible, but her face betrayed the shock she was processing below the surface.



333.    Det. Janzen told Ruth that the Marion Police Department had obtained a search warrant "on your premises, for electronic devices."

334.    He handed her a copy of the warrant and told her, "Basically what it says is they're entitled to any electronic device on the premises, including [] your cell phone, laptop computer."

335.    Ruth asked how long they'd keep the devices, and Det. Janzen told her maybe only an hour.

336.    Ruth responded that only an hour would be okay, but any longer would be a problem because she does not have a landline, meaning her cell phone was the Herbels' only way to contact anyone.

337.    Det. Janzen told Ruth she could sit and read the warrant once he secured all her electronic devices.

338.    Ruth pointed Det. Janzen to her cell phone and laptop, both of which Det. Janzen collected and set aside.

339.    After Ruth read the warrant, Det. Janzen texted Officer Hudlin, who was back at the *Record*'s offices, to say that he had seized Ruth's phone and computer and that she was ready to speak with Chief Cody.

340.    Officer Hudlin then told Chief Cody, "Ruth wants to talk.  Steven's there; she's ready to cooperate."

341.    Chief Cody left the *Record*'s office and drove over to the Herbel home.

342.    As soon as Chief Cody arrived at the Herbel home, Det. Janzen pointed to Ruth's seized devices in the other room, saying, "Her phone is right there on her laptop."

343.    Chief Cody then asked Ruth for somewhere they could talk.

344.    They sat down at the kitchen table and Chief Cody told Ruth, "So, before I start, I want to read you your rights."

345.    Chief Cody then recited some of the *Miranda* warnings and began interrogating Ruth at her kitchen table while Ronald paced anxiously behind them.

346.    Chief Cody told Ruth, "We're here for that identity theft, okay?  Possessing that personal DOR information from somebody is a crime. … It's a crime all by itself. … Transferring it back and forth and how it was obtained could be considered fraud, okay, in this case wire fraud."

347.    Chief Cody knew this statement was false.  Possessing a KDOR record is not a crime all by itself.  Nor is emailing a picture of the KDOR record "wire fraud."

348.    Chief Cody then asked Ruth who sent her the letter and who she sent it to.

349.   Ruth confirmed what she had told the Mayfield Administration all along: She received a picture of the letter from Pam Maag and she sent it only to City Administrator Jones.

350.   Chief Cody acknowledged that he had no evidence that Ruth ever accessed the KDOR database, a fact fatal to the theory supporting his warrant.  But, he said, "[y]ou can't be having it."

351.   Chief Cody told Ruth he had to seize her phone, but Ruth objected because she doesn't have a landline.  Ruth warned Chief Cody that she needs to be in contact with her children, the hospital, and the medical clinic.

352.   Chief Cody told her, "That's just part of the law because they require me to recover evidence. … You understand that we have to recover evidence and allow a forensic team to go through with it."

353.   Ruth told Chief Cody, "This doesn't put a very good light on the police department," because Ronald has dementia, and she needs a phone to contact his doctors.

354.   Chief Cody told her that he'd try to get her numbers for her "but I don't have much alternative [] because they require" him to take her phone.

355.   He told Ruth that they were seizing all her electronic devices and there was no way around it because "we're a small town" and don't have the technology to get everything out of them.

356.   No technological deficiency prevented Chief Cody or his search team from simply copying down the numbers Ruth needed from her contact list.

357.   Chief Cody continued: "Now that we know there was a crime committed on that phone, you can see why they have to have it."

358.   "No, wait a minute," Ruth objected, "you don't know there was a crime committed on that phone."  But Chief Cody reiterated the conspirators' theory that "possessing that thing alone, possessing it and then transferring it to someone else, even if it's Brogan is a crime.  So, having somebody's personal DOR information—now, I explain it to people like this, especially the KBI guy—is, it is a felony to do this for a reason."

359.   Det. Janzen again confirmed that he had already seized Ruth's phone and computer and that there was no way to stop them.  To make the point clear, Det. Janzen would not let Ruth touch her phone when it rang.  He made her look from a distance to see who was calling.

360.   It was also clear that officers had already seized Ruth's phone or she would have been able to get the phone numbers for her children or Ronald's doctors.

361.   Finally, Chief Cody got up to leave, having learned nothing beyond what Ruth told Brogan Jones in her email a week prior.

362.   At that point, Det. Janzen asked if they could just take Ruth's devices without running the preview search, but Ruth refused and insisted they run the searches at her house.

363.   On his way out, though, Chief Cody told Det. Janzen that he should just take Ruth's devices rather than waiting too long for Det. Christner to run a preview search: "If this is going to take a long time, [Ruth] can't dictate to us what we do and don't do."

364.   Det. Janzen remained in possession of Ruth's phone and computer while they waited for Officer Hudlin and Det. Christner to arrive.

365.   During that time, Ruth told Det. Janzen that she was concerned about the police accessing her emails—especially those between her and the *Record*.  She warned that there was

probably an email in which she suggested something romantic was going on between Kari Newell and Chief Cody.

366.    Det. Christner arrived a short time later.  Rather than conduct preview searches, Det. Christner employed the policy that Chief Cody and Sheriff Soyez decided on earlier: He told Ruth that he lacked the capability to run preview searches at her home and would have to just send her phone and computer to a forensic facility.

367.    Even though the search team already seized Ruth's devices and told Ruth they had to take them without conducting a preview search, Det. Christner then had Ruth sign a consent form in a meaningless attempt to retroactively cleanse the many Fourth Amendment violations that had already resulted in the unreasonable seizure of Ruth's phone and computer.

368.    Det. Christner then began to unplug Ruth's devices just as Officer Hudlin arrived to help him log Ruth's iPhone and laptop into evidence bags.

369.    When Officer Hudlin put Ruth's phone in the plastic evidence bag, Ruth said, "Wait a minute; they said I could get my phone numbers out of there.  My kids' phone numbers and stuff are in there."

370.    Officer Hudlin responded that he would need to talk to Chief Cody before he'd let Ruth get her phone numbers because he'd already placed her phone inside a plastic evidence bag.

371.    Ruth asked if they'd at least write down the phone numbers for her once he got back to the station, then, and Officer Hudlin had Ruth list the contacts she needed.

372.    As Ruth wrote down the names of her and Ronald's children and doctors, she told Officer Hudlin, "They told me when you got here that I could have these damn numbers.  If they don't give me these numbers, then I will raise hell."

373.    Officer Hudlin told her he couldn't imagine it would be a problem to get her the phone numbers she needed.

374.    Officer Hudlin, like Chief Cody and Det. Janzen before him, knew that Ruth didn't have another phone to contact Ronald's doctors or their children.

375.    The conspirators never gave Ruth the phone numbers she needed.

376.    While his team cataloged Ruth's devices, Chief Cody drove to his next target when received a text message from Kari Newell.

377.    Rather than texting back, Chief Cody—not realizing that his body camera was still recording—called Newell and told her, "We can't write anything, so…" She responded, "I understand."

378.    Newell told Chief Cody that she just heard police were removing all the computer equipment from the *Record*'s offices.  Chief Cody bragged, "Yeah, surprising how that works, isn't it?"

379.    Newell exclaimed, "Wow, that was fast!"

380.    Chief Cody laughed and told Newell that he just left Ruth's and was heading to Eric Meyer's house to search there, too.  Newell responded, "Holy Shit!"

### The Searches Took a Toll on the Herbels' Health

381.    The illegal raids left Ruth anxious, upset, depressed, and nervous.  She began suffering from headaches and sleeplessness.

382.    Ronald, with his dementia, was traumatized by the searches, as he couldn't understand what happened or why.  He remained on the couch for several hours after the police left and wouldn't eat.

383.    Ruth had to drive outside of Marion to purchase another cell phone so she could get in touch with their children and doctors.

384.    It was only after she spoke to her children that it began to sink in that the Mayfield Administration was treating Ruth like a criminal—and trying to make her seem like one.

385.    After the search, Ronald developed depression and increased anxiety, and he began to lose a lot of weight.  He wouldn't eat or sleep; he'd pace around the house and cry.

386.    Ruth began to worry that Ronald wouldn't make it.

387.    Ruth took Ronald to new doctors who ran lots of tests to try to treat Ronald's deteriorating condition.

388.    Ruth had to drive Ronald to Wichita once per month to see a new specialist.

389.    These trips were costly and time-consuming.  Ronald underwent more than 10 months of treatment to understand and address his new symptoms, which persist today.

390.    Ronald's medical visits added to the emotional, psychological, physical, and financial cost that the Herbels endured due to the illegal search of their home.

### The National Outrage & Immediate Aftermath

391.    After the search teams finished seizing all the electronic devices from Ruth and the *Record*'s employees, Sheriff Soyez threw his co-conspirators a pizza party to celebrate the illegal raids.

392.    When Chief Cody arrived at the party, he began gushing about how much fun he had tearing the cellphone from the hand of the reporter who was leading the investigation into his past misconduct.

393.     It was only then that Chief Cody's co-conspirators realized his body camera was still recording and turned it off for him.

394.     The next morning, Joan Meyer, the co-owner of the *Record* and mother of Eric, died from sudden cardiac arrest due to the trauma she endured during the illegal raid of her house.

395.     Joan Meyer's death increased the already growing outrage about the conspiracy.

396.     As the national outrage grew, the KBI announced on Sunday, August 13, that state investigators were taking over the investigation.

### The Conspirators Forge Ahead with Their Plan to Arrest Ruth to Remove Her from the City Council

397.     Neither the national outrage nor the KBI taking away their investigation was enough to stop the conspirators from trying to complete their plan to arrest their political adversaries.

398.     Undeterred, on Tuesday, August 15, two days after the KBI took away the Defendants' case, Chief Cody and Det. Christner exchanged draft probable-cause affidavits in support of warrants for the arrest of Ruth, Eric Meyer, and reporter Phyllis Zorn.

399.     With respect to Ruth's arrest, Det. Christner once again included a warning for Chief Cody: "I am not sure it fits any of the crimes we have discussed except the US fed code. Maybe there is something I am missing."

400.     Det. Christner was not missing anything, though—Ruth's conduct did not fit any crimes because her conduct was not illegal.  That should have been obvious to any reasonable officer all along.

401.   The conspirators' persistent inability to uncover any evidence of criminal wrongdoing was still not enough to deter them, as Chief Cody circulated the draft arrest warrants among his co-conspirators despite Det. Christner's warning.

402.   Even after stealing her cell phone and computer, the only evidence that police could come up with to support Ruth's arrest was that she received a copy of the Newell letter without Newell's consent, that she then "passed it to Brogan Jones," and that she stated that she "wanted to deny the renewal of Kari's liquor/caterers' license based on the KDOR record."

403.   Ruth never said she wanted to deny Newell's license based on the KDOR record—only that the city look into Newell's eligibility.  And regardless, none of those things were illegal.

404.   Any objectively reasonable police officer would have known that.

405.   Fortunately, on Wednesday, August 16, the conspiracy suffered another setback. Under immense pressure from journalists worldwide and likely the KBI, County Attorney Ensey filed a motion to release the evidence seized during the raids.

406.   Along with this motion, County Attorney Ensey issued a press release, which said that he asked the court to release the seized materials because there was "insufficient evidence" "to establish a legally sufficient nexus" between the crimes alleged and "the places searched and the items seized."

407.   County Attorney Ensey, however, was careful not to "clear" the victims of any wrongdoing.  On the contrary, County Attorney Ensey urged the court to allow the conspirators to keep the *Record*'s hard drive.

408.    But the court refused.  The Honorable Ben J. Sexton replied to County Attorney Ensey's request by emphasizing that his "order returning the property is very clear."

409.    The KBI then issued its own press release, also on Wednesday, August 16, which confirmed the investigation was ongoing and stated that the Bureau would report back to County Attorney Ensey once the investigation concluded.

### Chief Cody Destroys Evidence of the Real Criminal Conduct

410.    The fact that Chief Cody still tried to move forward with the plan to arrest Ruth after the KBI took away his investigation does not mean that he lacked consciousness of his guilt about his illegal conduct.  He knew what he and his co-conspirators had done—and were still trying to do—to Ruth was illegal.

411.    Facing national scrutiny, Chief Cody began destroying evidence and encouraging others to do the same.

412.    Chief Cody told Kari Newell to delete her text messages with him.

413.    Newell asked Chief Cody how destroying evidence might expose her criminally: "If attorneys or kbi go digging and see I deleted the texts as you asked me to, will I get in trouble?"

414.     Chief Cody responded by telling her she was being paranoid and saying he didn't want anyone to get the wrong impression about their relationship:



415.     Despite Chief Cody's assurances, the KBI was not "stepping out."  Instead, they gave the case to the Colorado Bureau of Investigation, which is still investigating as of the filing of this complaint on May 28, 2024.

**Marion Police Give Ruth's Devices to a Private Forensic Examiner**

416.     After the court ordered the conspirators to release all the items they took during the illegal raids, the *Record* retained a private forensic examiner to collect its employees' devices and account for everything the police had searched.

417.     In yet another act of recklessness, the Sheriff's Office turned over Ruth's devices to the *Record*'s forensic examiner, unbeknownst to Ruth.

418.     On August 16, Ruth learned from the *Record*'s attorney that the Sheriff's Office had inadvertently released the Herbels' property to the newspaper's forensic examiner.

419.    Ruth then hired the same forensic examiner to image and analyze her devices, at a cost of $3,507.27.

420.    On the evening of August 16, County Attorney Ensey said that he regretted releasing Ruth's devices without her permission.

421.    It was not until September 2 that Ruth finally got back her phone and computer.

**Chief Cody Resigns in Disgrace, but Marion Ratifies His Misconduct**

422.    In the two months following the illegal search of her home and the seizure of her phone and computer, Ruth tried repeatedly to get the City of Marion to suspend Chief Cody.

423.    Mayor Mayfield and his allies on the city council, however, refused to hold Chief Cody—or anyone else involved—accountable for their actions.

424.    The reason the Mayfield Administration refused to hold Chief Cody accountable is because Mayor Mayfield and Chief Cody were working together in furtherance of the city's policy and practice of retaliating against political dissidents.

425.    Instead of seeking accountability, Councilmember Zach Collett (Mayor Mayfield's protégé) reached out to a crisis-communication team for help defending the city's actions in the national press.

426.    There is no record of Mayor Mayfield disciplining Councilmember Collett in the same way he admonished Ruth anytime she spoke to outside organizations without full council approval.

427.    Despite the city's continued support of his actions, Chief Cody eventually gave up on October 2.  He resigned as the Marion Police Chief, effective October 15, in an email that, fittingly, he sent from his personal email address to Mayor Mayfield's personal email address.

428.    According to Chief Cody, "I do not want to defend my actions to the Council and I do not want for everyone to have to formally discuss any discipline."

429.    The Marion City Council decided that same day to appoint Officer Hudlin as the acting police chief.

430.    When the City of Marion promoted Officer Hudlin, it was aware that Officer Hudlin was an active participant in the conspiracy to deprive Ruth, Ronald, and the *Record*'s employees of their civil rights.

431.    The city knew, among other things, that Officer Hudlin consulted with Chief Cody on the warrant applications, worked with County Attorney Ensey's office to procure the warrants, and then executed them.

432.    The city council also knew that Officer Hudlin disregarded the terms of the warrants and physically removed computers from the *Record*'s offices without first conducting the required preview search.

433.    The city council's decision to appoint Officer Hudlin as Chief Cody's successor confirmed that the city approved of, and now ratified, Officer Hudlin's actions during the illegal raids.

434.    As of the filing of this complaint, nearly eight months into his temporary appointment, Officer Hudlin remains the acting police chief.

## CLAIMS FOR RELIEF

### COUNT I

**Retaliatory Search & Seizure**
**In Violation of the First & Fourteenth Amendments**
**(On behalf of Ruth Herbel against the individual Defendants)**

435.     Ruth realleges and incorporates by reference the allegations in ¶¶ 1-434 of this complaint as if fully restated here.

436.     Ruth's tenure on city council and as vice mayor was marked by her repeated efforts to increase governmental transparency and accountability when the Mayfield Administration failed to follow the law.

437.     Ruth's opposition to the Mayfield Administration in the media, on the campaign trail, and during city council meetings was quintessential political speech protected by the First and Fourteenth Amendments to the United States Constitution.

438.     At all times relevant to this complaint, it was clearly established that elected officials (and private citizens alike) enjoy a First Amendment right to engage in political disputes, campaign against issues and politicians they oppose, speak to the press, voice their concerns about issues that come up for a vote, and vote against issues that they oppose.

439.     Using their respective authorities under color of state law, the individual Defendants deprived Ruth of her rights under the First Amendment by retaliating against her for exercising those rights.

440.     Motivated by a desire to silence, punish, and intimidate Ruth for her exercise of free speech, the individual Defendants engaged in an illegal conspiracy to deprive Ruth of her clearly established rights under the First Amendment, ultimately resulting in the illegal seizure of her cell phone and computer.

441.    Mayor Mayfield tried several times to remove Ruth from city council in retaliation for her speech.  His attempts began by at least December 2022, after Ruth successfully campaigned against a charter amendment that Mayor Mayfield championed.

442.    After the mayor's first attempts to remove Ruth from office failed, Mayor Mayfield determined that arresting Ruth was the only way to remove her from city council.

443.    To accomplish Ruth's arrest, Mayor Mayfield ordered his hand-picked police chief, Gideon Cody, to conduct a sham investigation of Ruth and find crimes that could serve as pretext to execute a search warrant and, eventually, arrest and convict Ruth to remove her from city council.

444.    Mayor Mayfield and Chief Cody then enlisted several other city and county officials—including but not limited to Sheriff Soyez, Officer Hudlin, Det. Christner, and Det. Janzen—in a conspiracy to deprive Ruth of her First Amendment rights.

445.    All the individual Defendants knew or should have known that their conduct, the conduct of their co-conspirators, and the purpose of the conspiracy was unconstitutional.

446.    It is clearly established that retaliating against individuals by maliciously procuring a search warrant, abusing an official process for ulterior purposes, and planning their arrest violates the First Amendment.

447.    The facts alleged in this complaint demonstrate that the criminal investigation was a sham and that the individual Defendants acted out of animus to punish Ruth for her constitutionally protected speech.

448.    There was no legitimate basis to search Ruth's home, seize her phone and computer, and then prevent her from getting the phone numbers she needed to contact Ronald's medical providers and their children.

449.    The individual Defendants took these actions to punish Ruth for her opposition to the Mayfield Administration's preferred policies and general way of doing things.  But for Ruth's political speech and actions, the Defendants would have left her alone.

450.    There was no probable cause to support the search warrant for Ruth's home and electronic devices.

451.    Nevertheless, the individual Defendants maliciously procured a search warrant for Ruth's home and electronic devices.

452.    Even if probable cause existed—which it obviously did not—the Defendants' selective enforcement of the law and abuse of process to punish Ruth show that the crimes they alleged were pretextual.

453.    Indeed, everyone on the city council received a copy of the Newell letter, as Mayor Mayfield directed City Administrator Jones to forward the letter to them all.

454.    The individual Defendants did not investigate City Administrator Jones or any other councilmembers because they have never and would never investigate someone for viewing a document that lists someone's driver's license number or for sharing a picture that includes a driver's license number.

455.    No other similarly situated individuals (aside from the *Record*'s employees who were also victims of the same illegal scheme) have ever been investigated or charged by the

Marion Police or Marion County Sheriff's Office for sharing an image found on social media that contained someone's driver's license number.

456.   The individual Defendants even acknowledged on their body cameras that the "Marion Crime" Facebook page "always" has information that *actually was* illegally obtained from governmental databases like the Kansas Criminal Justice Information System.

457.   But the individual Defendants do not investigate or prosecute the individuals who post or share that personal information.

458.   The only reason the individual Defendants investigated Ruth for sharing *legally* obtained personal information was to retaliate against her for her protected speech.

459.   Ruth's political speech (*e.g.*, criticizing the Mayfield Administration in city council meetings, to the press, and on the campaign trail) was not a legitimate consideration in determining whether to investigate or arrest her.

460.   Nor was Ruth's other speech (*e.g.*, her decision to ask Pam Maag for the Newell letter, to share it with Brogan Jones, and to vote against Kari Newell's catering license).

461.   To make matters worse, the individual Defendants were not acting under time constraints and did not need to make any split-second decisions in their investigation of Ruth, their decision to procure a facially invalid search warrant, or their subsequent efforts to charge Ruth criminally.

462.   The individual Defendants all had ample time to research the law, seek legal advice, and consider the consequences of their actions before they decided to violate Ruth's civil rights.

463. But for their retaliatory animus, the individual Defendants never would have investigated Ruth, executed a search warrant for her home and electronic devices, or planned to arrest her for her actions related to obtaining and sharing the Newell letter.

464. The individual Defendants' unconstitutional acts would chill the protected speech of a person of ordinary firmness, and they did chill Ruth's speech.

465. Ruth now recognizes that her liberty is at the mercy of vindictive local officials who do not want her upsetting their preferred policies.

466. She has been less active in political life due to the individual Defendants' illegal conduct.

467. As a direct and proximate result of the individual Defendants' unconstitutional acts, motivated by retaliatory animus, Ruth has suffered, and will continue to suffer, extreme and severe mental and emotional trauma, post-traumatic stress, anxiety, sleeplessness, behavioral changes, mental anguish, deterioration of her health, pecuniary loss, and loss of enjoyment of life. This damage includes, but is not limited to, all the costs associated with doctors' visits, therapy, purchasing a new cell phone, and hiring a forensic examiner.

468. Punitive damages are justified because the Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Ruth's federally protected rights.

**COUNT II**

**Retaliatory Search & Seizure**
**In Violation of the First & Fourteenth Amendments**
**(On behalf of Ruth Herbel against the municipal Defendants)**

469.    Ruth realleges and incorporates by reference the allegations in ¶¶ 1-434 of this complaint as if fully restated here.

470.    Through the individual Defendants' actions and the subsequent ratification by the City and County of Marion, respectively, the municipal Defendants adopted and enforced an official policy, practice, or custom of retaliation against Ruth for her First Amendment activities, including her political opposition to the Mayfield Administration.

471.    The actions of Mayor Mayfield, Chief Cody, and Sheriff Soyez are attributable to the City and County of Marion, respectively.   As policymakers with final authority, these individual Defendants made a deliberate choice to adopt a policy of retaliation that resulted in the search of Ruth's home, the seizure of her electronic devices, and the drafting of warrants for her arrest.

472.    The conspiracy's express goal, which the City and County of Marion adopted as official policy, was to arrest Ruth to remove her from city council.

473.    Mayor Mayfield and Chief Cody were both policymakers for the City of Marion. Mayor Mayfield was the chief policymaker of the city, vested with superintending control of all officers and affairs of the city.  And Chief Cody, as the police chief, was authorized to make rules and regulations he deemed necessary for the police department's proper and efficient conduct. Alternatively, as a policymaker supervising and directing Chief Cody, Mayor Mayfield ratified Chief Cody's actions as municipal policy, and the City Council then ratified the actions of both officers.  In every instance, Mayor Mayfield and Chief Cody's decisions and actions represent the

official policy of the City of Marion.  As policymakers with final authority, Mayor Mayfield and Chief Cody made a deliberate choice to procure and execute facially invalid warrants and disregard the scope of those warrants to retaliate against their political opponents.

474.    As the Sheriff of Marion County, Sheriff Soyez is a policymaker for Marion County.  He is authorized to keep and preserve the peace and to serve and execute all process, writs, precepts, and orders.  All actions by Sheriff Soyez, along with the actions of the officers acting under his command, to further this illegal scheme were undertaken pursuant to Marion County's official municipal policy.  As a policymaker with final authority, Sheriff Soyez made a deliberate choice to participate in a conspiracy that set out to procure and execute facially invalid warrants and disregard the scope of those warrants as a means of political retaliation.

475.    These policymakers authorized and directed the City and County of Marion to retaliate against Ruth in violation of the First Amendment by orchestrating a scheme to arrest Ruth on manufactured charges.

476.    This scheme was part of an official policy, practice, or custom that was deliberate, ongoing, and pervasive—unlike on-the-spot decisions to arrest someone in which someone's speech is a legitimate consideration for their arrest.  Indeed, the conspirators applied the same policy to the *Record*, its publisher, and its employees.

477.    The retaliatory policies of the municipal Defendants are part of a persistent and widespread practice of retaliating against political dissidents.

478.    The ongoing and pervasive nature of these policies is exhibited by both the raid on the *Record* and its publisher's home, as well as the previous attempts to silence Ruth's political speech and to remove Ruth from the city council.

70

479.    Ruth's speech (*e.g.*, her general opposition to the Mayfield Administration, her interviews in or letters to the editors of the *Record*, her decision to ask Pam Maag for the Newell letter, to share it with City Administrator Jones, and to vote against Kari Newell's catering license) was not a legitimate basis for a search warrant or for the municipal Defendants' policy of retaliating against her.

480.    The actions undertaken or ratified by the City and County of Marion, acting in concert, were in retaliation for Ruth's exercising her First Amendment rights.  These actions caused direct harm to Ruth, including but not limited to damage to her reputation, health, financial circumstances, and other adverse effects.

481.    But for the retaliatory animus motivating the policies of both the City and County of Marion, the two municipalities would have never caused, permitted, or approved the plan to search Ruth's home and electronic devices to cause her arrest.

482.    But for the City and County's policies, practices, and customs of retaliation in response to criticism of those in power, the Marion Police Department and Marion County Sheriff's Office would not have searched Ruth's home, seized her electronic devices, planned her arrest, worked to destroy Ruth's reputation, and caused the various other harms that further serve to chill Ruth's First Amendment activities.

483.    As a direct and proximate result of the individual Defendants' unconstitutional acts, motivated by retaliatory animus, Ruth has suffered, and will continue to suffer, extreme and severe mental and emotional trauma, post-traumatic stress, anxiety, sleeplessness, behavioral changes, mental anguish, deterioration of her health, pecuniary loss, and loss of enjoyment of life.

This damage includes, but is not limited to, all the costs associated with doctors' visits, therapy, purchasing a new cell phone, and hiring a forensic examiner.

484.   Punitive damages are justified because the Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Ruth's federally protected rights.

**COUNT III**

**Unreasonable Search & Seizure**
**In Violation of the Fourth & Fourteenth Amendments**
**(On behalf of Ruth and Ronald Herbel against the individual Defendants)**

485.   Ruth and Ronald reallege and incorporate by reference the allegations in ¶¶ 1-434 of this complaint as if fully restated here.

486.   At the time of the illegal conduct outlined in this complaint, it was clearly established that the Fourth Amendment requires that a warrant can issue only when there is evidence amounting to probable cause, sworn to under oath or affirmation, that a search will reveal further evidence of a crime.

487.   It was also clearly established that a search warrant must describe with particularity the place to be searched and the things to be seized.

488.   And it was clearly established that officers executing a warrant must not exceed the scope of the warrant's terms.

489.   The warrant to search the Herbels' home and electronic devices, and the resulting search, violated the Fourth Amendment in at least five ways that an objectively reasonable officer would have recognized: (1) the warrant was issued based on materially false statements of fact; (2) the warrant was not supported by probable cause; (3) the warrant was not sworn under oath

or affirmation; (4) the scope of the warrant was overbroad; and (5) the officers executing the warrant exceeded its already overbroad scope.

490.    When the individual Defendants obtained and executed a warrant to search the Herbels' home and electronic devices, they did not have an objectively reasonable belief that Ruth or Ronald possessed any contraband, evidence, or instrumentalities of any crime.

491.    No probable cause even arguably existed to issue the warrant to search the Herbels' home or electronic devices, and no reasonable police officer could have believed probable cause existed.

492.    Indeed, Det. Christner, who drafted the warrant application and supporting affidavit, refused to sign them himself because he had not conducted any investigation in support of the warrant.

493.    The search warrants were issued based on materially false statements of fact by Det. Christner, which Chief Cody then adopted, including but not limited to the following:

    a.   The warrant application claims, without any factual basis, that the Newell letter Ruth received from Pam Maag "was downloaded directly from the Department of Revenue."

    b.   The warrant application falsely suggests that, because Kari Newell did not authorize anyone to download her driving record from KDOR, "someone obviously stole her identity," when there were multiple legal ways to obtain the document.

    c.   The false conclusion that "someone obviously stole [Kari Newell's] identity flows from a similar false claim in the warrant application for the *Record*'s offices, which

falsely states that the only way to obtain the Newell letter from KDOR was by "either impersonating the victim or lying about the reasons why the record was being sought."

494.   Contrary to these false statements and insinuations, there were several legal ways for someone to obtain the Newell letter.  The individual Defendants had no evidence that Pam Maag downloaded the Newell letter from KDOR illegally (or at all); nor did they have any reason to doubt that Maag simply got the letter from Kari Newell's husband.

495.   The individual Defendants just didn't bother to investigate or even consider the legal ways to obtain a KDOR record because their allegations were pretextual and their real motive was to punish Ruth for her political speech.

496.   Moreover, there was no evidence to support the individual Defendants' assertion that someone—let alone Ruth—stole Kari Newell's identity.

497.   Ruth never obtained personal information from a public database, and she never acted with any impermissible purpose.  On the contrary, Ruth received the personal information third-hand on Facebook, and she acted with the permissible purpose of considering the impact of the letter's non-confidential contents on her vote as a councilperson.

498.   The individual Defendants still accused Ruth of stealing Kari Newell's identity by knowingly, intentionally, or recklessly omitting a key element of the crime of identity theft. Identity theft requires a person to intend to "misrepresent that person," and the Defendants had no evidence that Ruth ever intended to misrepresent herself as Kari Newell.

499.   The purpose of these false statements was to maliciously procure a warrant unsupported by probable cause.

500.    The individual Defendants knew the statements in the warrant application were false or they acted in reckless disregard of the truth.

501.    Magistrate Viar relied on these false statements in issuing the warrant.

502.    The warrant application also included several material omissions, including the following:

a.  Ruth obtained the Newell letter from Pam Maag—not a government database.

b.  Ruth never accessed a government database.

c.  The information contained in the Newell letter (aside from her driver's license number) was posted publicly on Pam Maag's Facebook page before Ruth obtained the letter.

d.  The Defendants had no evidence that Pam Maag obtained the Newell letter from a government database.  Indeed, they had every reason to believe that Kari Newell's soon-to-be-ex-husband gave her a copy of the letter.

e.  The status of a Kansas driver's license is an open record available for public inspection on a state website.

f.  Ruth obtained and shared a copy of the letter in her role as city councilor, as she prepared to vote on Newell's application for a license to sell liquor.

g.  Ruth did not rely on any confidential or personal information when she voted against Kari Newell's catering license.

h.  Ruth and the *Record* were aware that the Marion Police Department and Sheriff's Office had known about Kari Newell's suspended license yet still allowed her to drive without consequence.

i. Ruth asked City Administrator Jones to ask Chief Cody and the Marion Police Department to investigate Kari Newell's suspended license.

503. These material omissions further induced Magistrate Viar into issuing a warrant without probable cause.

504. But even with these materially false statements and omissions, the warrant application still failed to even arguably state probable cause, as required by the Fourth Amendment.

505. The search warrant was thus void and facially invalid, for want of probable cause.

506. The search warrant was also void and facially invalid because it was not supported by oath or affirmation, as required by the Fourth Amendment.

507. No officer who drafted the warrant application and affidavit possessed personal or otherwise verifiable information about the warrant's contents.

508. And no officer swore to the veracity of the warrant's evidentiary basis.

509. Chief Cody was the purported affiant in support of the warrant application, but he did not sign the application or supporting affidavit under oath or affirmation.

510. Indeed, it's not clear whether Chief Cody signed the documents at all. Considering all four search warrants bear four different-looking signatures, there is no way of knowing which of the four documents—if any—he signed.

511. Chief Cody did not appear before Magistrate Viar or swear or attest to her that the facts supporting his warrant application were true. Nor did he swear or attest to the truthfulness of his allegations over the phone or by any other medium.

512.    As a result, the individual Defendants did not follow procedures that could have resulted in a perjury charge, as the Fourth Amendment requires, when it turned out that the warrant was based on false statements.

513.    Magistrate Viar signed the unsworn warrant anyway.

514.    In doing so, she crossed out the line for the signature of the notary who was supposed to witness Chief Cody sign the document, and she signed in the notary's place that Chief Cody's application was "SUBSCRIBED and SWORN to before me [Magistrate Viar]."

515.    But this "before me" language was false, as Chief Cody never appeared before Magistrate Viar, and no one else swore to the truthfulness of the evidence supporting the warrant.

516.    The unsworn warrant was clearly and obviously invalid.

517.    No objectively reasonable officer would have relied on the facially invalid warrant to search the Herbels' home and electronic devices.

518.    In addition to lacking probable cause and an oath or affirmation, the search warrant was also overbroad.

519.    By its terms, the warrant allowed police to search and seize 15 categories of evidence, which (as paraphrased) include:

   a. Any computer or digital device used to communicate protected KDOR information.

   b. Any records, correspondence, or other documents pertaining to Kari Newell.

   c. Any digital storage media and the digital content that have been used to store "documents and items of personal information as defined by K.S.A. 21-6107."

Section 21-6107(e)(2) defines personal information to include any "[n]ame," "birth date," "address," "telephone number," "mother's maiden name," or "place of employment."

d.  Computer software, hardware, or contents "related to the sharing of Internet access."

e.  Any items containing Ruth's passwords, access codes, or usernames.

520.  Such overbroad terms—including any device with someone's name, address, or telephone number—would easily let the Defendants search and seize any electronic device in the Herbels' home, regardless of whether it ever accessed the KDOR website or had any evidence of identity theft.

521.  Almost every device will include *someone*'s name, address, telephone number, or credit card information.

522.  The search terms also failed to include any temporal limits, so a device that logged into the KDOR website 10 years prior would be subject to seizure.

523.  The scope of the warrant was absurdly broad.

524.  Any objectively reasonable officer would have known that the search warrant for the Herbels' home and electronic devices was facially overbroad and failed to satisfy the Fourth Amendment's specificity requirement.

525.  The individual Defendants also exceeded the warrants' overbroad terms.

526.  Chief Cody, in consultation with Sheriff Soyez, instructed the search team of city and county officers to ignore the preview-search requirement he drafted because he felt that conducting the preview search was taking too long.

527.    As such, the individual Defendants had no basis to seize Ruth's cell phone and computer, as they could not determine which device, if either, would satisfy the preview search.

528.    Ruth objected to the search team taking her devices until they conducted a preview search.  But Chief Cody told his team that they were not to let Ruth dictate what they could or couldn't do.

529.    Chief Cody and Det. Christner both told Ruth that they did not have the capability to comply with the warrant's preview-search requirement, and they seized her devices anyway.

530.    No exception to the warrant requirement applied to excuse this warrantless seizure for the sake of convenience.

531.    The individual Defendants use of a facially invalid warrant to search the Herbel home and seize their electronic devices, and their disregard of the warrant's terms, violated Ruth and Ronald's clearly established Fourth Amendment right to be free from unconstitutional searches and seizures.

532.    As a direct and proximate result of the individual Defendants' unconstitutional conspiracy, motivated by retaliatory animus, Ruth and Ronald have suffered, and will continue to suffer, extreme and severe mental and emotional trauma, post-traumatic stress, anxiety, sleeplessness, behavioral changes, mental anguish, deterioration of their health, pecuniary loss, and loss of enjoyment of life.  This damage includes, but is not limited to, all the costs associated with doctors' visits, therapy, purchasing a new cell phone, and hiring a forensic examiner.

533.    Punitive damages are justified because the Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Ruth and Ronald's federally protected rights.

## COUNT IV

**Unreasonable Search & Seizure**
**In Violation of the Fourth & Fourteenth Amendments**
**(On behalf of Ruth and Ronald Herbel against the municipal Defendants)**

534.    Ruth and Ronald reallege and incorporate by reference the allegations in ¶¶ 1-434 of this complaint as if fully restated here.

535.    Through the individual Defendants' actions and the subsequent ratification by the City and County of Marion, respectively, the municipal Defendants adopted and enforced an official policy, practice, or custom of procuring and executing facially invalid warrants and disregarding the scope of those warrants.  These official policies violated Ruth and Ronald's Fourth Amendment rights to be free from unreasonable searches and seizures.

536.    Mayor Mayfield and Chief Cody were both policymakers for the City of Marion. Mayor Mayfield was the chief policymaker of the city, vested with superintending control of all officers and affairs of the city.  And Chief Cody, as the police chief, was authorized to make rules and regulations he deemed necessary for the police department's proper and efficient conduct. Alternatively, as a policymaker supervising and directing Chief Cody, Mayor Mayfield ratified Chief Cody's actions as municipal policy, and the City Council then ratified the actions of both officers.  In every instance, Mayor Mayfield and Chief Cody's decisions and actions represent the official policy of the City of Marion.  As policymakers with final authority, Mayor Mayfield and Chief Cody made a deliberate choice of procuring and executing facially invalid warrants and disregarding the scope of those warrants to retaliate against their political opponents.

537.    Sheriff Soyez is a policymaker for Marion County.  He is authorized to keep and preserve the peace and to serve and execute all process, writs, precepts, and orders.  All actions

by Sheriff Soyez, along with the actions of the officers acting under his command, to further this illegal scheme were undertaken pursuant to Marion County's official municipal policy. As a policymaker with final authority, Sheriff Soyez made a deliberate choice of participating in a conspiracy to procure and execute facially invalid warrants and disregard the scope of those warrants to retaliate against his political opponents. He then remained on call throughout the illegal raids to offer support and guidance to his co-conspirators on the search team.

538.   Following the obviously unconstitutional conduct outlined in this complaint, the city and county policymakers ratified their subordinates' actions. Indeed, rather than reprimand Det. Christner or Det. Janzen for their unconstitutional conduct, Sheriff Soyez threw them a party to celebrate. No officer involved was disciplined because they acted with their supervisor's full knowledge and approval.

539.   Mayor Mayfield, Chief Cody, and Sheriff Soyez authorized and directed the City and County of Marion to procure and execute a warrant to search the Herbels' home and seize their electronic devices with a warrant they knew or should have known was facially invalid in at least four ways.

540.   Pursuant to this official policy, practice, or custom, the individual Defendants knowingly used materially false statements and omissions to obtain a warrant for which they lacked probable cause.

541.   Pursuant to this official policy, practice, or custom, the individual Defendants drafted, procured, and executed a warrant that was absurdly overbroad and allowed the search team to seize electronic devices that they knew or should have known had nothing to do with the alleged crimes.

542.   Pursuant to this official policy, practice, or custom, the individual Defendants signed, procured, and executed a warrant without swearing the oath or affirmation required by the Fourth Amendment.

543.   But for the City and County of Marion's unconstitutional official policies and failure to train, the individual Defendants would not have been able to obtain a warrant to search the Herbels' home because they lacked probable cause, sworn to under oath or affirmation, to believe Ruth had committed any crimes.

544.   The same policymakers also authorized and directed the City and County of Marion to adopt an official policy of disregarding the scope of search warrants.

545.   Pursuant to this official policy, practice, or custom, the individual Defendants ignored the warrant's preview-search requirement that limited their ability to search and seize electronic devices.

546.   But for this official policy of ignoring the preview-search requirement, the individual Defendants would not have been able to seize any of the Herbels' devices because none had been used to access the KDOR website and none had been used to steal Kari Newell's identity.

547.   The individual Defendants' actions were also the result of the City and County of Marion's failure to train them to properly draft, procure, and execute a search warrant.

548.   The search warrant, which both city and county officers drafted and executed, failed to allege facts amounting to probable cause and grossly exceeded the requisite specificity of a search warrant.

549.     For instance, by authorizing the search of any device with "personal information" as defined by K.S.A. 21-6107, the warrant was authorizing the search and seizure of any device that contains someone's "[n]ame," "birth date," "address," "telephone number," "mother's maiden name," or "place of employment."

550.     Proper training in how to draft a warrant for electronic devices would have taught the individual Defendants to use terms that would limit a search to devices specifically used to commit the alleged crimes.

551.     The City and County of Marion also failed to train their officers how to design and conduct a preview search that would accomplish the stated goal of "exclude[ing] from the seizure those which have not been involved in the identify theft."

552.     Further, the City and County of Marion failed to train their officers in the oath-or-affirmation requirement.  This lack of training led officers to present an unsworn warrant to a judge and then execute that unsworn warrant.

553.     The City and County of Marion also failed to train their officers to comply with a warrant's requirements, even when doing was time-consuming.  On the contrary, Chief Cody—after consulting with Sheriff Soyez—instructed his officers to ignore the preview-search requirement and just guess which devices they could seize.

554.     The City and County of Marion's respective policies, practices, or customs described in this claim were deliberate, ongoing, and pervasive—unlike on-the-spot decisions to conduct a search without probable cause under exigent circumstances.

555.     These ongoing and pervasive policies are exhibited by the Defendants enforcing the same policies in the raids of the *Record* and its publisher's home.

556.     The Defendants' enforcement of these unconstitutional policies violated Ruth and Ronald's Fourth Amendment rights.

557.     As a direct and proximate result of the individual Defendants' unconstitutional conspiracy, motivated by retaliatory animus, Ruth and Ronald have suffered, and will continue to suffer, extreme and severe mental and emotional trauma, post-traumatic stress, anxiety, sleeplessness, behavioral changes, mental anguish, deterioration of their health, pecuniary loss, and loss of enjoyment of life.  This damage includes, but is not limited to, all the costs associated with doctors' visits, therapy, purchasing a new cell phone, and hiring a forensic examiner.

558.     Punitive damages are justified because the Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Ruth and Ronald's federally protected rights.

## COUNT V

**Conspiracy to Violate Ruth & Ronald's Civil Rights**
**In Violation of the First, Fourth, & Fourteenth Amendments**
**(On behalf of Ruth and Ronald Herbel against the individual Defendants)**

559.     Ruth and Ronald reallege and incorporate by reference the allegations in ¶¶ 1-434 of this complaint as if fully restated here.

560.     The constitutional violations alleged in this complaint were part of a conspiracy to deprive Ruth and Ronald of their civil rights.

561.     By at least Tuesday, August 8, the individual Defendants had a meeting of the minds and entered into an agreement to retaliate against Ruth for her protected speech, in violation of the First Amendment; execute an illegal search warrant on her home to seize her

electronic devices, in violation of the Fourth Amendment; and arrest and charge Ruth with a crime so they could remove her from city council.

562.     As alleged throughout this complaint, Mayor Mayfield, Chief Cody, and Sheriff Soyez conspired amongst themselves and several officers under their command to conduct a sham investigation of Ruth on charges they all knew or should have known were false.

563.     They acted with retaliatory animus to punish Ruth for her political speech by using the force of law to remove her from city council.

564.     Each individual Defendant knew or should have understood the scope and purpose of the conspiracy.

565.     Each individual Defendant also knew or should have known that the conspiracy would violate the civil rights of Ruth and her husband Ronald.

566.     Although the Defendants did not achieve their ultimate goal of charging Ruth with a crime to remove her from city council, they took several concerted steps toward that goal.

567.     Several of these concerted acts violated Ruth and Ronald's civil rights.

568.     The conspirators maliciously procured a warrant, and abused the warrant process to punish Ruth, in violation of the First Amendment.

569.     The conspirators also executed a facially invalid warrant and then exceeded the scope of that warrant to search the Herbels' home and seize their electronic devices in violation of the Fourth Amendment.

570.     As a direct and proximate result of the individual Defendants' unconstitutional conspiracy, motivated by retaliatory animus, Ruth and Ronald have suffered, and will continue to suffer, extreme and severe mental and emotional trauma, post-traumatic stress, anxiety,

sleeplessness, behavioral changes, mental anguish, deterioration of their health, pecuniary loss, and loss of enjoyment of life. This damage includes, but is not limited to, all the costs associated with doctors' visits, therapy, purchasing a new cell phone, and hiring a forensic examiner.

571.    Punitive damages are justified because the Defendants' conduct was motivated by evil motive or intent, or it involved reckless or callous indifference to Ruth and Ronald's federally protected rights.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court provide the following relief:

572.    Declare that the individual Defendants malicious, abusive, and retaliatory search of Ruth's home and plan to arrest her violated the First Amendment.

573.    Declare that the municipal Defendants' policy, practice, or custom of retaliating against political dissidents, as applied to Ruth, violated the First Amendment.

574.    Declare that the individual Defendants' violated Ruth and Ronald's Fourth Amendment rights by:

   a. Knowingly, intentionally, or recklessly procuring and executing a warrant based false statements of fact;

   b. Procuring and executing a warrant unsupported by arguable probable cause;

   c. Procuring and executing a warrant unsupported by an oath or affirmation;

   d. Procuring and executing an overbroad warrant;

   e. Exceeding the scope of the warrant for the Herbels' home and electronic devices.

575.    Award Ruth and Ronald compensatory and punitive in an amount in excess of $75,000 to be proven at trial, as well as nominal damages.

576.    Award Plaintiffs attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 as well as any other costs and fees that are legal and equitable.

577.    Award any further legal or equitable relief the Court deems just and proper.

### JURY DEMAND

Plaintiffs Ruth and Ronald Herbel demand a trial by jury on all triable issues.

### DESIGNATION OF PLACE OF TRIAL

Plaintiffs Ruth and Ronald Herbel designate Kansas City, Kansas, as the place of trial.

Respectfully submitted,

| | |
|---|---|
| **INSTITUTE FOR JUSTICE** | GOODWIN JOHNSTON LLC |
| | |
| Jared McClain* | By:  */s/ Andrew J. Goodwin*____ |
| Michael Soyer* | Andrew J. Goodwin (25819) |
| 901 N. Glebe Rd., Suite 900 | drew@goodwinjohnston.com |
| Arlington, VA 22203 | Matthew A. Johnston (28292) |
| (703) 682-9320 | matt@goodwinjohnston.com |
| jmcclain@ij.org | 1100 Main St., Suite 2201 |
| msoyer@ij.org | Kansas City, Missouri 64105 |
| | T: (816) 994-7500 |
| **pro hac vice* motions forthcoming | F: (816) 994-7507 |

*Attorneys for Plaintiffs*