IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **RUTH C. HERBEL, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 2:24-cv-02224-HLT-GEB** |
| **MARION, KANSAS, CITY OF, et al.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

This is a case brought under 42 U.S.C. § 1983. Plaintiffs Ruth and Ronald Herbel allege that a cadre of city and county officials in Marion, Kansas, orchestrated an unlawful search of their home and seizure of Ruth's phone and laptop in retaliation for Ruth's role as political gadfly to the mayor and others in the community. Plaintiffs assert claims for First Amendment retaliation, Fourth Amendment unreasonable search and seizure, and conspiracy. Defendants move to dismiss. Doc. 20; Doc. 29.

The facts alleged certainly give the Court pause and raise serious constitutional concerns. But, as sometimes happens in § 1983 cases, the allegations in the complaint don't always reach the conduct of all named defendants. The Court carefully considered the motions and the lengthy complaint given the gravity of the allegations. The Court finds that some claims survive but that several claims and Defendants must be dismissed.

The surviving claims include: Ruth's First Amendment retaliation claim against Gideon Cody; Ruth and Ronald's Fourth Amendment claim against Cody on all theories except the overbreadth theory; and Ruth and Ronald's Fourth Amendment claim against Steve Janzen, Aaron Christner, and Zach Hudlin based on the theory that they exceeded the scope of the warrant. The municipal-liability claims survive against the city to the extent claims against Cody survive, but

no municipal-liability claims survive against the county. All other claims are dismissed. This means that David Mayfield, Jeff Soyez, and the Marion Board of County Commissioners are dismissed from this case.

## I.   BACKGROUND[1]

### A.   The Parties

Plaintiffs are Ruth Herbel and her husband, Ronald Herbel. Ruth was vice-mayor of Marion, Kansas, in August 2023. Doc. 1 at ¶ 14. Her husband, Ronald, has dementia. *Id.* ¶ 15.

Defendants fall into two categories: the City Defendants and the County Defendants. The City Defendants are the City of Marion, former Marion Mayor David Mayfield, former Marion Police Chief Gideon Cody, and acting Marion Police Chief Zach Hudlin.[2] The County Defendants are Marion County Sheriff Jeff Soyez, Sheriff's Detective Aaron Christner, Sheriff's Detective Steve Janzen, and the Marion Board of County Commissioners. All individuals are sued in both their official and individual capacities, except Christner and Janzen, who are only sued in their individual capacities.

### B.   Disputes Between Ruth and Mayfield

Ruth has been politically active. *Id.* ¶ 37. She ran for city council in November 2019. *Id.* ¶ 40. She said she was "tired of the dishonesty in the city administration." *Id.* ¶ 41. Ruth campaigned with Mayfield on a platform of change and transparency. *Id.* ¶ 43. But Ruth and Mayfield began to clash after the election. *Id.* ¶ 44. The local paper reported that Ruth and Mayfield disagreed about city-council meetings. *Id.* ¶ 45. Ruth wanted freewheeling discussion, dissent, and debate. *Id.* Mayfield seemed to want to act as a rubber stamp. *Id.*

---

[1]   The Court accepts as true the following facts from the complaint. *See* Doc. 1.

[2]   Current Marion Mayor Michael Powers was also named in his official capacity. He has been dismissed. Doc. 28.

Ruth and Mayfield had several disputes. *Id.* ¶¶ 46-47. Mayfield once called her a "bitch" during an executive session. *Id.* ¶ 48. Mayfield began trying to control to whom Ruth could speak, how much she could speak, and on what topics. *Id.* ¶ 49. In November 2021, he required her to first raise concerns with the city administrator before raising them at meetings. *Id.* ¶ 50. He required her to give advance notice of any ordinances or policies she planned to mention. *Id.* ¶ 51. Mayfield had the city attorney send Ruth a letter warning her it could be illegal for her to speak to anyone interested in dealing with the city without full council approval. *Id.* ¶ 52. Mayfield forbade Ruth from contacting the Kansas League of Municipalities. *Id.* ¶ 53. Mayfield eventually forbade Ruth from contacting the city attorney. *Id.* ¶ 54. No other city council members had these restrictions. *Id.* ¶ 55.

Ruth frequently criticized Mayfield in the *Marion County Record*, which is the local paper. *Id.* ¶ 56. Ruth complained Mayfield was violating the city charter, handing out funds without authorization, giving raises to favored employees, holding illegal meetings, and disregarding procedure. *Id.* ¶ 57. The paper ran several stories detailing the tension between Ruth and Mayfield. *Id.* ¶¶ 58-59. The stories included comments by Ruth that upset Mayfield. *Id.* ¶ 59.

In July 2022, Mayfield and the city council passed an ordinance over Ruth's dissent. *Id.* ¶ 60. Ruth organized a referendum against the ordinance. *Id.* ¶ 63. She spent her own money on signs and advertising that criticized the ordinance. *Id.* ¶ 64. In December 2022, voters rejected Mayfield's ordinance by an overwhelming margin. *Id.* ¶ 65. The paper described it as a personal defeat for Mayfield. *Id.* ¶ 66.

About a month after the failed vote, Mayfield's wife filed a petition to recall Ruth from her position on the city council. *Id.* ¶ 68. Mayfield was a sponsor of the petition. *Id.* Mayfield's wife

promoted the removal petition on Facebook, which Mayfield re-posted. *Id.* ¶¶ 70-71. The recall petition failed because there weren't enough signatures collected. *Id.* ¶ 73.

In June 2023, Mayfield ordered the city administrator to make all city council members sign an acknowledgment that they held their office on an at-will basis, even though they were elected. *Id.* ¶ 74. Ruth crossed out the "at-will" language before signing. *Id.* ¶ 75.

### C.    Mayfield Hires Cody

Early in 2023, Marion began looking for a new police chief. *Id.* ¶ 77. Mayfield consulted with Soyez (the sheriff) about whom to hire. *Id*. ¶ 78. Soyez recommended his friend, Cody, who worked for the Kansas City, Missouri Police Department. *Id.* ¶ 79. Many "tipsters" began reaching out to the paper about Cody's troubled history in Kansas City. *Id.* ¶¶ 80-81. The "tipsters" shared details, "like how Cody ran over a dead body at a crime scene, made inappropriate sexual remarks to his colleagues, and was an egomaniac who was difficult to work with." *Id.* ¶ 81. Mayfield decided to hire Cody despite Cody's troubled history. *Id.* ¶ 84. Cody took the oath of office before the city council had a chance to formally vote on hiring him. *Id.* ¶¶ 85-86.

Cody immediately showed hostility toward the media. *Id.* ¶ 87. He declined interview requests with the paper and stopped providing weekly activity reports to the paper. *Id.* ¶ 88. The paper published that he had discontinued the practice. *Id.* ¶ 89. Cody also told the city administrator not to provide the paper with the pay scale for officers. *Id.* ¶ 90.

Cody's view of the media was shared by others in Mayfield's administration. *Id.* ¶ 91. By the end of July 2023, the city administrator told Mayfield they should cease all communication with the paper. *Id.* ¶ 92. Mayfield shared posts on Facebook calling journalists the "real villains in America." *Id.* ¶ 93.

D.     **Kari Newell**

On August 1, 2023, U.S. Congressman Jake LaTurner visited Marion. *Id.* ¶ 97. Kari Newell hosted the event at her coffee shop. *Id.* ¶ 98. Newell asked Cody to remove the paper's editor and reporter from the event at the coffee shop, which he did. *Id.* ¶¶ 101-103.

On August 4, 2023, Ruth was preparing for an upcoming city-council meeting. *Id.* ¶ 105. An item on the agenda was a catering license for Newell's other restaurant, which would allow her to sell liquor. *Id.* ¶ 107. Ruth had some questions about the license, particularly given something she had seen on Facebook about Newell's criminal history that had been posted by Pam Maag. *Id.* ¶¶ 113-114. Ruth had seen that Newell had a DUI conviction, and she asked the city administrator to ask Cody to look into it. *Id.* ¶ 114. The city administrator forwarded Ruth's concerns to Mayfield. *Id.* ¶ 117. The city administrator said he had spoken to Cody about it and that Cody didn't plan on taking any action. *Id.* ¶ 118.

Around that same time, Ruth reached out to Maag on Facebook to confirm what she had learned about Newell. *Id.* ¶ 119. Maag sent Ruth a picture of a letter dated August 1, 2023. *Id.* ¶ 120. It was addressed to Newell and was from the Kansas Department of Revenue ("KDOR") Division of Vehicles. *Id.* The letter described what Newell needed to do before Kansas would restore her driving privileges following suspension of her license because of a DUI. *Id.* ¶ 121. The letter included Newell's address, date of birth, and driver's license number. *Id.* ¶ 122. Maag obtained the letter from Newell's estranged husband. *Id.* ¶ 123. Ruth took a screenshot of the letter and sent it to the city administrator. *Id.* ¶ 124.

The paper also obtained a copy of the letter. The paper sent a copy of the letter to the police and sheriff's departments. *Id.* ¶ 126. The paper stated it confirmed the letter was public record and that it was legal for it to possess the letter. *Id.* ¶ 127. The paper explained that it had good reason

to believe its source received the letter from "the soon-to-be-former spouse of the businesswoman" identified in the letter (Newell). *Id.* ¶ 128. The paper raised concerns that someone was driving without a valid license and that law enforcement was aware of it. *Id.* ¶ 130. The paper confirmed the authenticity of the letter using a publicly available function on KDOR's website. *Id.* ¶¶ 132-133. Ruth never used the KDOR website. *Id.* ¶ 138.

Cody reached out to the city administrator about the paper's receipt of the Newell letter and said he wanted to discuss it. *Id.* ¶ 146. In response, the city administrator provided the name and contact information for the city attorney. *Id.* ¶ 147.

On August 7, 2023, the city administrator forwarded Ruth's screenshot to Mayfield and blind-copied the rest of the city council, except Ruth. *Id.* ¶ 140. He stated, "Just a heads up to what Ruth sent me this weekend." *Id.* Mayfield told the city administrator to send all of Ruth's emails to the rest of the city council "so they can see what she is doing." *Id.* ¶ 141. Some of those emails questioned Newell's eligibility for a catering license. *Id.* ¶ 142. Ruth identified some city ordinances and state laws that she thought might be violated if Newell was issued a catering license. *Id.* ¶¶ 142-143. She raised the concern that granting Newell a catering license would allow her to sell liquor at her coffee shop. *Id.* ¶ 142. Ruth asked the city administrator whether she was "heading in the wrong direction." *Id.* ¶ 143. The city administrator did not respond to Ruth's inquires on that subject. *Id.* ¶ 144.

Mayfield instructed Cody to open an investigation into his administration's critics. *Id.* ¶ 150. Cody reached out to KDOR, and Mayfield and Cody both reached out to Newell to warn her that Ruth knew about her suspended license. *Id.* ¶¶ 151-152. Mayfield and Cody claimed that Ruth would oppose Newell's catering license because of the DUI, even though Ruth's concerns were just about eligibility. *Id.* ¶ 153.

Cody told Newell that someone had stolen the letter from her mailbox. *Id.* ¶ 155. He didn't have any factual basis for this. *Id.* Newell said he was wrong, and Cody, again without factual basis, said someone had stolen her identity. *Id.* ¶ 156. Cody told Newell that the paper had shared her driving record with Ruth even though Cody knew Maag had given the letter to both Ruth and the paper. *Id.* ¶¶ 157-158.

Mayfield told Newell that the only way to stop Ruth and get her removed from the city council was to have her arrested and charged with a crime. *Id.* ¶ 160. Mayfield and Cody decided it was a crime for Ruth "to merely possess a screenshot of a screenshot of a letter detailing information posted publicly to Facebook." *Id.* ¶ 161.

Newell subsequently attended the August 7 city-council meeting and accused Ruth of posting her personal information on Facebook, even though Ruth had not done this. *Id.* ¶ 162. Newell also repeated Cody's incorrect statement that the paper had "illegally" given Ruth a copy of Newell's driving record. *Id.* ¶ 163. The paper's editor spoke at the meeting and stated Ruth did not give the paper a copy of the letter. *Id.* ¶ 168. Newell made other accusations and statements toward Ruth at the meeting. *Id.* ¶¶ 164-165. Newell's catering license was approved by the city council over Ruth's dissent. Newell warned, "This is going to become a case." *Id.* ¶¶ 166-167.

### E.     The Investigation

On August 8, 2023, the day after the city-council meeting, Marion police opened an investigation into Ruth, the paper's editor and reporter, and Maag. *Id.* ¶ 170. Cody met with Soyez. *Id.* ¶ 171. Soyez had animosity toward the paper and would lose credibility if the paper reported his office knowingly let Newell drive without a license. *Id.* ¶ 172. Under Soyez's direction, the sheriff's department began working with the police department to investigate Ruth and the paper. *Id.* ¶ 174.

Cody had the city administrator forward Ruth's emails to him. *Id.* ¶ 176. Cody also asked Newell to provide a written statement. *Id.* ¶ 177. Newell's statement confirmed that the letter had been posted to Facebook by someone connected to her estranged husband. *Id.* ¶ 179. Newell's statement also revealed that the paper was investigating Cody's departure from the Kansas City, Missouri Police Department and how Mayfield's administration was violating the law. *Id.* ¶ 180.

Cody also asked the city's IT contractor about Ruth's use of a personal email address. *Id.* ¶ 181. Use of personal email was not a crime and was widespread throughout the city council. *Id.* ¶¶ 182-183. Cody asked Christner, a detective with the sheriff's department, to issue warrants to preserve the email accounts of Ruth, of the paper's editor and reporter, and of the city administrator who had communicated with Ruth. *Id.* ¶ 185. Christner preserved Ruth's email account despite acknowledging "there was no legal authority" behind Cody's request. *Id.* ¶ 186.

Christner cautioned Cody about his request to preserve the email accounts for the paper because its email hosting company would likely notify the paper if they did. *Id.* ¶ 187. Christner instead advised that Cody should just issue a search warrant if he had probable cause. *Id.* ¶ 188. Cody agreed and asked Christner to draw up warrant applications. *Id.* ¶ 189.

Christner sent drafts the next day. He stated in his message to Cody: "I attached a draft for a [search warrant]. I am not comfortable swearing to an affidavit that I did not do the investigation on. I left my training and experience in red so you can change it to yours. Let me know what you think." *Id.* ¶ 190 (brackets in original).

The warrant application and affidavits contained conjecture and false statements. *Id.* ¶ 191. One example was that the letter Ruth received from Maag "was downloaded directly from the Department of Revenue." *Id.* ¶ 192. Cody knew this was false because both Ruth and the paper separately told him that it was Newell's estranged husband who provided the letter to Maag. *Id.*

¶ 193. The warrant application "insinuates the falsity that 'someone obviously stole [Newell's]
identity' because Newell did not authorize anyone to download her driving record from KDOR."
*Id.* ¶ 194 (brackets in original). Cody knew or should have known that identity theft was not a
reasonable conclusion, given the source of the letter. *Id.* ¶ 195. There were similar false statements
in the warrant for the paper. *Id.* ¶ 196.

The warrant application and affidavit also omitted "key context" that would have indicated
Ruth had not committed a crime. *Id.* ¶ 198. It omitted the following:

- Ruth obtained the letter from Maag, not a government database;

- Ruth never accessed a government database;

- the information in the Newell letter, with the exception of her
  driver's license number, was posted publicly on Facebook
  before Ruth obtained the letter;

- law enforcement had no reason to believe Maag obtained the
  letter from a government database and in fact had reason to
  believe Newell's estranged husband was the source;

- the status of a Kansas driver's license is an open record available
  to the public;

- Ruth obtained the letter in her role as city-council member as
  she prepared to vote on Newell's catering license;

- Ruth did not rely on any confidential or personal information in
  voting against Newell's catering license;

- Ruth and the paper told law enforcement that they knew Newell
  was being allowed to drive with a suspended license; and

- Ruth asked the city administrator to ask Cody to investigate
  Newell's suspended license.

*Id.* ¶ 199.

The warrant accused Ruth of committing two crimes. *Id.* ¶ 201.[3] The first is "Identity Theft" under K.S.A. § 21-6107. *Id.* ¶ 202. The warrant described this as "obtaining and possessing personal identifying information and document containing the same belonging to another person with the intent to subject that person to economic or bodily harm." *Id.* The warrant omitted that this only applies if a person intends to "misrepresent that person." *Id.* ¶ 203. Ruth never misrepresented Newell, and the warrant did not suggest otherwise. *Id.* ¶ 204.

The second crime listed is "Official Misconduct" under K.S.A. § 21-6002. *Id.* ¶ 205. This was described as "using confidential information acquired in the course of and related to the office to intentionally cause harm to another." *Id.* Ruth's conduct as described in the warrant did not satisfy these elements, as the Newell letter was not confidential information acquired in her role of city-council member. *Id.* ¶¶ 206-207. The document was publicly available on Facebook. *Id.* ¶ 207. The only harm alleged in the warrant was that Ruth planned to vote against Newell's catering license, but that was not based on any confidential information. *Id.* ¶ 208. Ruth's emails to the city administrator reflected as much, as she urged the city council to review licensing laws to ensure Newell was eligible. *Id.* ¶ 209. The warrant stated Ruth "obtained protected Kansas Department of Revenue information via social networking," which is not a crime. *Id.* ¶¶ 211-212.

The crimes listed on the warrant did not match the crimes in the warrant application. *Id.* ¶ 213. The application referenced identity theft and official misconduct, while the actual warrant authorized police to search for identity theft and "unlawful acts concerning computers" under K.S.A. § 21-5839. *Id.* ¶ 214. On the latter crime, the warrant did not allege probable cause

---

[3]   Defendants have attached copies of the warrant and application to the motions to dismiss. *See* Doc. 21-1; Doc. 30-6 and Doc. 30-7. These documents are properly considered. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

as to Ruth. *Id.* ¶ 215. There as no evidence that Ruth accessed or even knew the KDOR website existed. *Id.* ¶ 216. She did not improperly access any computer, exceed her authorization, attempt to defraud anyone, or disclose passwords. *Id.*

Cody began sharing final drafts of the warrant application and affidavit, which targeted Ruth's home and electronic devices. *Id.* ¶ 219. Cody's final drafts were virtually identical to Christner's drafts. *Id.* ¶ 220. Cody consulted with Soyez and Marion police officer Hudlin as he finalized the warrant applications and affidavits. *Id.* ¶ 221. Plaintiffs allege that Cody, Soyez, and "the joint task force they created" knew or should have known that statements in the warrant application and affidavit were false and that the evidence listed did not amount to probable cause that Ruth committed a crime. *Id.* ¶¶ 222-223. The warrant documents were finalized on August 10—just two days after law enforcement opened the investigation. *Id.* ¶ 224.

The investigation continued after the warrants were drafted. *Id.* ¶ 225. Hudlin tried to contact someone from KDOR but was unsuccessful. *Id.* ¶ 226. Hudlin also spoke to the KBI and asked them for help in getting in touch with KDOR. *Id.* ¶ 227. KDOR didn't respond until the search warrants were being executed and stated that their website didn't track IP addresses for searches on the Driver's License Status page. *Id.* ¶ 228. Despite this, Hudlin later provided a written statement that he did speak to someone at KDOR who said there was a "loophole" in the system that "would allow someone to access another person's private data" and that a reporter from the paper accessed Newell's data on August 4. *Id.* ¶ 229. Had law enforcement tried to legally access Newell's data through the KDOR website, it would have been obvious that the theories of identity theft or misuse of computers made no sense. *Id.* ¶ 232.

### F.     Approval of the Warrant

Cody purportedly signed the affidavits supporting the warrant applications. *Id.* ¶ 260.[4] The complaint raises questions as to whether the signatures on the documents are all actually Cody's signature because there are notable differences. *Id.* ¶¶ 265-266. Cody did not sign under oath or affirmation. *Id.* ¶ 263. Nor did he sign in front of the magistrate judge because he did not appear before the magistrate judge. *Id.* ¶ 264. No one signed the warrants in front of a notary. *Id.*

The warrant permitted law enforcement to seize the following:

- any computer or digital device used to communicate protected KDOR information;

- any records, correspondence, or documents pertaining to Newell;

- any digital media or content used to store "documents and items of personal information as defined by K.S.A. 21-6107," which could include names, birth dates, addresses, phone numbers, mother's maiden name, or place of employment;

- computer software, hardware, or contents "related to the sharing of Internet access;" and

- items containing Ruth's passwords, access codes, or usernames.

*Id.* ¶ 279. There were no temporal limits, meaning a device that accessed the KDOR website years earlier could have been subject to seizure. *Id.* ¶ 281.

The warrants also required officers to conduct a "preview search" on any device before seizing the device "to exclude from seizure those which have not been involved in the identity theft." *Id.* ¶ 282. The purpose of this requirement was to ensure officers would only seize devices that had evidence of wrongdoing. *Id.* ¶ 283.

---

[4]   This includes the warrant for Ruth's house, as well as a warrant for the paper and other properties related to the paper.

Law enforcement presented the warrant applications to Morris County Magistrate Judge Laura Viar. *Id.* ¶ 271. Viar signed the unsworn warrants for Ruth, the paper, and the paper's editor on August 11. *Id.* ¶ 287. Viar did not approve the warrant for Maag's home. *Id.* ¶ 288. Viar crossed out the line for the notary's signature and signed on the line for the notary even though Cody, as the affiant, was not present to swear to the truthfulness of the applications. *Id.* ¶ 289. In other words, although Viar signed that the applications were "subscribed and sworn to before me," that was not true because Cody did not appear before Viar. *See id.* ¶ 290.

### G.    Execution of the Warrants

Law enforcement began execution of the warrants at the paper. *Id.* ¶ 299. The first preview search took over an hour. *Id.* ¶ 301. Hudlin stated that they would be working "all freakin' day" if they complied with the preview-search requirement. *Id.* ¶ 304. Cody told the search team that if it was "too tedious" and going to take "hours upon hours," then they could make the "command decision" to just seize the devices. *Id.* ¶ 306. Cody told the team at the paper they could seize any computer they thought might have been used to access KDOR records without first running a preview search. *Id.* ¶ 307. This exceeded the limits of the search warrants. *Id.* ¶ 311. Cody called Soyez, apparently looking for confirmation that they could ignore the preview-search requirement. *Id.* ¶ 312.

Cody dispatched Janzen to secure Ruth's home while the search at the paper was occurring. *Id.* ¶ 302. Janzen arrived at the house and found Ronald sitting on the porch. *Id.* ¶ 326. Ronald went inside to find Ruth but couldn't immediately find her and became distressed. *Id.* ¶¶ 327-328. When Ruth came out, she settled Ronald down. *Id.* ¶¶ 330-331.

Janzen told Ruth he was there to search her house for electronic devices. *Id.* ¶ 334. Initially, Janzen said they'd only keep the devices for an hour. *Id.* ¶ 335. Ruth was concerned about officers

keeping them longer than that because her cell phone was the only means she had to contact anyone. *Id.* ¶ 336. Janzen collected Ruth's laptop and cell phone. *Id.* ¶ 338.

Cody arrived at the home. *Id.* ¶ 342. Cody read Ruth her rights and said, "We're here for that identity theft, okay? Possessing that personal DOR information from somebody is a crime," and that "[t]ransferring it back and forth and how it was obtained could be considered fraud, okay, in this case wire fraud." *Id.* ¶ 346. Cody knew that possessing a KDOR record is not a crime, nor is emailing a picture of a KDOR record "wire fraud." *Id.* ¶ 347.

Cody asked who sent Ruth the letter and to whom she sent it to. *Id.* ¶ 348. Ruth confirmed what had been said before: she received the letter from Maag and only sent it to the city administrator. *Id.* ¶ 349. Cody acknowledged Ruth hadn't accessed the KDOR database but still said, "you can't be having it." *Id.* ¶ 350.

Cody said they would be seizing Ruth's phone. *Id.* ¶ 351. Ruth again objected that she needed the phone to stay in touch with her children and Ronald's doctors. *Id.* ¶¶ 351, 353. Cody said he had to seize it to recover evidence because they "know there was a crime committed on that phone." *Id.* ¶¶ 352, 354, 357. Ruth objected, and Cody again stated that possessing the letter and passing it to the city administrator was a crime. *Id.* ¶ 358.

Janzen asked if they could take Ruth's devices without running a preview search, and Ruth insisted they run the search at the house. *Id.* ¶ 362. Cody told Janzen to just take the devices if it was going to take too long to do a preview search: "If this is going to take a long time, [Ruth] can't dictate to us what we do and don't do." *Id.* ¶ 363 (brackets in original). Ruth told Janzen that she was concerned about police accessing her emails because there was probably an email between her and the paper that suggested Cody was having a romantic relationship with Newell. *Id.* ¶ 365.

Christner arrived shortly thereafter and employed the policy put in place by Cody and Soyez—that the preview searches not be done. *Id.* ¶ 366. Christner told Ruth it would take too long to do the search at the house and they would have to send her phone and laptop to a forensic facility. *Id.* Christner and Hudlin, who had also arrived by that point, then began to put Ruth's devices into evidence bags. *Id.* ¶ 368. Ruth asked if she could get numbers for her children from her phone, but Hudlin said he'd have to talk to Cody first. *Id.* ¶¶ 369-370. Hudlin eventually had Ruth write down the contacts she needed and told her that he couldn't imagine it would be a problem to get her the numbers she needed. *Id.* ¶¶ 371, 373. Ruth never received the numbers. *Id.* ¶ 375.

Cody left Ruth's home. *Id.* ¶ 376. He then received a text from Newell. *Id.* Cody called her back and said, "We can't write anything, so . . . ." *Id.* ¶ 377. Newell said she heard police were removing computers from the paper's office and Cody said, "Yeah, surprising how that works, isn't it?" *Id.* ¶ 378. Newell said, "Wow, that was fast!" *Id.* ¶ 379. Cody said he had just left Ruth's house and was heading to the house of the paper's editor. *Id.* ¶ 380. Newell responded, "Holy shit!" *Id.*

### H.   Impact of the Search

Following the search, Ruth was anxious, upset, depressed, and nervous. *Id.* ¶ 381. Ronald was particularly upset due to his dementia. *Id.* ¶ 382. Ruth had to drive outside of Marion to purchase another phone so she could get in contact with her children and doctors. *Id.* ¶ 383. Ronald required additional medical care to deal with the stress from the search. *Id.* ¶¶ 385-390.

After the search, Soyez threw a pizza party to celebrate. *Id.* ¶ 391. Cody came to the party and began talking about how fun it was for him to tear the cellphone from the reporter who was

leading the investigation into his past misconduct. *Id.* ¶ 392. It was only then that others realized Cody's body camera was still recording and turned it off for him. *Id.* ¶ 393.

The national news media began to cover the raid at the paper. *Id.* ¶ 396. On August 13, the KBI announced it was taking over the investigation. *Id.* Despite this, Defendants continued their plan to arrest Ruth and the others. *Id.* ¶ 397. On August 15, Cody and Christner exchanged draft probable-cause affidavits in support of arrest warrants for Ruth and the paper's editor and reporter. *Id.* ¶ 398.

Christner told Cody that he was not sure "it fits any of the crimes we have discussed except the US fed code," with regard to Ruth's arrest. *Id.* ¶ 399. Cody nevertheless circulated the drafts. *Id.* ¶ 401. The only evidence to support Ruth's arrest was that she received a copy of the Newell letter without Newell's consent and sent it to the city administrator and that she wanted to deny Newell's catering license based on the KDOR record. *Id.* ¶ 402.

As a result of the nationwide scrutiny of the searches, on August 16 the Marion county attorney filed a motion to release the evidence seized in the raid. *Id.* ¶ 405. The county attorney also issued a press release that said there was "insufficient evidence" "to establish a legally sufficient nexus" between the crimes alleged and the items seized. *Id.* ¶ 406. The county attorney did not clear anyone of wrongdoing, however, and urged the court to allow law enforcement to keep the paper's hard drive. *Id.* ¶ 407. But a court ordered the property returned. *See id.* ¶ 408.

After the KBI took over the investigation and in light of the national scrutiny, Cody began destroying evidence, including telling Newell to delete her text messages. *Id.* ¶¶ 411-412. Newell was hesitant, but Cody told her he didn't want anyone to get the wrong impression about their relationship and to "[q]uit being paranoid." *Id.* ¶ 414. The KBI subsequently turned the case over to the Colorado Bureau of Investigation. *Id.* ¶ 415.

After the devices were ordered returned, the paper retained a private forensic examiner to determine what had been searched. *Id.* ¶ 416. The sheriff's department inadvertently turned over Ruth's devices to the forensic examiner as well. *Id.* ¶¶ 417-418. Ruth subsequently hired the same private forensic examiner to analyze her devices at a cost of $3,507.27. *Id.* ¶ 419. Ruth didn't receive her devices back until September 2. *Id.* ¶ 421.

### I.      Cody's Resignation

Following the search, Ruth repeatedly tried to get the city to suspend Cody. *Id.* ¶ 422. Mayfield and others refused. *Id.* ¶ 423. Cody eventually resigned on October 2, effective October 15. *Id.* ¶ 427. Cody stated, "I do not want to defend my actions to the Council and I do not want for everyone to have to formally discuss any discipline." *Id.* ¶ 428. The city appointed Hudlin as acting police chief, knowing that he had been an active participant in the search of Ruth's house and the paper. *Id.* ¶¶ 429-433. Hudlin remains acting chief. *Id.* ¶ 434.

### J.      Lawsuit

Ruth and Ronald filed this lawsuit against Defendants on May 28, 2024. They assert five claims. Count I is for retaliatory search and seizure in violation of the First Amendment by Ruth against the individuals. Count II is the same claim by Ruth against the municipal parties. Count III is for unreasonable search and seizure in violation of the Fourth Amendment by Ruth and Ronald against the individuals. Count IV is the same claim against the municipal parties. And Count V is for conspiracy to violate civil rights by Ruth and Ronald against the individuals.

## II.      STANDARD

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted). A claim is plausible if there is

sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation and citation omitted). A court must accept as true all well-pleaded allegations in the complaint, but it does not accept legal conclusions or conclusory statements. *Id.* at 678-79.

## III.    ANALYSIS

Defendants move to dismiss all claims. Doc. 20; Doc. 29. First, the Court considers Defendants' arguments that the complaint violates Rule 8. Second, the Court considers the First Amendment retaliation clam against the individuals. Third, the Court considers the Fourth Amendment claim against the individuals. Fourth, the Court considers the municipal-liability claims based on the alleged First and Fourth Amendment violations. Fifth, and finally, the Court considers the conspiracy claim against the individuals.

### A.    Rule 8

Both County Defendants and City Defendants move to dismiss under Rule 8. Doc. 21 at 5-6; Doc. 30 at 3-7. They argue that the length of the complaint (88 pages and 577 paragraphs) demonstrates it is not a short and plain statement of Plaintiffs' claims and that it is full of unnecessary information. Doc. 21 at 5; Doc. 30 at 4. City Defendants argue the complaint "is replete with dozens of pages of unrelated, bizarre, and untrue facts." Doc. 30 at 4. They also argue the complaint is a press release in disguise and take issue with the use of headings. *Id.* at 5.

Rule 8(a) requires that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Whether to dismiss under Rule 8 is a matter within a district court's discretion. *See Schupper v. Edie*, 193 F. App'x 744, 745 (10th Cir. 2006).

The Court declines to dismiss the complaint under Rule 8. Admittedly, Plaintiffs' pleading is not short. It is, in fact, <u>much longer</u> than most pleadings the Court encounters, even in complex constitutional cases. But its length, standing alone, does not warrant dismissal. Although longer than most complaints, the paragraphs are generally only one or two sentences long. There is considerable detail, but the facts and allegations are not hard to follow. It is generally easy to determine what occurred, when it occurred, and who was involved. The five claims are clearly laid out, including who is asserting them, against whom they are asserted, and the alleged legal theory. The Court finds this complaint distinct from others that have been found to violate Rule 8. *See Baker v. City of Loveland*, 686 F. App'x 619, 620-21 (10th Cir. 2017) (noting complaint was "filled with unnecessary legal arguments and detail" and "lack[ed] clarity about what each defendant allegedly did to incur liability"); *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007) (noting that the claim "goes on for 463 paragraphs spanning 83 pages, and yet it neither identifies a concrete legal theory nor targets a particular defendant"); *Givens v. City of Wichita*, 2024 WL 1198503, at *7 (D. Kan. 2024) (noting that complaint was "complicated, confusing, and contains excessive references to seemingly irrelevant matters," made "countless allegations against non-parties," conflated legally distinct claims, and had a timeline that was "nearly impossible to construct").

Nor does the Court find Plaintiffs' use of headings abusive. As City Defendants concede, "[c]aptions in pleadings are an appropriate and helpful tool for lawyers and parties to organize their submissions to the Court, when used properly." Doc. 30 at 5. Although City Defendants

contend the headings in this complaint are "inflammatory" and leave City Defendants uncertain as to whether to admit or deny them, the Court does not find them so problematic.

The Court is mindful of the frequently invoked caution that "[s]omething labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint." *McHenry v. Renne*, 84 F.3d 1172, 1180 (9th Cir. 1996). There is a certain degree of this going on with Plaintiffs' complaint. But the Court did not struggle to discern the claims. And both County Defendants and City Defendants have filed fulsome motions to dismiss that attack all the claims in the case. Nothing about either motion indicates Defendants struggled to discern the claims against them. Nor have Defendants moved to strike any portion of the complaint under Rule 12(f). *See* Fed. R. Civ. P. 12(f) (allowing a court to strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter").

Given this analysis, the Court declines to dismiss the complaint under Rule 8.

### B.      Count I: First Amendment Retaliation – Individual Defendants

Count I is a First Amendment retaliation claim by Ruth against the individuals. Ruth alleges that the search of her home was motivated by a desire to punish Ruth's exercise of free speech. Doc. 1 at ¶¶ 435-468. The elements of a First Amendment retaliation claim outside the employment context are: "(a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007); *see also Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

### 1.   Soyez, Janzen, Christner, and Hudlin

Soyez, Janzen, and Christner move to dismiss Count I.[5] They argue that Plaintiffs fail to state a First Amendment retaliation claim because there are no allegations that any of them were motivated to act against Ruth as a response to her protected activity. Doc. 21 at 9-11. Hudlin likewise moves to dismiss because there are no allegations that he had a retaliatory animus. Doc. 30 at 24.

The Court assumes without deciding that Plaintiffs have alleged facts sufficient to meet the first two factors of First Amendment retaliation. But Plaintiffs' claim fails on the third factor because there are no facts alleged that Soyez, Janzen, Christner, or Hudlin were motivated by a retaliatory animus in any action taken toward Ruth. There are no factual allegations that they were motivated to act because of Ruth's protected activity—there are no facts even suggesting they knew of any protected activity by Ruth.[6] There is one allegation that Soyez "held animus toward the *Record* and stood to lose credibility if the paper reported that his office had knowingly allowed Newell to drive around without a license for a decade." Doc. 1 at ¶ 172. But even if this is sufficient to plausibly allege that Soyez was substantially motivated to retaliate against the paper for its protected activity, it says nothing about any motivations he held towards Ruth.

Plaintiffs argue that the dispute between Ruth and Mayfield "was widely publicized in Marion," and Cody asked Soyez for help in investigating Ruth. Doc. 40 at 9. As a result, they contend the "retaliatory intent should have been obvious," and that "First Amendment alarm bells

---

[5]   County Defendants argue that Ronald doesn't allege any of the elements of a First Amendment retaliation claim. Doc. 21 at 9 n.4. But Count I is only asserted by Ruth. Doc. 1 at 65.

[6]   Plaintiffs cite to the fact that Ruth told Janzen she was worried about the police seeing her emails to the paper speculating that Cody had a relationship with Newell. Doc. 40 at 9. But this occurred after the search warrant had been executed, or at least while it was being executed. Given that the adverse action complained of by Ruth in her First Amendment retaliation claim is the unlawful search and seizure, this fact could not have provided Janzen with a motivation to initiate that action, when he did not know of it until after the search had started.

should have rung." *Id.*; *see also* Doc. 43 at 17. But a § 1983 claim must be attributable to a defendant's own actions. *A.M. v. Holmes*, 830 F.3d 1123, 1163 (10th Cir. 2016). The Tenth Circuit has cautioned courts to ensure that motive is adequately pleaded for each individual defendant. *Id.* ("More specifically, in cases where plaintiffs have presented enough individualized evidence of a substantial motive to retaliate to establish § 1983 liability for a First Amendment retaliation claim, we have emphasized that the evidence indicated that each individual defendant had such a substantial motive."). In other words, the fact that <u>someone</u> may have been acting for retaliatory reasons does not suffice to show that that Soyez, Janzen, Christner, or Hudlin were acting for retaliatory reasons. In *Holmes*, the Tenth Circuit specifically noted that the only allegations about the defendant's motives were based on a generalized knowledge about the underlying situation. *Id.* at 1164. It found "this evidence falls far short of showing that [the] search was substantially motivated by a desire to retaliate . . . ." *Id.* at 1163. The same is true here for Plaintiffs' attempt to link the conflict between Ruth and Mayfield or Ruth and Cody to the other individuals.

Given this, the Court finds Plaintiffs have a failed to state a First Amendment retaliation claim against Soyez, Janzen, Christner, or Hudlin in their individual capacity. This claim is dismissed with prejudice as to these Defendants.[7]

### 2.     Mayfield

City Defendants argue Ruth has not alleged a First Amendment violation by Mayfield because she has not alleged that Mayfield caused any constitutional violation, other than authorizing Cody to investigate Ruth. Doc. 30 at 23. Plaintiffs respond that it was Mayfield who

---

[7] Plaintiffs' failure to state a plausible First Amendment retaliation claim against Soyez, Janzen, Christner, and Hudlin alternatively entitles them to qualified immunity on that claim. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (stating that an assertion of qualified immunity requires a plaintiff to show that: (1) the defendant's actions violate a constitutional right and (2) the constitutional issue was clearly established at the time of the defendant's actions); *see also Holmes*, 830 F.3d at 1164 ("This lack of particularized evidence is simply not sufficient to support liability under § 1983, or to defeat Ms. Holmes's claim of qualified immunity.").

ordered the retaliation in response to Ruth's protected activity, and he is therefore liable on this claim. Doc. 43 at 16.

As discussed above, a First Amendment retaliation claim requires three things: (1) constitutionally protected activity, (2) action by the defendant caused the plaintiff to suffer an injury that would chill a person of ordinary firmness, and (3) retaliatory motivation. *See Van Deelen*, 497 F.3d at 1155-56. City Defendants do not dispute the first or third elements as to Mayfield.[8] Doc. 30 at 23. But they argue that "authorizing" Cody to investigate Ruth is insufficient to show that Mayfield caused her constitutional injury. *Id.* The issue is therefore whether there are sufficient facts to allege that Mayfield himself caused Ruth to suffer a constitutional injury.

Mayfield did not directly participate in procuring and executing the search warrant (discussed further below in the context of the Fourth Amendment claim). But Plaintiffs have alleged that "Mayor Mayfield instructed Chief Cody to open an investigation into the administration's critics." Doc. 1 at ¶ 150. They also allege that Mayfield and Cody "decided it could be a crime for Ruth to merely possess a screenshot of a screenshot of a letter detailing information posted publicly to Facebook," *id.* ¶ 161, and that Mayfield told Newell the only way to get Ruth off the city council was to have her arrested and charged with a crime, *id.* ¶ 160.

These facts are insufficient to allege that Mayfield personally caused Ruth to suffer a retaliatory search and seizure because of her protected First Amendment activity. The First Amendment claim is predicated on the retaliatory search and seizure, which Mayfield was not

---

[8]   Although City Defendants argue as to Cody that the search and seizure of a person's phone and computer would not chill a person of ordinary firmness, they do not make that argument on behalf of Mayfield. *See* Doc. 30 at 31. The Court also rejects that argument, as discussed below.

personally involved in. The simple instruction to open investigation is insufficient to link Mayfield to the search and seizure that subsequently occurred.[9]

Plaintiffs cite two cases in support of their position that it is "clearly established that the officer in charge who directs and supervises his subordinates to execute an invalid search warrant is liable for the resulting Fourth Amendment violation." Doc. 43 at 16. This overstates what the complaint alleges Mayfield actually did. All the complaint alleges is that Mayfield instructed Cody to open an <u>investigation</u>. Doc. 1 at ¶ 150. The investigation eventually led to the search warrant, but there are no allegations that Mayfield directed and supervised the officers in preparing or executing the search warrant. For that reason, the cases Plaintiffs rely on are inapposite. *See* Doc. 43 at 16-17.[10] The First Amendment retaliation claim against Mayfield in his individual capacity is therefore dismissed with prejudice.

### 3.   Cody

City Defendants argue that Ruth has not alleged a First Amendment violation by Cody because she has not pleaded that a reasonable person would be chilled by the conduct alleged in this case or that Cody was substantially motivated by a retaliatory animus.[11] Doc. 30 at 21-22; *see also Van Deelen*, 497 F.3d at 1155-56 (listing elements of a First Amendment retaliation claim). The Court disagrees on both points. First, the argument that a reasonable person would not be

---

[9]   This likely would also entitle Mayfield to qualified immunity. *See Martley v. Basehor, Kan., City of*, 537 F. Supp. 3d 1260, 1268 (D. Kan. 2021) (noting that "a First Amendment retaliation claim based on the instigation of a criminal investigation is not a clearly established constitutional issue"). The analysis as to Cody is distinct, however, because he was directly involved in the alleged Fourth Amendment violation.

[10]   Specifically, in *Cassady v. Goering*, the defendant was the sheriff who directed a deputy to obtain a search warrant and supervised the execution of the warrant. 567 F.3d 628, 644 (10th Cir. 2009). In *Poolaw v. Marcantel*, the Tenth Circuit stated that an officer can be said to "cause" a constitutional violation where they "set in motion a series of events" that the defendant should know would cause others to deprive someone of a constitutional right. 565 F.3d 721, 732-33 (10th Cir. 2009). But in that case, the two officers were more directly involved in the search—one ordered it and the other swore the affidavit. *Id.* at 733. These cases are not factually analogous to Mayfield's involvement here.

[11]   Defendants do not argue that Ruth's activities were not protected. *See* Doc. 30 at 21, 23-24, 32; Doc. 21 at 9.

chilled by a search warrant executed on their home and seizure of their phone and laptop is unsupported and not persuasive, particularly at this early stage of the litigation.[12] This is particularly true given the areas sought to be searched—Ruth's only phone and her computer. *See United States v. Christie*, 717 F.3d 1156, 1164 (10th Cir. 2013) ("In today's world, if any place or thing is especially vulnerable to a worrisome exploratory rummaging by the government, it may be our personal computers.").

Second, as for Cody's purported retaliatory motive, the complaint alleges that Cody was made aware of Ruth's inquiries about Newell. Doc. 1 at ¶¶ 145-150. Mayfield asked Cody to open an investigation into "the administration's critics." *Id.* ¶ 150. Cody asked the city administrator to forward Ruth's emails to him. *Id.* ¶ 176. Cody reached out to Newell to warn her that Ruth knew about the suspended license and planned to oppose Newell's catering license. *Id.* ¶¶ 152-153. The complaint alleges Cody "fed Newell a fake story" about how Ruth came to have the letter. *Id.* ¶¶ 154-159. It also alleges that Cody knew facts that suggested Ruth committed no crime but ignored them and persisted with the investigation. *Id.* ¶¶ 192-197. Cody and Newell also communicated during the execution of the search warrants, and Cody warned her not to put anything in writing before bragging about the searches. *Id.* ¶¶ 376-380. Cody later told Newell to destroy her texts with him so people wouldn't "get the wrong impression" about their relationship. *Id.* ¶¶ 410-415. At this stage of the litigation, this is sufficient to allege that Cody was motivated to initiate the investigation and search of Ruth's house because of her protected activity involving

---

[12] The only authority cited by City Defendants for this proposition is "*Smith.*" Doc. 30 at 22. The Court presumes this is a citation to *Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001), which City Defendants cite earlier in their brief. In *Smith*, the Tenth Circuit considered a retaliation claim by the operator of a university athletics fan website against the university's Athletic Director for Media Relations. 258 F.3d at 1171-72. The retaliation claim was based on the defendant denying the plaintiff certain media resources typically given to other media, and the fact the defendant didn't treat the website as "media" or "press." *Id.* at 1172. The Tenth Circuit found this would not chill a person of ordinary firmness from continuing to operate a website. *Id.* at 1177. The Court finds *Smith* plainly distinguishable from the facts of this case, which involves the search by law enforcement of Plaintiffs' home and the seizure of personal electronic devices.

the Newell letter. Based on this, the Court finds Ruth has plausibly alleged a claim for First Amendment retaliation against Cody.

Cody alternatively invokes qualified immunity on this claim. Doc. 30 at 22-23. An assertion of qualified immunity requires a plaintiff to show that: (1) the defendant's actions violate a constitutional right and (2) the constitutional issue was clearly established at the time of the defendant's actions. *Medina*, 252 F.3d at 1128. On the first prong, the Court has found Ruth has stated a plausible First Amendment retaliation claim against Cody.

On the second prong, Plaintiffs argue that it has long been established that the First Amendment prohibits retaliation against those who engage in protected activity and that the law is sufficiently settled on this point that such retaliation is an obvious constitutional violation. Doc. 43 at 15-16. Generally, to be clearly established, the contours of the right must be sufficiently clear so that the official would know that what he was doing violated the right. *Medina*, 252 F.3d at 1128. It is usually not sufficient to point to a right with a high level of generality. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). But a case directly on point is not always required. "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004); *see also Frasier v. Evans*, 992 F.3d 1003, 1015 (10th Cir. 2021) ("In this regard, the Supreme Court has reminded us recently that under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful.").

The Court finds Plaintiffs have satisfied the clearly established prong at this stage of the litigation given the egregiousness of the allegations. Plaintiffs allege that Cody initiated the search of their home based on false statements and a search warrant suffering from multiple deficiencies,

resulting in the seizure of Ruth's phone and computer, solely in retaliation for Ruth's protected First Amendment activity.[13] The Court finds that seeking a search warrant to seize and search a person's personal phone and laptop based on their possession of a letter obtained via social media in retaliation for their protected political activity and speech would meet that egregiousness standard. *See Mink v. Knox*, 613 F.3d 995, 1003-04 (10th Cir. 2010) ("It goes without saying that a government official may not base her probable cause determination on an 'unjustifiable standard,' such as speech protected by the First Amendment.");[14] *Worrell*, 219 F.3d at 1212 ("We have stated that any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." (cleaned up)); *see also Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005) (denying qualified immunity where building inspector entered property without permission or a warrant allegedly in retaliation for protected speech and association); *see also Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 43 (1st Cir. 2024) ("If the First Amendment means anything in a situation like this, it is that public officials cannot—as they did here—threaten a person with legal action under an obviously inapt statute simply because he published speech they did not like.").

---

[13]  As discussed further below, the Fourth Amendment claim against Cody survives the motion to dismiss. Therefore, the egregiousness of the First Amendment claim is somewhat dependent on the ultimate outcome of the Fourth Amendment claim.

[14]  In *Mink*, a university student used an editorial column of an online journal to ostensibly mock a university professor, who then complained to police. 613 F.3d at 998. Police initiated a libel investigation, which led to a district attorney seeking a search warrant for the student's home and personal computer. *Id.* at 999. The court denied qualified immunity on the Fourth Amendment claim and found that the speech at issue was "parody and rhetorical hyperbole, which cannot reasonably be taken as stating actual fact, [and which] enjoys the full protection of the First Amendment and therefore cannot constitute the crime of criminal libel for purposes of a probable cause determination." *Id.* at 1011.

Cody may be able to assert qualified immunity at summary judgment on a more developed record. But the motion is denied at this stage as to Ruth's First Amendment retaliation claim against Cody.

### C.   Count III: Unreasonable Search and Seizure – Individual Defendants

The Court next considers Plaintiffs' claim for unreasonable search and seizure. The Fourth Amendment claim is asserted against all six individuals. Plaintiffs allege the search of Plaintiffs' home violated the Fourth Amendment in five ways: (1) the warrant was based on materially false statements; (2) the warrant was not supported by probable cause; (3) the warrant was not sworn under oath; (4) the warrant was overbroad in scope; and (5) the officers executing the warrant exceeded its scope. Doc. 1 at ¶ 489. The Court follows the lead of the parties and considers whether Plaintiffs have stated claims based on each of these theories against each of the individuals.

### 1.   Warrant Based on Materially False Statements

Plaintiffs' first theory is that the warrant included false statements. Doc. 1 at ¶ 493. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." US Const. amd. IV. The probable-cause requirement presumes a truthful showing. *Harte v. Bd. of Commissioners of Cnty. of Johnson, Kan.*, 864 F.3d 1154, 1162 (10th Cir. 2017). Where false statements are included either knowingly or with reckless disregard for the truth, and it undermines the existence of probable cause, the warrant is invalid. *See id.*; *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996).

### a.  Soyez, Janzen, Mayfield, and Hudlin

County Defendants argue that Soyez and Janzen cannot be liable on this theory because there are no facts alleging either had any involvement in the drafting of the warrant. Doc. 21 at 11. City Defendants make similar arguments about Mayfield and Hudlin. Doc. 30 at 32. In response, Plaintiffs argue that "Defendants" should have known the warrant was misleading and that "they" included statements and omissions in the warrant application that were materially misleading. Doc. 40 at 13-14; Doc. 43 at 22-25. Plaintiffs also impute Cody's knowledge to Hudlin. Doc. 43 at 24.

The Court finds Plaintiffs have failed to state a claim against Soyez, Janzen, Mayfield, or Hudlin based on a theory that the warrant contained false statements. There are no facts alleged in the complaint that any of these individuals had anything do with drafting the warrant application or the warrant itself. There are no facts that any of them made any materially false statements or omissions. Plaintiffs' half-hearted arguments that "they" should have known is not availing. It is well established that § 1983 claims brought against individuals must be specific enough to put that particular individual on notice of the claims asserted against him and must "make clear exactly who is alleged to have done what to whom." *Bledsoe v. Carreno*, 53 F.4th 589, 607 (10th Cir. 2022). "In general, state actors may only be held liable under § 1983 for their own acts, not the acts of third parties." *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008); *see also Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) ("But common to all § 1983 and *Bivens* claims is the requirement that liability be predicated on a violation traceable to a defendant-official's own individual actions." (internal quotation and citation omitted)). The fact that false statements may have been made by someone is not sufficient to hold Soyez, Janzen, Mayfield, or Hudlin personally liable where there are no factual allegations that <u>they</u> made any false statements. This theory is dismissed against Soyez, Janzen, Mayfield, and Hudlin with prejudice.

### b.  Christner

County Defendants argue that there are no allegations that Christner participated in the investigation or was aware of any alleged false statements or omissions, so there are no plausible allegations that he included knowing or reckless false statements in the warrant application. Doc. 21 at 12-13. The complaint in fact specifically alleges that Christner would not sign the affidavit because he did not do the investigation. *See* Doc. 1 at ¶ 190 (alleging that Christner told Cody he was "not comfortable swearing to an affidavit that I did not do the investigation on"). Plaintiffs respond that it was Christner's draft that contained the false statements and he's not entitled to the inference that he "simply put Cody's investigation onto paper . . . because the complaint does not allege who created the misinformation." Doc. 40 at 14.

Plaintiffs have failed to state a claim against Christner based on any alleged false statements in the warrant application. Although Christner drafted the initial warrant application at Cody's request, Doc. 1 at ¶ 189, the complaint specifically states that Christner said he would not sign the affidavit because he did not do the investigation, *id.* ¶ 190. Nothing explains how Christner initially got the information for the drafts. Nor are there allegations that Christner did any independent investigation or knew of any misstatements by Cody. If Christner did not do the investigation, it is unclear how he would have made knowingly false statements. Plaintiffs contend that because the complaint does not specifically allege who created the misinformation, it is "equally likely that the warrant's deficiencies came from Christner, Cody, or a combination of the two." Doc. 40 at 15. But that's not a reasonable inference to draw from the complaint.

Nor is the failure of Christner to do the investigation sufficient to state a claim. The "failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard

for the truth. To the contrary, it is generally considered to betoken negligence at most." *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014). This theory against Christner is dismissed with prejudice.

### c.    Cody

As to Cody, City Defendants argue that the allegedly false statements "were not used in the search warrant application or were actually not relevant." Doc. 30 at 29. The basis for this argument is not entirely clear. The complaint alleges that there were at least two materially false statements in the warrant: that the Newell letter "was downloaded directly from the Department of Revenue," and that "someone obviously stole [Newell's] identity." Doc. 1 at ¶ 493.[15] Both of these statements appear in the warrant application. Doc. 21-1 at 8. Thus, the Court rejects the City Defendants' argument that this theory should be dismissed because the allegedly false statements were not included in the warrant application. They clearly were included.[16]

City Defendants also argue that Cody is entitled to qualified immunity because he relied on the magistrate judge's determination that the warrant established probable cause. Doc. 30 at 27-30. Where qualified immunity is asserted in defense of an unlawful-search claim, courts "ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." *Stonecipher*, 759 F.3d at 1141 (internal quotation and citation omitted). Arguable probable cause exists if "the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* The best indicator that officers acted in good faith is approval of a warrant by a neutral magistrate judge. *Id.* But if "no reasonably competent officer would have concluded that a warrant should issue," there is no

---

[15]   The complaint also alleges several material omissions. Doc. 1 at ¶ 502.

[16]   City Defendants also briefly state that the alleged false statements "were not actually relevant." Doc. 30 at 29. But they do not explain why this is the case.

such protection. *Id.* at 1141-42. In other words, qualified immunity does not protect an officer "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 1142. Nor can a magistrate-judge-issued warrant protect an officer who misrepresents or omits material facts. *Id.*

Here, Plaintiffs have alleged that Cody included certain falsehoods and omissions in the warrant application. *See* Doc. 43 at 23; *see also* Doc. 1 at ¶¶ 493, 502. Cody could not therefore have relied on the magistrate judge's determination that probable cause existed if that finding was tainted by his misstatements or omissions. At this stage of the litigation and based on the arguments presented, the Court concludes that Plaintiffs overcome qualified immunity and this theory as to Cody survives. *See Turner v. Lotspeich,* 1996 WL 23195, at *2 (10th Cir. 1996) ("[T]he law [is] clearly established that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause." (brackets in original)).

### 2. Warrant Not Supported by Probable Cause

Plaintiffs' next theory is that the search of their home violated the Fourth Amendment because the warrant was not supported by probable cause.

### a. Soyez and Mayfield

As with the above theory, the Court finds Plaintiffs have not stated a claim against Soyez and Mayfield. There are simply no facts alleged that either of them had any involvement in drafting, obtaining, or executing the search warrant. This theory is dismissed as to them with prejudice.[17]

---

[17] At most, there are some vague and brief allegations that Cody consulted with Soyez about the warrant. Doc. 1 at ¶¶ 221-222, 312, 366. But Cody reaching out to, consulting, or calling Soyez does not demonstrate he, personally,

### b.       Janzen, Christner, and Hudlin

Janzen and Christner argue they are entitled to qualified immunity on this theory because all they did was help execute the warrant, and they were entitled to rely on the fact that the magistrate judge issued the warrant. Doc. 21 at 14-15; Doc. 46 at 5. Hudlin makes a similar argument—that he was entitled to rely on the presumed validity of a warrant procured by another officer. Doc. 30 at 32.

These arguments assert qualified immunity. As discussed above, qualified immunity in the Fourth Amendment context often turns on whether there was arguable probable cause. *Stonecipher*, 759 F.3d at 1141. As an initial matter, the Court interprets Defendants arguments to be that there was <u>arguable</u> probable cause such that Janzen, Christner, and Hudlin reasonably relied on the magistrate-judge-approved warrant, *see* Doc. 21 at 14-15, Doc. 30 at 32, not that the warrants were in fact supported by <u>actual</u> probable cause. The Tenth Circuit has clarified the distinction. Actual probable cause exists "for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place." *Sabeerin v. Albuquerque Police Dep't*, 2022 WL 1013809, at *4 (10th Cir. 2022). But "[a]rguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* (quoting *Stonecipher*, 759 F.3d at 1141).

Approval by a neutral magistrate judge is the "clearest indication that the officers acted in an objectively reasonable manner." *Rathbun v. Montoya*, 628 F. App'x 988, 993-94 (10th Cir.

---

knew the content of the search warrant or took any action with regard to it. The complaint also alleges that Soyez suggested adding "one more target to the list" when he "suggested that the search team raid the Meyers' home as well." *Id.* ¶ 234. Meyer was the publisher of the paper. Even if this was sufficient to state a claim for a Fourth Amendment violation against Soyez by Meyer—which the Court does not decide—it has nothing to do with Ruth or Ronald. Meyer is not a party to this case.

2015). But if "no reasonably competent officer would have concluded that a warrant should issue," there is no protection. *Stonecipher*, 759 F.3d at 1141-42. Qualified immunity does not protect an officer "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 1142. But "the threshold for establishing this exception is a high one," because an officer generally cannot be expected to question the magistrate judge's determination. *Rathbun*, 628 F. App'x at 994 (citation omitted). Arguable probable cause is an objective standard. *Sabeerin*, 2022 WL 1013809, at *6.

Here, the warrant was issued by a magistrate judge. Thus, at the motion-to-dismiss stage, the question becomes whether Plaintiffs have plausibly alleged that the warrant was so lacking in probable cause that it was unreasonable for Janzen, Christner, and Hudlin to rely on the magistrate judge's approval. On the current record, the Court finds Plaintiffs have not met this high standard.

The complaint alleges that the warrant and warrant application stated that evidence of "Identity Theft" might be found in the search of Ruth's devices. Doc. 1 at ¶ 202. Under K.S.A. § 21-6107, "[i]dentity theft is obtaining, possessing . . . any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to . . . misrepresent that person in order to subject that person to economic or bodily harm." The warrant neglected to state that an element of that crime is misrepresentation. *Id.* ¶ 203.

The warrant application also listed the crime of "Official Misconduct." *Id.* ¶ 205; *see also* K.S.A. § 21-6002 (defining "official misconduct" as "using confidential information acquired in the course of and related to the . . . employee's office . . . to intentionally cause harm to another"). But "official misconduct" was only listed in the warrant application. Doc. 1 at ¶ 214.

The warrant itself stated that the second crime being investigated was "unlawful acts concerning computers," a violation of K.S.A. § 21-5839.[18] *Id.* ¶ 213. Neither County Defendants nor City Defendants suggest there was probable cause to suspect Ruth of "unlawful acts concerning computers," *see* Doc. 21 at 14-15; Doc. 30 at 27-29, so it is unclear how this made its way into the warrant for Ruth's devices, other than a drafting error.

The Court is somewhat dubious that the facts alleged in the warrant would support a charge of identity theft or unlawful acts concerning computers. But it is less clear whether no reasonable officer could rely on the magistrate judge's approval of the warrant based on the charge of official misconduct. The warrant application states that Ruth obtained a copy of the Newell letter, which contained private information. Doc. 21-1 at 5-6. It states that the city administrator reported that Ruth intended to use that information to deny Newell's request for a catering license. *Id.* On its face, this could support arguable probable cause for the crime of official misconduct. In other words, belief in the existence of probable cause was not entirely unreasonable. Because there was arguable probable cause, Janzen, Christner, and Hudlin are entitled to qualified immunity.

Plaintiffs argue two points as to why there was no arguable probable cause as to official misconduct. First, they cite *United States v. Suggs* and claim that officers could not reasonably rely on "official misconduct" because it was listed in the application but not the warrant. Doc. 40 at 11 n.3 (citing *Suggs*, 998 F.3d 1125, 1132-33 (10th Cir. 2021)); Doc. 43 at 20 n.4 (same). But *Suggs* is distinguishable. There, the warrant permitted search and seizure of "any item identified as being involved <u>in crime</u>." 998 F.3d at 1132-33 (emphasis added). The Tenth Circuit found that "crime" was too general to refer to the underlying criminal act that was actually being investigated. *Id.* at 1133. *Suggs* did not hold, as Plaintiffs seem to suggest, that a crime listed in the application

---

[18]  Identity theft was listed in both the warrant application and the warrant.

but not the warrant is not reasonably relied on. The issue in *Suggs* was that there was no reference at all to any specific offense or even the underlying crime being investigated. *Id.* at 1134 ("Nowhere does the warrant reference any specific offense—let alone the particular firearm-related crime under investigation. In fact, the warrant never even mentions the vehicle shooting.").[19]

Second, Plaintiffs argue there is no arguable probable cause based on official misconduct because there is nothing to suggest that Ruth obtained the Newell letter through her official position given that it states she received it "via social networking." Doc. 40 at 11 n.3; Doc. 43 at 20 n.4. But this alone isn't enough for the Court to find that the warrant "lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Stonecipher*, 759 F.3d at 1142.[20]

In sum, the Court notes that the Tenth Circuit and other courts have cautioned that the approval of a warrant by a neutral magistrate judge is "the clearest indication that the officers acted in an objectively reasonable manner." *Id.* at 1141. Overcoming that and allowing suit to proceed against individuals who had no other role except executing a search warrant is a high hurdle. *Id.* Plaintiffs have not overcome that high hurdle in this case, and Janzen, Christner, and Hudlin are therefore entitled to qualified immunity on this theory based on the existence of arguable probable cause. This theory is dismissed as to them with prejudice.

### c.   Cody

---

[19]   *Suggs* later discussed the circumstances under which a warrant application can cure a warrant's lack of particularity. Plaintiffs don't cite that part of *Suggs* in support of their argument on this point. Nor do they explain how discrepancies between the application and the warrant negate arguable probable cause.

[20]   Although Plaintiffs' response to the motion to dismiss suggests Ruth did not obtain the letter in any official capacity, the complaint alleges that the warrant application wrongly failed to mention that "Ruth obtained and shared a copy of the letter in her role as city councilor, as she prepared to vote on Newell's application for a license to sell liquor." Doc. 1 at ¶ 502(f).

Like the other officers, City Defendants argue that Cody had at least arguable probable cause to support the crimes alleged in the warrant. Doc. 30 at 27-28. The Court disagrees and finds that Cody is not entitled to dismissal of this theory at this stage.

The facts alleged against Cody are much more developed, particularly with what he knew about the facts of the investigation. And many of the facts known to Cody are at odds with representations in the warrant. Specifically, Plaintiffs allege that Newell refuted Cody's suggestion that the letter was stolen from her mailbox. Doc. 1 at ¶¶ 155. It was Cody who told Newell without factual basis that someone stole her identity. *Id.* ¶ 156. This allegedly false statement was included in the warrant. Doc. 21-1 at 8. Cody also falsely stated that the paper gave Newell's driving record to Ruth, which he knew was false. Doc. 1 at ¶¶ 157-158. Cody had also been told that Maag received the letter from Newell's estranged husband. *Id.* ¶¶ 193, 195. The warrant application and affidavit failed to mention this, and didn't state that Ruth never accessed any government database. *Id.* ¶ 199. The information in the Newell letter had been publicly posted on Facebook before Ruth ever obtained it, and with the information in the letter, Newell's records could be legally accessed from the KDOR website. *Id.* ¶¶ 197, 199. Cody acknowledged to Ruth during the search that there was no evidence she ever accessed the KDOR website; but he nonetheless told her that simply possessing the KDOR letter was a crime and that transferring it was wire fraud, which he knew was false. *Id.* ¶¶ 346-347, 350.

Given these allegations and drawing all reasonable inferences, the Court cannot conclude at this stage that Cody could have reasonably relied on Viar's approval of the warrant. Many of the facts known to Cody call into question whether there was probable cause to support any of the crimes listed in the warrant. Moreover, as discussed above, Plaintiffs have alleged Cody made false statements or omissions in the warrant application and warrant. The fact that a magistrate

judge approved a warrant does not shield an officer who misrepresents or omits material facts to that magistrate judge. *Stonecipher*, 759 F.3d at 1142. Given that Plaintiffs have stated a plausible claim against Cody for misrepresenting material facts, he is likewise not entitled to dismissal on this theory.

### 3.    Warrant Not Sworn Under Oath

Plaintiffs' third theory is that the warrant was not sworn under oath because Cody did not appear before the magistrate judge.

### a.    Soyez, Mayfield, Janzen, Christner, and Hudlin

This theory fails as to Soyez and Mayfield because there are no allegations they had any involvement with the presentation of the warrant to the magistrate judge or that they even ever saw the warrant. As for Janzen, Christner, and Hudlin, Plaintiffs have likewise failed to state a claim against them under this theory. County Defendants argue that there are no allegations that Janzen or Christner knew that Cody failed to appear before the magistrate judge. Doc. 21 at 15-16. City Defendants make a similar argument that Hudlin was not involved but for his role in the execution of the warrant. Doc. 30 at 32.

In response, Plaintiffs only argue that these individuals "should have known better" because the place for the notary's signature was crossed out. Doc. 40 at 16; *see also* Doc. 43 at 25. Although the warrant reflects that the magistrate judge crossed out the word "Notary" and signed on that line, the affidavit still reflects that it was subscribed and sworn before the magistrate judge. *See* Doc. 21-1 at 10. Thus, from the face of the warrant application, there's nothing that would indicate that Janzen, Hudlin, or Christner would have known that Cody failed to appear to swear before the magistrate judge (assuming, as the Court is required to do at this stage, that this allegation is true).

This theory is therefore dismissed with prejudice as to Soyez, Mayfield, Janzen, Hudlin, and Christner.

### b.    Cody

City Defendants somewhat miss the mark with their argument for dismissal of this theory against Cody. They seem to largely just dispute the factual allegation in the complaint that Cody's affidavit was unsworn and that Cody did not appear before the magistrate judge. Doc. 30 at 29-30. While it might ultimately prove to be the case that Cody did appear before the magistrate judge and made sworn statements, *see id.*, the complaint states that the affidavit was unsworn, that neither Cody nor any other officer was sworn in before a notary, and that Cody did not appear before the magistrate judge. Doc. 1 at ¶¶ 263-264. These allegations are accepted as true at this stage, and this theory survives as to Cody.[21]

### 4.    Warrant Overly Broad in Sope

Plaintiffs' fourth theory is that the warrant was overly broad in scope. Plaintiffs allege that the warrant violated the Fourth Amendment because it allowed police to seize, among other things, any computer or device used to communicate protected KDOR information, any documents or records pertaining to Newell, any digital storage that contained names, birthdates, addresses, or phone numbers, and computer software or hardware "related to the sharing of Internet access."[22] *See Id.* ¶ 519. Plaintiffs allege this is overbroad. They explain that it would have allowed officers to search any electronic device in Plaintiffs' home regardless of whether it accessed the KDOR

---

[21]   In the last line of the argument, City Defendants state that the warrant application states that Cody was placed "under oath." Doc. 30 at 30. But this fails to address the allegations in the complaint suggesting that Cody did not, in fact, even sign all the warrant applications. *See* Doc. 1 at ¶¶ 265-267.

[22]   This last provision states in full: "Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address." Doc. 21-1 at 12.

website because almost every device will include someone's name or other information and because there were no temporal limits. *Id.* ¶¶ 520-522.

### a.      Soyez and Mayfield

Again, this theory fails as to Soyez and Mayfield because they were not involved with the warrant based on the facts alleged in the complaint. This theory is dismissed as to them with prejudice.

### b.      Janzen, Christner, Hudlin, and Cody

The Fourth Amendment carries a particularity requirement. *Christie*, 717 F.3d at 1164-65. Its purpose is to protect against generalized or "wide-ranging exploratory searches." *Id.* at 1164. Warrants authorizing computer searches for "any and all" information are necessarily overbroad and outside the bounds of the Fourth Amendment's particularity requirement. *See id.* at 1164-65. But where a warrant is limited in scope by reference to either a specific crime or specific material, the particularity requirement may be met. *Id.* at 1165; *see also Mink*, 613 F.3d at 1010 ("A warrant is overly broad if it does not contain sufficiently particularized language that creates a nexus between the suspected crime and the items to be seized.").

The Court finds Plaintiffs cannot support their Fourth Amendment claim based on an overly broad warrant. To be sure, the warrant application and warrant are not well-drafted. But both reference the underlying alleged crimes that were being investigated. Doc. 21-1 at 1, 9, 11. This is unlike *Suggs*, on which Plaintiffs again rely. In *Suggs*, as discussed above, the warrant contained a "miscellaneous" catch-all provision that permitted officers to search and seize "any item identified as being involved in crime." 998 F.3d at 1132-33. The Tenth Circuit held that reference to "crime" versus "a crime" or "the crime," either of which could be more specific, was simply too broad. *Id.* at 1133.

That is not what the warrant in this case did. It specifically referred to the allegedly unlawful acts being investigated.[23] All items fall under the same introductory paragraph. *See id.* at 1133-34 (noting the separate categorization of different search terms suggesting "they authorized officers to search for items different than those expressly listed elsewhere"). This is sufficient even if some other terms would otherwise be considered overly broad. As *Suggs* noted, "a warrant may satisfy the particularity requirement if its text constrains the search to evidence of a specific crime such that it sufficiently narrows language that, on its face, sweeps too broadly." *Id.* at 1134.[24] Moreover, several of the provisions included specific limitations, e.g. devices used to access the KDOR website or documents pertaining to Newell. Doc. 21-1 at 11. Given the reference to the crimes being investigated coupled with the other limitations, the warrant did not lack the requisite particularity. *See Suggs*, 998 F.3d at 1133 (noting that warrants should be construed "in a practical and commonsense fashion, avoiding a hypertechnical reading of their terms"). The Court therefore dismisses this theory as to Christen, Janzen, Hudlin, and Cody with prejudice.[25]

---

[23]  Plaintiffs argue that the application and affidavit cannot "fix" the overly broad warrant because it was not sufficiently incorporated and may have not been attached. Whether that's true, the warrant itself listed at least some crimes that were being investigated.

[24]  Plaintiffs cite *United States v. Leary*, 846 F.2d 592, 602 (10th Cir. 1988), for the proposition that "reference to a broad statute 'does not sufficiently limit the scope of a search warrant.'" Doc. 40 at 17. But as Plaintiffs concede, the warrant contained other limiting features, such as reference to Newell's records and KDOR records. *See id.*; *see also* Doc. 21-1 at 11-12. In *Leary*, the Tenth Circuit noted "that it is not the mere reference to the statute that makes the Kleinberg warrant overbroad, it is the <u>absence of any limiting features</u>." 846 F.2d at 601 n.15. There, the only limitation "encompassed virtually every document that one might expect to find in a modern export company's office." *Id.* at 602. Although Plaintiffs argue that not enough items were limited here, the Court is not convinced that this converts the warrant into the type of general warrant typically found to violate the Fourth Amendment. Further, the warrant included a preview-search requirement that was aimed at explicitly limiting the items seized. Defendants' alleged failure to comply with that provision is addressed separately below.

[25]  The Court notes Plaintiffs' argument that the application cannot lend particularity unless it is expressly incorporated and attached. Doc. 40- at 18. The warrant does state that the "items listed in the Application for Search Warrant and the affidavit of probable cause are incorporated herein by reference." Doc. 21-1 at 12. But the record is silent as to whether the application was actually attached to the warrant. The Court need not resolve this issue at this stage because its analysis on the overbreadth is based solely on the warrant.

### 5.   Execution Exceeded Scope of Warrant

The fifth theory is that Defendants exceeded the scope of the warrant by initially seizing Ruth's phone and computer without first conducting a preview search. Doc. 1 at ¶¶ 526-531. Defendants argue that officers were entitled to seize Ruth's phone and computer before running a preview search. Doc. 21 at 16-17; Doc. 30 at 30-31.

### a.   Mayfield

As with all the above theories, this theory fails as to Mayfield because he was not involved with the warrant based on the facts alleged in the complaint. Nor are there any facts alleged that Mayfield was involved in executing the search warrant or that he disregarded the preview-search requirement. He is dismissed with prejudice under this theory.

### b.   Soyez

The facts about Soyez's involvement on the preview-search issue are slim. The only potential role Soyez had with the warrant at all is with regard to the decision to forego the preview-search requirement. Plaintiffs state that "Soyez agreed in a call with Cody that the search team should ignore the preview searches." Doc. 40 at 19. This overstates what is alleged in the complaint.

The complaint states that Cody told the search team while they were executing the search at the paper that they could skip the preview search if it was going to be "too tedious" or take too long. Doc. 1 at ¶ 306. He told them they could make the "command decision" to take the devices without a preview search. *Id.* ¶¶ 306-311. "Eventually, Chief Cody called Sheriff Soyez, apparently looking for confirmation that the conspirators should ignore the warrants' preview-search requirement," and that "[a]fter the two men spoke, Chief Cody turned to Det. Christner and Officer Hudlin and said, 'Let's get the fuck out of here.'" *Id.* ¶ 312-313.

Notably, there are no allegations about what Cody told Soyez during this call, what Soyez said, or what Soyez even knew the warrant to require (i.e., whether he even knew it had a preview-search requirement).[26] The complaint also alleges that Christner later "employed the policy that Chief Cody and Sheriff Soyez decided on earlier." *Id.* ¶ 366. But again, there are no allegations about what Soyez said, was told, knew, or agreed to. Even if Cody sought "confirmation" from Soyez, the facts alleged suggest Cody had already instructed officers to ignore the preview-search requirement "because he felt that conducting the preview search was taking too long." *Id.* ¶¶ 363, 526.

In sum, these allegations do not plausibly allege that Soyez caused a violation of Plaintiffs' Fourth Amendment rights by directing anyone to ignore the preview-search requirement.[27] This claim is dismissed as to him with prejudice.

### c.      Janzen, Christner, Hudlin, and Cody

Plaintiffs allege Janzen, Christner, Hudlin, and Cody were directly involved in executing the search warrant at Plaintiffs' home. Defendants argue that they were entitled to take Ruth's phone and laptop without first running the preview search under *United States v. Hargus*, 128 F.3d 1358 (10th Cir. 1997). The Court finds *Hargus* inapposite and does not support dismissal of this claim against Janzen, Christner, Hudlin, and Cody at this stage.

"A warrant may permit only the search of particularly described places and only particularly described things may be seized." *United States v. Burgess*, 576 F.3d 1078, 1094 (10th Cir. 2009). Execution of a search warrant is governed by the Fourth Amendment's reasonableness

---

[26]  The only allegation about Soyez's knowledge of the substance of the warrant is that as Cody was finalizing the warrant application and affidavit, he (Cody) "consulted with Sheriff Soyez and Officer Zach Hudlin." Doc. 1 at ¶ 221. There are no allegations Soyez ever saw the warrant application or warrant or the extent of the consultation.

[27]  Another allegation in the complaint states: "They made a conscious choice to ignore the preview-search requirement . . . ." Doc. 1 at ¶ 316. This collective allegation is not sufficient to ensnare Soyez under this theory. *See Pahls*, 718 F.3d at 1225-26.

standard. *Hargus*, 128 F.3d at 1363. Where officers "grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined" and the warrant may be invalid. *See id.*

Here, the search warrant for Plaintiffs' home contains the following direction: "Conduct a preview search of all located digital communications devices and digital storage media <u>to exclude from seizure</u> those which have not been involved in the identity theft, by use of manual or automated preview tools." Doc. 21-1 at 11 (emphasis added). The complaint alleges that the officers conducting the search of Plaintiffs' house did not do a preview search of Ruth's phone or laptop before seizing them. Based on this, Plaintiffs have plausibly alleged that Janzen, Christner, Hudlin, and Cody exceeded the terms of the warrant when they seized Ruth's phone and laptop without conducting a preview search first.

County Defendants argue that the warrant and Kansas law authorized them to transfer and forensically process electronic information off-site. This misses the issue by ignoring the preview-search requirement. *See* Doc. 21  at 17.[28] The warrant specifically directed that a preview search be conducted "to exclude <u>from seizure</u> those which have not been involved in the identity theft." Doc. 21-1 at 11 (emphasis added). In other words, the preview search was to be used to determine <u>which items should be seized in the first place</u>. Where any properly seized items were later forensically analyzed is beside the point.

Nor does *Hargus* require dismissal of these claims. In *Hargus*, a search warrant resulted in seizure of file cabinets, which included items not specified in the warrant. 128 F.3d at 1361. The warrant was for certain oil and gas records. *Id.* at 1362. Officers located oil and gas records in

---

[28]  County Defendants likewise assert qualified immunity on this point. Doc. 21 at 19. But they assert the defense based on an incorrect premise that there was no preview-search requirement in the warrant. *Id.*

every drawer of the file cabinets. *Id.* at 1363. Because sorting out the oil and gas records from the other papers in the cabinets on site would have been impractical and time consuming, the officers just seized the file cabinets and all their contents. *Id.* The Tenth Circuit was "given pause by the wholesale seizure of file cabinets and miscellaneous papers and property not specified in the search warrant," but nevertheless found that the officers did not grossly exceed the scope of the search warrant. *Id.* Although the time-consuming nature of sorting through the documents on site was noted, the court also explained that the officers had verified that the records listed in the search warrant "were present in every drawer of both file cabinets." *Id.*

The last point is what distinguishes *Hargus* from this case. Here, the claim is that Defendants <u>did not</u> verify that the information they were after was present on Ruth's phone or laptop. In other words, the officers in *Hargus* <u>did</u> do the equivalent of a preview search of the file cabinets (albeit presumably a less technical one) before seizing the file cabinets. No such preview search or the equivalent was done here, at least as currently alleged.

Based on the arguments presented, the Court denies the motions to dismiss on this theory as to Janzen, Christner, Hudlin, and Cody.

### D. Counts II and IV: Municipal Liability for First and Fourth Amendment Claims

Counts II and IV are the municipal-liability counterparts to the substantive First and Fourth Amendment claims against the individuals in Counts I and III. A municipality can only be liable under § 1983 for its own unconstitutional acts. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). "[T]o establish municipal liability, a plaintiff must show [(1)] the existence of a municipal policy or custom, and [(2)] that there is a direct causal link between the policy or custom and the injury alleged." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993). The first element— a policy or custom—can take several forms:

> (1) a formal regulation or policy statement; (2) an informal custom
> amoun[ting] to a widespread practice that, although not authorized
> by written law or express municipal policy, is so permanent and well
> settled as to constitute a custom or usage with the force of law; (3)
> the decisions of employees with final policymaking authority; (4)
> the ratification by such final policymakers of the decisions—and the
> basis for them—of subordinates to whom authority was delegated
> subject to these policymakers' review and approval; or (5) the
> failure to adequately train or supervise employees, so long as that
> failure results from deliberate indifference to the injuries that may
> be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation omitted).

"[Municipal-liability] claims are not meant to create respondeat superior liability for every
constitutional violation that may involve a municipal employee." *Pino v. Weidl*, 2020 WL
3960424, at *4-5 (D. Kan. 2020). "Ordinarily, a single incident of unconstitutional behavior is
insufficient to impose municipal liability." *Id.*

The Court considers the municipal-liability claims against the county and city in turn.

### 1.    County

County Defendants move to dismiss Counts II (First Amendment retaliation) and IV
(unconstitutional search and seizure) for municipal liability against the county and Soyez in his
official capacity as sheriff. Doc. 21 at 6. Plaintiffs base their municipal-liability claims against the
county on the fact that Soyez was a final policymaker and on failure to train. Doc. 40 at 4.[29]

### a.    Final Policymaker Decision

"[W]hen an official takes action over which he or she has final policymaking authority, the
policymaker is the municipality, so it is fair to impose liability on that entity for that action."
*Whitson v. Bd. of Cnty. Comm'rs of Cnty. of Sedgwick*, 106 F.4th 1063, 1072 (10th Cir. 2024). But

---

[29] The allegations about a failure to train only appear in the municipal-liability claim for unreasonable search and
seizure. *See* Doc. 1 at ¶¶ 534-558. But the parties generally analyze the municipal-liability claims (for both First
Amendment retaliation and unreasonable search and seizure, respectively) together.

it is not enough to just identify an act by a decisionmaker. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). "[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* Culpability is shown through facts that an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right." *Id.* at 405. Causation may be established if the plaintiff shows "the municipality was the moving force behind the injury alleged." *Blueberry v. Comanche Cnty. Facilities Auth.*, 672 F. App'x 814, 817 (10th Cir. 2016). Where "the action taken or directed by the . . . authorized decisionmaker itself violates federal law," then "the municipal action was the moving force behind the injury of which the plaintiff complains." *Brown*, 520 U.S. at 405; *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

County Defendants argue that Plaintiffs have not alleged that any action by Soyez was the moving force behind the alleged constitutional violations, even assuming he is a final policymaker. This essentially attacks the causation element. *See Hinton*, 997 F.2d at 782 (requiring "a direct causal link between the policy or custom and the injury alleged"); *Schneider*, 717 F.3d at 770 ("To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." (internal quotation omitted)). In other words, County Defendants argue no act by Soyez caused Plaintiffs' constitutional violations. The Court agrees. Even assuming Soyez is a final policymaker for the county, Plaintiffs have not alleged that any such final decision he made was the moving force behind any constitutional violation. This is because, as discussed above, there are no facts that Soyez took any action against Plaintiffs. If Soyez did not cause any constitutional violation, the county cannot be liable based on his role as a final policymaker.

The allegations cited by Plaintiffs on this issue are that Cody met with Soyez "to recruit him into the conspiracy," that Soyez held animosity toward the paper, that Soyez "willfully joined the mayor and police chief's conspiracy," that the sheriff's office began working with the police department under Soyez's direction, and that Christner (a sheriff detective) assisted Cody. *See* Doc. 40 at 5 (citing Doc. 1 at ¶¶ 171-174, 185-191, 398-400, and 444). Plaintiffs also cite allegations that Cody consulted with Soyez (without further detail), *id.* (citing Doc. 1 at ¶ 221), that Soyez suggested a search of the publisher's house, *id.* (citing Doc. 1 at ¶ 234), that Cody called Soyez looking for confirmation to ignore the preview-search requirement (without further details of the conversation or Soyez's response), *id.* (citing Doc. 1 at ¶ 312, 366), and that Soyez threw a pizza party after the search, *id.* (citing Doc. 1 at ¶ 391). But none of these allegations suggest that Soyez made a final decision that caused the deprivation of Plaintiffs' rights.

Plaintiffs also argue that the complaint contains well-pleaded allegations and inferences "that Soyez directed and supervised his subordinates' unconstitutional acts." Doc. 40 at 5. But municipal liability cannot be based on respondeat superior. *Whitson*, 106 F.4th at 1072. This theory cannot form the basis for municipal liability against the county.

### b.    Failure to Train

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. Municipal liability based on a failure to train is only available in limited circumstances. *Schneider*, 717 F.3d at 773. Where municipal liability is premised on a failure to train, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 770. A deliberate indifference standard applies, meaning the failure to train must reflect a deliberate choice by a municipality. *Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998). This can

be shown by a pattern of tortious conduct for which training was obviously needed. *See id.* Alternatively, deliberate indifference to a training need can be shown where a municipality fails to train employees to "handle recurring situations, thus presenting an obvious potential for constitutional violations." *Id.*; *see also George v. Beaver Cnty.*, 32 F.4th 1246, 1253 (10th Cir. 2022) ("Evidence of a pre-existing pattern of violations is only unnecessary in a narrow range of circumstances . . . in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious." (internal quotation and citation omitted)). "In the context of a 'failure to train' claim under § 1983, even a showing of gross negligence by the municipality is inadequate to meet the state-of-mind requirement." *Blueberry*, 672 F. App'x at 817.

County Defendants argue that Plaintiffs have not pleaded any facts about any training or the lack thereof by the county or Soyez, nor are there allegations about prior violations that would indicate training was deficient. Doc. 21 at 8. Plaintiffs argue that what County Defendants did was not "a one-off" because "they repeated their unconstitutional conduct across four separate warrants and three illegal raids." Doc. 40 at 6. Alternatively, even if there was not a pervasive problem indicative of a lack of training, Plaintiffs contend that the county was indifferent for its failure to train because the county didn't train its officers to deal with the predictable problems associated with drafting and executing warrants involving electronic devices. *Id.* at 7.

Plaintiffs' arguments are insufficient to establish municipal liability based on a failure to train. The only allegations in the complaint about the training—or lack thereof—of the individual officers are conclusory statements that the municipalities failed to train their officers regarding how to draft and execute warrants. Doc. 1 at ¶¶ 550-553. Conclusory statements do not help a complaint survive a motion to dismiss. Nor is it sufficient to merely allege general ways in which training was insufficient. *See Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) ("Instead Carr

merely enumerates the multiple ways in which he contends the Officers were inadequately trained, but without proffering any evidence of knowledge of the purported deficiencies on the part of the City.").

To the extent Plaintiffs contend that this was not a "one-off" because Defendants "repeated their unconstitutional conduct across four separate warrants and three illegal raids," Doc. 40 at 6, this appears to refer to the warrants that were simultaneously investigated, drafted, and executed on Ruth and Ronald's house, as well as on the paper and the paper's editor. "But contemporaneous or subsequent conduct cannot establish a pattern of violations . . . ." *Connick*, 563 U.S. at 63.

Plaintiffs contend that warrants involving electronic devices are predictable problems officers are likely to encounter. Doc. 40 at 7. But the only allegation that training was insufficient in this regard are based on the facts of this case. The Tenth Circuit has specially cautioned against such after-the-fact reasoning. *See Carr*, 337 F.3d at 1231 ("All of Carr's other assertions of alleged failure to train or inadequate training flunk the causation requirement, for they uniformly partake of the post hoc, ergo propter hoc fallacy rather than providing any evidence of how the training (or lack thereof) actually resulted in the excessive force."); *see also Teetz v. Bd. of Cnty. Comm's of Sedgwick Cnty., Kan.*, 2023 WL 7698030, at *8 (D. Kan. 2023) ("It is not enough for a plaintiff to allege that an officer's wrong decision injured a citizen during a predictable situation.").

Plaintiffs have therefore failed to state a claim for municipal liability against the county based on a theory of a decision by a final policymaker or failure to train for either Count II or Count IV. The county is therefore dismissed with prejudice, as are the official capacity claims against Soyez.

2.     **City**[30]

City Defendants move to dismiss the municipal-liability claims against the city in Count II (First Amendment retaliation), Doc. 30 at 24-26, and in Count IV (unreasonable search and seizure), *id.* at 32-33. City Defendants' arguments are very general, however. As Plaintiffs note, City Defendants do not generally delineate between the different theories Plaintiffs advance, i.e., the different ways a municipal policy can be shown. Doc. 43 at 10.

In their reply brief, City Defendants do briefly address the different theories of failure to train, ratification, and final policymaker. Doc. 49 at 6-8. But the lack of meaningful argument on this point by City Defendants simplifies the analysis. In the reply, City Defendants concede Cody would be the final policymaker for the city with regard to any claims of police misconduct. *Id.* at 7. But they argue that there can be no municipal liability under this theory because Plaintiffs have not pleaded any constitutional violation by Cody.[31] As discussed throughout, the Court has found Plaintiffs have stated constitutional violations by Cody. Accordingly, on the current record, the Court declines to dismiss the municipal-liability claims against the city. Given that there is at least some ground for municipal liability against the city, the Court does not reach the other theories of ratification or failure to train.[32]

---

[30]  In addition to suing the city, Plaintiffs assert municipal-liability claims against Mayfield, Cody, and Hudlin in their official capacities. These claims are redundant of claims against the city and are therefore dismissed with prejudice. *See Taylor*, 82 F.3d at 1564 (noting that official capacity suits should be treated as a suit against the entity).

[31]  Any municipal-liability claims based on Mayfield as a final policymaker are dismissed for the same reason the similar claims based on Soyez's conduct are dismissed. Even assuming Mayfield is a final policymaker for the city, there is no causal connection to any decision by Mayfield to any constitutional injury suffered by Plaintiffs. As discussed throughout, Plaintiffs have failed to identify any constitutional violation attributable to Mayfield.

[32]  Plaintiffs' theory of municipal liability based on a failure to train fails as to the city for the same reason it fails as to the county. Specifically, the allegations in the complaint about failure to train are conclusory. Doc. 1 at ¶¶ 550-553; *see also Carr*, 337 F.3d at 1229. Nor can contemporaneous conduct establish a pattern. *Connick*, 563 U.S. at 63.

E.      **Count V: Conspiracy – Individual Defendants**

The final claim, Count V, is a § 1983 conspiracy claim against the individuals. Plaintiffs allege the individuals conspired to violate Plaintiffs' First, Fourth, and Fourteenth Amendment rights. Doc. 1 at ¶¶ 559-571.

"A federal conspiracy action under § 1983 requires at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Givens*, 2024 WL 1198503, at *21 (internal quotation and citation omitted). A plaintiff pleads a § 1983 conspiracy claim by alleging "specific facts showing an agreement and concerted action among defendants." *Bledsoe*, 53 F.4th at 609 (internal quotation and citation omitted). There must also be facts alleging a "common, unconstitutional goal" and "concerted action." *Id.* (internal quotation and citation omitted). Assent can be inferred from acts furthering the conspiracy's goal. *Id.* There does not need to be an express agreement but "participants in the conspiracy must share the general conspiratorial objective." *Frasier*, 992 F.3d at 1024 (citation omitted). Conclusory allegations of a conspiracy do not suffice. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998).

The Court finds Plaintiffs have failed to state a plausible claim for conspiracy. There are no non-conclusory allegations that any of the individuals shared a conspiratorial goal. The closest Plaintiffs come on this point is the allegation that "Mayfield instructed [Cody] to open an investigation into the administration's critics." Doc. 1 at ¶ 150. But this only implicates Mayfield and Cody, not any of the other individuals. And, as to Mayfield and Cody, it is still too vague and conclusory to state a claim for § 1983 conspiracy. As discussed above, Mayfield had almost no involvement in this matter beyond this point, and even if he asked Cody to investigate Ruth, there

are no allegations that he instigated—or shared a conspiratorial objective regarding—any constitutional violations.

As to the others, Plaintiffs largely rely on actions they took with regard to the search warrant. But the fact that they were involved in the investigation, however flawed it was, does not indicate a conspiracy existed. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010) ("At best, the record shows that Maddox and Neal assisted Carver (and other officers) in investigating Skybar and the Griders . . . But showing that Maddox and Neal 'conspired' to investigate Skybar, which is lawful and part of their duties as law enforcement officers, is a far cry from showing that Maddox and Neal agreed to fabricate, and then maliciously prosecute Grider for, a bribery crime he did not commit."). Parallel action is not suggestive of a conspiratorial intent. *See Frasier*, 992 F.3d at 1025 ("Therefore, proof that defendants engaged in '[p]arallel action . . . does not necessarily indicate an agreement to act in concert.'" (internal citation omitted)).

The Court therefore grants the motions on this claim and dismisses the conspiracy claim with prejudice.

## IV.   CONCLUSION

In sum, Ruth's First Amendment retaliation claim in Count I is dismissed as to all individuals except Cody. Ruth and Ronald's Fourth Amendment claim in Count III is dismissed as to all individuals except Cody on theories 1, 2, 3, and 5, and Janzen, Christner, and Hudlin on theory 5. The municipal-liability claims in Counts II and IV survive as to the city based on the surviving theories against Cody but are dismissed against the county. The conspiracy claim in Count V is also dismissed. The county, Soyez, and Mayfield are dismissed from the case. All dismissals are with prejudice.[33]

---

[33] Dismissal is with prejudice. This is generally proper under Rule 12(b)(6) particularly given the failure to amend as of right or to seek leave to amend consistent with the federal and local rules while the motion was pending. Fed.

THE COURT THEREFORE ORDERS that County Defendants' Motion to Dismiss (Doc. 20) is GRANTED IN PART and DENIED IN PART as explained above.

THE COURT FURTHER ORDERS that City Defendants' Motion to Dismiss (Doc. 29) is GRANTED IN PART and DENIED IN PART as explained above.

IT IS SO ORDERED.

Dated: October 4, 2024                              _/s/ Holly L. Teeter_____
                                                    HOLLY L. TEETER
                                                    UNITED STATES DISTRICT JUDGE

---

R. Civ. P. 15; D. Kan. Rule 15.1; *see also Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 132-33 (D.C. Cir. 2012) (Kavanaugh, J., concurring) (explaining that dismissal under Rule 12(b)(6) is generally with prejudice unless stated otherwise and that opportunities to amend under Rule 15 in response to motions to dismiss provide a fair opportunity for a plaintiff to avoid such a result). This approach also promotes efficiency and prevents parties from taking a "wait-and-see" approach to see what can get by before making fulsome efforts to address the challenged issues.