## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

RUTH & RONALD HERBEL,                )
                                     )
    *Plaintiffs,*                )
                                     )
v.                                   )
                                     )
CITY OF MARION, KANSAS, *et al.*,    )   Case No. 24-2224-HLT-GEB
                                     )
                                     )
    *Defendants.*                )
                                     )
_____ )

## PLAINTIFFS' EXHIBIT TO MOTION FOR RECONSIDERATION

    Plaintiffs filed their Motion for Reconsideration and Leave to Amend Complaint on December 13, 2024 (Dkt. 51). Unfortunately, a technical issue with the CM/ECF system prevented Plaintiffs from uploading Exhibit A to the Motion for Reconsideration. Attached to this letter is the corresponding exhibit.

Date: December 16, 2024        Respectfully submitted,

INSTITUTE FOR JUSTICE        GOODWIN JOHNSTON LLC

Jared McClain* (D.C. 1720062)    */s/ Andrew J. Goodwin*
jmcclain@ij.org          Andrew J. Goodwin (25819)
Michael B. Soyfer* (N.Y. 5488580,  drew@goodwinjohnston.com
D.C. 230366)           Matthew A. Johnston (28292)
msoyfer@ij.org          matt@goodwinjohnston.com
901 N. Glebe Rd., Suite 900     1100 Main St., Suite 2201
Arlington, VA 22203        Kansas City, Missouri 64105
T: (703) 682-9320         T: (816) 994-7500
F: (703) 682-9321         F: (816) 994-7507

* *Admitted pro hac vice*

*Attorneys for Plaintiffs*

# EXHIBIT A

## PLAINTIFFS' MOTION FOR RECONSIDERATION

*Ruth Herbel, et al. v. City of Marion, Kansas, et al.*

## THE 8TH JUDICIAL DISTRICT OF MARION COUNTY, KANSAS

***IN RE: SEARCH WARRANT FOR***: the premises commonly known as 1768 Upland Marion, Marion County, Kansas. The premise is described as a single wide trailer private residence with red painted wood type siding and white painted skirting. The residence has a small wooden porch with stairs leading to the front door that faces West.

### APPLICATION FOR SEARCH WARRANT

**State of Kansas, Marion County, ss:**

Gideon Cody, of lawful age, after first being duly sworn on oath, on information and belief states:

Affiant has probable cause to believe and does believe that an offense against the laws of the State of Kansas, **K.S.A. 21-6107 Identity Theft** (obtained and possessed personal identifying information and document containing the same belonging to another person with the intent to subject that person to economic or bodily harm.) has been committed and that certain contraband, fruits, instrumentalities, and evidence of such offense are located in or upon the above-described person, place, thing or means of conveyance. Those items are as follows:

1. Forensically process and analyze in a controlled setting all listed electronic media, for the purpose of viewing and or retrieving for evidentiary purposes all data including electronic images, documents and stored electronic communications.

2. Digital communications devices allowing access to the Internet or to cellular digital networks which were or have been used to communicate protected Kansas Department of Revenue information.

3. A computer or digital device that has been used to communicate protected Kansas Department of Revenue information

4. Documents and records pertaining to Kari Newell

5. Conduct a preview search of all located digital communications devices and digital storage media to exclude from seizure those which have not been involved in the identity theft, by use of manual or automated preview tools.

6. Digital storage media and the digital content which are, or have been, used to store documents and items of personal information as defined by K.S.A. 21-6107.

Page 1 of 10

| MPD Case # | 23-108 | 1768 Upland SW Affidavit | Chief Gideon |

Ex. A 1

7. Digital software and application software installation and operation media.

8. Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.

9. If computers or other digital devices are found in a running state, the investigator may acquire evidence from the devices prior to shutting the devices off. This acquisition may take several hours depending on the volume of data. This will include the contents of volatile memory related to computers and other digital communication devices that would tend to show the current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details necessary to preserve the true state of running evidence.

10. Manuals and other documents (whether digital or written) which describe operation of items or software seized.

11. Items containing or displaying passwords, access codes, usernames, or other identifiers necessary to examine or operate items, software or information seized.

12. Correspondence or other documents (whether digital or written) pertaining to Kari Newell

13. Items or digital information that would tend to establish ownership or use of computers and Internet access equipment and ownership or use of any Internet service accounts and cellular digital networks to participate in the identity theft of Kari Newell.

14. Items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements, and other identification documents.

15. Pictures of the exterior and interior of the premises.


*That the basis of affiant's probable cause is:*

I, Gideon Cody, of lawful age, being first duly sworn on oath, state:

Affiant is the Chief of Police with Marion Kansas Police Department. I began my law enforcement career in June of 1999 and worked as a police officer for the Kansas City Missouri Police Department. I completed the requirements for basic law enforcement training at the Kansas City Missouri Police Department and certified in the State of Missouri as a police officer and currently hold my provisional Law Enforcement certification with the state of Kansas. My law enforcement career included training in judicial custody, juvenile interrogation, crime scene processing and investigation, narcotics investigation, county and municipal offense investigation,

| MPD Case # | 23-108 | 1768 Upland SW Affidavit | Chief Gideon |

**Ex. A 2**

interrogation processes, DWI investigation, accident investigation, and fraud and counterfeiting. As a commander with the Kansas City Missouri Police Department I was in charge of investigations units.  I have investigated several cases of identity theft and fraud.

Affiant is assisted in this investigation by Detective Aaron Christner with the Marion County, KS Sheriff's Office.  Detective Christner was first a patrol deputy starting in February 2019 and worked as a police officer at Anthony, KS Police Department from June 2016 to June 2018. Detective Christner completed the requirements for basic law enforcement training at the Kansas Law Enforcement Training Center (KLETC), September 30, 2016 and is a certified Law Enforcement Officer in the State of Kansas.  Detective Christner has attended The Vital Role of Preservation Letters in Investigations training from the National White-Collar Crime Center (NW3C) and Basic Internet Investigations from KLETC. Detective Christner has completed the Obtaining & Understanding Cloud-Based Evidence training at KLETC in June 2022. Detective Christner has also been a co-instructor for the Obtaining & Understanding Cloud-Based Evidence training through KLETC. Detective Christner has also attended the Introduction and Basic Courses for osTriage in 2023.  Detective Christner has also completed the FBI First Responder Course as part of the Cyber Investigator Certificate Program in November 2022. While working as a law enforcement officer, Detective Christner is an affiliate with the Internet Crimes Against Children Task Force.  As a member of the Task Force Detective Christner conducts investigations involving electronic storage and sharing of child sexual exploitation material via computers, electronic devices and the internet.

During the investigation, your Affiant has learned and been advised of the following:

## SEARCH AND SEIZURE

Affiant knows from training and experienced Detectives that searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.  The search of a computer system is an exacting scientific procedure, which is designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction, both from external sources and from destructive code imbedded in the system as a "booby trap", the controlled environment of a laboratory is essential to its complete and accurate analysis.

Affiant knows from experienced Detectives that searches and seizures of evidence from computers and other Internet access devices require law enforcement to seize most or all electronic items (hardware, software, passwords, and instructions) to be processed later by a qualified digital evidence expert in a controlled environment.  Digital storage media may include but is not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical, solid state or mechanical storage which can be accessed by computers or other electronic devices to store or retrieve data or images, which can store the equivalent of thousands of pages of information. Users may store information in random order with deceptive file names, which requires searching authorities to

Page 3 of 10

examine all the stored data to determine whether it is included in the warrant. This sorting process renders it impractical to attempt this kind of data search on site.

Affiant knows from experienced Detectives that computers and other digital communications devices contain volatile memory that contains information only while the device is in a powered on and/or running state. Your affiant knows that powering off the device may result in the loss of the volatile information. Your affiant also knows that adding an external evidence storage device will cause minor changes to the state of the computer but will allow for the best effort in fully capturing the state of the running evidence. Your affiant knows that this capture of information requires technical expertise to ensure the resulting data can be examined by all subsequent investigators. Your affiant knows that this captured information may include current and recent use of the computer, use of encryption, use of other communications devices, routers of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details relevant to use the system.

Affiant knows from training and experienced Detectives that when entering businesses, that it is common to find multiple devices capable of accessing or storing evidence. It is common to encounter devices which may be used by persons other than the person(s) suspected of identity theft. Due to the large number of devices that may be on the premise, your affiant knows that law enforcement officers can conduct a preview of these devices on scene. This preview can be conducted in a manner which preserves the integrity of the device and its digital information. This preview can be conducted either manually or by use of automated preview tools, such as OS Triage, TUX 4N6 (TUX Forensics) or Internet Evidence Finder. This preview can be accomplished in as little as a few minutes and will allow investigators to release certain items at the scene.

Affiant knows from training and experienced Detectives that in order to fully retrieve data from a computer or other digital communications system the analyst needs all storage media as well as the storage devices. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware access software or drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as documentation, items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software.

Affiant knows from training and experienced Detectives that files related to identity theft on computers and other digital communications devices are usually obtained from the Internet or from cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the method of location or creation of the, search terms used, exchange, transfer, distribution, possession or origin of the files.

Affiant knows from training and experienced Detectives that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

Page 4 of 10

| MPD Case #    23-108 | 1768 Upland SW Affidavit | Chief Gideon |
|---|---|---|

**Ex. A 4**

Affiant knows from training and experienced Detectives that computers or other digital devices used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the device as well as ownership and use of Internet service accounts used for the Internet or cellular data network access.

Affiant knows from training and experienced Detectives that digital crime scenes usually include items or digital information that would tend to establish ownership or use of digital devices and Internet access equipment and ownership or use of any Internet service or digital cellular service accounts used to participate in identity theft.

Affiant knows from training and experienced Detectives that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## DETAILS OF THE INVESTIGATION:

That since this Affidavit is being submitted for the limited purpose of securing a search warrant; the Affiant has not included each and every fact known concerning this investigation.

On Tuesday August 1, 2023 at or around 1500 hours I attended a meet-and-greet at Kari's Kitchen located at 301 E Santa Fe Marion, Marion County, Kansas 66861. Marion County Record publisher Eric Meyer and reporter Phyllis Zorn were present. I was asked by the owner of the business, Kari Newell, to remove Eric and Phyllis because she did not want them in her establishment. I informed Eric and Phyllis of Kari's wishes and they left.

On Friday August 4, 2023 at or around 1851 hours I received an email from Eric Meyer. In the email he states that he received a copy of someone's private Department of Revenue Records. In the email he alleged possible police misconduct regarding how the Department of Revenue Record was obtained.

After reading the email on Monday August 7, 2023 at or around 0610 hours, I then contacted Marion City Administrator, Brogan Jones, and told him that an internal investigation should be conducted. Brogan stated he was aware of the Department of Revenue Record (DOR record) because City Council member, Ruth Herbel, sent him a screenshot via email of the DOR record belonging to Kari Newell. Ruth states in the email that she received the DOR record from Pam

Page 5 of 10

| MPD Case #   23-108 | 1768 Upland SW Affidavit | Chief Gideon |

Maag. Brogan stated Ruth wanted to deny the renewal of Kari's liquor/caterers' license based on the DOR record and that the license was on the City Council Agenda for a meeting the same afternoon. I asked that he forward those emails so that I can continue my investigation.

Later that morning I received the email which was originally from Ruth Herbel. I saw that it contained a screenshot with a Kansas Department of Revenue record addressed to the victim, Kari Newell.

**Brogan Jones M.P.A.**
City Administrator
Office:(620)382-3703
Cell:(620)381-0716
bjones@marionks.net



From: Ruth Herbel <rherbelfamily@gmail.com>
Sent: Friday, August 4, 2023 5:17 PM
To: Brogan Jones <BJones@marionks.net>
Subject: Kari Newell

| MPD Case # | 23-108 | 1768 Upland SW Affidavit | Chief Gideon |

**Ex. A 6**



| MPD Case # | 23-108 | 1768 Upland SW Affidavit | Chief Gideon |

Ex. A 7

I then contacted Kari, she stated she did not know how someone was able to access her mail and she gave no one permission to obtain, access, or open her private mail.

My investigation revealed the letter was not stolen from her mailbox, rather it was downloaded directly from the Department of Revenue.

I again contacted the victim, she stated that she did not download or authorize anyone to download any information from the Department of Revenue and someone obviously stole her identity.

In the Marion Record Newspaper with a publish date of August 9, 2023, there is an article written by Eric Meyer. The article is titled "Restaurateur accuses paper, councilwoman". In the article Eric Meyer discusses Kari Newell accusing the Marion Record of illegally obtaining her DOR information. Eric Meyer states "the information actually provided by a "source" who contacted Marion Record via social media and also sent the information to the <u>council member</u>". "It had received the material from someone who had bragged about retaining connections despite no longer working in law enforcement". The third paragraph in the article states, "After verifying that the information was accurate and had been obtained, as the source claimed from a public website, the Record decided not to publish it" The article publication reads that a councilwoman received the information. It corroborates a witness statement that Ruth Herbel obtained protected Kansas Department of Revenue information via social networking where she identifies Pam Maag who is married to a retired Roger Maag from the Kansas Highway Patrol.

| MPD Case # | 23-108 | 1768 Upland SW Affidavit | Chief Gideon |

Ex. A 8

From: Brogan Jones <BJones@marionks.net>
Date: August 4, 2023 at 4:44:28 PM CDT
To: David Mayfield <d.mayfield@marionks.net>
Cc: Janet Robinson <JRobinson@marionks.net>
Subject: Email from Ruth

I received this from Ruth just earlier. First I want to state that Chief/PD will not be looking into this. Secondly the State is the oversight for this and will conduct all this type of research. We as a city need to stay out of this "hear say" or whatever else you want to call it. We will go forward like any other individual and or business and let the State handle their business.

"Okay, you do know that she has been supposedly convicted of DUI. Maybe Cody could check this out. This information was put on Facebook Wednesday by one of her close friends, Pam Maag, who I think is the wife of Roger Maag, who was or is a highway patrolman. I sent Pam an PM to see if I could find out more."

Just let me know if any questions.

Brogan Jones M.P.A.
City Administrator
Office:(620)382-3703
Cell:(620)381-0716

City Administrator Brogan Jones stated Ruth wanted to deny the renewal of Kari's liquor/caterers' license based on the DOR record and that the license was on the City Council Agenda for a meeting the same afternoon (08/07/2023).

Pam Maag's address is 1768 Upland, Marion in Marion County, KS according to Kansas Department of Revenue records.

I believe that certain contraband, fruits, instrumentalities, and evidence of **K.S.A. 21-6107 - Identity theft** and **K.S.A. 21-6002** .

| MPD Case # | 23-108 | 1768 Upland SW Affidavit | Chief Gideon |

## FURTHER AFFIANT SAITH NOT

WHEREFORE, Affiant prays that a search warrant be issued, according to law, to search for, apprehend and seize, the above-described items, if any there be, holding them to be dealt with according to law.

_____
Chief Gideon Cody, Affiant

SUBSCRIBED and SWORN to before me this _____ day of _____ 20_____.

_____
Notary

**Page 10 of 10**

| MPD Case #    23-108 | 1768 Upland SW Affidavit | Chief Gideon |

000010

Ex. A 10

## THE 8TH JUDICIAL DISTRICT OF MARION COUNTY, KANSAS

*IN RE: SEARCH WARRANT FOR*: the premises commonly known as 1768 Upland Marion, Marion County, Kansas.  The premise is described as a single wide trailer private residence with red painted wood type siding and white painted skirting. The residence has a small wooden porch with stairs leading to the front door that faces West.

## SEARCH WARRANT

**State of Kansas, Marion County, SS:**

THE STATE OF KANSAS TO:

      Chief Gideon Cody, Marion Police Department, or any peace officer of the State of Kansas.

      Having evidence under oath before me from which I find there is probable cause to believe that an offense against the laws of the State of Kansas, including but not limited to violations of **K.S.A. 21-6107 - Identity theft** and **K.S.A. 21-5839 - Unlawful acts concerning computers**, has been committed and that certain contraband, fruits, instrumentalities and evidence of such offense, to-wit:

1. Forensically process and analyze in a controlled setting all listed electronic media, for the purpose of viewing and or retrieving for evidentiary purposes all data including electronic images, documents and stored electronic communications.

2. Digital communications devices allowing access to the Internet or to cellular digital networks which were or have been used to access the Kansas Department of Revenue records website.

3. A computer or digital device that has been used to access the Kansas Department of Revenue records website.

4. Documents and records pertaining to Kari Newell

5. Conduct a preview search of all located digital communications devices and digital storage media to exclude from seizure those which have not been involved in the identity theft, by use of manual or automated preview tools.

6. Digital storage media and the digital content which are, or have been, used to store documents and items of personal information as defined by K.S.A. 21-6107.

7. Digital software and application software installation and operation media.

Page 1 of 4

| MPD Case # | 23-108 | 1768 Upland SW | Chief Gideon Cody |
| --- | --- | --- | --- |

Ex. A 11

8.  Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.

9.  If computers or other digital devices are found in a running state, the investigator may acquire evidence from the devices prior to shutting the devices off.  This acquisition may take several hours depending on the volume of data.  This will include the contents of volatile memory related to computers and other digital communication devices that would tend to show the current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details necessary to preserve the true state of running evidence.

10.  Manuals and other documents (whether digital or written) which describe operation of items or software seized.

11.  Items containing or displaying passwords, access codes, usernames, or other identifiers necessary to examine or operate items, software or information seized.

12.  Correspondence or other documents (whether digital or written) pertaining to Kari Newell

13.  Items or digital information that would tend to establish ownership or use of computers and Internet access equipment and ownership or use of any Internet service accounts and cellular digital networks to participate in the identity theft of Kari Newell.

14.  Items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements, and other identification documents.

15.  Pictures of the exterior and interior of the premises.

The items listed in the Application for Search Warrant and the affidavit of probable cause are incorporated herein by reference and are located in or upon the above-described persons, places, things or means of conveyance.

**YOU ARE THEREFORE COMMANDED** forthwith to search the persons, place, thing, or means of conveyance herein before specified for such items holding them to be dealt with according to law and make due return of this warrant within (10) days of the date hereof.

Page 2 of 4

| | MPD Case # | 23-108 | 1768 Upland SW | Chief Gideon Cody |

**Ex. A 12**

Issued this _____day of _____, 20____ at _____o'clock _____M.

_____
**JUDGE**, District Court, Marion County Kansas

## **RETURN**

I received this warrant on the _____ day of _____, 20_____, at approximately _____ o'clock _____.m., and executed the same on the _____ day of

Page 3 of 4

| MPD Case # | 23-108 | 1768 Upland SW | Chief Gideon Cody |

Ex. A 13

_____, 20\_\_\_\_, by seizing the property described on the inventory and receipt attached hereto or shown on the reverse side hereof.

OFFICER SUPERVISING SEARCH

_____

TITLE:_____

| MPD Case # | 23-108 | 1768 Upland SW | Chief Gideon Cody |

**Ex. A 14**

000014

| ☒ INITIAL   ☐ DELETE | **KANSAS STANDARD OFFENSE REPORT** | PAGE  1   OF |
| ☐ MODIFY   ☐ ADD | FRONT PAGE OPEN PUBLIC RECORD | |

| ☐ ON VIEW   ☐ DISPATCHED | NAME OF AGENCY | KS AGENCY ORI NUMBER | CASE NUMBER |
| ☐ CITIZEN | Marion Police Department | KS0580200 | 23-109 |

**I N C I D E N T**

| DATE OFFENSE STARTED (MMDDCCYY) | TIME (HHMM) | DATE OFFENSE ENDED (MMDDCCYY) | TIME (HHMM) | DATE OF REPORT (MMDDCCYY) |
| 08/04/2023 | 00:00 | 08/07/2023 | 19:00 | 08/08/2023 |

| EXCEPTIONAL CLEARANCE DATE (MMDDCCYY) | EXCEPTIONAL CLEARANCE | A. ☐ DEATH OF OFFENDER | B. ☐ PROSECUTION DENIED | C. ☐ EXTRADITION DENIED |
| | | D. ☐ VICTIM REFUSES TO TESTIFY | E. ☐ JUVENILE - NO CUSTODY | N. ☒ NOT APPLICABLE |

| LOCATION OF OFFENSE | REPORT AREA | TIME REPORTED | TIME ARRIVED | TIME CLEARED |
| 301 E Santa Fe Marion KS 66861 | | 06:10 | 06:10 | 19:00 |

| CHAPTER   SECTION   SUB 1   SUB 2 | ☐ ATTEMPTED | AID / ABET ☐ CONSPIRACY | CHAPTER   SECTION   SUB 1   SUB 2 | ☐ ATTEMPTED | AID / ABET ☐ CONSPIRACY |
| 21-6107(b)(1) | ☒ COMPLETED | ☐ SOLICITATION | 21-5909(a2)(A)(c1) | ☒ COMPLETED | ☐ SOLICITATION |

| DESCRIPTION | DESCRIPTION |
| Identity fraud; Use/supplying to obtain documenain with personal info | Intimidation of witness or victim; Prevent reporting of victimization |

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY F. ☐ FORCE N. ☐ NO FORCE | PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY F. ☐ FORCE N. ☐ NO FORCE |
| 08 | 88 | | | | 08 | 88 | | | |

**O F F E N S E  #  1**

TYPE OF THEFT
M. ☐ COIN MACHINE   E. ☐ EMBEZZLEMENT
A. ☐ FROM BUILDING   T. ☐ POSS. STOLEN PROP.
A. ☐ M V PARTS & ACC.   V. ☐ MOTOR VEHICLE
S. ☐ SHOPLIFTING   F. ☐ THEFT FROM M V
P. ☐ POCKET-PICKING   O. ☐ ALL OTHER
S. ☐ PURSE SNATCHING   N. ☐ NOT APPLICABLE

TYPE OF FORCE / WEAPON
11. ☐ FIREARM   ☐ AUTO
12. ☐ HANDGUN   ☐ AUTO
13. ☐ RIFLE   ☐ AUTO
14. ☐ SHOTGUN   ☐ AUTO
15. ☐ OTHER   ☐ AUTO
       FIREARM
20. ☐ KNIFE / CUT INSTR.
30. ☐ BLUNT OBJECT
35. ☐ MOTOR VEHICLE
40. ☐ PERSONAL WEAPON
50. ☐ POISON
60. ☐ EXPLOSIVE
65. ☐ FIRE / INCID / DEVICE
70. ☐ DRUGS / NARC.
85. ☐ ASPHYXIATION
90. ☐ OTHER
95. ☐ UNKNOWN
99. ☐ NONE

OFFENDER SUSPECTED OF USING (SELECT UP TO 3)
A. ☐ ALCOHOL   D. ☐ DRUG / NARCOTICS
C. ☐ COMPUTER EQUIP.   N. ☒ NOT APPLICABLE

TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)
B. ☐ BUYING / RECEIVING   T. ☐ TRANSIT/TRANSMIT IMPORT
C. ☐ CULT / MANU / PUBL   U. ☐ USING/CONSUMING
D. ☐ DIST / SELLING   J. ☐ JUVENILE GANG
E. ☐ EXPLOIT. CHILDREN   G. ☐ OTHER GANG
O. ☐ OPER/PROMOTE   N. ☐ NO GANG INVOLVEMENT
P. ☐ POSSESS / CONCEAL   ASSIST

LOCAL CODE

**O F F E N S E  #  2**

TYPE OF THEFT
M. ☐ COIN MACHINE   E. ☐ EMBEZZLEMENT
A. ☐ FROM BUILDING   T. ☐ POSS. STOLEN PROP.
A. ☐ M V PARTS & ACC.   V. ☐ MOTOR VEHICLE
S. ☐ SHOPLIFTING   F. ☐ THEFT FROM M V
P. ☐ POCKET-PICKING   O. ☐ ALL OTHER
S. ☐ PURSE SNATCHING   N. ☒ NOT APPLICABLE

TYPE OF FORCE / WEAPON
11. ☐ FIREARM   ☐ AUTO
12. ☐ HANDGUN   ☐ AUTO
13. ☐ RIFLE   ☐ AUTO
14. ☐ SHOTGUN   ☐ AUTO
15. ☐ OTHER   ☐ AUTO
       FIREARM
20. ☐ KNIFE / CUT INSTR.
30. ☐ BLUNT OBJECT
35. ☐ MOTOR VEHICLE
40. ☐ PERSONAL WEAPON
50. ☐ POISON
60. ☐ EXPLOSIVE
65. ☐ FIRE / INCID / DEVICE
70. ☐ DRUGS / NARC.
85. ☐ ASPHYXIATION
90. ☐ OTHER
95. ☐ UNKNOWN
99. ☒ NONE

OFFENDER SUSPECTED OF USING (SELECT UP TO 3)
A. ☐ ALCOHOL   D. ☐ DRUG / NARCOTICS
C. ☐ COMPUTER EQUIP.   N. ☒ NOT APPLICABLE

TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)
B. ☐ BUYING / RECEIVING   T. ☐ TRANSIT/TRANSMIT IMPORT
C. ☐ CULT / MANU / PUBL   U. ☐ USING/CONSUMING
D. ☐ DIST / SELLING   J. ☐ JUVENILE GANG
E. ☐ EXPLOIT. CHILDREN   G. ☐ OTHER GANG
O. ☐ OPER/PROMOTE   N. ☒ NO GANG INVOLVEMENT
P. ☐ POSSESS / CONCEAL   ASSIST

LOCAL CODE

**V I C T I M  #  1**

| TYPE OF VICTIM | | VICTIM OF OFFENSE NUMBER |
| I. ☒ INDIVIDUAL   S. ☐ SOCIETY / PUBLIC   R. ☐ RELIGIOUS ORGANIZATION   O. ☐ OTHER | | 1. ☒   2. ☒   3. ☐   4. ☐   5. ☐   6. ☐   7. ☐   8. ☐   9. ☐   10. ☐ |
| B. ☐ BUSINESS   F. ☐ FINANCIAL INSTITUTION   G. ☐ GOVERNMENT   U. ☐ UNKNOWN | | |

| NAME: LAST | FIRST | MIDDLE |
| Newell | Kari | Anne |

| ADDRESS: STREET | CITY | STATE | ZIP |
| 301 E Santa Fe | Marion | KS | 66861 |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | DATE OF BIRTH (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
| | W | F | N | R | 45 | 08/13/1977 | 502 | 155 | | HAZ |

| DRIVERS LICENSE NUMBER | DL STATE | EMPLOYER / SCHOOL |
| K01255505 | KS | |

| TELEPHONE NUMBER (WORK/SCHOOL) | ADDRESS: STREET | CITY | STATE | ZIP |
| | | | | |

| CIRCUM. AGG ASLT/BATTERY (MAX 2) | VICTIMS RELATIONSHIP TO CORRESPONDING SUSPECT NUMBER (INDICATE ALL SUSPECTS) | TYPE OF INJURY ( MAX 5) |
| | 1. AQ   2. AQ   3. AQ   4. AQ   5.   6.   7.   8.   9.   10. | 1.   2.   3.   4.   5. |

| ☐ RP | NAME: LAST | FIRST | MIDDLE | ADDRESS: STREET | CITY | STATE | ZIP |
| ☐ DC | | | | | | | |
| ☐ W | TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES./N- RES. | AGE | DATE OF BIRTH (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
| ☐ O | EMPLOYER/SCHOOL | | | ADDRESS: STREET | CITY | STATE ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |

**P R O P. D E S C**

| TYPE LOSS | PROPERTY / DRUG CODE | DESCRIPTION / SUSPECTED DRUG TYPE | ESTIMATED QUANTITY | FRACTION | TYPE DRUG MEASURE | VALUE | DATE RECOVERED |
| | | | | | | | |

| REPORTING OFFICER | BADGE # | DATE | COPIES TO | PROPERTY TOTAL |
| G. Cody | 200 | 08/08/2023 | | |

Ex. A 15

# CRIMINAL INVESTIGATION RECORD / NOT AN OPEN PUBLIC RECORD

| KS AGENCY ORI NUMBER<br>KS0580200 | CASE NUMBER<br>23-109 | DATE OF REPORT (MMDDCCYY)<br>08/08/2023 | PAGE 5 OF |
|---|---|---|---|

### METHOD

**INSTRUMENT USED FOR ENTRY:**
1. ☐ KEY    5. ☐ BOLT CUTTER    9. ☐ THROWN OBJECT
2. ☐ PRY TOOL    6. ☐ CHOPPING TOOL    10. ☐ OTHER
3. ☐ SAW / DRILL    7. ☐ VICE GRIPS    11. ☒ NOT APPLICABLE
4. ☐ HAMMER    8. ☐ PHYSICAL FORCE

**POINT OF ENTRY**
9. ☒ NOT APPLICABLE
1. ☐ FRONT    2. ☐ REAR
3. ☐ SIDE    4. ☐ ROOF

**POINT OF EXIT**
9. ☒ NOT APPLICABLE
1. ☐ FRONT    2. ☐ REAR
3. ☐ SIDE    4. ☐ ROOF

**PREMISE NEIGHBORHOOD**
R. ☐ RURAL / FARM / AGRICULTURE
S. ☐ SUBURBAN / RESIDENCE
B. ☐ URBAN / BUSINESS / COMMERCIAL
U. ☐ UNINHABITED

**SAFE ENTERED**
1. ☐ YES    3. ☐ ATTEMPTED    5. ☐ PEELED    7. ☐ COMBINATION KNOWN
2. ☐ NO    4. ☐ REMOVED    6. ☐ EXPLODED    8. ☐ NOT APPLICABLE

**INCIDENT ACTIVITY**
G. ☐ GANG RELATED
C. ☐ DOMESTIC VIOLENCE CHILDREN PRESENT
D. ☐ DOMESTIC VIOLENCE

S. ☐ DRIVE BY SHOOTING
J. ☐ CAR JACKING
N. ☒ NOT APPLICABLE

### SUSPECT # 2

| NAME: LAST<br>Herbel | FIRST<br>Ruth | MIDDLE<br>Cornelia |
|---|---|---|

| ADDRESS: STREET<br>611 S Freeborn | CITY<br>Marion | STATE<br>KS | ZIP<br>66861 |
|---|---|---|---|

| TELEPHONE NUMBER (HOME ) | RACE<br>W | SEX<br>F | ETHNICITY<br>N | RES. / N- RES.<br>R | AGE<br>80 | D.O.B. (MMDDCCYY)<br>01/30/1943 | HEIGHT<br>506 | WEIGHT<br>235 | HAIR | EYES<br>GRN |
|---|---|---|---|---|---|---|---|---|---|---|

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|

MONIKERS/ALIAS

ADDITIONAL SUSPECT DESCRIPTORS

| SUSPECT VEHICLE: | MAKE | YEAR | MODEL | COLOR | VEHICLE STYLE |
|---|---|---|---|---|---|

| LICENSE NUMBER | YEAR | STATE | VEHICLE IDENTIFICATION NUMBER | OTHER |
|---|---|---|---|---|

### SUSPECT #

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|

| ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|

MONIKERS/ALIAS

ADDITIONAL SUSPECT DESCRIPTORS

| SUSPECT VEHICLE: | MAKE | YEAR | MODEL | COLOR | VEHICLE STYLE |
|---|---|---|---|---|---|

| LICENSE NUMBER | YEAR | STATE | VEHICLE IDENTIFICATION NUMBER | OTHER |
|---|---|---|---|---|

**EVIDENCE INFORMATION**
☐ NONE    ☐ SUBMITTED    ☐ RETAINED BY VICTIM    ☐ RETAINED BY OFFICER    ☐ RETAINED BY INVESTIGATIVE AGENCY    ☐ TRANSFER TO OTHER AGENCY
☐ OTHER

**EVIDENCE OBTAINED**
☐ LATENT PRINTS    ☐ WEAPONS / TOOLS    ☐ SEXUAL ASSAULT KIT    ☐ STAINS    ☐ SEMEN    ☐ DRUGS
☐ OTHER PRINTS    ☐ PHOTOS    ☐ HAIR    ☐ BLOOD    ☐ DOCUMENTS    ☐ ALCOHOL
☐ OTHER

| EVIDENCE COLLECTOR | LOCATION STORED |
|---|---|

DESCRIBE BRIEFLY HOW OFFENSE WAS COMMITTED

**Ex. A 16**

# KANSAS STANDARD OFFENSE REPORT
## FRONT PAGE OPEN PUBLIC RECORD

PAGE 7 OF

| ☒ INITIAL | ☐ DELETE |
|---|---|
| ☐ MODIFY | ☐ ADD |

| ☐ ON VIEW | ☐ DISPATCHED | NAME OF AGENCY | KS AGENCY ORI NUMBER | CASE NUMBER |
| ☐ CITIZEN | | Marion Police Department | KS0580200 | 23-109 |

### INCIDENT

| DATE OFFENSE STARTED (MMDDCCYY) | TIME (HHMM) | DATE OFFENSE ENDED (MMDDCCYY) | TIME (HHMM) | DATE OF REPORT (MMDDCCYY) |
|---|---|---|---|---|
| 08/04/2023 | 00:00 | 08/07/2023 | 19:00 | 08/08/2023 |

| EXCEPTIONAL CLEARANCE DATE (MMDDCCYY) | EXCEPTIONAL CLEARANCE | A. ☐ DEATH OF OFFENDER  D. ☐ VICTIM REFUSES TO TESTIFY | B. ☐ PROSECUTION DENIED  E. ☐ JUVENILE - NO CUSTODY | C. ☐ EXTRADITION DENIED  N. ☒ NOT APPLICABLE |
|---|---|---|---|---|

| LOCATION OF OFFENSE | REPORT AREA | TIME REPORTED | TIME ARRIVED | TIME CLEARED |
|---|---|---|---|---|
| 301 E Santa Fe Marion KS 66861 | | 06:10 | 06:10 | 19:00 |

### OFFENSE # 7

| CHAPTER | SECTION | SUB 1 | SUB 2 | ☐ ATTEMPTED  ☒ COMPLETED | ☐ AID / ABET CONSPIRACY SOLICITATION |
|---|---|---|---|---|---|
| 21-6107 | | | | | |

DESCRIPTION
Identity theft

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY F. ☐ FORCE  N. ☐ NO FORCE |
|---|---|---|---|---|
| 08 | | 88 | | |

TYPE OF THEFT
- M. ☐ COIN MACHINE
- A. ☐ FROM BUILDING
- A. ☐ M V PARTS & ACC.
- L. ☐ SHOPLIFTING
- P. ☐ POCKET-PICKING
- S. ☐ PURSE SNATCHING
- E. ☐ EMBEZZLEMENT
- V. ☐ POSS. STOLEN PROP.
- V. ☐ MOTOR VEHICLE
- F. ☐ THEFT FROM M V
- O. ☐ ALL OTHER
- N. ☐ NOT APPLICABLE

TYPE OF FORCE / WEAPON
- 11. ☐ FIREARM ☐ AUTO
- 12. ☐ HANDGUN ☐ AUTO
- 13. ☐ RIFLE ☐ AUTO
- 14. ☐ SHOTGUN ☐ AUTO
- 15. ☐ OTHER FIREARM ☐ AUTO
- 20. ☐ KNIFE / CUT INSTR.
- 30. ☐ BLUNT OBJECT
- 35. ☐ MOTOR VEHICLE
- 40. ☐ PERSONAL WEAPON
- 50. ☐ POISON
- 60. ☐ EXPLOSIVE
- 65. ☐ FIRE / INCID / DEVICE
- 70. ☐ DRUGS / NARC.
- 85. ☐ ASPHYXIATION
- 90. ☐ OTHER
- 95. ☐ UNKNOWN
- 99. ☐ NONE

OFFENDER SUSPECTED OF USING (SELECT UP TO 3)
- A. ☐ ALCOHOL
- C. ☐ COMPUTER EQUIP.
- D. ☐ DRUG / NARCOTICS
- N. ☒ NOT APPLICABLE

TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)
- B. ☐ BUYING / RECEIVING
- C. ☐ CULT / MANU / PUBL
- D. ☐ DIST / SELLING
- E. ☐ EXPLOIT. CHILDREN
- O. ☐ OPER/PROMOTE ASSIST
- P. ☐ POSSESS / CONCEAL
- T. ☐ TRANS/TRANSMIT IMPORT
- U. ☐ USING/CONSUMING
- J. ☐ JUVENILE GANG
- G. ☐ OTHER GANG
- N. ☐ NO GANG INVOLVEMENT

LOCAL CODE

### OFFENSE # 8

| CHAPTER | SECTION | SUB 1 | SUB 2 | ☐ ATTEMPTED  ☒ COMPLETED | ☐ AID / ABET CONSPIRACY SOLICITATION |
|---|---|---|---|---|---|
| 21-6101(a)(1)(b1) | | | | | |

DESCRIPTION
Breach of privacy; intercept message without consent

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY F. ☐ FORCE  N. ☐ NO FORCE |
|---|---|---|---|---|
| 08 | | 88 | | |

TYPE OF THEFT
- M. ☐ COIN MACHINE
- A. ☐ FROM BUILDING
- A. ☐ M V PARTS & ACC.
- L. ☐ SHOPLIFTING
- P. ☐ POCKET-PICKING
- S. ☐ PURSE SNATCHING
- E. ☐ EMBEZZLEMENT
- V. ☐ POSS. STOLEN PROP.
- V. ☐ MOTOR VEHICLE
- F. ☐ THEFT FROM M V
- O. ☐ ALL OTHER
- N. ☐ NOT APPLICABLE

TYPE OF FORCE / WEAPON
- 11. ☐ FIREARM ☐ AUTO
- 12. ☐ HANDGUN ☐ AUTO
- 13. ☐ RIFLE ☐ AUTO
- 14. ☐ SHOTGUN ☐ AUTO
- 15. ☐ OTHER ☐ AUTO
- 20. ☐ KNIFE / CUT INSTR.
- 30. ☐ BLUNT OBJECT
- 35. ☐ MOTOR VEHICLE
- 40. ☐ PERSONAL WEAPON
- 50. ☐ POISON
- 60. ☐ EXPLOSIVE
- 65. ☐ FIRE / INCID / DEVICE
- 70. ☐ DRUGS / NARC.
- 85. ☐ ASPHYXIATION
- 90. ☐ OTHER
- 95. ☐ UNKNOWN
- 99. ☐ NONE

OFFENDER SUSPECTED OF USING (SELECT UP TO 3)
- A. ☐ ALCOHOL
- C. ☐ COMPUTER EQUIP.
- D. ☐ DRUG / NARCOTICS
- N. ☒ NOT APPLICABLE

TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)
- B. ☐ BUYING / RECEIVING
- C. ☐ CULT / MANU / PUBL
- D. ☐ DIST / SELLING
- E. ☐ EXPLOIT. CHILDREN
- O. ☐ OPER/PROMOTE ASSIST
- P. ☐ POSSESS / CONCEAL
- T. ☐ TRANS/TRANSMIT IMPORT
- U. ☐ USING/CONSUMING
- J. ☐ JUVENILE GANG
- G. ☐ OTHER GANG
- N. ☐ NO GANG INVOLVEMENT

LOCAL CODE

### VICTIM # 1

TYPE OF VICTIM
- I. ☒ INDIVIDUAL
- B. ☐ BUSINESS
- S. ☐ SOCIETY / PUBLIC
- F. ☐ FINANCIAL INSTITUTION
- R. ☐ RELIGIOUS ORGANIZATION
- G. ☐ GOVERNMENT
- O. ☐ OTHER
- U. ☐ UNKNOWN

VICTIM OF OFFENSE NUMBER
1. ☒  2. ☒  3. ☐  4. ☐  5. ☐  6. ☐  7. ☐  8. ☒  9. ☐  10. ☐

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| Newell | Kari | Anne |

| ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|
| 301 E Santa Fe | Marion | KS | 66861 |

| TELEPHONE NUMBER (HOME) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | DATE OF BIRTH (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | W | F | N | R | 45 | 08/13/1977 | 502 | 155 | | HAZ |

| DRIVERS LICENSE NUMBER | DL STATE | EMPLOYER / SCHOOL |
|---|---|---|
| K01255505 | KS | |

| TELEPHONE NUMBER (WORK/SCHOOL) | ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|---|

| CIRCUM. AGG ASLT/BATTERY (MAX 2) | VICTIMS RELATIONSHIP TO CORRESPONDING SUSPECT NUMBER (INDICATE ALL SUSPECTS) | TYPE OF INJURY ( MAX 5) |
|---|---|---|
| | 1. AQ  2. AQ  3. AQ  4. AQ  6.  7.  8.  9.  10. | 1.  2.  3.  4.  5. |

| | NAME: LAST | FIRST | MIDDLE | ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| ☐ RP  ☐ DC  ☐ W  ☐ O | | | | | | | |

| TELEPHONE NUMBER (HOME) | RACE | SEX | ETHNICITY | RES./N- RES. | AGE | DATE OF BIRTH (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE | ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|---|

### PROP. DESC

| TYPE LOSS | PROPERTY / DRUG CODE | DESCRIPTION / SUSPECTED DRUG TYPE | ESTIMATED QUANTITY | FRACTION | TYPE DRUG MEASURE | VALUE | DATE RECOVERED |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| REPORTING OFFICER | BADGE # | DATE | COPIES TO | PROPERTY TOTAL |
|---|---|---|---|---|
| G. Cody | 200 | 08/08/2023 | | |

Ex. A 17

000019

## CRIMINAL INVESTIGATION RECORD / <u>NOT AN OPEN PUBLIC RECORD</u>

| KS AGENCY ORI NUMBER | CASE NUMBER | DATE OF REPORT (MMDDCCYY) | |
|---|---|---|---|
| KS0580200 | 23-109 | 08/08/2023 | PAGE  8  OF |

**M E T H O D**

INSTRUMENT USED FOR ENTRY:
1. ☐ KEY  5. ☐ BOLT CUTTER  9. ☐ THROWN OBJECT
2. ☐ PRY TOOL  6. ☐ CHOPPING TOOL  10. ☐ OTHER
3. ☐ SAW / DRILL  7. ☐ VICE GRIPS  11. ☒ NOT APPLICABLE
4. ☐ HAMMER  8. ☐ PHYSICAL FORCE

POINT OF ENTRY
9. ☒ NOT APPLICABLE
1. ☐ FRONT  2. ☐ REAR
3. ☐ SIDE  4. ☐ ROOF

POINT OF EXIT
9. ☒ NOT APPLICABLE
1. ☐ FRONT  2. ☐ REAR
3. ☐ SIDE  4. ☐ ROOF

PREMISE NEIGHBORHOOD
R. ☐ RURAL / FARM / AGRICULTURE
S. ☐ SUBURBAN / RESIDENCE
B. ☐ URBAN / BUSINESS / COMMERCIAL
U. ☐ UNINHABITED

SAFE ENTERED
1. ☐ YES  3. ☐ ATTEMPTED  5. ☐ PEELED  7. ☐ COMBINATION KNOWN
2. ☐ NO  4. ☐ REMOVED  6. ☐ EXPLODED  8. ☐ NOT APPLICABLE

INCIDENT ACTIVITY
G. ☐ GANG RELATED
C. ☐ DOMESTIC VIOLENCE CHILDREN PRESENT
D. ☐ DOMESTIC VIOLENCE

S. ☐ DRIVE BY SHOOTING
J. ☐ CAR JACKING
N. ☒ NOT APPLICABLE

**S U S P E C T  #  3**

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| Zorn | Phyllis | Jeanette |

| ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|
| 1503 Victory Lane | Marion | KS | 66861 |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | W | F | N | R | 63 | 09/21/1959 | 504 | 183 | | BLU |

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE   ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|
| | | | | |

MONIKERS/ALIAS

ADDITIONAL SUSPECT DESCRIPTORS

| SUSPECT VEHICLE: | MAKE | YEAR | MODEL | COLOR | VEHICLE STYLE |
|---|---|---|---|---|---|
| | | | | | |

| LICENSE NUMBER | YEAR | STATE | VEHICLE IDENTIFICATION NUMBER | OTHER |
|---|---|---|---|---|
| | | | | |

**S U S P E C T  #**

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| | | |

| ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE   ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|
| | | | | |

MONIKERS/ALIAS

ADDITIONAL SUSPECT DESCRIPTORS

| SUSPECT VEHICLE: | MAKE | YEAR | MODEL | COLOR | VEHICLE STYLE |
|---|---|---|---|---|---|
| | | | | | |

| LICENSE NUMBER | YEAR | STATE | VEHICLE IDENTIFICATION NUMBER | OTHER |
|---|---|---|---|---|
| | | | | |

EVIDENCE INFORMATION
☐ NONE  ☐ SUBMITTED  ☐ RETAINED BY VICTIM  ☐ RETAINED BY OFFICER  ☐ RETAINED BY INVESTIGATIVE AGENCY  ☐ TRANSFER TO OTHER AGENCY
☐ OTHER

EVIDENCE OBTAINED
☐ LATENT PRINTS  ☐ WEAPONS / TOOLS  ☐ SEXUAL ASSAULT KIT  ☐ STAINS  ☐ SEMEN  ☐ DRUGS
☐ OTHER PRINTS  ☐ PHOTOS  ☐ HAIR  ☐ BLOOD  ☐ DOCUMENTS  ☐ ALCOHOL
☐ OTHER

| EVIDENCE COLLECTOR | LOCATION STORED |
|---|---|
| | |

DESCRIBE BRIEFLY HOW OFFENSE WAS COMMITTED

**Ex. A 18**

# KANSAS STANDARD OFFENSE REPORT
### FRONT PAGE OPEN PUBLIC RECORD

PAGE _____ OF _____

| | |
|---|---|
| ☒ INITIAL  ☐ DELETE | |
| ☐ MODIFY  ☐ ADD | |

☐ ON VIEW  ☐ DISPATCHED  ☐ CITIZEN

| NAME OF AGENCY | KS AGENCY ORI NUMBER | CASE NUMBER |
|---|---|---|
| Marion Police Department | KS0580200 | 23-109 |

**INCIDENT**

| DATE OFFENSE STARTED (MMDDCCYY) | TIME (HHMM) | DATE OFFENSE ENDED (MMDDCCYY) | TIME (HHMM) | DATE OF REPORT (MMDDCCYY) |
|---|---|---|---|---|
| 08/04/2023 | 00:00 | 08/07/2023 | 19:00 | 08/08/2023 |

| EXCEPTIONAL CLEARANCE DATE (MMDDCCYY) | EXCEPTIONAL CLEARANCE | | |
|---|---|---|---|
| | A. ☐ DEATH OF OFFENDER | B. ☐ PROSECUTION DENIED | C. ☐ EXTRADITION DENIED |
| | D. ☐ VICTIM REFUSES TO TESTIFY | ☐ JUVENILE - NO CUSTODY | N. ☒ NOT APPLICABLE |

| LOCATION OF OFFENSE | REPORT AREA | TIME REPORTED | TIME ARRIVED | TIME CLEARED |
|---|---|---|---|---|
| 301 E Santa Fe Marion KS 66861 | | 06:10 | 06:10 | 19:00 |

**OFFENSE # 10**

| CHAPTER | SECTION | SUB 1 | SUB 2 | |
|---|---|---|---|---|
| 21-6107 | | | | ☐ ATTEMPTED  ☒ COMPLETED  ☐ AID / ABET CONSPIRACY SOLICITATION |

DESCRIPTION: Identity theft

| CHAPTER | SECTION | SUB 1 | SUB 2 | |
|---|---|---|---|---|
| 21-6101(a)(1)(b1) | | | | ☐ ATTEMPTED  ☒ COMPLETED  ☐ AID / ABET CONSPIRACY SOLICITATION |

DESCRIPTION: Breach of privacy; intercept message without consent

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY |
|---|---|---|---|---|
| 08 | | 88 | | F. ☐ FORCE  N. ☐ NO FORCE |

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY |
|---|---|---|---|---|
| 08 | | 88 | | F. ☐ FORCE  N. ☐ NO FORCE |

TYPE OF THEFT (left):
M. ☐ COIN MACHINE  B. ☐ FROM BUILDING  A. ☐ M V PARTS & ACC.  L. ☐ SHOPLIFTING  F. ☐ POCKET-PICKING  S. ☐ PURSE SNATCHING  E. ☐ EMBEZZLEMENT  T. ☐ POSS. STOLEN PROP.  V. ☐ MOTOR VEHICLE  F. ☐ THEFT FROM M V  O. ☐ ALL OTHER  N. ☐ NOT APPLICABLE

TYPE OF FORCE / WEAPON (left):
11. ☐ FIREARM ☐ AUTO  12. ☐ HANDGUN ☐ AUTO  13. ☐ RIFLE ☐ AUTO  14. ☐ SHOTGUN ☐ AUTO  15. ☐ OTHER ☐ AUTO  FIREARM  20. ☐ KNIFE / CUT INSTR.  30. ☐ BLUNT OBJECT  35. ☐ MOTOR VEHICLE  40. ☐ PERSONAL WEAPON  50. ☐ POISON  65. ☐ FIRE / INCID / DEVICE  70. ☐ DRUGS / NARC.  85. ☐ ASPHYXIATION  90. ☐ OTHER  95. ☐ UNKNOWN  99. ☐ NONE

OFFENDER SUSPECTED OF USING (SELECT UP TO 3) (left):
A. ☐ ALCOHOL  D. ☐ DRUG / NARCOTICS  C. ☐ COMPUTER EQUIP.  N. ☒ NOT APPLICABLE

TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3) (left):
B. ☐ BUYING / RECEIVING  T. ☐ TRANS/TRANSMIT IMPORT  C. ☐ CULT / MANU / PUBL  U. ☐ USING/CONSUMING  D. ☐ DIST / SELLING  J. ☐ JUVENILE GANG  E. ☐ EXPLOIT. CHILDREN  G. ☐ OTHER GANG  O. ☐ OPER/PROMOTE ASSIST  N. ☐ NO GANG INVOLVEMENT  P. ☐ POSSESS / CONCEAL

LOCAL CODE (left):

TYPE OF THEFT (right):
M. ☐ COIN MACHINE  B. ☐ FROM BUILDING  A. ☐ M V PARTS & ACC.  L. ☐ SHOPLIFTING  F. ☐ POCKET-PICKING  S. ☐ PURSE SNATCHING  E. ☐ EMBEZZLEMENT  T. ☐ POSS. STOLEN PROP.  V. ☐ MOTOR VEHICLE  F. ☐ THEFT FROM M V  O. ☐ ALL OTHER  N. ☐ NOT APPLICABLE

TYPE OF FORCE / WEAPON (right):
11. ☐ FIREARM ☐ AUTO  12. ☐ HANDGUN ☐ AUTO  13. ☐ RIFLE ☐ AUTO  14. ☐ SHOTGUN ☐ AUTO  15. ☐ OTHER ☐ AUTO  FIREARM  20. ☐ KNIFE / CUT INSTR.  30. ☐ BLUNT OBJECT  35. ☐ MOTOR VEHICLE  40. ☐ PERSONAL WEAPON  50. ☐ POISON  65. ☐ FIRE / INCID / DEVICE  70. ☐ DRUGS / NARC.  85. ☐ ASPHYXIATION  90. ☐ OTHER  95. ☐ UNKNOWN  99. ☐ NONE

OFFENDER SUSPECTED OF USING (SELECT UP TO 3) (right):
A. ☐ ALCOHOL  D. ☐ DRUG / NARCOTICS  C. ☐ COMPUTER EQUIP.  N. ☒ NOT APPLICABLE

TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3) (right):
B. ☐ BUYING / RECEIVING  T. ☐ TRANS/TRANSMIT IMPORT  C. ☐ CULT / MANU / PUBL  U. ☐ USING/CONSUMING  D. ☐ DIST / SELLING  J. ☐ JUVENILE GANG  E. ☐ EXPLOIT. CHILDREN  G. ☐ OTHER GANG  O. ☐ OPER/PROMOTE ASSIST  N. ☐ NO GANG INVOLVEMENT  P. ☐ POSSESS / CONCEAL

LOCAL CODE (right):

**VICTIM # 1**

| TYPE OF VICTIM | | VICTIM OF OFFENSE NUMBER |
|---|---|---|
| I. ☒ INDIVIDUAL  S. ☐ SOCIETY / PUBLIC  R. ☐ RELIGIOUS ORGANIZATION  O. ☐ OTHER  B. ☐ BUSINESS  F. ☐ FINANCIAL INSTITUTION  G. ☐ GOVERNMENT  U. ☐ UNKNOWN | | 1. ☒  2. ☒  3. ☐  4. ☐  5. ☐  6. ☐  7. ☐  8. ☐  9. ☐  10. ☒ |

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| Newell | Kari | Anne |

| ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|
| 301 E Santa Fe | Marion | KS | 66861 |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | DATE OF BIRTH (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | W | F | N | R | 45 | 08/13/1977 | 502 | 155 | | HAZ |

| DRIVERS LICENSE NUMBER | DL STATE | EMPLOYER / SCHOOL |
|---|---|---|
| K01255505 | KS | |

| TELEPHONE NUMBER (WORK/SCHOOL) | ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|---|
| | | | | |

| CIRCUM. AGG ASLT/BATTERY (MAX 2) | VICTIMS RELATIONSHIP TO CORRESPONDING SUSPECT NUMBER (INDICATE ALL SUSPECTS) | TYPE OF INJURY ( MAX 5) |
|---|---|---|
| | 1. AQ  2. AQ  3. AQ  4. AQ  5.  6.  7.  8.  9.  10. | 1.  2.  3.  4.  5. |

☐ RP  ☐ DC  ☐ W  ☐ O

| NAME: LAST | FIRST | MIDDLE | ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| | | | | | | |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES./N- RES. | AGE | DATE OF BIRTH (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE | ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|---|
| | | | | | |

**PROP. DESC**

| TYPE LOSS | PROPERTY / DRUG CODE | DESCRIPTION / SUSPECTED DRUG TYPE | ESTIMATED QUANTITY | FRACTION | TYPE DRUG MEASURE | VALUE | DATE RECOVERED |
|---|---|---|---|---|---|---|---|
| 7 | 0158 | Kansas DOR Record | 1 | | | $0.00 | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| REPORTING OFFICER | BADGE # | DATE | COPIES TO | PROPERTY TOTAL |
|---|---|---|---|---|
| G. Cody | 200 | 08/08/2023 | | **Ex. A 19** |

## CRIMINAL INVESTIGATION RECORD /   NOT AN OPEN PUBLIC RECORD

| KS AGENCY ORI NUMBER | CASE NUMBER | DATE OF REPORT (MMDDCCYY) | |
|---|---|---|---|
| KS0580200 | 23-109 | 08/08/2023 | PAGE     OF |

**METHOD**

INSTRUMENT USED FOR ENTRY:
1. ☐ KEY     5. ☐ BOLT CUTTER     9. ☐ THROWN OBJECT
2. ☐ PRY TOOL     6. ☐ CHOPPING TOOL     10. ☐ OTHER
3. ☐ SAW / DRILL     7. ☐ VICE GRIPS     11. ☒ NOT APPLICABLE
4. ☐ HAMMER     8. ☐ PHYSICAL FORCE

POINT OF ENTRY
9. ☒ NOT APPLICABLE
1. ☐ FRONT     2. ☐ REAR
3. ☐ SIDE     4. ☐ ROOF

POINT OF EXIT
9. ☒ NOT APPLICABLE
1. ☐ FRONT     2. ☐ REAR
3. ☐ SIDE     4. ☐ ROOF

PREMISE NEIGHBORHOOD
R. ☐ RURAL / FARM / AGRICULTURE
S. ☐ SUBURBAN / RESIDENCE
B. ☐ URBAN / BUSINESS / COMMERCIAL
U. ☐ UNINHABITED

SAFE ENTERED
1. ☐ YES     3. ☐ ATTEMPTED     5. ☐ PEELED     7. ☐ COMBINATION KNOWN
2. ☐ NO     4. ☐ REMOVED     6. ☐ EXPLODED     8. ☐ NOT APPLICABLE

INCIDENT ACTIVITY
G. ☐ GANG RELATED
C. ☐ DOMESTIC VIOLENCE CHILDREN PRESENT
D. ☐ DOMESTIC VIOLENCE

S. ☐ DRIVE BY SHOOTING
J. ☐ CAR JACKING
N. ☒ NOT APPLICABLE

**SUSPECT # 4**

| NAME:  LAST | FIRST | MIDDLE |
|---|---|---|
| Maag | Pamela | Marie |

| ADDRESS:  STREET | CITY | STATE | ZIP |
|---|---|---|---|
| 1768 Upland | Marion | KS | 66861 |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N-RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | W | F | N | N | 53 | 01/28/1970 | 506 | 230 | | BLU |

| EMPLOYER/SCHOOL | ADDRESS:  STREET | CITY | STATE   ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|
| | | | | |

MONIKERS/ALIAS

ADDITIONAL SUSPECT DESCRIPTORS

| SUSPECT VEHICLE: | MAKE | YEAR | MODEL | COLOR | VEHICLE STYLE |
|---|---|---|---|---|---|
| | | | | | |

| LICENSE NUMBER | YEAR | STATE | VEHICLE IDENTIFICATION NUMBER | OTHER |
|---|---|---|---|---|
| | | | | |

**SUSPECT #**

| NAME:  LAST | FIRST | MIDDLE |
|---|---|---|
| | | |

| ADDRESS:  STREET | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N-RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| EMPLOYER/SCHOOL | ADDRESS:  STREET | CITY | STATE   ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|
| | | | | |

MONIKERS/ALIAS

ADDITIONAL SUSPECT DESCRIPTORS

| SUSPECT VEHICLE: | MAKE | YEAR | MODEL | COLOR | VEHICLE STYLE |
|---|---|---|---|---|---|
| | | | | | |

| LICENSE NUMBER | YEAR | STATE | VEHICLE IDENTIFICATION NUMBER | OTHER |
|---|---|---|---|---|
| | | | | |

EVIDENCE INFORMATION
☐ NONE     ☐ SUBMITTED     ☐ RETAINED BY VICTIM     ☐ RETAINED BY OFFICER     ☐ RETAINED BY INVESTIGATIVE AGENCY     ☐ TRANSFER TO OTHER AGENCY
☐ OTHER

EVIDENCE OBTAINED
☐ LATENT PRINTS     ☐ WEAPONS / TOOLS     ☐ SEXUAL ASSAULT KIT     ☐ STAINS     ☐ SEMEN     ☐ DRUGS
☐ OTHER PRINTS     ☐ PHOTOS     ☐ HAIR     ☐ BLOOD     ☐ DOCUMENTS     ☐ ALCOHOL
☐ OTHER

| EVIDENCE COLLECTOR | LOCATION STORED |
|---|---|
| | |

DESCRIBE BRIEFLY HOW OFFENSE WAS COMMITTED

**Ex. A 20**

**KANSAS STANDARD OFFENSE SUPPLEMENT REPORT**
FRONT PAGE OPEN PUBLIC RECORD

PAGE 3 OF

| NAME OF AGENCY | KS AGENCY ORI NUMBER | CASE NUMBER |
|---|---|---|
| Marion Police Department | KS0580200 | 23-109 |

| CHAPTER | SECTION | SUB 1 | SUB 2 | ☐ ATTEMPTED ☒ COMPLETED | ☐ AID / ABET ☐ CONSPIRACY ☐ SOLICITATION |
|---|---|---|---|---|---|
| 21-5904 | | | | | |

DESCRIPTION
Interference with LEO; unknown circumstance

| CHAPTER | SECTION | SUB 1 | SUB 2 | ☐ ATTEMPTED ☐ COMPLETED | ☐ AID / ABET ☐ CONSPIRACY ☐ SOLICITATION |
|---|---|---|---|---|---|
| | | | | | |

DESCRIPTION

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY |
|---|---|---|---|---|
| 08 | | 88 | | F. ☐ FORCE  N. ☐ NO FORCE |

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY |
|---|---|---|---|---|
| | | | | F. ☐ FORCE  N. ☐ NO FORCE |

**OFFENSE # 3**

TYPE OF THEFT
M. ☐ COIN MACHINE
B. ☐ FROM BUILDING
A. ☐ M V PARTS & ACC.
L. ☐ SHOPLIFTING
P. ☐ POCKET-PICKING
S. ☐ PURSE SNATCHING
E. ☐ EMBEZZLEMENT
T. ☐ POSS STOLEN PROP.
V. ☐ MOTOR VEHICLE
F. ☐ THEFT FROM M V
O. ☐ ALL OTHER
N. ☐ NOT APPLICABLE

TYPE OF FORCE / WEAPON
11. ☐ FIREARM ☐ AUTO
12. ☐ HANDGUN ☐ AUTO
13. ☐ RIFLE ☐ AUTO
14. ☐ SHOTGUN ☐ AUTO
15. ☐ OTHER ☐ AUTO FIREARM
20. ☐ KNIFE / CUT INSTR.
30. ☐ BLUNT OBJECT
35. ☐ MOTOR VEHICLE
40. ☐ PERSONAL WEAPON
50. ☐ POISON
60. ☐ EXPLOSIVE
65. ☐ FIRE / INCID / DEVICE
70. ☐ DRUGS / NARC.
85. ☐ ASPHYXIATION
90. ☐ OTHER
95. ☐ UNKNOWN
99. ☐ NONE

OFFENDER SUSPECTED OF USING (SELECT UP TO 3)
A. ☐ ALCOHOL
C. ☐ COMPUTER EQUIP.
D. ☐ DRUG / NARCOTICS
N. ☒ NOT APPLICABLE

TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)
B. ☐ BUYING / RECEIVING
C. ☐ CULT / MANU / PUBL
D. ☐ DIST / SELLING
E. ☐ EXPLOIT. CHILDREN
O. ☐ OPER/PROMOTE/ ASSIST
P. ☐ POSSESS / CONCEAL.
T. ☐ TRANS/TRANSMIT/ IMPORT
U. ☐ USING/CONSUMING
J. ☐ JUVENILE GANG
G. ☐ OTHER GANG
N. ☐ NO GANG INVOLVEMENT

LOCAL CODE

**OFFENSE #** (right column, blank)

TYPE OF THEFT
M. ☐ COIN MACHINE
B. ☐ FROM BUILDING
A. ☐ M V PARTS & ACC.
L. ☐ SHOPLIFTING
P. ☐ POCKET-PICKING
S. ☐ PURSE SNATCHING
E. ☐ EMBEZZLEMENT
T. ☐ POSS STOLEN PROP.
V. ☐ MOTOR VEHICLE
F. ☐ THEFT FROM M V
N. ☐ ALL OTHER
N. ☐ NOT APPLICABLE

TYPE OF FORCE / WEAPON
11. ☐ FIREARM ☐ AUTO
12. ☐ HANDGUN ☐ AUTO
13. ☐ RIFLE ☐ AUTO
14. ☐ SHOTGUN ☐ AUTO
15. ☐ OTHER ☐ AUTO FIREARM
20. ☐ KNIFE / CUT INSTR.
30. ☐ BLUNT OBJECT
35. ☐ MOTOR VEHICLE
40. ☐ PERSONAL WEAPON
50. ☐ POISON
60. ☐ EXPLOSIVE
65. ☐ FIRE / INCID / DEVICE
70. ☐ DRUGS / NARC.
85. ☐ ASPHYXIATION
90. ☐ OTHER
95. ☐ UNKNOWN
99. ☐ NONE

OFFENDER SUSPECTED OF USING (SELECT UP TO 3)
A. ☐ ALCOHOL
C. ☐ COMPUTER EQUIP.
D. ☐ DRUG / NARCOTICS
N. ☐ NOT APPLICABLE

TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)
B. ☐ BUYING / RECEIVING
C. ☐ CULT / MANU / PUBL
D. ☐ DIST / SELLING
E. ☐ EXPLOIT. CHILDREN
O. ☐ OPER/PROMOTE/ ASSIST
P. ☐ POSSESS / CONCEAL.
T. ☐ TRANS/TRANSMIT/ IMPORT
U. ☐ USING/CONSUMING
J. ☐ JUVENILE GANG
G. ☐ OTHER GANG
N. ☐ NO GANG INVOLVEMENT

LOCAL CODE

**VICTIM # 2**

TYPE OF VICTIM
I. ☐ INDIVIDUAL
B. ☐ BUSINESS
S. ☒ SOCIETY / PUBLIC
F. ☐ FINANCIAL INSTITUTION
R. ☐ RELIGIOUS ORGANIZATION
G. ☐ GOVERNMENT
O. ☐ OTHER
U. ☐ UNKNOWN

VICTIM OF OFFENSE NUMBER
1. ☐  2. ☐  3. ☒  4. ☐  5. ☐  6. ☐  7. ☐  8. ☐  9. ☐  10. ☐

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| | | |

| ADDRESS: STREET | CITY | STATE  ZIP |
|---|---|---|
| | | |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| DRIVERS LICENSE NUMBER | DL STATE | EMPLOYER / SCHOOL |
|---|---|---|
| | | |

| TELEPHONE NUMBER (WORK/SCHOOL) | ADDRESS: STREET | CITY | STATE  ZIP |
|---|---|---|---|
| | | | |

CIRCUM. AGG ASLT/BATTERY (MAX 2)   1   2
VICTIMS RELATIONSHIP TO CORRESPONDING SUSPECT NUMBER (INDICATE ALL SUSPECTS)   1   2   3   4   5   6   7   8   9   10
TYPE OF INJURY ( MAX 5)   1   2   3   4   5

**VICTIM #** (blank)

TYPE OF VICTIM
I. ☐ INDIVIDUAL
B. ☐ BUSINESS
S. ☐ SOCIETY / PUBLIC
F. ☐ FINANCIAL INSTITUTION
R. ☐ RELIGIOUS ORGANIZATION
G. ☐ GOVERNMENT
O. ☐ OTHER
U. ☐ UNKNOWN

VICTIM OF OFFENSE NUMBER
1. ☐  2. ☐  3. ☐  4. ☐  5. ☐  6. ☐  7. ☐  8. ☐  9. ☐  10. ☐

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| | | |

| ADDRESS: STREET | CITY | STATE  ZIP |
|---|---|---|
| | | |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| DRIVERS LICENSE NUMBER | DL STATE | EMPLOYER / SCHOOL |
|---|---|---|
| | | |

| TELEPHONE NUMBER (WORK/SCHOOL) | ADDRESS: STREET | CITY | STATE  ZIP |
|---|---|---|---|
| | | | |

CIRCUM. AGG ASLT/BATTERY (MAX 2)   1   2
VICTIMS RELATIONSHIP TO CORRESPONDING SUSPECT NUMBER (INDICATE ALL SUSPECTS)   1   2   3   4   5   6   7   8   9   10
TYPE OF INJURY ( MAX 5)   1   2   3   4   5

☐ RP
☐ DC
☐ W
☐ O

| NAME: LAST | FIRST | MIDDLE | ADDRESS: STREET | CITY | STATE  ZIP |
|---|---|---|---|---|---|
| | | | | | |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. /N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE  ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|
| | | | | |

| REPORTING OFFICER | BADGE # | DATE | COPIES TO | |
|---|---|---|---|---|
| G. Cody | 200 | 08/08/2023 | | **Ex. A 21** |

000025

# KANSAS STANDARD OFFENSE SUPPLEMENT REPORT

## BACK PAGE OPEN PUBLIC RECORD

PAGE        OF

| | NAME: LAST | FIRST | MIDDLE | ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|

☐ RP
☐ DC
☐ W
☐ O

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES./N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE | ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|---|

| | NAME: LAST | FIRST | MIDDLE | ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|

☐ RP
☐ DC
☐ W
☐ O

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES./N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE | ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|---|

| | NAME: LAST | FIRST | MIDDLE | ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|

☐ RP
☐ DC
☐ W
☐ O

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES./N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE | ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|---|

TYPE PROPERTY LOSS: 1 = NONE  2 = BURNED  3 = COUNTERFEITED / FORGERY  4 = DESTROYED / DAMAGED / VANDALIZED  5 = RECOVERED  6 = SEIZED  7 = STOLEN  8 = UNKNOWN

**P R O P E R T Y   D E S C R I P T I O N**

| TYPE LOSS | PROPERTY/ DRUG CODE | DESCRIPTION | QUANTITY | FRACTION | TYPE DRUG MEASURE | VALUE | DATE RECOVERED (MMDDCCYY) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | PROPERTY TOTAL | |

Ex. A 22

# KANSAS STANDARD OFFENSE SUPPLEMENT REPORT
## FRONT PAGE OPEN PUBLIC RECORD

PAGE 6 OF

| NAME OF AGENCY | KS AGENCY ORI NUMBER | CASE NUMBER |
|---|---|---|
| Marion Police Department | KS0580200 | 23-109 |

| CHAPTER | SECTION | SUB 1 | SUB 2 | ☐ ATTEMPTED ☒ COMPLETED | ☐ AID / ABET ☐ CONSPIRACY ☐ SOLICITATION | CHAPTER | SECTION | SUB 1 | SUB 2 | ☐ ATTEMPTED ☐ COMPLETED | ☐ AID / ABET ☐ CONSPIRACY ☐ SOLICITATION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21-5919(a)(2) | | | | | | | | | | | |

**DESCRIPTION**
Perform unauthorized official act; Certify execution of legal document

**DESCRIPTION**

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY | PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY |
|---|---|---|---|---|---|---|---|---|---|
| 08 | 88 | | | F. ☐ FORCE  N. ☐ NO FORCE | | | | | F. ☐ FORCE  N. ☐ NO FORCE |

### OFFENSE # 6

**TYPE OF THEFT**
M. ☐ COIN MACHINE
T. ☐ FROM BUILDING
A. ☐ M V PARTS & ACC.
L. ☐ SHOPLIFTING
P. ☐ POCKET-PICKING
S. ☐ PURSE SNATCHING
E. ☐ EMBEZZLEMENT
T. ☐ POSS STOLEN PROP.
F. ☐ MOTOR VEHICLE
F. ☐ THEFT FROM M V
O. ☐ ALL OTHER
N. ☐ NOT APPLICABLE

**TYPE OF FORCE / WEAPON**
11. ☐ FIREARM ☐ AUTO
12. ☐ HANDGUN ☐ AUTO
13. ☐ RIFLE ☐ AUTO
14. ☐ SHOTGUN ☐ AUTO
15. ☐ OTHER ☐ AUTO FIREARM
20. ☐ KNIFE / CUT INSTR.
30. ☐ BLUNT OBJECT
35. ☐ MOTOR VEHICLE
40. ☐ PERSONAL WEAPON
50. ☐ POISON
60. ☐ EXPLOSIVE
65. ☐ FIRE / INCID / DEVICE
70. ☐ DRUGS / NARC.
85. ☐ ASPHYXIATION
90. ☐ OTHER
95. ☐ UNKNOWN
99. ☐ NONE

**OFFENDER SUSPECTED OF USING (SELECT UP TO 3)**
A. ☐ ALCOHOL
C. ☐ COMPUTER EQUIP.
D. ☐ DRUG / NARCOTICS
N. ☒ NOT APPLICABLE

**TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)**
B. ☐ BUYING / RECEIVING
C. ☐ CULT / MANU / PUBL
D. ☐ DIST / SELLING
E. ☐ EXPLOIT. CHILDREN
O. ☐ OPER/PROMOTE/ ASSIST
P. ☐ POSSESS / CONCEAL
T. ☐ TRANS/TRANSMIT/ IMPORT
U. ☐ USING/CONSUMING
J. ☐ JUVENILE GANG
G. ☐ OTHER GANG
N. ☐ NO GANG INVOLVEMENT

**LOCAL CODE**

---

Second offense block (empty):

**TYPE OF THEFT**
M. ☐ COIN MACHINE
T. ☐ FROM BUILDING
A. ☐ M V PARTS & ACC.
L. ☐ SHOPLIFTING
P. ☐ POCKET-PICKING
S. ☐ PURSE SNATCHING
E. ☐ EMBEZZLEMENT
T. ☐ POSS STOLEN PROP.
F. ☐ MOTOR VEHICLE
F. ☐ THEFT FROM M V
O. ☐ ALL OTHER
N. ☐ NOT APPLICABLE

**TYPE OF FORCE / WEAPON**
11. ☐ FIREARM ☐ AUTO
12. ☐ HANDGUN ☐ AUTO
13. ☐ RIFLE ☐ AUTO
14. ☐ SHOTGUN ☐ AUTO
15. ☐ OTHER ☐ AUTO FIREARM
20. ☐ KNIFE / CUT INSTR.
30. ☐ BLUNT OBJECT
35. ☐ MOTOR VEHICLE
40. ☐ PERSONAL WEAPON
50. ☐ POISON
60. ☐ EXPLOSIVE
65. ☐ FIRE / INCID / DEVICE
70. ☐ DRUGS / NARC.
85. ☐ ASPHYXIATION
90. ☐ OTHER
95. ☐ UNKNOWN
99. ☐ NONE

**OFFENDER SUSPECTED OF USING (SELECT UP TO 3)**
A. ☐ ALCOHOL
C. ☐ COMPUTER EQUIP.
D. ☐ DRUG / NARCOTICS
N. ☐ NOT APPLICABLE

**TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)**
B. ☐ BUYING / RECEIVING
C. ☐ CULT / MANU / PUBL
D. ☐ DIST / SELLING
E. ☐ EXPLOIT. CHILDREN
O. ☐ OPER/PROMOTE/ ASSIST
P. ☐ POSSESS / CONCEAL
T. ☐ TRANS/TRANSMIT/ IMPORT
U. ☐ USING/CONSUMING
J. ☐ JUVENILE GANG
G. ☐ OTHER GANG
N. ☐ NO GANG INVOLVEMENT

**LOCAL CODE**

---

### VICTIM # 1

**TYPE OF VICTIM**
I. ☒ INDIVIDUAL
B. ☐ BUSINESS
S. ☐ SOCIETY / PUBLIC
F. ☐ FINANCIAL INSTITUTION
R. ☐ RELIGIOUS ORGANIZATION
G. ☐ GOVERNMENT
O. ☐ OTHER
U. ☐ UNKNOWN

**VICTIM OF OFFENSE NUMBER**
1.☐ 2.☐ 3.☐ 4.☐ 5.☒ 6.☐ 7.☐ 8.☐ 9.☐ 10.☐

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| Newell | Kari | Anne |

| ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|
| 301 E Santa Fe | Marion | KS | 66861 |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | W | F | N | R | 45 | 08/13/1977 | 502 | 155 | | HAZ |

| DRIVERS LICENSE NUMBER | DL STATE | EMPLOYER / SCHOOL |
|---|---|---|
| K01255505 | KS | |

| TELEPHONE NUMBER (WORK/SCHOOL) | ADDRESS: STREET | CITY | STATE ZIP |
|---|---|---|---|
| | | | |

| CIRCUM. AGG ASLT/BATTERY (MAX 2) | VICTIMS RELATIONSHIP TO CORRESPONDING SUSPECT NUMBER (INDICATE ALL SUSPECTS) | TYPE OF INJURY ( MAX 5) |
|---|---|---|
| 1  2 | 1  2  3  4  5  6  7  8  9  10 | 1  2  3  4  5 |

### VICTIM #

**TYPE OF VICTIM**
I. ☐ INDIVIDUAL
B. ☐ BUSINESS
S. ☐ SOCIETY / PUBLIC
F. ☐ FINANCIAL INSTITUTION
R. ☐ RELIGIOUS ORGANIZATION
G. ☐ GOVERNMENT
O. ☐ OTHER
U. ☐ UNKNOWN

**VICTIM OF OFFENSE NUMBER**
1.☐ 2.☐ 3.☐ 4.☐ 5.☐ 6.☐ 7.☐ 8.☐ 9.☐ 10.☐

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| | | |

| ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES. / N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| DRIVERS LICENSE NUMBER | DL STATE | EMPLOYER / SCHOOL |
|---|---|---|
| | | |

| TELEPHONE NUMBER (WORK/SCHOOL) | ADDRESS: STREET | CITY | STATE ZIP |
|---|---|---|---|
| | | | |

| CIRCUM. AGG ASLT/BATTERY (MAX 2) | VICTIMS RELATIONSHIP TO CORRESPONDING SUSPECT NUMBER (INDICATE ALL SUSPECTS) | TYPE OF INJURY ( MAX 5) |
|---|---|---|
| 1  2 | 1  2  3  4  5  6  7  8  9  10 | 1  2  3  4  5 |

| | NAME: LAST | FIRST | MIDDLE | ADDRESS: STREET | CITY | STATE ZIP |
|---|---|---|---|---|---|---|
| ☐RP ☐DC ☐W ☐O | | | | | | |

| TELEPHONE NUMBER (HOME ) | RACE | SEX | ETHNICITY | RES./N- RES. | AGE | D.O.B. (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| EMPLOYER/SCHOOL | ADDRESS: STREET | CITY | STATE ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
|---|---|---|---|---|
| | | | | |

| REPORTING OFFICER | BADGE # | DATE | COPIES TO | |
|---|---|---|---|---|
| G. Cody | 200 | 08/08/2023 | | **Ex. A 23** |

10:04

224 Zach Hudlin

Wednesday, August 9

Is your county email a
.christner@marioncoks.net?
14:50

Just saw this

Achristner@marioncoks.net
16:02

Ok. I'll send that case over
first thing in the morning.
16:47

16:53    Ok

Thursday, August 10

I just sent you the
completed search warrants.
10:28

10:35    Got it

Just sent the one for Maag
10:36

Tuesday, August 15



10:04

224 Zach Hudlin

16:02    Achristner@marioncoks.net

Ok. I'll send that case over first thing in the morning.
16:47

16:53    Ok

Thursday, August 10

I just sent you the completed search warrants.
10:28

10:35    Got it

Just sent the one for Maag    10:36

Tuesday, August 15

Are you going to be at the office soon? Cody needs Mercer's video.
10:58

10:59    10-4

000710



10:05

Gideon Cody

Tuesday, August 8

Please email me a brief
summary of the situation
also please

09:46

Wednesday, August 9

Call me when you are on
your way to work

05:55

Thursday, August 10

I have made the changes.
Come by my office and we
will formulate a plan

06:22

We have to do Eric's house
as well. He works from
home. I am writing the
affidavit and SW now. In
sheriff's office

13:08

13:08    Ok

Friday, August 11

000711



affidavit and SW now. In sheriff's office

13:08

Ok 13:08

Friday, August 11

Call me when you are available

09:09

I'm at the office. Let me know when you're ready

09:43

Monday, August 14

Give me a call when you get a call

Chance *

16:49

No hurry, we can talk in the morning

16:57

Tuesday, August 15

I lost you

12:57

000712

but the only facts set forth in any of these warrant suggest that Phyllis Zorn may have done so,  The only suggestion that Ruth Herbel committed a crime is that she shared the document – no effort was made to establish that she obtained the document.  This warrant appears to be utterly lacking in probable cause.

4. Eric Meyer's residence - 435 Locust – alleged violations of identity theft and computer crime.  The application attributes a statement to Mr. Meyer that he allegedly confessed that Phyllis Zorn had obtained the KDOR.  If true, that might establish that Ms. Zorn committed the crime of identity theft or computer crime, but it would offer no reason to believe that the fruits or instrumentalities of said crime(s) are in the residence of her employer, Mr. Meyer. The only effort made to try to cobble together a nexus to Mr. Meyer's home is the officer's conclusory statement that Mr. Meyer is known to work from home.

**Additional concerns**:
First, at the 2nd full paragraph on page 4 of most of these affidavits, the boilerplate language in the warrant recognizes that, when faced with multiple electronic devices at a scene, law enforcement officers can perform a "preview" at the scene to  determine which device was utilized in the commission of the office. Specific reference was made to "OIS Triage" and other software packages capable of facilitating such a preview.  However, I am not aware that the law enforcement officers in this matter had the equipment or training necessary to have conducted such a preview or that any effort was made to limit the number of devices seized.  Rather than attempting to limit the scope of the seizure -- as the suggested in the warrant application – the officers simply seized multiple computers/devices as well as at least one cell phone from a reporter who was not mentioned in any of the affidavits.

Second, the statements attributed to Mr. Meyer in the warrant application for his house – that he admitted Phyllis Zorn had obtained the KDOR document – should have been included in the respective applications for the three personal residences. I reach that conclusion because a defensible argument could be made that this acknowledgement tends to undermine any notion that Meyer, Maag or Herbel personally obtained the document or that there is any reason to believe that the fruits or instrumentalities of this crime would be in the residences of Meyer, Maag or Herbel.

**Conclusion:**
The affidavit for the newspaper office *arguably* establishes that Ms. Zorn committed the crime of identity theft under the *Hicks* standard: whether the affidavit provided a substantial basis for
the magistrate's determination that there is a fair probability that evidence will be found in the place to be searched.  Arguably.

However, Mr. Wilkerson, Mr. Paschal and I find no evidence to establish the physical location that the crime of identity theft may have been committed, what devices might have been used or any nexus to the newspaper building, the computer located within that building or the three homes. Compounding that problem is the issue that multiple devices were seized with no effort having been made in the warrant applications to establish why other devices not used by Ms. Zorn, should be seized

I would suggest that every effort be made to return to the material seized to the owners in an expedited manner. These warrants will not sustain appellate review.

If you have any further questions – let me know.

Marc Bennett
District Attorney

4

Untitled

Zach Hudlin

Mon 8/7/2023 2:07 PM

To:Gideon Cody <GCody@marionks.net>;

📎  1 attachments (467 KB)
Screenshot_4.jpg;

https://www.kansas.gov/ssrv-mvr-ltd/

Untitled

Zach Hudlin

Tue 8/8/2023 2:02 PM

To: Gideon Cody <GCody@marionks.net>;

21-5909 Witness Intimidation
21-6101 Breach of Privacy
21-6107 Identity Theft
21-6424 Unlawful Use of Communication Facility
21-6002 Official Misconduct

Untitled

Zach Hudlin

Wed 8/9/2023 8:31 AM

To: Gideon Cody <GCody@marionks.net>;

## ERIC

**21-5904.    Interference with law enforcement.** (a) Interference with law enforcement is:

(1)    Falsely reporting to a law enforcement officer, law enforcement agency or state investigative agency:

(C)    any information, knowing that such information is false and intending to influence, impede or obstruct such officer's or agency's duty; or

**21-5302.    Conspiracy.** (a) A conspiracy is an agreement with another person to commit a crime or to assist in committing a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by such person or by a co-conspirator.

(b)    It is immaterial to the criminal liability of a person charged with conspiracy that any other person with whom the defendant conspired lacked the actual intent to commit the underlying crime provided that the defendant believed the other person did have the actual intent to commit the underlying crime.

## RUTH

**21-5919.    Performance of an unauthorized official act.** (a) Performance of an unauthorized official act is knowingly and without lawful authority:

(2)    certifying an acknowledgment of the execution of any document which by law may be recorded.

While Mr. Meyer walked away while talking on the phone Mrs. Meyer mentions openly, she has not had her medication. Mrs. Meyer then states, 'she may have another stroke she is stressed'. Deputy Regier asks if she needs an ambulance and she yells, 'no I'm not having a stroke, I'm just pissed off', 'you're stupid'. Mr. Meyer reenters the room and Deputy Regier mentions to Mr. Meyer about Mrs. Meyer needing medication. He asks his mother if she needs to take her pills. She answers where are my pills he says he will get them. She is upset about the noise on the 'Alexa' machine. Mr. Meyer reenters with pills and apple sauce looking container. He puts both small bowls on the table next to Mrs. Meyer. She appears to lose a pill or cannot find one. She looks for it around her person then tries to get Mr. Meyers attention, but he is preoccupied with the phone call. She continues to try and get his attention, but he appears focused on the call.

When he gets off of the phone she asks, 'do I have five pills'? He looks and then says, 'you should have six pills', he says take those pills that one is not important, he mentions it may be the vitamin but is not sure he will check. He says, 'just take those pills'. He leaves and comes back into the room saying its just the vitamin D pill.

Mr. Meyer now decides to return to the office and speak with Deb Gruver his employee. He tells Mrs. Meyer he is leaving again but will return soon. (Mr. Meyer does not return before officers leave the premises.)

Mrs. Meyer continued to sit on the recliner in the front room area now. I stood close by as I continued to observe Mrs. Meyer's rollercoaster state of mind and now began to be more verbally violent. Mrs. Meyer began to cry again spouting off verbal threats and hateful comments about the police and sheriff. She would regularly kick her walker that sat in front of her. She would raise her voice, saying things like, 'cheaters, hope your happy, you're wrong, dumb dumb bullies, I'm mad, bunch of Nazi's'. Deputy Regier tried to calm her by asking to get her a drink and she did not want any help. This went on for several minutes before Mr. Meyer's voice came over 'Alexa' audio and he began to talk with Mrs. Meyer. He stated they are done at the Record, and he will be home soon.

Mrs. Meyer continued to sit in the recliner, yelling, complaining often not making sense. She kicked and cried until the police chief and team arrived. She then became more verbally violent and abusive. She was yelling not to touch stuff, calling us 'assholes', and walking up to me face to face with a mad scowl on her face, as if to hit me in rage. She turned from me and pushed her walker and forced into Deputy Regier, hitting him while he stood near me. I told her to be careful. Deputy Regier after being hit, moved, and let her continue ranting and walking into the front room area. It was soon after she stood in rage and rant that she tossed her walker down a step and toward where the officers were identifying evidence for collection. Deputy Regier picked up her walker and set it in front of her so she could use it for support.

Soon after, officers began to secure evidence into the patrol car when at some point I mentioned to chief and officers that there was the laptop carrying case in the bedroom and asked if that should be checked for search warrant material. We agreed and collected the bag as Mrs. Meyer stepped into my space now in the front room and grabbed it out of my hand. I held onto it explaining we need to check it for items on the search warrant. She was verbally upset and continued to yell at us. I tried to lessen her anger by stating we are leaving soon.

I mentioned to Officer Hudlin that the paperwork on the dining room table might need to be checked for documents identified on the search warrant as Mr. Meyer wanted to remove it earlier. I stood by while Officer Hudlin glanced through some of the stack of documents, when he said go get my team, we need to document this.

Mrs. Meyer was still in anger standing there yelling at officers at first but as they began to leave, she walked abruptly toward her bedroom. It was mentioned earlier there was gun in her nightstand, so I swiftly stepped into the hallway from the front room near her bedroom to monitor her for officer safety. She sat on her recliner in her bedroom and continued to yell at us. She also began crying again. She yelled at me to come in her room, so I hesitantly stepped into the bedroom doorway as there was a potential of a gun in the nightstand. I did and she said she was going to sue me. I asked her if she was okay. We were leaving and wanted her to be good before we left.

| OFFICE OF THE STATE FIRE MARSHAL – INVESTIGATIONS DIVISION<br>800 SW JACKSON ST. STE. 104, TOPEKA, KS. 66612 | OSFM Case Number:<br>2023-250 | Report Number:<br>2 |
|---|---|---|

I asked her if she needed EMS, and she yelled no.

I told Mrs. Meyer we were leaving.  The team left and I was the last one out the front door, while she sat in her recliner continuing to yell at us.  She mentioned something about shoot if we come back, but I disregarded it as I walked out the door.

This is a summary report of events and was taken from personal presence and body camera footage.

Eric K. Meyer – █████████

████████████

Marion, Kansas 66861
Co-Owner – Marion Record

Joan Wight Meyer – ██████

████████

Marion, Kansas 66861
Co-Owner – Marion Record

| OSFM Case Number: 2023-250 | Report By: Chris Mercer | | Date of Report: August 4, 2023 |
|---|---|---|---|

EX: A 33

Page 4 of 4

---

**From:**      Aaron Christner <AChristner@marioncoks.net>
**Sent:**      Thursday, August 10, 2023 3:25 PM
**To:**
**Subject:**   Become a Member of the HARCFL Team

What is the process to become a member of HARCFL?  Is there a cost involved?  If so, what is the cost?

Detective Aaron Christner #128
Kansas ICAC Task Force
Marion County Sheriff's Office
202 South 4th Street
Marion, KS 66861
O - 620-382-2144

F - 620-382-3441
aaron.christner@leo.gov

Email Confidentiality Statement: This message and accompanying documents or attachments are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended for the specified individual(s) only.  This information is confidential in nature and may contain Law Enforcement Sensitive information.  If you are not  the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, copying, or the taking of any action based on the contents of this information is strictly prohibited.  If you have received this communication in error, please notify the sender immediately by E-mail or other means provided above, and delete the original message.

Ex. A 34

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1 | because there was some protected part of the KDOR site.  Uh, at that time neither one of us had

2 | ever been on KDOR.  Um, and I'm trying to think how that went.  Anyway, I think he said that he

3 | had talked to her or something, but, and found out it wasn't through the mail.  It was the KDOR

4 | site.

5 | John Zamora:  Okay.  And, mean, and talked to her, meaning –

6 | Jeff Soyez:     Gideon Cody talked to Kari Newell.

7 | John Zamora:  Okay.

8 | Jeff Soyez:     'Cause he thought it was a, a, a, uh, he, he, somebody took her mail.

9 | John Zamora:  Okay.

10 | Jeff Soyez:     And that's how they got that information, that she'd had a DUI in the past.  But then

11 | he found out that he, that, I guess the record went through KDOR, um, got the information, and

12 | then that's how it was found out.

13 | John Zamora:  Right.

14 | Jeff Soyez:     Um, he believed that it was a theft of I, identity theft, um, some fraudulent use of a

15 | computer, and something else.  I don't remember exactly what.

16 | ~~Other Speaker~~ ==Larry Starkey==: Was that, was that when the driver protection –

17 | Other Speaker:        Yeah.

18 | Jeff Soyez:     Yeah.

19 | John Zamora:  D, DPPE, something?

20 | ~~Other Speaker~~ ==Larry Starkey==: Yeah.  Whatever.

21 | Jeff Soyez:     He kept talking about the DPPA.  Um, so he said, well, what, he said in that email,

22 | so it went to the – what's her – Ruth Hurbel, who is the city council member.  Um, so he said, you

23 | know, he said I believe I've got some city corruption here as well.  Um, my advice to him

PAGE **9** OF **82**

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1 immediately was, was like, well, if you think you've got some city corruption, we're not the guys to

2 talk to.  You need to call your mayor immediately and deal with your mayor.  And that's what I

3 would suggest you do.  Uh –

4 ~~Other Speaker~~ Michael Struwe:        Do you know who the mayor is?

5 Jeff Soyez:    David Mayfield.

6 ~~Other Speaker~~ Michael Struwe:        Do you know if he did that?

7 Jeff Soyez:    Yes, he, I believe he did, yes.  So he had a conversation with Dave Mayfield.  And

8 I, and I told him in that same meeting too, I said you probably oughta get a hold of the Kansas

9 Bureau of Investigations on this one and sit down and visit with them about it.

10 John Zamora:  Sure.

11 Jeff Soyez:    Um, so then it was a couple of days later he called us and said that, uh, KBI, uh,

12 Todd, or, yeah, I think it was Todd Leads –

13 John Zamora:  Uh huh.

14 Jeff Soyez:    – was coming in.  So we all met over there, um –

15 John Zamora:  With, with Todd as well?

16 Jeff Soyez:    With Todd, yeah.

17 John Zamora:  Okay.

18 Jeff Soyez:    It was me, Undersheriff Larry, it was myself, Jeff Sawyer, Undersheriff Larry

19 Starkey, Detective Aaron ~~Krisner~~ Christner, and Gideon Cody and Todd Leads from the KBI.  So

20 he presented his entire case to, to Todd.  Todd looked it over, um, and said I think, he, he said, well,

21 give me the entire case.  I'll let you, uh, um, basically run with it, but I wanna review, you know.

22 So anyway –

23 John Zamora:  And real quick, do you remember the date, around the timeframe that you all met?

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1    Jeff Soyez:      Aaron ~~Krisner~~ Christner would know that.

2    John Zamora:  Okay.  ****.

3    Jeff Soyez:      Do you want him in here?

4    John Zamora:  No, 'cause we're gonna interview him.

5    Jeff Soyez:      Okay.

6    John Zamora:  Yeah, after.  Yeah.

7    Jeff Soyez:      Okay.  Um, I don't remember the exact date to be honest with you.  Um –

8    John Zamora:  How many days prior to the search warrant, would you guess?

9    Jeff Soyez:      To what?

10   John Zamora:  Prior to the search warrant getting executed.

11   Jeff Soyez:      Oh, probably a week, I would think.

12   John Zamora:  Okay.

13   Jeff Soyez:      I think it was about a week.

14   John Zamora:  Okay.

15   Jeff Soyez:      Um, I –

16   ~~Other Speaker~~ Jeff Soyez:      Would you say about a week?

17   ~~Other Speaker~~ Larry Starkey: Uh, a week or less, I think.

18   Jeff Soyez:      Yeah.

19   ~~Other Speaker~~ Larry Starkey: I'm –

20   Jeff Soyez:      I wouldn't, I don't think it was any more than a week.

21   John Zamora:  Okay.

22   Jeff Soyez:      Anyway, uh, my impression at that point was, is that, you know, Cody said he

23   could, well, I got, I got a crime.  And I told him, I said, well, if you've got a crime, you've gotta do

PAGE **11** OF **82**

Ex. A 37

## Interview of Marion County Sheriff's Office Staff on 11/16/23

1   your job. Um, but, you know, it's your investigation. Uh, and then I left there and actually went to

2   the county attorney's office, and I told Joe Enzy, I said, here's the deal. You're getting ready to get

3   a big old nasty, hairy case in your lap. I would suggest that you hire a special prosecutor and just

4   stay away from this entire case, if I were you. He said I will look into ****. I said okay, that's fine

5   with me.

6   ~~Other Speaker~~ Michael Struwe:          When was that?

7   Jeff Soyez:     Uh, that was the same day that meeting was.

8   John Zamora: Okay.

9   Jeff Soyez:     Um, and it was the, b, it would've been the same day that Aaron was with us over

10  there in that meeting.

11  John Zamora: Okay.

12  Jeff Soyez:     So those were the two meetings we had with him. Um, I never spoke with Kari

13  Newell. I don't know anything about it. I didn't look at any of what he had other than what he was

14  telling us he had. Um, he did at one point, after I talked to the county attorney, he sent, uh, which

15  is in that case file right there. That's the entire case file right there. Um –

16  John Zamora: Your, your guys' case file?

17  Jeff Soyez:     Yes. Yes.

18  John Zamora: Can we get a copy? Or is that for us?

19  Jeff Soyez:     Uh, we can get a copy of it –

20  Other Speaker:          Yeah.

21  Jeff Soyez:     – probably for you.

22  John Zamora: Okay. That'd be awesome.

23  ~~Other Speaker~~ Michael Struwe:          **** this is like the original case files?

Ex. A 38

## Interview of Marion County Sheriff's Office Staff on 11/16/23

1    Jeff Soyez:      Yeah, yeah.

2    ~~Other Speaker~~ Michael Struwe:        This is yours?

3    Jeff Soyez:      Yeah.  That's, that's our case file, yeah.

4    John Zamora:  Okay.

5    ~~Other Speaker~~ Larry Starkey: Do you want me to have Sarah start on that?

6    Jeff Soyez:      Yeah.  Double check with Aaron and make sure – yeah, that's the original case file.

7    It's got the original label on it.

8    Other Speaker:        Yeah.

9    ~~Other Speaker~~ Michael Struwe:        And if anything –

10   John Zamora:  Okay.

11   ~~Other Speaker~~ Michael Struwe:        – I mean, if you're amicable to it, we may thumb through it.

12   Jeff Soyez:      I don't care what you ****.

13   Other Speaker:        ****.

14   Other Speaker:        ****.

15   ~~Other Speaker~~ Larry Starkey: **** look at it and see if it's something you want.

16   ~~Other Speaker~~ Michael Struwe:        Well, as I understand, that it's been provided to KBI?

17   Jeff Soyez:      Yeah.  Oh, KBI's got everything we have.  Yeah.

18   ~~Other Speaker~~ Michael Struwe:        And, so –

19   John Zamora:  Okay.

20   ~~Other Speaker~~ Michael Struwe:        – John, if you're okay with it, I may just look and make sure

21   –

22   John Zamora:  Well, I, I would say yeah.  If, if we can, just get this, we say we have this from y'all.

23   Jeff Soyez:      Okay, yeah.

PAGE **13** OF **82**

**Ex. A 39**

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1   John Zamora:  That would be great.

2   ~~Other Speaker~~ Larry Starkey: **** get started on that.

3   John Zamora:  Okay.  Awesome.  Thank you.

4   Jeff Soyez:     Um, I'm trying to think.  Where was I at?  We were, I went and talked to the county

5   attorney.  Um, I'd gotten a phone call, I wanna say it was like a couple of days before the warrant.

6   Cody said he had talked to Agent Papajoyed.  I think that's her name.

7   Other Speaker:        I can tell you that.

8   Other Speaker:        Yeah.

9   Other Speaker:        I think I got her **** glasses at.  I think I've got her card right here.  ****.

10  ~~Other Speaker~~ <mark>Michael Struwe</mark>:        I'd let him in, but I'm not sure if he's authorized.

11  Jeff Soyez:     Oh, yeah.  He can come in.  He's got a key.  I, I'm, it was, **** talked to Agent

12  Papajoyed.  I think that's the female detective or the agent.

13  John Zamora:  Okay, Papajoy or Joe?

14  Jeff Soyez:     Papajoy.

15  ~~Other Speaker~~ <mark>Michael Struwe</mark>:        Popejoy maybe?

16  Jeff Soyez:     Popejoy.  Yeah.

17  ~~Other Speaker~~ <mark>Michael Struwe</mark>:        **** sound right?  Okay.

18  Jeff Soyez:     Um, and he told me that she told him that, uh, everything looked good, um, to keep

19  going forward.  And **** didn't say like keep going forward with the search warrant.  They just

20  said to keep on with the investigation.  Cody said, well, I think we're good to go.  I said okay.  Well,

21  then the day before the search warrant – I think the search warrant was on the 11th of August?

22  ~~Other Speaker~~ Larry Starkey: Y, yeah.

23  John Zamora:  That's what we ~~****~~ <mark>recall</mark>, yes.

PAGE **14** OF **82**

Ex. A 40

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1  Jeff Soyez:      Yeah.  So on the 10th, so on the 11th, I was supposed to ~~****~~ go to some taser they

2  were introducing down in Wichita, the new Taser 10.

3  John Zamora:  Mm.

4  Jeff Soyez:     I was supposed to go with the chief of police down there.  Um, Gideon called me –

5  so it had been on the evening of the 10th – and said, hey, I'm gonna apply for these warrants.  Um,

6  I said, oh, okay.  Interesting.  So I called him and told him, I said I'm not going on this taser

7  training.  I'm gonna stay back and see what happens here.  Um, that day we had, uh, Sergeant Matt

8  Regeir, um, ~~Stephen Jansen~~ Janzen, Aaron ~~Krisner~~ Christner.  I don't think ~~Stephen~~ Steven was on

9  duty.  I know Matt wasn't; he was just in court that day.  Um, I'm talking about the day of the

10  warrant.  Uh, so anyway, he had the search warrants.  Like, oh, you got your search warrants.  Um,

11  he asked for support from us.  Um, I pulled those three guys that I just named, Aaron ~~Krisner~~

12  Christner, ~~Stephen Jansen~~ Steven Janzen who was a detective, and Matt Regeir who was a

13  sergeant.  I pulled them in.  I said here's what the deal is, guys.  He's got a search warrant for the

14  Marion Record, for these two other residences.  Um, you can help.  I said, I gave them the

15  opportunity.  I said you can tell me to go pound sand, you don't want any part of this, or you can,

16  you know, assist him.  I told them, I said, you, I told Detective, uh, ~~Jansen~~Janzen ~~Stephen Jansen~~

17  Steven Janzen and Detective, or, and Sergeant Regeir, I said all I want you guys to do is secure the

18  residences that he has search warrants for.  I don't want you searching for anything.  I don't want

19  you looking for anything.  I don't want you logging evidence or carrying anything out of the house.

20  You are there to secure the residence and make sure everybody's safe.  Marion PD will handle the

21  rest of it.  And they said, yeah, that's fine.  We'll do that.  And I think ~~Stephen Jansen~~ Steven Janzen

22  went to Ruth Hurbel's house, and Matt Regeir went to, um, Eric Meyer and I can't ****, Joanne

23  Meyer?

PAGE **15** OF **82**

## Interview of Marion County Sheriff's Office Staff on 11/16/23

1  ~~Other Speaker~~ Larry Starkey: Yeah.

2  Jeff Soyez:    Jo, Joanne Meyer's residence.  They secured those.  Aaron ~~Krisner~~ Christner, he has

3  some kind of FBI software that I don't know anything about that he can actually put it in the

4  computer – he's trained to do it – and put in keywords to look for what he's –

5  John Zamora: Mm hmm.

6  Jeff Soyez:    – looking for.  Um, so I told him he could go over there.  If they needed him to do

7  that, he could do that over there, but I told my guys, said you do not search anything.  You do not

8  carry anything.  You don't put your name on a damn thing on this thing.

9  ~~Other Speaker~~ Michael Struwe:        Where's over there ****.

10  Jeff Soyez:    **** oh, I'm sorry.  Marion Record.

11  Other Speaker:        ****.

12  Jeff Soyez:    At the, at the newspaper office.

13  ~~Other Speaker~~ Michael Struwe:        So, ~~Jansen~~ Janzen went to Hurbel.  **** it Ray, Rayger?

14  How are you saying that?

15  Jeff Soyez:    Regeir.

16  ~~Other Speaker~~ Michael Struwe:        Regeir?

17  Jeff Soyez:    Yeah.

18  ~~Other Speaker~~ Michael Struwe:        How do you spell that?

19  Jeff Soyez:    R-E-G-E-I-R.

20  ~~Other Speaker~~ Michael Struwe:        R-E-G –

21  Jeff Soyez:    E-I-R.

22  ~~Other Speaker~~ Michael Struwe:        E-I-R.

23  Jeff Soyez:    Mm hmm.

PAGE **16** OF **82**

## Interview of Marion County Sheriff's Office Staff on 11/16/23

1 | John Zamora: Okay.

2 | Jeff Soyez:    So.

3 | John Zamora: Obviously not signed just what he was planning on?

4 | Jeff Soyez:    What he was, what he was planning on using to make the arrest or file the charges

5 | ****.

6 | John Zamora: Okay. Now, when you say after the search warrant was it immediately after or after

7 | all heck broke loose?

8 | Jeff Soyez:    Nah, it was pretty quickly afterwards, yeah.

9 | John Zamora: Was it?

10 | Jeff Soyez:    It was in that, I'm pretty sure it's in that case log 'cause all of our, I had the guys put

11 | all of our emails and everything in that case file.

12 | John Zamora: Okay. Awesome, awesome.

13 | Jeff Soyez:    Yeah.

14 | John Zamora: Okay. And in general, um, Gideon Cody from when he got hired, do you remember

15 | when he got hired here?

16 | Jeff Soyez:    Um, he's with the, what month was that?

17 | ~~Other Speaker~~ Larry Starkey: **** a couple months before ****.

18 | Jeff Soyez:    Yeah, a couple months before that.

19 | ~~Other Speaker~~ Larry Starkey: I, well, I'll say 2 months but it might've been –

20 | John Zamora: Okay.

21 | ~~Other Speaker~~ Larry Starkey: – more than that.

22 | Jeff Soyez:    And I can tell you how he found out about the job.

23 | John Zamora: Sure.

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1   county jurisdiction. They try and separate it that way. Of course, you can agency assist if

2   someone's got tools or training or something. Do you know?

3   Jeff Soyez:     The question would be for Aaron ~~Krisner~~ <mark>Christner</mark>.

4   ~~Other Speaker~~ <mark>Michael Struwe</mark>::     Okay.

5   Jeff Soyez:     Um, because that, that all kind of evolved before I got, I think I got here with her.

6   Because when I first brought it up to him he's like yeah, I've already looked into that thing once

7   already. So.

8   ~~Other Speaker~~ <mark>Michael Struwe</mark>::     When did you take office?

9   Jeff Soyez:     Crapola, um –

10   Other Speaker:     April.

11   Jeff Soyez:     April.

12   Other Speaker:     Of 20 –

13   Jeff Soyez:     '22.

14   Other Speaker:     – 22.

15   Jeff Soyez:     Yeah.

16   ~~Other Speaker~~ <mark>Michael Struwe</mark>::     Okay. And obviously you're elected ****.

17   Jeff Soyez:     Yeah, I was, I was appointed by the Republican Party because Sheriff Craft passed

18   away.

19   ~~Other Speaker~~ <mark>Michael Struwe</mark>::     Okay.

20   Jeff Soyez:     Um, so the Republican party, um, nominated me into office. Um, and then I had to

21   run the end of that year. I ran unopposed and, and obviously won.

22   John Zamora: ****.

23   ~~Other Speaker~~ <mark>Michael Struwe</mark>::     Okay. That's helpful. I understand.

PAGE **30** OF **82**

002859

## Interview of Marion County Sheriff's Office Staff on 11/16/23

1  John Zamora:  Thank you.  There was, uh, some documentation on October 2nd, um, some sort of

2  meeting that you had at the, a truck stop in Newton.  Cody was there, the mayor William Mayfield

3  –

4  Jeff Soyez:      What?

5  John Zamora:  And County Board of Commissioners Vice Chair Dave, is it David Crofoot?

6  Jeff Soyez:      Um, yeah.

7  John Zamora:  And you so October –

8  Jeff Soyez:      At a truck stop?

9  John Zamora:  It says a secret meeting at the truck stop in Newton.  And I have no idea where

10  Newton is.  Is that close by?

11  ~~Other Speaker~~ Jeff Soyez:      Uh, that would be over there ****.

12  Jeff Soyez:      And absolutely not.

13  John Zamora:  Okay.

14  Jeff Soyez:      No.

15  ~~Other Speaker~~ Michael Struwe::        And this is, this is, I, I would classify that more as like intel

16  that's been stated and so –

17  Jeff Soyez:      Now –

18  ~~Other Speaker~~ Michael Struwe::        – your name was ****.

19  Jeff Soyez:      – I know through our lawyer, through KCAM that I think Mattivi and Marion's

20  lawyers met.  But we didn't meet with anybody.

21  John Zamora:  Okay.

22  Jeff Soyez:      ****.

23

PAGE **31** OF **82**

Ex. A 45

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1   John Zamora:  Yeah, and just, just something as we're getting all this paper in I'm just

2   documenting I asked you about it because I don't know anything about it.

3   Jeff Soyez:     Yeah, I don't –

4   John Zamora:  Yeah.

5   Jeff Soyez:     That's the first I've ever heard of that.

6   John Zamora:  Yeah.

7   Jeff Soyez:     You know it –

8   ~~Other Speaker~~ Michael Struwe::     You didn't have a meeting with, you know, after this has

9   blown up 'cause obviously it kinda blew up.

10  Jeff Soyez:     Mm hmm.

11  ~~Other Speaker~~ Michael Struwe::     Um, you didn't have a meeting out of town with Cody and

12  the mayor or –

13  Jeff Soyez:     No.

14  ~~Other Speaker~~ Michael Struwe::     – others involved in this?

15  Jeff Soyez:     No.

16  ~~Other Speaker~~ Michael Struwe::     Do you know if anyone from your office did?

17  Jeff Soyez:     Not that I'm aware of.

18  Other Speaker:     No.

19  Jeff Soyez:     You ****?

20  ~~Other Speaker~~ Larry Starkey: No, this is the first I've heard of that.

21  Other Speaker:     Okay.

22  John Zamora:  Okay.  Is there anything that you think we should know?

23  Jeff Soyez:     Hmm.  I obviously haven't watched all the body cam footage.

PAGE **32** OF **82**

Ex. A 46

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1   John Zamora:  Yeah, but then, of course, we get curious on what happens when there's no body

2   cam.

3   Jeff Soyez:     Mm hmm.

4   John Zamora:  When they still have access to the facility.

5   Jeff Soyez:     Yeah.

6   John Zamora:  Not to say anything did or didn't.  Just curiosity.  Okay.  I'll –

7   Jeff Soyez:     Um, the other thing is my other curiosity is, is I was visiting with the county

8   attorney.  You might want to visit with him but –

9   John Zamora:  And who is that again?

10  Jeff Soyez:     Joel Ensey.

11  John Zamora:  Okay.

12  Jeff Soyez:     That, it'd be, the curious question is I asked him here, I want to say a couple weeks

13  ago, of what's the status of the search warrants?  'Cause I was told the judge did not rescind the

14  search warrants or refused to rescind them so what is the status of the search warrants?  Nobody

15  seems to know.

16  ~~Other Speaker~~ Michael Struwe:          Uh, obviously you and I think I've seen a picture of you

17  returning a phone.

18  Jeff Soyez:     Mm hmm.

19  ~~Other Speaker~~ Michael Struwe:          Right.  So –

20  ~~Other Speaker~~ Larry Starkey: Yeah, all of –

21  John Zamora:  Everything you have.

22  ~~Other Speaker~~ Larry Starkey: Yeah, all of that evidence ended up in our evidence locker because

23  it's more secure then –

Ex. A 47

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1   Jeff Soyez:     Oh yeah, I forgot about that.

2   ~~Other Speaker~~ Larry Starkey: – what Marion PD had.

3   ~~Other Speaker~~ Michael Struwe::       When you say all the evidence, do you literally mean every

4   item that they took including documents or –

5   Jeff Soyez:     Yes.

6   ~~Other Speaker~~ Michael Struwe::       – is it just digital?

7   Jeff Soyez:     Just the digital.

8   ~~Other Speaker~~ Larry Starkey: It, it, all their computers, the phones.

9   ~~Other Speaker~~ Michael Struwe:       So paper documents that may have been seized –

10  Jeff Soyez:     Digital.

11  ~~Other Speaker~~ Larry Starkey: We didn't have those.

12  Jeff Soyez:     No, no.

13  ~~Other Speaker~~ Michael Struwe::       But as I'm, and correct me when I'm wrong here, as I'm sort

14  of understanding with this, with ~~Krisner~~ Christner he's got an expertise that maybe isn't around at

15  the city or elsewhere.

16  Jeff Soyez:     Absolutely.

17  ~~Other Speaker~~ Michael Struwe::       And so regarding digital forensics, he's kinda the go-to guy.

18  Jeff Soyez:     Yes.

19  ~~Other Speaker~~ Michael Struwe::       And so did Marion PD and anybody specifically request that

20  you hold that evidence?

21  Jeff Soyez:     Yes, the, uh, Gideon Cody requested us to hold the evidence in our locker.

22  ~~Other Speaker~~ Michael Struwe::       Digital evidence?

23  Jeff Soyez:     Yeah.

PAGE **36** OF **82**

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1  ~~Other Speaker~~ Michael Struwe:        Okay.

2  Jeff Soyez:      It's more secure.  Um, yeah kinda back to the Aaron ~~Krisner~~ Christner thing, I guess

3  with, I didn't go over that very well.  Um, when we were in those meetings with, with, uh, the KBI,

4  us and Gideon Cody, um, and Zach had went.  Well, he was in and out I guess doing stuff with, for

5  Gideon.  Um, he asked, he was unsure on how the search warrants look here.  That's why, other

6  reason why Aaron was offered up.  I was like well, if you need somebody to help you format the

7  way the judge's like the search warrants here, you can use him.  Um, and I asked Aaron, I said are

8  you okay with that.  And he goes yeah, I'm fine with that.  Um, so Aaron's part was pretty much

9  just makin' sure that everything was in the order the judges like it and here's how they like to see it.

10 Here's what information you have to help him basically I would say format and make sure it's

11 correct.

12 John Zamora:  Okay.

13 Jeff Soyez:      And he'll talk to you about that.

14 Other Speaker:        Is that partially your understanding because Cody's new to **** this

15 district?

16 Jeff Soyez:      Missouri officer coming to Kansas.

17 Other Speaker:        Okay.

18 Jeff Soyez:      He was still on, he's, well but not now, I guess, but he was on provisional license

19 through, uh, **** TC from my understanding or the –

20 ~~Other Speaker~~ Michael Struwe:        Briefly how does that work?  Provisional, I, I mean,

21 Colorado has its version.  What does that look like in Kansas?

22 Jeff Soyez:      So if you come from out of state to come be an officer here you can take a job and

23 even, even a new officer gets a provisional, um, before he goes to academy that basically says that

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1  Jeff Soyez:     And I will, I'll straight up tell ya', I called our KCAP Board this morning.  I'm like

2  hey, I got, uh, Colorado Bureau of Investigations representing KBI call us this morning.

3  Other Speaker:      Yeah, sure.

4  Jeff Soyez:    I said, I just need to touch base with you.

5  John Zamora:  Absolutely.

6  Jeff Soyez:    Make sure you're okay with it.

7  John Zamora:  We expect that.

8  Jeff Soyez:    Yeah, he goes absolutely.  He goes talk to 'em all you want.

9  John Zamora:  Yeah.

10  Jeff Soyez:    So.

11  ~~Other Speaker~~ Michael Struwe:      That was your attorneys ****?

12  Jeff Soyez:    Yes, Jeff Kuhlman.

13  ~~Other Speaker~~ Michael Struwe:      Okay.

14  Jeff Soyez:    He's from Watkins Calcara out of Great Bend, Kansas.

15  John Zamora:  Okay.

16  ~~Other Speaker~~ Michael Struwe:      How do you spell Kuhlman?

17  Jeff Soyez:    Uh, K-U-H-L-M-A-N.

18  ~~Other Speaker~~ Michael Struwe:      And that's your legal representation?

19  Jeff Soyez:    Yeah, Jeff Kuhlman, yeah.

20  ~~Other Speaker~~ Michael Struwe:      And you touched base with him this morning?

21  Jeff Soyez:    Yeah, absolutely.

22  ~~Other Speaker~~ Michael Struwe:      And he said?

23  Jeff Soyez:    Yeah, go for it.

PAGE **43** OF **82**

### Interview of Marion County Sheriff's Office Staff on 11/16/23

1  ~~Other Speaker~~ Michael Struwe:          Okay.

2  Jeff Soyez:     He said to visit with him afterwards.  He goes **** –

3  Other Speaker:          Yeah.

4  Jeff Soyez:     – give me a call when it's done.  He's in depositions this morning or something else

5  so.

6  ~~Other Speaker~~ Michael Struwe:          I understand.

7  John Zamora:  And then, um, and forgive me if I mentioned this, did anybody from your agency

8  after all this chaos of how people, I think people kinda learned how Kari's driver's license was let's

9  say info was obtained.  Did anybody from your office run that, let's say free site or anything?

10  Jeff Soyez:     Run her, on her?

11  John Zamora:  On her.

12  Jeff Soyez:     I didn't.  Did you?

13  ~~Other Speaker~~ Larry Starkey  Not that I know of.

14  John Zamora:  Okay.  'Cause we have a few, let's say IP addresses but we're so far able to put them

15  all together by just –

16  Jeff Soyez:     I know we, I know –

17  John Zamora:  Not that it's even wrong.

18  Jeff Soyez:     No, but I know we were at the front desk and I, Sarah would know what name, but

19  I don't think we typed her name in.  I don't remember whose name we typed in.

20  ~~Other Speaker~~ Larry Starkey:  No, Sarah, she probably did her own.

21  Jeff Soyez:     Yeah, I was gonna say –

22  John Zamora:  Yeah.

23  Jeff Soyez:     – I think she actually typed her own name.

PAGE **44** OF **82**

002873

## Interview of Marion County Sheriff's Office Staff on 11/16/23

1  Jeff Soyez:     And I think that's probably –

2  Other Speaker:        ****.

3  Jeff Soyez:     – **** more this case started was

4  Other Speaker:        Yes.

5  Jeff Soyez:     – was over there at the Jake LaTurner –

6  John Zamora:  Mm hmm.

7  Jeff Soyez:     – deal.  That's where this whole thing started.

8  ~~Other Speaker~~ Michael Struwe:        Tell me, I don't understand what you mean by that.  Do you

9  have first-hand knowledge of that or is that –

10  Jeff Soyez:     Well –

11  ~~Other Speaker~~ Michael Struwe:        Were you there, for example?

12  Jeff Soyez:     We were there after the fact.

13  ~~Other Speaker~~ Larry Starkey: Yeah, we got there like 5 minutes after and they got –

14  ~~Other Speaker~~ Michael Struwe:        What's, what's the **** what –

15  ~~Other Speaker~~ Larry Starkey: Meyer and, was Phyllis there, too?

16  Jeff Soyez:     Yes, I think so.  Uh, so anyway, Jake LaTurner came to town.  They were having a

17  social get together at, I don't know what the name of that, is that Kari's Kitchen or whatever or –

18  Other Speaker:        Yeah.

19  Jeff Soyez:     – across the coffee shop.

20  Other Speaker:        It's, yeah.

21  Jeff Soyez:     Yeah, it's across the street from the ****

22  Other Speaker:        Elgin, um, Coffee.

23

## Interview of Jonathan Benavidez on November 16, 2023

1   Jonathon Benavidez:  – and then, so after that, I have no clue, and then they shut the door.

2   John:  Okay.  I don't wanna get too much, like, on a touchy subject.  Um, heard that you were

3   terminated –

4   Jonathon Benavidez:  Yes.

5   John    – and why?  What, what, what happened there?

6   Jonathon Benavidez:  Um, I was, uh, when I was sick, and I woke up late and missed work, so.

7   John:  Okay.  How, just one time or –

8   Jonathon Benavidez:  Uh –

9   John:  – how many times or –

10  Jonathon Benavidez:  Once, and then on top of that, I was having issues qualifying with a

11  handgun, so.

12  John:  Okay.  Did it have anything to do with –

13  Jonathon Benavidez:  No.

14  John:  – this?

15  Jonathon Benavidez:  No, it did not.

16  John:  Okay.

17  Jonathon Benavidez:  I actually, I think I have that **** that paperwork.  I kept locking my keys

18  in my car.  Uh, is this the termination one?  Yeah.

19  John:  Okay.  **** handgun ***.  (?)

20  Jonathon Benavidez:  But yeah, I was having, I had locked my keys in the squad car or –

21  John:  Huh.

22  Jonathon Benavidez:  – **** leave them on (?) my desk and get locked outta the building, and

23  then I couldn't qualify.  That was their last straw.

PAGE **12** OF **28**

**Ex. A 53**

**Interview of Jonathan Benavidez on November 16, 2023**

1    ~~Other Speaker~~ <mark>Agent Struwe</mark>: Okay.

2    John:   How, how many people do you have in your jail?

3    Jonathon Benavidez:  I don't work there anymore.

4    John:   No, you, that you would.  Just outta curious – ****.

5    Jonathon Benavidez:   We can fit, like, 33 in there.

6    John:   Okay.

7    Jonathon Benavidez:   So it's not very big.

8    John:   So not too big.

9    Jonathon Benavidez:   No.

10   John:   Yeah.  Yeah.  Cool.  All right, we will get outta your way.

11   Other Speaker:        Yes, sir.

12   ~~Other Speaker~~ <mark>Agent Struwe</mark>: Thanks for your time.

13   John:   All right, thanks.

14   ~~Other Speaker~~ <mark>Agent Struwe</mark>: Have a good night.

15   Jonathon Benavidez:   Yup, you, too.

16   ~~Other Speaker~~ <mark>Agent Struwe</mark>: Yeah, appreciate it.

17   ~~Other Speaker~~ <mark>I believe this was Jonathan Benavidez</mark>:        All right, what time do we got to meet

18   Frederick?

19   Other Speaker:        ****

20   Other Speaker:        Oh, ****.

21   John:   Okay, I am cutting off the body cam now.

22

23

On Monday August 7, 2023 at approximately 0610 hours, I read an email from Eric Meyers that stated he received a copy of someone's private Department of Revenue Records (see attachment EricEmail). There were allegations of possible police misconduct on how the Department of Revenue Record was obtained. I then contacted the Marion City Administrator, Brogan Jones, at his office.

Brogan stated he was aware of the Department of Revenue Record (DOR record) of the private citizen because a City Council member, Ruth Herbel, sent him a screenshot via email. Brogan stated she wanted to deny the renewal of their liquor license based on the DOR record and that the liquor license was on the City Council Agenda for a meeting the same afternoon. I asked that he send me a copy so that I can investigate further. I opened the email and saw that it contained a picture from Facebook Messenger with a DOR record addressed to the victim, Kari Newell. I contacted Kari, she stated she did not know how someone was able to access her mail and she gave no one permission to obtain, access or open her private mail.

An investigation revealed the letter was not stolen from her mailbox, rather it was downloaded from the Department of Revenue. The Department of Revenue advised the individuals who downloaded the information were Phyllis Zorn (reporter who works for Eric Meyer) and Kari Newell the victim (three minutes after Phyllis Zorn downloaded the information). Downloading the document involved either impersonating the victim or lying about the reasons why the DOR record was obtained. I again contacted the victim, she stated that she did not download or authorize anyone to download any information from the Department of Revenue and someone obviously stole her identity. She later stated that Eric Meyers admitted his employee downloaded the private Department of Revenue record information. She further stated this was contrary to what he announced at the City Council Meeting on 08/07/2023. She stated the City Council Meeting is recorded and available on YouTube. She stated Eric Meyer then threatened her with bad publicity in his paper (Marion County Record) if she did not back off.

Eric Meyer intimidated a victim (Kari Newell) with an intent to vex, annoy, harm or injure her and to prevent her from making a report to law enforcement or causing a civil action to be filed. KSA 21-5909 a.A.

**Interview of Chief Zach Hudlin on (DATE)**

1    John Zamora:  Zach?

2    Zach Hudlin:  Yep.

3    John Zamora:  John Zamora, good to meet ya.

4    Zach Hudlin:  Nice to meet ya.

5    John Zamora:  My partner –

6    Zach Hudlin:  Zach –

7    Other Speaker:        Michael –

8    Zach Hudlin:  – Zach –

9    Other Speaker:        – ~~Strewey~~ Struwe –

10   Zach Hudlin:  – Hudlin.

11   Other Speaker:        – ****.

12   Zach Hudlin:  Nice to meet you.

13   John Zamora:  – Hudlin.

14   Zach Hudlin:  Yeah.

15   John Zamora:  Where –

16   Zach Hudlin:  Hi.

17   John Zamora:  – can we meet?  Awesome.  So I first appreciate you meeting with us.

18   Zach Hudlin:  Absolutely.

19   John Zamora:  Um, per our policy, we have body cam on.

20   Zach Hudlin:  Sure.

21   John Zamora:  I have a digital recorder in case this stuff doesn't work.

22   Zach Hudlin:  Yeah.

23   John Zamora:  Um, we just want to say, well, you're the chief now, right?

003067

**Interview of Chief Zach Hudlin on (DATE)**

1  Zach Hudlin:  Yeah.

2  John Zamora:  Okay, lucky you.

3  Zach Hudlin:  Uh huh.

4  John Zamora:  Awesome.  This is not an internal investigation, we'd be doing it anyway.  We are

5  looking at potential criminal charges.

6  Zach Hudlin:  Okay.

7  John Zamora:  That's what we're here to, uh, talk to you about.  You know the game, if you're

8  uncomfortable, you don't want to chat, just say John, I'm uncomfortable and I don't want to chat.

9  Zach Hudlin:  Yeah.

10  John Zamora:  Cool, okay.  You good?

11  Zach Hudlin:  Yep.

12  John Zamora:  Let me get some stuff kind of pulled out here.

13  Other Speaker:        This is okay right here?

14  Zach Hudlin:  Yes.

15  Other Speaker:        Okay.  I don't wanna mess up your.

16  John Zamora:  So, how many people you got here ~~now~~ man?

17  Zach Hudlin:  We have –

18  John Zamora:  **** working.

19  Zach Hudlin:  – four now.

20  John Zamora:  Four?

21  Zach Hudlin:  Uh, yes.  Yeah.

22  John Zamora:  ~~And then~~ Well that's, better than –

23  Zach Hudlin:  Full, full staff, we'd be five but we have four right now.

PAGE **2** OF **162**

003068                                    Ex. A 57

**Interview of Chief Zach Hudlin on (DATE)**

1    John Zamora:  – ~~that's ****~~ And that's not too bad.

2    Zach Hudlin:  Yeah.

3    Other Speaker:        Yeah, I appreciate you making the time.  Again, if at any point, you want us

4    to get out of here or, uh –

5    Zach Hudlin:  Yeah.

6    Other Speaker:        – not talk –

7    Zach Hudlin:  Well –

8    Other Speaker:        – to us –

9    Zach Hudlin:  – like I –

10    Other Speaker:        – just to –

11    Zach Hudlin:  – told him –

12    Other Speaker:        – let –

13    Zach Hudlin:  – last –

14    Other Speaker:        – us –

15    Zach Hudlin:  – night –

16    Other Speaker:        – know.

17    Zach Hudlin:  – I'm the duty guy today, so –

18    John Zamora:  Okay.

19    Zach Hudlin:  – I may have to run out –

20    John Zamora:  **** –

21    Zach Hudlin:  – for –

22    John Zamora:  – **** if that **** –

23    Other Speaker:        Absolutely.

### Interview of Chief Zach Hudlin on (DATE)

1   Zach Hudlin:  – **** happen, so.

2   John Zamora:  Uh, we, we get it totally.  **** While I'm get getting stuff ready, if you want, you

3   can, basically, we're looking into all the stuff that happened with the search warrant.  Um, can you

4   tell us your involvement with it let's say from the start, how it all got brought up and just kind of

5   what happened to the execution of search warrant and then just a little bit of the aftermath, like

6   who was involved in meetings, what was the game –

7   Zach Hudlin:  Sure.

8   John Zamora:  – plan, just –

9   Zach Hudlin:  Um –

10  – everything that, that you can, uh, remember.

11  Zach Hudlin:  Okay.  I'm gonna pull up the, like, narrative thing I wrote a couple months ago, just

12  so I've got notes –

13  John Zamora:  Oh, awesome.

14  Zach Hudlin:  – um –

15  John Zamora:  You know, to be honest, man, uh, can we get a copy of –

16  Zach Hudlin:  – yeah.

17  John Zamora:  – that too?  Perfect.  Then we can kind of go through it at the same time with you

18  and you might answer a bunch of my questions.

19  Other Speaker:        And how do you spell your last name again?

20  Zach Hudlin:  H-U-D-L-I-N.

21  John Zamora:  Cool.

22  Other Speaker:        Thank you.

23  John Zamora:  So how long have you lived up here or worked up here?

**Interview of Chief Zach Hudlin on (DATE)**

1   Zach Hudlin:  – so like if, if we hired some guy off the street, he would get a provisional cert

2   waiver, so then paperwork to C post and then we would get out, he would get a provisional

3   certification for a –

4   John Zamora:  Okay.

5   Zach Hudlin:  – year.

6   John Zamora:  Got it, got it.  So he can work for a year but during that time, he needs to go through

7   the academy and –

8   Zach Hudlin:  Yeah, within –

9   John Zamora:  – certify.

10  Zach Hudlin:  – in that year, he's got to go through either part time or full time, the academy,

11  depending on how you hired him.

12  John Zamora:  Okay.  And ~~when~~ while you're getting that, ~~when~~ what did you know about ****

13  Chief, Former Chief Cody, was he certified?  Did he ever get a certification –

14  Zach Hudlin:  Not –

15  John Zamora:  – here?

16  Zach Hudlin:  – he got a provisional through Kansas –

17  John Zamora:  Okay.

18  Zach Hudlin:  – um, but from what I was told, I mean, he worked for Kansas City, Missouri for –

19  John Zamora:  A lot of years.

20  Zach Hudlin:  – yeah.

21  John Zamora:  Yeah.

22  Zach Hudlin:  And so he had a Missouri certification but he had to take a, um, challenge test or

23  reciprocity test to get certified in **** Kansas –

**Interview of Chief Zach Hudlin on (DATE)**

1   John Zamora:  Okay.

2   Zach Hudlin:  – **** this –

3   John Zamora:  Mm hmm.

4   Zach Hudlin:  – um, and they were going through some for, uh, sorry, I have to save this as a PDF,

5   my printer, my computer won't print –

6   John Zamora:  Ah.

7   Zach Hudlin:  – Word files –

8   John Zamora:  Uh huh.

9   Zach Hudlin:  – for some reason.

10  John Zamora:  Yeah.

11  Zach Hudlin:  Um, so he had to, they were going through, through some, um, curriculum changes

12  and so that –

13  John Zamora:  Mm hmm.

14  Zach Hudlin:  – him testing got drug out and then –

15  John Zamora:  Got it.

16  Zach Hudlin:  – he **** ==left==, so.

17  John Zamora:  Okay.

18  Zach Hudlin:  Uh, **** after the fact.  I didn't realize this, but if you, um, resign or get fired or

19  whatever before you go to the academy with that provisional, then you can't get another

20  provisional for a year.

21  John Zamora:  Hmm.

22  Zach Hudlin:   So there's provisional revoked, he couldn't work in Kansas as a law enforcement

23  officer until, uh, October 2nd of next year.

PAGE **8** OF **162**

**Interview of Chief Zach Hudlin on (DATE)**

1   Zach Hudlin:   – um, so this all started, um, from an email.  I mean, so when I, when I got included,

2   um, I was forwarded an email, um, that was from, I believe it, again, this is 3 months ago –

3   John Zamora:  Absolutely.

4   Zach Hudlin:   – so, uh, I, I think how this happened, this started was I was forwarded an email

5   from Brogan Jones, the city administrator –

6   John Zamora:  Okay.

7   Zach Hudlin:   – of here's what, what Ruth Herbel told Brogan, Brogan told Cody, Cody forwarded

8   it to me and then it was hey, here's what we've got, figure it out –

9   John Zamora:  Okay.

10  Zach Hudlin:   – basically.  Um, and so –

11  John Zamora:  And so was that Cody saying here's what we got, figure it out –

12  Zach Hudlin:   – well, like –

13  John Zamora:  – or ****?

14  Zach Hudlin:   – here's the email –

15  John Zamora:  Okay.

16  Zach Hudlin:   – um, see if this letter that's in this email, so we initially started out thinking that

17  somebody had stole her mail.

18  John Zamora:  Okay.

19  Zach Hudlin:   Um, we found out pretty quickly that you can access it online, um, but so we're,

20  that, that started as a, as a mail fraud, is what we thought, so, um, you know, it was find out who

21  should have had access to her mail or who did have access to her mail and then, again, it pretty

22  quickly turned into okay, you can, this is just a digital copy, so that it was find out if that's

23  something that the public can have.

PAGE **11** OF **162**

**Interview of Chief Zach Hudlin on (DATE)**

1    John Zamora:  Sure.

2    Zach Hudlin:   Um, and find out a way to try and figure out who someone could have gotten that, if

3    they didn't steal her mail.

4    John Zamora:  Mm hmm.

5    Other Speaker:        Mm hmm.

6    Zach Hudlin:   Um, and so that led to, that, one of 'em, I guess I don't have titles on those but, um,

7    so –

8    Other Speaker:        So did, uh –

9    Zach Hudlin:   – that, that –

10   Other Speaker:        – did chief kind of assign this to you, like is this a case assignment –

11   Zach Hudlin:   – it's –

12   Other Speaker:        – or who would be primary if that –

13   Zach Hudlin:   – it was –

14   Other Speaker:        – ****?

15   Zach Hudlin:   – him.  I, uh, I'd, the way I looked at it is he didn't a hundred percent know Kansas

16   Law, so he was relying on me to figure out what the crimes were involved, potentially –

17   Other Speaker:        Okay.

18   Zach Hudlin:   – for this thing.

19   Other Speaker:        So it's like a –

20   Zach Hudlin:   So –

21   Other Speaker:        – you guys –

22   Zach Hudlin:   – it was –

23   Other Speaker:        – were working together.

## Interview of Chief Zach Hudlin on (DATE)

1   Zach Hudlin:   – his case, –

2   Other Speaker::        Okay.

3   Zach Hudlin:   – he was right in there, he was doing all that, I was assisting him with it.

4   Other Speaker:         Okay.

5   Zach Hudlin:   It, it was his rodeo.

6   John Zamora:  Mm hmm.

7   Other Speaker:         Okay.

8   Zach Hudlin:   Um, he just, he was assigning me little tasks inside of that bigger case of hey, go

9   find this thing out, go find this thing out –

10  John Zamora:  ****.

11  Zach Hudlin:   – write this part, send a guy over to take pictures of the house for a search warrant,

12  that kind of thing.

13  John Zamora:  Okay.

14  Zach Hudlin:   Yeah.

15  John Zamora:  And yeah, I was gonna ask something quick.  Go and continue on though and I'll,

16  I'll **** hit ya probably after.

17  Zach Hudlin:   Yeah, um, and so, um, on Monday, August 7th, um, I had called KDOR, Kansas

18  Department of Revenue –

19  John Zamora:  Okay.

20  Zach Hudlin:   – um, I think it was their, it's called their driver, driver's license services or

21  something, just to find out if, like what this letter is, how someone would get it, um, and if they

22  were allowed to have it, and –

23  John Zamora:  Right.

PAGE **13** OF **162**

### Interview of Chief Zach Hudlin on (DATE)

1  Zach Hudlin:  – so after being on hold and transferred back and forth from this person to that

2  person and whatever, um, I talked to someone in IT –

3  John Zamora:  Okay.

4  Zach Hudlin:  – who told me that this isn't a public record, that they –

5  John Zamora:  Okay –

6  Zach Hudlin:  – accessed it –

7  John Zamora:  – this is not a public record or –

8  Zach Hudlin:  – that's –

9  John Zamora:  – it is?

10  Zach Hudlin:  – what they told me.

11  John Zamora:  Okay.

12  Zach Hudlin:  That –

13  John Zamora:  Okay.

14  Zach Hudlin:  – it was not a public record, that, um, basically, the public was able to access it but

15  it was a loophole in their system, that all you had to do was input the correct address for the, um, so

16  they, they just had to put in my correct address and they can get my driving record.

17  John Zamora:  Okay –

18  Zach Hudlin:  And it –

19  John Zamora:  – just so –

20  Zach Hudlin:  – and that it was a loophole in their system.

21  John Zamora:  Okay.  So just if I have your address, I can just, I don't need your name or –

22  Zach Hudlin:  So you –

23  John Zamora:  – date of –

PAGE **14** OF **162**

### Interview of Chief Zach Hudlin on (DATE)

1    Zach Hudlin:   – I mean –

2    John Zamora:   – birth or –

3    Zach Hudlin:   – you have to –

4    John Zamora:   – name or –

5    Zach Hudlin:   – have the –

6    John Zamora:   – **** –

7    Zach Hudlin:   – name –

8    John Zamora:   – ****?

9    Zach Hudlin:   – but you don't need like the Social or date of birth or anything like that.

10   John Zamora:   Okay and what –

11   Zach Hudlin:   Um –

12   John Zamora:   – what would you need, that you recall from them, what would you need, let's say

13   you want to get my information, what would you need from me to say I want to see if, uh, Zamora's

14   suspended.

15   Zach Hudlin:   Yeah.  So what they told me is that from this, this loophole in their system, you just

16   had to, you had to have their, their name, but the only piece of information that had to be correct,

17   outside of name, was you had to have their current legal mailing address and it would pop up all of

18   this information.

19   John Zamora:   Okay.  So then did you all check it out?

20   Zach Hudlin:   Yeah.  I mean, while I was on the phone with her, I pulled it up.

21   John Zamora:   Okay, what did –

22   Zach Hudlin:   Um –

23   John Zamora:   – what did you get?

PAGE **15** OF **162**

### Interview of Chief Zach Hudlin on (DATE)

1   Zach Hudlin:  – uh, I, it showed me, um, all of her driving history, so when she had, um, well, got

2   vert, got a – actually, I think, I might have a screenshot of that.  Let's see if I can ****.  So you end

3   up onto this page –

4   John Zamora:  Okay.

5   Zach Hudlin:  – this is a screenshot of that page.

6   John Zamora:  Okay.

7   Zach Hudlin:  Uh, um, where you put in their information, just put in first and last name –

8   John Zamora:  Okay.

9   Zach Hudlin:  – and then that information has to be correct, um, and then you click accept and it

10  will spit out all of their driving record.  You can use the –

11  Other Speaker:        I was just gonna put this up here.

12  Zach Hudlin:  – okay.

13  Other Speaker:        If that's –

14  Zach Hudlin:  Yeah.

15  Other Speaker:        – better for you.

16  Zach Hudlin:  Um –

17  John Zamora:  Okay.

18  Zach Hudlin:  – uh.

19  John Zamora:  So and you've done, obviously, a lot of work on this as well, so –

20  Zach Hudlin:  Sure –

21  John Zamora:  – after –

22  Zach Hudlin:  – I mean, you've pulled this up too –

23  John Zamora:  – that –

PAGE **16** OF **162**

### Interview of Chief Zach Hudlin on (DATE)

1   Zach Hudlin:  – I'd imagine.

2   John Zamora:  – ab, absolutely.  Now, what I learned, tell me what you thought requested

3   information.

4   Zach Hudlin:  Well, so I misunderstood that in the beginning.

5   John Zamora: Okay.

6   Zach Hudlin:  Um but that's were, so the, the conversation with KDOR, um, led to, okay, this isn't

7   a public record and then I said okay, do you have any idea who accessed that information.

8   John Zamora: Uh huh.

9   Zach Hudlin:  Um, and so that's ~~were~~ <mark>where</mark> this is who, uh, it, the, the, that's what, that's where

10  you, you, if you were trying to get my information, that's where you would put your information.

11  John Zamora: Right.

12  Zach Hudlin:  Um –

13  John Zamora: Exactly.  But it seems like errors can be made.

14  Zach Hudlin:  – yes.

15  John Zamora: Right.

16  Zach Hudlin:  Um, and so when talking to KDOR, they told me the two that had accessed that

17  was, um, <mark>**** Pam Maag</mark> on, phew, ****, yeah, on Friday, August 4th –

18  John Zamora: Uh huh.

19  Zach Hudlin:  – okay, no, I was wrong, it was on, it was Phyllis.

20  John Zamora: Okay.

21  Zach Hudlin:  So on Friday, August 4th, so the Friday before –

22  John Zamora: Uh huh.

23  Zach Hudlin:  – um, Phyllis Zorn had requested the information and gotten the information.

PAGE **17** OF **162**

**Interview of Chief Zach Hudlin on (DATE)**

1  Zach Hudlin:  Yes.

2  John Zamora:  Okay.  So not just name and address, but they'd have to have –

3  Zach Hudlin:  Yeah.

4  John Zamora:  – more info.

5  Zach Hudlin:  Right, but what KDOR told me is that the, the part, the, the, um, the piece of

6  information that had to be correct was if they just had the address, it would spit out the record.

7  John Zamora:  Hmm, okay.

8  Zach Hudlin:  So it, and when I talked to her, she had, they were aware of the loophole, they, that

9  she had meetings the whole next week about it to figure out what they were gonna do to get it

10  fixed.

11  John Zamora:  Okay.  And we'll come back to KDOR.  I know it's on my, my list here, so –

12  Zach Hudlin:  Uh huh.

13  John Zamora:  – then after you got that information and you told chief, hey, this is what I found,

14  that would be on the 7th, um, I can, I ran it myself, was it the same information that you all were

15  looking at that that –

16  Zach Hudlin:  Yeah.

17  John Zamora:  – was –

18  Zach Hudlin:  We were –

19  John Zamora:  – ****.

20  Zach Hudlin:  – able to pull up that same letter that we got, that was forwarded –

21  John Zamora:  Where –

22  Zach Hudlin:  – to me from Ruth –

23  John Zamora:  – okay.

## Interview of Chief Zach Hudlin on (DATE)

1   Zach Hudlin:   – we were able to pull up that same exact letter.

2   John Zamora:   Got ya, okay.  So then and ~~she~~ <mark>Chief</mark> knew that.  You said hey, I'm able to do this –

3   Zach Hudlin:   Yeah.

4   John Zamora:   – or I did it?

5   Zach Hudlin:   Yeah.

6   John Zamora:   Okay.  Um, from there, then what happens from there?

7   Zach Hudlin:   Um, let me close that one.

8   John Zamora:   Here, I'll get that from –

9   Zach Hudlin:   So it's –

10  John Zamora:   – **** statement.

11  Other Speaker:          These written?

12  John Zamora:   Yeah.

13  Other Speaker:          Okay.

14  John Zamora:   Oh, the –        No, –

15  Other Speaker:          ****?

16  John Zamora:   – the typed.

17  Zach Hudlin:   Um, yeah, so at that point, we knew then that, um, we had a council member

18  involved, we had, potentially, the newspaper or what, we potentially had the council member, a

19  newspaper, um, and so it was something way bigger than somebody grabbing a letter out of the

20  mail.

21  John Zamora:   Right.

22  Zach Hudlin:   Um, so then he got, he, the, got a hold of the KBI, um, and they –

23  John Zamora:   Who –

PAGE **28** OF **162**

Ex. A 70

**Interview of Chief Zach Hudlin on (DATE)**

1  Zach Hudlin:   Yeah.

2  John Zamora:  – unless –

3  Zach Hudlin:   So the only things I didn't include in that was the, um, the Word back ups of these,

4  these search warrants, um, the affidavits for the search warrants which will be in the search

5  warrants, um, the picture of Ruth's house, more keep, more Word double ups, a picture of Pam's

6  house and, uh, everything else you're **** –

7  John Zamora:  Okay.

8  Zach Hudlin:   – over.

9  John Zamora:  What was your role in the search warrant?

10  Zach Hudlin:   Property officer.

11  John Zamora:  Okay, what – let's say creating the search warrant, did you assist with –

12  Zach Hudlin:   He had me look over it after, so he would send me a not such a final version, but

13  here's what I've written, let me know what you think and so –

14  John Zamora:  Okay.

15  Zach Hudlin:   – I would make corrections or make suggestions and send it back.

16  John Zamora:  Okay.  Is that part of the email stuff or have –

17  Zach Hudlin:   I don't have any of that email saved.  Uh –

18  John Zamora:  Okay.  Do you have those kind of, I guess, because who else all, also helped with

19  the sear, the search warrant, let's say creating the search warrant, like **** –

20  Zach Hudlin:   My under –

21  John Zamora:  – **** –

22  Zach Hudlin:   – standing was that it was –

23  John Zamora:  – ****.

PAGE **42** OF **162**

003108

Ex. A 71

**Interview of Chief Zach Hudlin on (DATE)**

1    Zach Hudlin:  – but like the, the bulk of the creating it was, uh, Cody and Christner.

2    John Zamora:  Okay.  Yeah.  That's my understanding too.  So –

3    Zach Hudlin:  But I was just here's what we got, read it over, go through grammar crap, that kind

4    of stuff.

5    John Zamora:  Okay.  Did you add any like narrative, like I think you should add, add this charge

6    or learn this or add –

7    Zach Hudlin:  Well, so there –

8    John Zamora:  – X –

9    Zach Hudlin:  – there was some –

10   John Zamora:  – Y –

11   Zach Hudlin:  – communication –

12   John Zamora:  – Z?

13   Zach Hudlin:  – back and forth of read through this, let me know what crimes you think we have

14   and so then I would go into the, um –

15   John Zamora:  Your, we call it –

16   Zach Hudlin:  – ****.

17   John Zamora:  – CRS but yeah, you're –

18   Zach Hudlin:  Yeah.  Uh –

19   John Zamora:  – **** advising –

20   Zach Hudlin:  – I just –

21   John Zamora:  – ****.

22   Zach Hudlin:  – pull up the, uh, the Kansas Legislature thing and –

23   John Zamora:  Okay.

003109

**Interview of Chief Zach Hudlin on (DATE)**

1  Zach Hudlin:  Yeah, so –

2  John Zamora:  – the roles –

3  Zach Hudlin:  – then –

4  John Zamora:  – and?

5  Zach Hudlin:  – um, we cold, I mean, we got like some evidence bags and some property tags and

6  things like that from here and then went and met with everybody at the sheriff's office to figure out

7  what that game plan was gonna be.

8  John Zamora:  Uh huh.  And what was the –

9  Zach Hudlin:  Um, and so then, we just, I mean, we just figured out who was gonna go where,

10  what, who was gonna do what, that we were gonna send these two people to this house, these two

11  people to this house, we were gonna go to the Record office, we were gonna start there, they were

12  gonna –

13  John Zamora:  So who's gonna go to the Record office?

14  Zach Hudlin:  Uh, so it was, it was me and Cody and Jonathan from here –

15  John Zamora:  Okay.

16  Zach Hudlin:  – and then Steven ~~Jansen~~ Janzen started there with us as well.

17  John Zamora:  Okay.  Christner?

18  Zach Hudlin:  Christner, yeah, sorry.

19  John Zamora:  Okay.

20  Zach Hudlin:  Yeah.

21  John Zamora:  Yeah.  Okay.  Um –

22  Zach Hudlin:  Yeah, and then it, eventually, Steven went over to, uh, Ruth Herbel's house, but he

23  started at the, at the Record office with us.

PAGE **64** OF **162**

**Interview of Chief Zach Hudlin on (DATE)**

1   Zach Hudlin:  Um, I don't know when the last time was I saw it.  I don't know what version of it I

2   saw but yeah, that, my involvement was look for, for grammar stuff, make sure that it's accurate to

3   what you know --

4   John Zamora:  Okay.

5   Zach Hudlin:  -- or if there's anything you think we need to add.

6   John Zamora:  Did you observe on, in the warrant, there was a section put in from, I guess, the

7   KDOR site with 13, I call 'em like statements.  There is A through M check boxes, fill in the circle

8   to say --

9   Zach Hudlin:  Oh, yeah.

10  John Zamora:  Okay.

11  Zach Hudlin:  Um, I know what you're talking about.  I don't remember --

12  John Zamora:  ****.

13  Zach Hudlin:  -- seeing that in the search warrant but I, it's on a, a separate, like, it's where you

14  would pay to get your --

15  John Zamora:  Right, exactly.

16  Zach Hudlin:  -- uh, driving record.  It --

17  John Zamora:  Okay.

18  Zach Hudlin:  -- it has that giant list of these are what I am or these are what I want it --

19  John Zamora:  Exactly.

20  Zach Hudlin:  -- for or --

21  John Zamora:  This is --

22  Zach Hudlin:  -- whatever.

23  John Zamora:  -- why?

**Interview of Chief Zach Hudlin on (DATE)**

1    John Zamora:  ****.

2    Zach Hudlin:  – yeah.

3    John Zamora:  So it would be that record itself.

4    John Zamora:  Okay, does that surprise you at all, like, I mean, was that used 'cause you're saying

5    the person who used that pretty much committed a crime.

6    Zach Hudlin:  Well, so that, though, that, that box with all those selections is on that other site –

7    John Zamora:  Right.

8    Zach Hudlin:  – not the one that it, I talked to KDOR about.

9    John Zamora:  Uh huh, okay.

10   Other Speaker:        And that you told Cody about.

11   Zach Hudlin:  Right.

12   John Zamora:  Yeah.

13   Other Speaker:        That's, that's our confusion is from what we've seen so far, you were on with

14   KDOR talking about this public site, –

15   Zach Hudlin:  Right –

16   Other Speaker:        – the –

17   Zach Hudlin:  – talking –

18   Other Speaker:        – it's –

19   Zach Hudlin:  – about the –

20   Other Speaker:        – free.

21   Zach Hudlin:  – yellow one that I had had a screen grab of.

22   Other Speaker:        Yeah, we'll call it the free, so we're talking about the same thing.

23   Zach Hudlin:  Sure.

**Interview of Chief Zach Hudlin on (DATE)**

1   Other Speaker:        Okay, so that's the free side –

2   Zach Hudlin:  Yes.

3   Other Speaker:        – and then there's this whole other side, the paid side –

4   Zach Hudlin:  Right.

5   Other Speaker:        – that –

6   Zach Hudlin:  That looks –

7   Other Speaker:        – you –

8   Zach Hudlin:  – completely different from that –

9   Other Speaker:        – yeah and it –

10  Zach Hudlin:  – yeah.

11  Other Speaker:        – it has a pay wall, you know, you can't –

12  Zach Hudlin:  Yeah.

13  Other Speaker:        – get past it without paying and it has a, those 13 exemptions or –

14  Zach Hudlin:  This was –

15  Other Speaker:        – disclaimers –

16  Zach Hudlin:  – or this is why you want the –

17  Other Speaker:        – yeah.

18  Zach Hudlin:  – information to –

19  Other Speaker:        You need to attest to something and this –

20  Zach Hudlin:  – yeah.

21  Other Speaker:        – is why I'm doing this and it's under this –

22  Zach Hudlin:  Yeah.

23  Other Speaker:        – authority.

### Interview of Chief Zach Hudlin on (DATE)

1   John Zamora:  Mm hmm, it's included into one.

2   Other Speaker:            – it's the probable cause statement for the crime that you or Cody believes

3   has occurred –

4   Zach Hudlin:  Right.

5   Other Speaker:            – when the information you have that –

6   Zach Hudlin:  Is from a different site.

7   Other Speaker:            – a different site –

8   Zach Hudlin:  So yes –

9   Other Speaker:            – a –

10   Zach Hudlin:  – so –

11   Other Speaker:            – different –

12   Zach Hudlin:  – now –

13   Other Speaker:            – portal.

14   Zach Hudlin:  – so yeah, so like I said, I don't re, remember seeing that in there.  I probably would

15   have noted it, 'cause it's weird.  Um, but knowing now that that's in there, that's not the site that I

16   was dealing with at all, so they're, I mean, they're two separate animals.

17   Other Speaker:            Okay.

18   Zach Hudlin:  Uh, um –

19   Other Speaker:            So if you had seen that in that affidavit, would you have drawn attention to

20   that?

21   Zach Hudlin:  Yeah, 'cause that's, again, that's, they're two separate –

22   Other Speaker:            Okay.

23   Zach Hudlin:  – things, we're not comparing –

PAGE **83** OF **162**

**Interview of Chief Zach Hudlin on (DATE)**

1    Other Speaker:          – stand is –

2    Zach Hudlin:   Yeah.

3    Other Speaker:          – how did that, uh, 13 disclaimers get into the affidavit –

4    Zach Hudlin:   Yeah, not by –

5    Other Speaker:          – and –

6    Zach Hudlin:   – me.

7    Other Speaker:          – now, you know, a judge is using that as part of their determination on –

8    Zach Hudlin:   Yeah.

9    Other Speaker:          – whether or not a, a crime occurred.

10   Zach Hudlin:   Sure and so, again, I'm not saying I didn't see that.  I don't recall seeing that and I –

11   Other Speaker:          Yeah.

12   Zach Hudlin:   – feel like if I saw, again, a, a picture inside of a text document, I'd feel like that

13   would have been odd to me and I would have noted that.

14   Other Speaker:          Okay and then –

15   Zach Hudlin:   Because –

16   Other Speaker:          – upon further review, specifically, of that picture, seeing these 13 dis –

17   Zach Hudlin:   Right.

18   Other Speaker:          – claimers –

19   Zach Hudlin:   I mean, I'd know right away that that's not from this site –

20   Other Speaker:          – not –

21   Zach Hudlin:   – it's –

22   Other Speaker:          – what you have –

23

003151

## Interview of Chief Zach Hudlin on (DATE)

1   John Zamora: **** talking about.

2   Zach Hudlin:  Yeah.  There are four pages.  That, and so there were two pages front and back.

3   John Zamora:  Okay.

4   Zach Hudlin:  So I, again, actually, uh, the original should be in here.  Yeah, right there.  So there

5   are the originals of that.  That is what we received, but, um –

6   John Zamora:  And so –

7   Zach Hudlin:  – um –

8   John Zamora:  – let me –

9   Zach Hudlin:  – so –

10  John Zamora:  – it, and let's go back to –

11  Other Speaker Dispatch:        **** –

12  John Zamora:  – **** so then –

13  Other Speaker Dispatch:        – going to a Code Green refusal –

14  John Zamora:  – how –

15  Other Speaker Dispatch:        – we're **** –

16  John Zamora:  – **** who what, how ****?

17  Zach Hudlin:  So that morning, how do, that was the morning that we met with KBI.

18  Other Speaker Dispatch:        ****.

19  Zach Hudlin:  Uh –

20  John Zamora:  Uh huh.

21  Zach Hudlin:  – so that morning, um, Cody told me, hey, we need to go, Kari's got a statement

22  written.  We need to go get it and so I told Jonathan –

23  John Zamora:  Okay.

## Interview of Chief Zach Hudlin on (DATE)

1  Zach Hudlin:  – Benevides, this is where you need to go.  I, I gave him a manila envelope –

2  John Zamora:  Okay.

3  Zach Hudlin:  – and I had said take this over there, seal it up, bring it back to me.

4  John Zamora:  Okay.

5  Zach Hudlin:  And go, go get the statement.  This is what we received.  This thing, about the fifth

6  page, I don't understand, um, so this is what we got.

7  John Zamora:  Okay, so then did Jonathan, in fact, go over there?

8  Zach Hudlin:  Yeah, he went over there –

9  John Zamora:  So –

10  Zach Hudlin:  – came back a couple minutes later and again, I don't remember a timeline –

11  John Zamora:  – okay.

12  Zach Hudlin:  – but, um –

13  John Zamora:  And what did he do with it?

14  ~~Other Speaker~~ Dispatch:       **** with first response manager –

15  Zach Hudlin:  Handed it to me, I opened it up and –

16  John Zamora:  Was it –

17  Zach Hudlin:  – immediately –

18  John Zamora:  – was it sealed?

19  Zach Hudlin:  – yeah.

20  John Zamora:  Okay.

21  Zach Hudlin:  Um, and then it immediately went to our, the printer is moved now but I went to the

22  back office and immediately made copies, scanned it and so –

23  John Zamora:  Okay.

PAGE **89** OF **162**

003155                                         Ex. A 80

Interview of Chief Zach Hudlin on (DATE)

1    Zach Hudlin:  – that's when I saved it as a PDF, so I think, probably what happened here, um, is I

2    probably laid these both down on the scanner, made a color copy and then scanned those in

3    through our, through here, so that we had as many pages on single pages rather than –

4    John Zamora:  Right.

5    Zach Hudlin:  – scanning –

6    John Zamora:  Right, right.

7    Zach Hudlin:  – each individual and flipping it over and whatever –

8    John Zamora:  Yep.

9    Zach Hudlin:  – um, to make copies of those, and then, I mean, since that was – yeah, so then

10   Leeds got a digital copy of it or not a digital copy.  He got a, a printed out copy of what you're

11   seeing here –

12   John Zamora:  Mm hmm.

13   Zach Hudlin:  – he got one of those that morning as well.

14   John Zamora:  Okay.  And then –

15   Zach Hudlin:  And so this was –

16   John Zamora:  – I get guess it's documented but Kari is saying there is a couple pages missing.  Do

17   we know, were you the only one that handled it?  Did you reseal it or obviously, it's in just your

18   folder here, did that –

19   Zach Hudlin:  Right.

20   John Zamora:  – one go into –

21   Zach Hudlin:  I mean –

22   John Zamora:  – evidence –

23   Zach Hudlin:  – that's where it –

PAGE **90** OF **162**

**Interview of Chief Zach Hudlin on (DATE)**

1  John Zamora:  – or?

2  Zach Hudlin:  – I mean, for us, that's where it, a victim statement would always go is it –

3  John Zamora:  Okay.

4  Zach Hudlin:  – it's not evidence, it goes, I mean, I saved a digital copy and then it went in the case

5  folder.

6  John Zamora:  Got ya –

7  Zach Hudlin:  And –

8  John Zamora:  – okay.

9  Zach Hudlin:  – now, so it went straight from Jonathan, then it came to me and I opened up the

10  manila envelope and I had pulled out those two pages and made copies.

11  Other Speaker:       And where's the envelope at?  It's j, is it trash?

12  Zach Hudlin:  Yeah.

13  Other Speaker:       Okay.

14  Zach Hudlin:  Yeah, I mean, at that, we would, I just, we, uh, I, I, yeah, it just, it's just, Jonathan

15  didn't need to be involved any more than he already was.  We knew, knew going into it, it was

16  gonna turn, it was not gonna be a typical, you're going to a drug house and doing a search warrant.

17  John Zamora:  Mm hmm.

18  Zach Hudlin:  Um, I had, I don't think anybody, other than maybe the newspaper in the moment,

19  foresaw it turning into what it turned into, but we knew it wasn't gonna be your typical search

20  warrant and so, um, we, meaning, uh, well, screw that.  I tried to limit my involvement as much as

21  possible because I didn't want to be the one holding the bag at the end.  Um, if –

22  John Zamora:  What –

23  Zach Hudlin:  – it did blow up into –

PAGE **91** OF **162**

**Interview of Chief Zach Hudlin on (DATE)**

1   John Zamora:  – what were your concerns?

2   Zach Hudlin:  – I mean, it's a newspaper office.

3   John Zamora:  Okay.  And, uh –

4   Zach Hudlin:  Um –

5   John Zamora:  – what was the concerns about that?

6   Zach Hudlin:  – well, I mean, it, about it specifically being a newspaper, a newspaper office, I

7   didn't have any con, necessarily any specific concerns, but knowing Eric and knowing that it's, it's

8   the media and that it's a council member, it was gonna be a big deal, and so that's why when we

9   started and Cody even said the same thing, that, um, you know, we'll, we'll, basically, we'll give

10  people their tasks and they will be involved with their task, so that's why I was the property officer.

11  I wasn't the one writing search warrants.  I wasn't the one interviewing people.  I wasn't, um, I

12  mean, I ended up searching a little bit but my job was, I had a clipboard, here's the property we're

13  seizing and sealing it in an envelope and I hold onto it until we move onto the next place.  So I

14  mean –

15  John Zamora:  Okay.

16  Zach Hudlin:  – if you've watched my video, you saw they already done everything at the other

17  two places, that's just where I happened to start 'cause that's where we were gonna be seizing things

18  from first –

19  John Zamora:  Mm hmm.

20  Zach Hudlin:  – so when we went to, uh, Ruth's house next, I showed up, here's the property we

21  need, seal it up, tag it, give her a copy and roll out –

22  John Zamora:  Okay.

23  Zach Hudlin:  – to the next place.

**Interview of Chief Zach Hudlin on (DATE)**

1  coming from where he came from, how he could justify ask/tell/make.  It's not how I would've

2  done it, because it's not, not who I think we are.

3  John Zamora:  And we're just talking there's nothing in the warrant that we say Deb's name –

4  Zach Hudlin:  Sure.

5  John Zamora:  – is even in here.

6  Zach Hudlin:  Yeah.

7  John Zamora:  So, all understood.  Okay, um, so I think you did that, who all from your agency

8  was present?  So that's gonna be Benevides and ****?

9  Zach Hudlin:  Yes, and Cody.

10  John Zamora:  So just you three?

11  Zach Hudlin:  Yeah.

12  John Zamora:  Okay.

13  Zach Hudlin:  At the time, there were only four of us.

14  John Zamora:  Okay.

15  Zach Hudlin:  Um, and based on – well, so there a couple of reasons why, um, Duane McCarty

16  wasn't involved.  Once of those is that we already knew he was leaving, or we had very, I, I don't

17  remember if we knew he was leaving, but we certainly, at, at bare minimum we had very high

18  suspicions he was leaving.  And so, we weren't gonna involve him in –

19  John Zamora: Yes.

20  Zach Hudlin:  – something that was potentially going to go out past when we thought he was

21  gonna be here.  Um, he's also, um, he, he's friends with Ruth and we knew she was involved.  Um,

22  and from Eric's email that he sent to Jeff Cody, um there was some – I don't know if allegation is

23  the right word – there was some illusions.  That potentially there was some, like ~~policeman's~~

PAGE **113** OF **162**

## Interview of Chief Zach Hudlin on (DATE)

1   ~~conduct~~ police misconduct or this was a misuse of ~~SEJIS~~ CJIS Um, and so the, the potential was,

2   um, that because of his connection to these people that potentially that's where, if ~~SEJIS~~ CJIS was

3   violated, if that, that was how this started, that potentially that's where it came from.  Sorry, his

4   desk used to be right there.  So if that's where this came from potentially, um, and so that, we just

5   didn't include him.

6   John Zamora:  Did you check up on that, um, concern, like well it might be him?  I mean did you

7   do any –

8   Zach Hudlin:  Um, so I, I did make phone calls.  I never got a solid answer on how to figure that

9   out.

10   John Zamora:  Well, I know in ours, and I think that's universal like a QQ on CCIC NCIC.  Ours is

11   CCIC, so yours if probably KCIC, you know, quick query, driver's license.  So it's like, so during

12   that timeframe –

13   Zach Hudlin:  Well, and so –

14   John Zamora:  – in whatever name to say who all looked her up?

15   Zach Hudlin:  I don't –

16   John Zamora:  Who all obtained –

17   Zach Hudlin:  That might be possible to do for somebody, but I don't, I don't know how to do that.

18   Um, I did ask Dispatch if they could get me a list of, like, who all he ran.

19   John Zamora:  Okay, your guy here?

20   Zach Hudlin:  Yeah.

21   John Zamora:  Okay, and what's his name?

22   Zach Hudlin:  Duane McCarty.

23   John Zamora: Okay.

**Interview of Chief Zach Hudlin on (DATE)**

1   Zach Hudlin:   Um, so I mean I, I knew all the people and Cody didn't.

2   John Zamora:   Right.

3   Zach Hudlin:   So I, I was okay with asking the initial questions.  But at a certain point I don't,

4   again, I don't want my name on this.  Like I, if you wanna figure this stuff out, that's on you, bro.

5   Other Speaker:        On the chief.

6   Zach Hudlin:   Yeah.  Um, you know, 'cause now we're looking at investigating one of our officers.

7   I don't know that that's my responsibility as an officer.

8   Other Speaker:        Yeah, but was Duane ever put on leave?

9   Zach Hudlin:   So I mean if it was, you know, if I get called to his house 'cause he, we get called

10  there for a domestic or something, you deal with that in the moment.  But this is not something that

11  is in the moment, so even if we got called there I, I'm not gonna be the one.  Like, I'll deal with the

12  situation in the moment, but we're gonna have a deputy be the one that would have to arrest him.

13  Um, 'cause that's just –

14  Other Speaker:        Did it ever go so far to Duane on, uh, admin leave or –

15  Zach Hudlin:   No.

16  Other Speaker:        – on modified schedule or anything?  So, was that talk mostly between you

17  and Cody then?

18  Zach Hudlin:   Yeah.

19  Other Speaker:        About that maybe it's going –

20  Zach Hudlin:   Yeah.

21  Other Speaker:        – 'cause of the connection with like you said?

22  Zach Hudlin:   Yeah.  Well, and again, Jonathan had been here a couple days.  Uh, so we, yeah.

23  John Zamora:   He wouldn't even know what any of that is?

**Interview of Chief Zach Hudlin on (DATE)**

1  don't have that are between Cody and Christner or Cody and Mayfield or Cody and whoever, I

2  don't have any of that.  Uh –

3  John Zamora: And, Michael, explain a little bit of what, what the game plan is with, um, what's

4  your IT guy's name?

5  Other Speaker:        Lloyd.

6  John Zamora: Lloyd?  Yeah.

7  Zach Hudlin:   Yeah, Lloyd can get you a download of all that.

8  John Zamora: Okay, that's good.

9  Other Speaker:        Um, so we  understood him to be the county IT, it's true for the city also.

10  He's like the only guy in town.

11  Zach Hudlin:   Yeah, he's the computer guy in town.

12  Other Speaker:        ****, yeah, so he's got access on the back end to your email servers and

13  stuff.

14  Zach Hudlin:   Yeah, yeah, he's, uh, again, I'm not, I'm tech enough that I can figure things out

15  typically but I don't, I don't know all the back end stuff, but he's the guy we call when we need a

16  new email set up for a new employee.

17  Other Speaker:        Okay.

18  Zach Hudlin:   For here and the county.

19  Other Speaker:        That's, uh, so I had a question jotted down here, early on you said, um, we

20  don't have the emails between you and Cody working on the search warrants.  We were talkin'

21  about your guys back and forth on the search warrants and kinda collaborating, and I think John

22  asked something about, you know, was that via email or whatever, and you said, yeah, we don't

23  have those emails.

PAGE **123** OF **162**

### Interview of Chief Zach Hudlin on (DATE)

1   Zach Hudlin:   Right, it's just, it's not something I saved, uh, like, say, PDF copies of.

2   Other Speaker:         So were there emails back and forth between you and Cody on, on that?

3   Zach Hudlin:   Yeah, 'cause that would be, I mean, that was the easier way, like when I was

4   looking at the statute stuff for him, that would be the easier way rather than writing it down on a

5   piece of paper and –

6   Other Speaker:         Yeah.

7   Zach Hudlin:   – bringing it over, then he could look it up to find out if it really did fit what he was

8   looking at.

9   Other Speaker:         Definitely.

10  Zach Hudlin:   'Cause I, I mean, when I pulled all those statutes it was here's everything I think that

11  fit, you weed it out and see what you think.

12  Other Speaker:         So those emails aren't on your Outlook anymore?

13  Zach Hudlin:   Uh, they should, I mean, I don't know ****, so it should be.

14  Other Speaker:         Okay.

15  John Zamora:  Is that in the file that you gave us?

16  Zach Hudlin:   No, that's what I mean, they're, they're probably in my email still, but it's not

17  somethin' that I would have saved, um, –

18  Other Speaker:         So, has anybody asked you, hey, Zach, we have this request or an attorney is

19  –

20  Zach Hudlin:  No.

21  Other Speaker:         – sending you this?

22  Zach Hudlin:  No, that, that's all gone through, uh, sorry, I will let you finish your question.

23

## Interview of Chief Zach Hudlin on (DATE)

1    ~~Other Speaker~~ KDOR:          Later.

2    ~~Other Speaker~~ Desiree:        Bye.

3    ~~Other Speaker~~ Desiree:        This is Desiree.

4    Zach Hudlin:   My name is Zach Hudlin, I just got transferred to you.

5    ~~Other Speaker~~ Desiree:        Yes, okay.

6    Zach Hudlin:   Um, you know the ~~**** that's on here~~ back story at all what's going on here?

7    ~~Other Speaker~~ Desiree:        Uh, a little bit, so I was a little confused ~~like when~~ that's why I had

8    him transfer you, ~~but~~ cause I deal with that kinda stuff, I deal with the records, then, ~~uh, uh,~~ the uh

9    portals ~~I~~ to get the records, so I was just, ~~****~~ I just had him transfer ~~there's~~ cause it's a lot ~~in there~~

10   easier that me goin' back and forth with him to relay to you –

11   Zach Hudlin: Sure

12    ~~Other Speaker~~ Desiree: ~~uh , so~~ um, what I know, so, um, so how did you get the ~~****~~ testing

13   letter?

14   Zach Hudlin:   Um, so we received a copy of it from our local newspaper who got it from what

15   they're sayin' is confidential source.  Um, so ~~****~~ since that time while I was on hold with him, uh,

16   I mean, I can get a copy of the letter, I just ~~have to~~ click the box ~~the thing,~~ that's saying I'm doing it

17   for, you know, legal reasons and it will spit out a copy of that letter. 2:16:19

18   ~~Other Speaker~~ Desiree:        Right.

19   Zach Hudlin:   Um, so I guess really what I'm asking is I wanna know if somebody else has done

20   what I just did and ask for a copy of that letter ~~that contains~~ they just had all of her personal

21   information.

22   ~~Other Speaker~~ Desiree:        It would appear that way.  Um, yeah, I have, cause what happens is

23   so when you, so if you just requested to view the documents, I will actually be able to see that in

### Interview of Chief Zach Hudlin on (DATE)

1   the morning as long as you put your name on there.  Um, even if you put it as her name it still

2   comes through.   Um, but it looks, does a Phyllis ring a bell to you?

3   Zach Hudlin:   Yeah, what's **** the last name?

4   ~~Other Speaker~~ Desiree:        Zorn.

5   Zach Hudlin:   ~~Well,~~ Yep K, and so that ~~person's~~ person ~~still~~ filled out **** this same form that I

6   just did.

7   ~~Other Speaker~~ Desiree:        Yep.

8   Zach Hudlin:   And ~~of course~~ clicked I'm doing this legally and they were able to get a copy of this

9   letter.

10  ~~Other Speaker~~ Desiree:        Yes.

11  Zach Hudlin:   Okay, and then do you know the date when that was done?

12  ~~Other Speaker~~ Desiree:        Um, let's see, it shows up in the morning, so it would have been

13  done Friday. And I don't know about what time on Friday 'cause it's just a batch that hits at 7:00 in

14  the morning and it throws all of the, um, throws all those **** the ~~document side~~ documents that I

15  can check into, well, everybody ~~checks~~ can on our end, but it just throws those over there so we can

16  see who's accessing the records, but if Phyllis does not work for PD, um, I would imagine she

17  probably works for the paper.

18  Zach Hudlin:   Probably.

19  ~~Other Speaker~~ Desiree:        That's, a little –

20  Zach Hudlin:   So but, ~~She's~~ she is the only one other than me which I ~~didn't ****~~ I guess you'll

21  know about tomorrow morning. That has filled that out And, and requested those documents.

22  ~~Other Speaker~~ Desiree:        Well, and the weird thing is it is, I have that name on there on

23  August 6th and then a driver herself did it ,it looks 3 minutes after on August 4th.

### Interview of Chief Zach Hudlin on (DATE)

1    Zach Hudlin:   Okay, and so, where, where are you getting **** I mean, ? How does, how are you

2    getting the name that actually ran it versus who the running is, has they're running it as?

3    Zach Hudlin:   So when you **** go.

4    Other Speaker Desiree:        **** So like tomorrow morning it will tell you that, I, I'm guessing

5    that **** Zach Hudlin ran it, but where is, where is that information coming from?

6    Zach Hudlin:   Um, as long as –

7    Other Speaker Desiree:        Sorry just a second, Dispatcher's yellin' at me?

8    Zach Hudlin Desiree:  Okay.

9    Zach Hudlin:   I'm surprised that hasn't happened right now.

10   John Zamora:  Okay.

11   Other Speaker Dispatch:        **** requesting traffic control in about 30 minutes for an ****

12   stakeup (?).

13   Zach Hudlin:   Okay, sorry about that.

14   Other Speaker:        That's okay.  Um, so when you are page **** that asks for an the address,

15   and you go down, down to the bottom and it says signature or whatever it is, if you type in your

16   name then it will come through that you were the one requested it, requesting it.  However, if

17   someone has her information and they sign it as her, it shows up as her being the one who ran it, so

18   I guess, I guess what I'm saying is on the 3 minutes after this Phyllis lady ran it I don't actually

19   know if it was Kari or not that ran her own records, but **** um, I'm actually, we're currently

20   working on this because, um, yeah, they're there's, I mean, honestly, if anybody has your address

21   as it appears on your driver's license, they can access all of your documents in your file, um, which

22   we don't, we don't want, um, –

23

### Interview of Chief Zach Hudlin on (DATE)

1   Zach Hudlin:   Yeah, okay, so I misunderstood then when I filled that part of that, uh, the

2   requester's information, uh, I breezed past that and so I put in Kari's information there and then

3   clicked ~~the thing~~ Ok and that's what spit out this document, so the person, so you're saying that

4   someone put in that other name –

5   Other Speaker:        Mm hmm.

6   Zach Hudlin:   – and requested this information and it still spit it out because she had all the right

7   answers.

8   Other Speaker:        Yep.  So yes, we are, I've, uh, actually I think it's next week I have a meeting

9   on this whole driver's license status check because it's, um, I guess until we started diving into it we

10  didn't really realize how unsecure it was, uh –

11  Zach Hudlin:   Yeah.

12  ~~Other Speaker~~ Desiree:  ~~mean,~~ Being, being that, I mean like I said, if you have her address which

13  if you guys got the letter, you have her address, name and all the answers, so anybody can pull it

14  up, um, so yeah, we actually have meetings coming up on that to make it a little bit more secure,

15  um, so not everybody can access someone's documents, yeah.

16  Zach Hudlin:   Yeah.  Okay.

17  ~~Other Speaker~~ Desiree:        So that is the name that shows up under the requester's name on the

18  one that happened on 8/4, um, and yeah, if she ~~****~~ doesn't  work for ~~PDN~~ PD ~~then~~ I would

19  assume that she probably works for the newspaper.

20  Zach Hudlin:   Correct.  Um, and so, my last question, uh, so that's what was ~~pulled~~ filled out in

21  that ~~folder~~ form.  Do you have any records of like this is the IP address that requested it, it's just

22  whatever they chose to put in there?

23  ~~Other Speaker~~ Desiree:        Correct.

PAGE **140** OF **162**

**Interview of Chief Zach Hudlin on (DATE)**

1    Zach Hudlin:   Yeah, um, I mean, so - go ahead.

2    John Zamora:  Oh, uh, no, go ahead, a little bit of difference here.

3    Zach Hudlin:   So, right, so, um, I mean, she didn't directly say it's not a public thing, but I, I guess

4    that was my, that's what I took away from it that anybody can do it, we're tryin' to fix it, you

5    shouldn't be able to do it, so again, she didn't directly say that's not a public document or whatever,

6    but I mean, now sounds, I mean, even before you played the call for me it sounds like now the, the

7    world is saying that everybody **** have that so, I mean, you can see how I got there from what

8    she was telling me.

9    John Zamora:  Yeah, and when I went through it, because just what you said, you know, the

10   address, but she knows you're on that, I believe, 'cause I've spent a lotta times with KDOR, the

11   head legal guy, um, and we ran though a whole mock scenario with Scooby Doo, so what you need

12   is that the initial, tell me if it's was different for you, you got your name , you got your date of birth,

13   you have your driver's license information, so we need those, that information there.  Then it will

14   click you to that site, now we want your address and it has to be exactly what is on the driver's

15   license.

16   Zach Hudlin:   Right.

17   John Zamora:  Then it opens up the world for you, so you'll have that one with like I think the

18   blocks at some point in time.

19   Zach Hudlin:   Yeah.

20   John Zamora:  Now when you want to see –

21   Zach Hudlin:   That once screenshot  that shows Center Court House and all that, and then

22   underneath that is where it said, um, again, I think the number is 19, but it was 19 documents, then

23   that's where you would get that –

### Interview of Chief Zach Hudlin on (DATE)

1 Zach Hudlin:  I don't, I don't know.  I mean, we thought in the moment it was, but, um, but again,

2 we were going, uh, I mean, I'd, I'd connected those other dots that you're not supposed to have this

3 because we're trying to fix it.  Um, so, I mean, if you stumble on something, is it a crime.  If you

4 stumble onto a loophole, is that a crime?

5 Other Speaker:        Right.  I guess that's a good way to.

6 Zach Hudlin:  Um, –

7 John Zamora:  And then, all of a sudden, you're gonna have a whole lotta work to do because

8 anyone who ever touched KDOR from the city of Marion has now committed a crime if they

9 obtain that info.

10 Zach Hudlin:   Yeah.  Well, and so that's where, that, that's where Cody went after I told him that

11 these are the two that got it, or these are the two names that popped up, is that, okay, well, how long

12 have they been doing this, how many time, how many other people have they violated to where he

13 went in our conversation of now who do we look for 'cause they've probably done it to every single

14 cop in the County, or they've done it to every criminal in the County, or whatever, and so that's

15 where he, he ran with that – I mean, he didn't do anything with it, but that's where his brain, that,

16 that's where he led himself down.

17 Other Speaker:        Yeah, it's just, you know, when you get to the end of this, well, the

18 beginning of the end here, where the affidavit's submitted, there's a lot of leaps of, uh,

19 understanding or, or maybe assumptions because some of that wording is pretty direct in that

20 affidavit.  Um, Phyllis Zorn looked it up, 3 minute later somebody pretending to be Kari looked it

21 up, you would've had to do these 13 things, which is way over here and does not –

22 Zach Hudlin:  Right, –

23 Other Speaker:        – have anything –

### Interview of Chief Zach Hudlin on (DATE)

1   Zach Hudlin:   – **** website.

2   Other Speaker:          – to do with –  Yeah, totally a separate thing.  That's not true.  Um, that

3   would be a materially false fact, right?  That's not true.  You wouldn't have to do that to get this, so

4   someone had to –

5   Zach Hudlin:   I mean, you probably could, but that's not what I was asking them.

6   Other Speaker:          Right, I mean, as far as the affidavit reads, when you go through it and

7   select, –

8   Zach Hudlin:   Right.

9   Other Speaker:          – okay, is this factual information, Phyllis Zorn did it, now Kari did it or

10  somebody pretending to be Kari –

11  Zach Hudlin:   Sure.

12  Other Speaker:          – did this, and would have had to click one of these things and taking on her

13  identity that's not actually true.  You know what I mean?

14  Zach Hudlin:   Right.

15  Other Speaker:          Um, and you had a conversation with, uh, KDOR about this whole other,

16  the public portal, the free portal, that it's not even that simple with that portal.  I mean, it's not that

17  simple that, hey, if you punch this in and do this, you've hacked it so to speak, or you've missed,

18  done, you've, you've done an, uh, unlawful thing obviously.  In fact, when you're doing it, you did

19  the same thing that, maybe, Phyllis did.  Do you know what I mean?

20  Zach Hudlin:   Right.

21  Other Speaker:          So, when you look at the affidavit and go, how did we get to this affidavit,

22  that's kinda what we're trying to piece together, is –

23  Zach Hudlin:   Sure.

**Interview of Chief Zach Hudlin on (DATE)**

1   Other Speaker:          – you know –

2   Other Speaker:          What, we're there mistakes –

3   Zach Hudlin:  Right.  So, I mean, –

4   Other Speaker:          Was there carelessness, were there mistakes, is there any malicious intent,

5   that kind of stuff.  We're trying to answer those questions.

6   Zach Hudlin:  Right.

7   Other Speaker:          Hey, what, what was, well, who knew what, at what time did they know it,

8   what did they do, and then what was their motivation kind of.

9   Zach Hudlin:  Sure.

10  Other Speaker:          So.

11  Zach Hudlin:   Yeah, I mean, so there was no, from my, from me, um, nothing malicious.  I mean,

12  nothing you would necessarily careless of, of lack of understanding.  Looking back at it now, um,

13  there was some assumptions like I, after listening to that phone call, the, it wasn't as direct as ****

14  – again, I see how I got there.  Um, so, um, yeah, I just…

15  John Zamora:  Yeah, we just, yeah, we, kinda touching back on those, you know, just the 13

16  things, and then that, at least that clarifies –  I'm glad that, 'cause I received that document with,

17  like, the C checked, and I'm like –

18  Zach Hudlin:  Right.

19  John Zamora:  – what the heck is –

20  Zach Hudlin:  Right, –

21  John Zamora:  – this.

22  Zach Hudlin:  – and so I'm –

23  John Zamora:  **** –

**Interview of Chief Zach Hudlin on (DATE)**

1   Zach Hudlin:  – **** –

2   John Zamora:  – so at least –

3   Zach Hudlin:  – I emailed that, so I'm sure –

4   John Zamora:  Yeah.

5   Zach Hudlin:  – he just used the same screenshot.  So.

6   John Zamora:  But he didn't because –

7   Other Speaker:        Yeah, that's **** –

8   John Zamora:  – there was nothing checked.

9   Zach Hudlin:  Oh, okay.

10  John Zamora:  And so we –

11  John Zamora:  Yeah, checked.

12  John Zamora:  – were looking, okay, –

13  Zach Hudlin:  Okay, –

14  John Zamora:  – **** –

15  Zach Hudlin:  – I'm, I'm following you.

16  John Zamora:  Yeah.  If you violated, let's say, these 13, I call 'em statements, that's just in my

17  mind, um, and you checked off one, then, yeah, that's gonna be a forgery that's illegal.  You're –

18  Zach Hudlin:  Right.

19  John Zamora:  – **** –

20  Zach Hudlin:  But, but again –

21  John Zamora:  – **** but nothing was checked and there was nothing in the warrant that said

22  AND this person, Phyllis, checked this.

23  Zach Hudlin:  Right.

**Interview of Chief Zach Hudlin on (DATE)**

1   John Zamora:  Or –

2   Zach Hudlin:  Well, and, and we're talking about –

3   John Zamora:  – **** –

4   Zach Hudlin:  – two se –

5   John Zamora:  – **** –

6   Zach Hudlin:  – different subjects for the two ****.

7   John Zamora:  Exactly.

8   Zach Hudlin:  Yeah.

9   John Zamora:  Geez.

10  Zach Hudlin:  Um, –

11  John Zamora:  And you just dealt with ****.

12  Zach Hudlin:  And so –  Right.  And so, I mean, I don't remember even sending him that

13  screenshot, but that's where, I mean, to a certain extent, you just have to kinda take me at my word

14  that we –

15  John Zamora:  Oh, yeah.

16  Zach Hudlin:  – had a conversation about it.

17  John Zamora:  Mm hmm.

18  Zach Hudlin:  Because I didn't email absolutely every –  I mean, all of our communication wasn't

19  done by email.

20  John Zamora:  Sure.

21  Zach Hudlin:  Um, but, I mean, it, it's, again, they're, they're two very different websites w, that,

22  they don't even look the same.

23  Other Speaker:        Right.

### Interview of <u>KBI Special Agent Todd Leeds</u> on (11/17/2023)

1   Agent Todd Leeds:    ~~Um~~ Yeah I think I responded.

2   Speaker 2:    Yeah, I had the same problem.  I got bounced around the phone tree for about an

3   hour yesterday.

4   Agent Todd Leeds:    Um-hmm.

5   Speaker 2:    To me, it seemed like you were responding to him, ~~although it was a~~ on the

6   Agent Todd Leeds:    Oh, ~~then he~~ cause I didn't responded to that one.

7   Speaker 2:    – the, the KDOR, but, so this one came in at, on Thursday, August 10, 5:57, then

8   Friday, August 11 at 9:09.  So, two emails.  The last one ~~of course were~~ the four search warrants

9   are in the judge's hands, should be signed any minute.  And I think you ~~stopped right~~ saw that there

10   (pointing to the email).

11   Agent Todd Leeds:    Um-hmm.

12   Speaker 2:    And uh, then your response at 10:04 was, I had the same problem.  Got bounced

13   around the phone tree for about an hour yesterday from your iPhone.

14   Agent Todd Leeds:    Yeah.

15   Speaker 2:    To him.  So, I guess I'm just kinda curious, because I'm gonna be like, okay, well

16   here he's saying okay, um, did you execute these today, meaning okay, I saw that, and did you

17   execute it, or would it be, in any case I mean, hey, man, dude, stop, time, um, timeout right now

18   instead of let's say, I, I'm just picking your mind.  So, please don't ~~****~~ think you know.

19   Agent Todd Leeds:    No.  Absolutely.  No.  That, that's a fair question.  No, I, ~~I'd say~~ honestly I

20   don't know, because I don't know why he was sending me a search warrant.  Um.

21   Speaker 2:    Did they talk about search warrants?  Did they provide any search warrants to you

22   previous?

23

003477

**Ex. A 99**

**Interview of <u>KBI Special Agent Todd Leeds</u> on (11/17/2023)**

1   Agent Todd Leeds:      No.  The only thing they talked about, you should definitely, you should

2   definitely interview Jeff Soyez, **** being the office.  But he's like, wait, the best course of action

3   is **** <mark>you should probably do some</mark> you some recent **** preservation letters.  I'm like, yeah,

4   preservation letters sound good.  Uh, do some preservation letters, and um, yeah, and that was it.

5   We did not talk at all about search warrants.  I told him I was gonna have to get back with him the

6   following week, um, about the case.

7   Speaker 2:      And I think <mark>on</mark> the ~~other night~~ <mark>9th</mark> you had mentioned that you had the conversation,

8   right, with the group?  Because we have here, it's gonna be Jeff, the sheriff, Under-Sheriff Larry,

9   uh, ~~Jeff ****~~ <mark>Investigator</mark>.

10   Agent Todd Leeds:      Jeff Soyez?

11   Speaker 2:      Yes.  Uh, Jeff Soyez, uh, Under-Sheriff Larry Starkey, Investigator Aaron

12   Christner, Chief Gideon Cody, um, ~~KBIU~~ <mark>KBI/you</mark>, and also present was, uh, Zach ~~Hudland~~

13   <mark>Hudlin</mark>.

14   Agent Todd Leeds:      Okay.

15   Speaker 2:      Was that, was that right about that meeting?  Would you think?  'Cause you said

16   <mark>****</mark> <mark>others were there.</mark>

17   Agent Todd Leeds:      Yeah, they were right.  So, we were in his, we were in the, Cody's office in

18   the Marion County Police Department, or Marion –

19   Speaker 2:      Um-hmm.

20   Agent Todd Leeds:      – Police Department.  He, the chief was sitting behind the desk, and the

21   sheriff was sitting there next to him, kind of on the other corner of the desk, and there were some

22   other guys kinda milling about there in that office.

23   Speaker 2:      Um-hmm.

003478

## Interview of <u>KBI Special Agent Todd Leeds </u>on (11/17/2023)

1   Other Speaker:     Okay.

2   Agent Todd Leeds:    All right. Uh, the purpose of this memorandum is to document Kansas

3   superior investigation KBI Special Agent Todd Leeds in-person meeting with the Marion, uh,

4   Police Department, Chief of Police Gideon Cody, which occurred August 9, 2023, from

5   approximately 10:30 a.m. to 11:00 a.m. at the Marion Police Department in reference to KBI Case

6   KBI23-533. On Monday, August 7, uh, 2023, Chief Gideon Cody of the Marion Police

7   Department requested KBI investigative assistance for a public corruption/official misconduct

8   case with, uh, within his jurisdiction. On Tuesday, August 8, 2023, uh, SA Leeds was contacted by

9   Special Agent in Charge Bethany Popejoy, uh, via telephone. SAC Popejoy, uh, Popejoy was my

10  supervisor at the time and, uh, told SA Leeds he would be assigned a new case in Marion County,

11  Kansas. SA Leeds was instructed to con, contact the Marion Police Department Chief of Police for

12  further information on this case. SA Leeds contacted, uh, MPD Chief of Police, Gideon Cody, via

13  telephone at 816-309-0841. Chief Cody told SA Leeds that he, uh, had what he believed was an

14  official misconduct/public corruption case and needed KBI investigative assistance in this matter.

15  SA Leeds agreed to meet with, uh, Chief Cody the next morning to discuss the case. Uh, On

16  Wednesday, August 9, 2023, SA Leeds drove to the City of Marion located in Marion County,

17  Kansas, and contacted MPD Chief of Police Gideon Cody in his office at the Marion Police

18  Department. Uh, present in Chief Cody's office for the meeting were Chief Cody and the Marion

19  County Sheriff, Jeff Soyez, along with two other police officers or detectives, uh, who would get

20  assigned to assist with the investigation. Chief Cody explained the investigation he had opened,

21  uh, for the MPD as follows: On or about Monday, August 7, 2023, Chief Cody was contacted via

22  email by a man named Eric Meyer. Eric Meyer is a resident of the City of Marion. Meyer is the

23  owner of a local newspaper named "The Marion Record." In this email, Meyer said he had to

Case # 23-442



**SHERIFF**
Jeffrey T. Soyez

202 S. 4th
Marion, KS 66861

**UNDERSHERIFF**
Larry R. Starkey

Phone: 620-382-2144
Fax:    620-382-3441

*www.marioncoks.net*

On August 24, 2023 at approximately 1000 hrs, I, Detective Aaron Christner, County Attorney Joel Ensey and Undersheriff Larry Starkey conducted a conference call with Bernie Rhodes and Jack Nevins.

I explained to Mr. Rhodes and Mr. Nevins the details of the osTriage capture and what copies I had of the digital data.

I told Mr. Rhodes that I would like a court order before deleting or destroying any data or devices. I also said that I wanted to retain a copy of the data for the possibility of future litigation.

Mr. Ensey said that he would get the IT administrator Lloyd Davies in contact with Mr. Rhodes and Mr. Nevins to explain and ensure security of the files that are currently stored in the Marion County OneDrive files.

The call ended at approximately 1036 hrs.

Around 1107 hrs, I gave Marion County Communications Director Chelsea Weber a call request form requesting a copy of the recording from the call.

| Detective A. Christner | Report: 08/24/2023 | Page 1 of 1 |

**Ex. A 102**

Case # 23-442

**SHERIFF**
Jeffrey T. Soyez

202 S. 4th
Marion, KS 66861



**UNDERSHERIFF**
Larry R. Starkey

Phone: 620-382-2144
Fax:    620-382-3441

On August 8, 2023, while off duty, I, Detective Aaron Christner, received a phone call from Undersheriff Larry Starkey. He told me that he was with Marion Police Chief Gideon Cody. The Marion Police Department was requesting assistance on a case involving the use of computers and technology. Chief Cody briefed me on the case and sent me an email requesting some preservations that needed to be done.

On August 8, 2023 around 1320 hrs, I submitted a preservation request to Google for rherbelfamily@gmail.com.

On August 9, 2023 around 1304 I submitted a preservation request to Yahoo for phyllis_zorn@yahoo.com. Around 1312 hrs, I faxed a preservation request to CyberLynk Network for accounts Phyllis@MarionCountyRecord.com and Eric Meyers Eric@MarionCountyRecord.com.

On August 9 and 10, 2023 I assisted in writing search warrant applications for several locations in Marion, Marion County, KS.

On August 10, 2023, in preparation for executing the search warrants I modified the osTriage settings to search for items pertaining to the search warrants. I changed the keyword configuration to look for items related to the search warrants and removed the keywords looking for child sexual exploitation material.

On August 11, 2023 around 1056 hrs, I arrived at the Marion Record, 117 S 3rd St in Marion, Marion County, KS to assist Marion Police Department with the execution of a search warrant. I assisted in clearing the building and once secure photographed the premise. I photographed the outside of the building and the inside on the main level.

On the computer that was identified as Phyllis Zorn's I started osTriage around 1111 hrs. It was unlocked.

| Detective A. Christner | Report: 08/21/2023 | Page 1 of 5 |

---

Case # 23-442



**SHERIFF**
Jeffrey T. Soyez

202 S. 4th
Marion, KS 66861

www.marioncoks.net

**UNDERSHERIFF**
Larry R. Starkey

Phone: 620-382-2144
Fax: 620-382-3441

The evidence was all collected by officers of Marion Police Department but transferred to the Marion County Sheriff's Office evidence storage. I plugged in the phones that had been seized to ensure that they would stay charged. I was told that Eric's phone was unable to be placed in airplane mode without a password.

On August 14, 2023, I copied the osTriage folder from the drive used in the search warrant execution to a USB flash drive for evidentiary purposes. Afte the copy I ran Karen's Hasher on both files.

The SHA-1 hash value for the original configuration that was on the SSD is
F0DD87015FFA2D7BB8C97B68BA46C5AEC97DF7CB

The SHA-1 hash value for the backup on the flash drive is
F0DD87015FFA2D7BB8C97B68BA46C5AEC97DF7CB

I assisted in writing a probable cause affidavit for Eric Meyer. In doing so I retrieved the document seized from Eric's house and Marion Record.

While investigating the source of the document I found what appears to be the same document using https://www.kdor.ks.gov/Apps/DLStatus/secure/default.aspx

A user must enter the driver's license number, first name, last name and date of birth.

When checking Kari Newell's information it creates a page that appears to be the same as the document the was collected from Eric Meyer's house.

In addition to the document, if a user does not complete each field the error message at the top of the page states "You must enter your first name." It states that for each respective field.

| Detective A. Christner | Report: 08/21/2023 | Page 3 of 5 |

Ex. A 104

003653

(3) using confidential information acquired in the course of and related to the officer's or employee's office or employment for the private benefit or gain of the officer or employee or another or to intentionally cause harm to another;

II.    **21-6107.    Identity theft; identity fraud.** (a) Identity theft is obtaining, possessing, transferring, using, selling or purchasing any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to defraud that person, or anyone else, in order to receive any benefit.

(b)    Identity fraud is:

(1)    Using or supplying information the person knows to be false in order to obtain a document containing any personal identifying information; or

II.    **21-5839.    Unlawful acts concerning computers.** (a) It is unlawful for any person to:

. . .

(5)    knowingly and without authorization, access or attempt to access any computer, computer system, computer network or computer software, program, documentation, data or property contained in any computer, computer system or computer network.

**Nexus:**

Four search warrants were issued in this situation:

1. <u>The Newspaper offices</u> - 17 S. 3rd Street, Marion, Kansas - alleged violations of identity theft and computer crime. The affidavit sets forth facts to suggest that Phyllis Zorn accessed the KDOR document by asserting false information on the KDOR website. Parenthetically, it also seems to suggest that its possible Pam Maag obtained the information -- a possibility compounded by the second search warrant for Ms. Maag's residence at 1718 Upland. A colorable claim is made to establish that Phyllis may have committed the crime commonly referred to as Computer Crime, in violation of KSA 21-5839, however no effort is made in the warrant application to establish that Phyllis utilized a computer located in her home, at the newspaper offices, used her cell phone or some other device in some other location. A subpoena to obtain the IP address utilized for the ostensible download from the KDOR webpage could have and should have been sought first to limit the scope of this application.

2. Pam Maag's home – 1768 Upland, Marion, Ks – alleged violation of identity theft. This warrant is based solely on innuendo. I had to read this multiple times to follow the thread -- which seems to be that Ruth, who is married to a former highway patrolman forwarded the KDOR document to another. No effort is made to establish that she is the one who illegally downloaded the document, where she might have done this or by what means. No effort was made to explain why the officer(s) believe the fruits or instrumentalities of a crime are in her home or in devices in her home. The affidavit is silent as to issues of venue and nexus.

3. Ruth Herbel's home – 611 S, Freeborn – alleged violations of identity theft and official misconduct. First, no effort was made to establish that Ruth Herbel downloaded the material in her capacity as a council member. As such any reliance on Official Misconduct is utterly misplaced. As to identity theft, a colorable effort is made to establish that someone illegally obtained the KDOR records,

3

Ex. A 105

| | |
|---|---|
| 1 | Det. Christner:         It was me, Todd, Todd Leads from the KBI, um, Sheriff Soyez, uh, Former |
| 2 | Chief Gideon Cody and Undersheriff Sheriff Larry Starkey. I believe Marion Officer Zach, can't |
| 3 | think of his last name all of a sudden, but Zach – |
| 4 | Agent Zamora:         Hudlin? |
| 5 | Det. Christner:         Hudlin, yes, um, was also there. Um, and then I think they had just hired a |
| 6 | new one. He might have been just kinda running around, but he wasn't necessarily involved in the |
| 7 | meeting. |
| 8 | Agent Struwe:         So, where was that at? |
| 9 | Det. Christner:         That was at Marion PD. |
| 10 | Agent Struwe:         Okay. |
| 11 | Det. Christner:         In Gideon's office. |
| 12 | Agent Struwe:         What, what's the summary of that meeting? What did you learn in that |
| 13 | meeting? |
| 14 | Det. Christner:         Um, they briefed Leads on kinda what was going on with the, the Record |
| 15 | and the accessing the driver's record, driving record of, um, Kari Newell, if I remember correctly. |
| 16 | Agent Struwe:         Who, who briefed that? |
| 17 | Det. Christner:         I think Cody did most the talking, but I remember Jeff talking a little bit. |
| 18 | Agent Struwe:         Okay. |
| 19 | Det. Christner:         Um – |
| 20 | Agent Struwe:         So, when Cody's talking and he's briefing leads of KBI, you know, what is |
| 21 | he telling him about this case? What is this case about? |
| 22 | Det. Christner:         Boy, that was a long time ago. |
| 23 | Agent Struwe:         Sure, if you don't remember, you don't remember. |

PAGE 5 OF 131

| | | |
|---|---|---|
| 1 | Det. Christner: | Um – |
| 2 | Agent Zamora: | Or in general? |
| 3 | Agent Struwe: | Yeah. |
| 4 | Det. Christner: | Uh, I just don't know if what my memory is from after that meeting from |
| 5 | that specific day. | |
| 6 | Agent Struwe: | Sure. |
| 7 | Agent Zamora: | Gotcha. Gotcha. |
| 8 | Det. Christner: | I have them all... |
| 9 | Agent Struwe: | Makes sense. |
| 10 | Det. Christner: | I just, I don't, I don't know if I can say specifically what happened in that |
| 11 | meeting. | |
| 12 | Agent Struwe: | Okay. |
| 13 | Agent Zamora: | Alright. We're good. |
| 14 | Det. Christner: | Um, I do remember Leads getting a copy of either a copy of a report draft or |
| 15 | something, some kind of documentation, and he said well, let me look this over, and I think he said | |
| 16 | he'd get back to us, get back to Cody on it.  Um, I also remember them talking about, um, I, I, I | |
| 17 | work with ICAT, I work internet crimes against children, so I work with digital cloud – | |
| 18 | Agent Struwe: | Right. |
| 19 | Det. Christner: | – um, internet-based   evidence a lot, and I, I remember, I don't remember |
| 20 | exactly what I said, but I believe I talked about that digital evidence is volatile because of my | |
| 21 | experience with what I do with it | |
| 22 | Agent Struwe: | All right. |
| 23 | | |

PAGE **6** OF **131**

| | |
|---|---|
| 1 | Det. Christner:        Um, and I remember Leads saying something about once it's online, it's |
| 2 | there forever, and I wasn't gonna argue with him at that point, although I disagreed.  After he left, |
| 3 | I'd, I'd made that clear that I didn't agree with what he said, based on my experience, um, and |
| 4 | training in digital, in digital evidence. |
| 5 | Agent Struwe:        So, did that meeting continue when Leads left?  Did you kinda have – |
| 6 | Det. Christner:        Yes, Leads left – |
| 7 | Agent Struwe:        – a secondary meeting, just you and – |
| 8 | Det. Christner:        – and then the rest of us, the other local people were still there. |
| 9 | Agent Struwe:        Okay. |
| 10 | Det. Christner:        Um, is what I'm remembering, and, like I said, I made it, I, I explained that I |
| 11 | didn't agree that that evidence was always gonna be there.  That there is volatile data, um, and let's |
| 12 | see, I think the meeting kinda just ended with us just kinda, I'm not really sure how it ended.  I don't |
| 13 | exactly. |
| 14 | Agent Struwe:        Was there talk at that time about this going towards a search warrant? |
| 15 | Whether that be – |
| 16 | Det. Christner:        Right. |
| 17 | Agent Struwe:        – paper to, you know, an online entity, paper to a company, court ordered |
| 18 | production of records, or a physical, um – |
| 19 | Det. Christner:        I really don't remember. |
| 20 | Agent Struwe:        You don't remember at that – |
| 21 | Det. Christner:        I don't remember if we spoke about a search warrant at that time. |
| 22 | Agent Struwe:        As of Wednesday? |
| 23 | Det. Christner:        We might have, but I don't, I don't know. |

PAGE 7 OF 131

| | | |
|---|---|---|
| 1 | Agent Struwe: | And does that include the time that Leads is there? |
| 2 | Det. Christner: | I, I don't remember. |
| 3 | Agent Struwe: | Okay, so you don't recall specific, hey, we're in this meeting, and we're |
| 4 | talking about this is going towards search warrant, and Leads is present for that, as well as |
| 5 | everybody else you mentioned?  You don't have that specific recollection? |
| 6 | Det. Christner: | Maybe.  I mean, I just, I just, I don't wanna say for sure. |
| 7 | Agent Struwe: | You were there.  I wasn't, and I, yep, absolutely. |
| 8 | Det. Christner: | Yeah. |
| 9 | Agent Struwe: | I just wanna understand you.  You don't remember that being said? |
| 10 | Det. Christner: | Maybe, maybe not.  I just, I can't, I don't wanna say one way or the other. |
| 11 | Agent Struwe: | Okay. |
| 12 | Agent Zamora: | And, and, no worries. |
| 13 | Agent Struwe: | Yep. |
| 14 | Det. Christner: | Um – |
| 15 | Agent Struwe: | Okay, so that's Wednesday. |
| 16 | Det. Christner: | Maybe, yeah, I mean, I wanna say yes, but I don't, I don't know that I could |
| 17 | sit in court and testify to it, saying for a fact. |
| 18 | Agent Struwe: | So you don't know. |
| 19 | Det. Christner: | Right. |
| 20 | Agent Struwe: | Okay. |
| 21 | Det. Christner: | Um – |
| 22 | Agent Struwe: | So, that's Wednesday the 9th. |
| 23 | Det. Christner: | Yep, and then – |

PAGE **8** OF **131**

003812

| | | |
|---|---|---|
| 1 | Agent Zamora: | Okay, so real quick, so then Leads leaves, and then y'all just kinda chat |
| 2 | about stuff? | |
| 3 | Det. Christner: | A little bit longer, yeah. |
| 4 | Agent Zamora: | Any idea what that was, like game plan, was there any game plan?  Did, |
| 5 | good case, bad case, interesting case? | |
| 6 | Det. Christner: | I remember Sheriff Sawyer saying, um, I think he said this when Leads was |
| 7 | still there that if we didn't do something as a law enforcement age, entity, that Kari was gonna go |
| 8 | after them in a civil suit, um, I believe that was Kari, er, Leads was there also.  So I remember that |
| 9 | being said. | |
| 10 | Agent Zamora: | Do you know what kind of civil suit? |
| 11 | Det. Christner: | Based on, I think it was because of the way the information had been |
| 12 | shared. | |
| 13 | Agent Zamora: | Okay. |
| 14 | Det. Christner: | Um, I believe through The Record, the way it had been shared. |
| 15 | Agent Zamora: | Okay, how The Record received it or how The Record shared it? |
| 16 | Det. Christner: | I'm not sure if we discussed the specifics on that – |
| 17 | Agent Zamora: | Okay. |
| 18 | Det. Christner: | Either way, I just remember that, I just remember Sheriff Sawyer saying |
| 19 | something like, to that end of 'cause I remember his words were if we don't, not exactly verbatim, |
| 20 | but – | |
| 21 | Agent Zamora: | Mm hmm. |
| 22 | Det. Christner: | – basically, if we don't do something as law enforcement, "she's gonna go |
| 23 | for blood."  "She's gonna go for blood," is what I remember him saying. |

PAGE **9** OF **131**

003813

1    experience, this is what I've done to say this is who I am, did you also, and, and I thought I saw it,

2    forgive me, I have this much paper I'm looking through –

3    Det. Christner:          Right.

4    Agent Zamora:          – um, try to assist Cody with, okay, this is what I would say based on what

5    you gave me, this is how I would kinda write the words and here's the crimes that I see, but you do

6    it your way.  I'm just saying here's some suggestions?

7    Det. Christner:          Yes.  Um, Cody sent me a template.  I did add some things to, I mean, he

8    sent me, I s, I think we went back and forth a couple of times.

9    Agent Zamora:          Okay.

10   Det. Christner:          He sent me something, um, I added some things to it.

11   Agent Zamora:          Okay.

12   Det. Christner:          Um, I know what one thing specifically that I added was I copy and pasted

13   the, uh, the Kansas Department of Revenue had a list on one of their web pages, has a list of certain

14   criteria you had to meet to access certain records.

15   Agent Zamora:          Is that the A through M?

16   Det. Christner:          I believe so.  I can look later, yes.

17   Agent Zamora:          Okay.

18   Det. Christner:          And I did copy and paste that into the template, um, and then, yeah, I did

19   send it, and I told, because I had talked to Jeff, I said I, I'm not comfortable swearing o this because

20   it's not my investigation.  Um, and so I remember sending it back to Cody and telling him that this,

21   you know, this is what we've got, and, um –

22

23

003818

| | | |
|---|---|---|
| 1 | Agent Struwe: | Okay. |
| 2 | Det. Christner: | Um – |
| 3 | Agent Struwe: | How did you find that if you recall? |
| 4 | Det. Christner: | I think I just did a web search and just went on the Kansas Department of |

5  Revenue website and just started looking through because I knew there was one, I had prior

6  knowledge that there was another.  There's two different pages that you can access driving record,

7  um, so I knew there was one where it's a pretty basic information, name, date of birth, that kind of

8  thing.

| 9 | Agent Zamora: | Right. |
| 10 | Det. Christner: | Um, and then there's the other page, there's another site that has all these |

11  options –

| 12 | Agent Zamora: | And for these options, was there any difference between the one name, date |

13  of birth, and this also has DL number compared to this, they indicate anything.  What was the

14  difference between Site 1 and then Site 2?  Let's say this site?

| 15 | Det. Christner: | Right – |
| 16 | Agent Zamora: | Because this is like, I don't wanna say, the more, it's dif, it's different. |
| 17 | Det. Christner: | Yes, it is different, um, I know this one you had to pay for – |
| 18 | Agent Zamora: | Right. |
| 19 | Det. Christner: | – to get a record. |
| 20 | Agent Zamora: | Mm hmm. |
| 21 | Det. Christner: | Um, I also remember that when I went over, over it with Cody, one morning |

22  we were sitting in his office after I had sent him that template, um, I was going over that, and I said

23  is this the site that you believe they used, and he said yes.  Um, cuz I said, cuz I know there's

PAGE **16** OF **131**

1   another site, and he goes no, it's, it's this one, and I wasn't sure.  I also know that at one point there

2   was several of us sitting up front in our office manager's, uh, her desk, and I think she pulled up

3   that page when we were talking about all the different stuff (unintelligible).

4   Agent Zamora:          KDOR, right?

5   Det. Christner:          Um –

6   Agent Zamora:          Cody, when he says yes, this is the site, did he say which one was checked?

7   Agent Struwe:           Or if it was the pay site?

8   Det. Christner:          Mm hmm.

9   Agent Struwe:           This or the non-pay, I think you called it basic.

10  Det. Christner:          Yeah.

11  Agent Zamora:          I think you said that Cody said this was the one that was used?

12  Det. Christner:          Yeah, I believe, yeah –

13  Agent Zamora:          Okay. This one was --

14  Det. Christner:          – he said, I said is it this one, shall we leave this in here, and he said yeah,

15  that's, that's the one, um, because the information that he gave me, here, he said, or that he had, I

16  guess, or that he gave me that I thought he had was, um, that Ms. Newell's name had been used,

17  um, according to the information they got from the Kansas Department of Revenue, Ms. Newell's

18  name had been used to access the site at, like, 2:45 or whatever –

19  Agent Zamora:          Okay.

20  Det. Christner:          – and then Phyllis Zorn, and those names, those times are just estimate –

21  Agent Zamora:          Sure.  No yeah, we get it.

22  Det. Christner:          A reference.

23

PAGE **17** OF **131**

1  Det. Christner:          Based on the information I was given, yes.

2  Agent Zamora:            Through, from –

3  Det. Christner:          From Cody, yes.

4  Agent Zamora:            Okay, and then just to make sure, Cody said you, in fact, asked him.  Did

5  you use this site or did you use this site?  Did you say the basic site?

6  Det. Christner:          I said do you think they used this one or the other one, and, and as I was

7  getting ready to pull up the other site and show him, I think, he said no, it was, it was this one.

8  Agent Zamora:            This one right here.

9  Det. Christner:          Is what I remember, yeah.

10  Agent Zamora:           Okay.  Okay.  And that's why we left this in, so to speak, the warrant.

11  Det. Christner:          Yes, he wanted to leave that in.

12  Agent Zamora:           Okay.  Then, let me ask you, are you familiar now with the KDOR and let's

13  say the free site, all the stuff that you can get compared to this site?

14  Det. Christner:          Um –

15  Agent Zamora:           So, did you, like, kind of out of curiosity, well, let me just check it out?

16  Det. Christner:          Well, I had checked out the free site before, um, I mean, like, years ago.

17  Agent Zamora:           Okay.

18  Det. Christner:          Um, and this other one we had put in some people's information but then

19  once we got to the point of paying we didn't go through it, and, um, I remember even asking Cody,

20  I said, "Should we even be doing this," he said, "Well, yeah, it's part of the investigation," so –

21  Agent Zamora:           So you were putting in people's names, let's say?

22  Det. Christner:          I believe Kari's –

23

PAGE **19** OF **131**

003823

1  Agent Zamora:         Okay, Kari's.  So then go, go through that, so was it just you and Cody doing

2  that or was anybody else present for that?

3  Det. Christner:       I think it was just me and Cody in his office.

4  Agent Zamora:         Okay.

5  Det. Christner:       Because the other officer that was on duty was not involved in the

6  investigation.

7  Agent Zamora:         Okay.  So, then if you can recall, we've been studying this, so I think I have

8  it down quite a bit.  Um, the free site, what is that request, how did all that work that you recall

9  when you were kinda playing with it?

10 Det. Christner:       I don't remember if it –

11 Agent Zamora:         And/or then this –

12 Det. Christner:       Right.

13 Agent Zamora:         – pay site.

14 Det. Christner:       I believe we put Ms. Newell's information in the free, what I call the free

15 site.

16 Agent Zamora:         Okay.

17 Det. Christner:       – the basic one, and I believe it gave us this same, yeah, it gave us the same

18 information that the, had been published that started this whole, and, this whole thing –

19 Agent Zamora:         Okay.

20 Det. Christner:       – except for, well, but I, I don't remember if it gave us the document because

21 there had been a document that had been emailed around either, like, scanned in –

22 Agent Zamora:         Okay.  Sure.  Yep.  Yep.

23 Det. Christner:       -- or a picture of.

PAGE **20** OF **131**

| | | |
|---|---|---|
| 1 | Agent Struwe: | Okay. |
| 2 | Agent Zamora: | Or, basically, you were both, clarify, working on it together? |
| 3 | Det. Christner: | Correct. |
| 4 | Agent Zamora: | Like (unintelligible) book (unintelligible) and then you add some stuff and |
| 5 | then he adds some stuff. | |
| 6 | Det. Christner: | Yeah, and at one point, like I said, I was sitting in his office and we were |
| 7 | taking turns sitting down typing and, um, just writing it to, to try to show the probable cause of |
| 8 | what we believe the crime had occurred. | |
| 9 | Agent Zamora: | Right, now check in here to see where it was that, that you did say some, |
| 10 | because I know I saw it somewhere, I can't remember where. | |
| 11 | Agent Struwe: | And that's, to clarify, where you just said on the free site, there's some kind |
| 12 | of, my words not yours, checkbox or some kind of – | |
| 13 | Det. Christner: | Well, it, it – |
| 14 | Agent Struwe: | – disclaimer or something you said – |
| 15 | Det. Christner: | Yes, and I think that's in my, I know I wrote it.  I know I wrote it down |
| 16 | somewhere. | |
| 17 | Agent Struwe: | Whether it be working on the affi or a – |
| 18 | Det. Christner: | Um – |
| 19 | Agent Struwe: | – police report, or something? |
| 20 | Det. Christner: | Right.  It must have been in my report. |
| 21 | Agent Zamora: | Okay. And those are in? |
| 22 | Det. Christner: | (unintelligible). |
| 23 | | |

PAGE **23** OF **131**

| | | |
|---|---|---|
| 1 | Sheriff Soyez: | How many people are coming do you know? |
| 2 | Det. Christner: | I have no idea. |
| 3 | Sheriff Soyez: | Okay.  I didn't know if you guys were gonna (unintelligible) from the top. |
| 4 | Det. Christner: | I guess, do you – |
| 5 | Agent Zamora: | I mean, we, we can pack it up if we need to. |
| 6 | Sheriff Soyez: | How many people do you have coming? |
| 7 | Uknown speaker: | Usually about six or seven (unintelligible) |
| 8 | Sheriff Soyez: | Just stay tight.  (unintelligible) |
| 9 | Agent Struwe: | Would that be that, do you think that Viar, or however we say this name, |
| 10 | | reviewed the Maag warrant and didn't sign it? |
| 11 | Det. Christner: | Yes, I believe she reviewed all of 'em is my understanding. |
| 12 | Agent Struwe: | And is, is the Maag warrant same as, like, the rest? |
| 13 | Det. Christner: | Um, – |
| 14 | Agent Zamora: | Because we have two that have this in here and one of 'em that doesn't. |
| 15 | Det. Christner: | Here's the copy I have. |
| 16 | Agent Zamora: | Okay.  I think Freeborn. |
| 17 | Det. Christner: | That's Herbel. |
| 18 | Agent Zamora: | Herbel?  We don't have that, I mean we have this stuff. |
| 19 | Det. Christner: | Right. |
| 20 | Agent Zamora: | Course you can't see it.  But we don't have that "A through M" in hers. |
| 21 | Det. Christner: | Right.  Because I don't believe that we thought that she had accessed it.  She |
| 22 | | had gotten the record – |
| 23 | Agent Zamora: | She, she, she – |

PAGE **51** OF **131**

| | | |
|---|---|---|
| 1 | Det. Christner: | Um, and I remember bringing up in that meeting with Leeds on the 9th, I |
| 2 | | said, "I didn't make a preservation because in my trainings with exploitation cases and digital |
| 3 | | evidence I was told sometimes those small mom and pop organizations, when you make a |
| 4 | | preservation will say, 'Hey, the the – |
| 5 | Agent Struwe: | Mm hmm. |
| 6 | Det. Christner: | – such and such law enforcement just made a preservation on your |
| 7 | | account.'" The big guys don't. |
| 8 | Agent Struwe: | Right. |
| 9 | Det. Christner: | But, you know, sometimes those mom and pop will, um, and so I was, and I |
| 10 | | remember telling, telling them that I didn't want to, you know, I was hesitant about that for that |
| 11 | | reason. |
| 12 | Agent Struwe: | Sure. |
| 13 | Det. Christner: | Um, so that was the first email. I did some preservations. Um – |
| 14 | Agent Struwe: | But you believe all – |
| 15 | Det. Christner: | This was a preservation on somebody's Facebook. I don't know if this case |
| 16 | | was, if this was a separate case or this case. I don't remember. Oh, no, that's, yeah, I don't |
| 17 | | remember. Oh no, yeah, it was. Okay. Oh, I wonder if I, I wonder if I emailed, gave that to |
| 18 | | anybody. I might have forgot about that. I may not have provided that to – |
| 19 | Agent Struwe: | It's a preservation for this case? |
| 20 | Det. Christner: | Yes. It was a preservation – |
| 21 | Agent Zamora: | Whose Facebook? |
| 22 | Det. Christner: | I don't remember. |
| 23 | Agent Zamora: | Hmm. |

PAGE **109** OF **131**

1    Det. Christner:          Like I'd have to go in and log in –

2    Agent Zamora:            Would be one of these three probably?

3    Det. Christner:          Mm hmm.  I –

4    Agent Zamora:            Okay.  Well, let's skip –

5    Det. Christner:          I believe it was Herbel's but –

6    Agent Zamora:            Okay.  Um, so did that transfer over, that download?  Or we still got some

7    time on that?

8    Det. Christner:          It's still downloading some emails.  It's still downloading something.

9    Agent Zamora:            Okay.

10   Det. Christner:          Oh that's 'cause we have that, this open. I don't know what it's still

11   downloading.  It's actually, it's probably done it's just not, I might just have to restart my computer

12   to get it to clear, excuse me, to clear up.  So I believe it's all downloaded now.

13   Agent Zamora:            Okay.

14   Det. Christner:          I can put that on a clean flash drive but it's gonna take, it is 24 gigabytes and

15   we only have USB 2.0s which are slow.  I would say it would, I would get, estimate it would take

16   a couple of hours to transfer all that.

17   Agent Struwe:            Oh really?  Oh okay.

18   Det. Christner:          Um, I mean, I can start it right now and it'll give us an estimate.

19   Agent Struwe:            Yeah, let's see what it says.

20   Det. Christner:          Okay.

21   Agent Struwe:            See this thing just give me the blue screen of death.

22   Agent Zamora:            Mm hmm.

23

PAGE **110** OF **131**

Ex. A 119

1  |gain, you know, in the long run.  So, um, you know, I had no ill will in any of this.  You know, if

2  other people did, I don't know.

3  Agent Zamora:        And hopefully we didn't come across at all saying that.

4  Det. Christner:        I just want that, I just want that said.

5  Agent Zamora:        Or anything that, okay.

6  Det. Christner:        Because I, I don't know.  I'm, I just want that clear that I had no ill will in –

7  Agent Zamora:        Ab, absolutely.

8  Det. Christner:        – this towards anyone.  Um, has The Record printed stuff about my prior?  I,

9  maybe, I'm not sure.  Um, and I think most of what they print actually about me prior to all this has

10  actually been pretty positive for the cases I've worked.  Um, and I wouldn't even say that what

11  they've printed since is negative towards me.  If they've mentioned my name it's just the facts of

12  what I did.

13  Agent Zamora:        Right.

14  Det. Christner:        Um, so I don't know that I have, you know, do they print stuff that a lot of

15  people don't agree with and understand that they print?  Do I agree with everything they print?

16  Probably not.  But people are gonna do what they're gonna do.  Um, oh, I do remember bringing up

17  at one of those early meetings, that meeting on the 9th before Leeds got there 'cause he wasn't there

18  right on time.  I remember bringing up concerns about First Amendment issues.  And being told

19  that this wasn't a First Amendment issue this was a Fourth Amendment issue.

20  Agent Zamora:        And how did that go?  That conversation to who, with who?

21  Det. Christner:        It was with Jeff, Larry and Gideon Cody.

22  Agent Zamora:        Okay.

23

1   Det. Christner:          'cause I remember bringing up my concerns, you know, because I'm,

2   whether I agree with some of the First Amendment stuff that people print, it's, the, the Supreme

3   Court is pretty clear on that.

4   Agent Zamora:          Right.

5   Det. Christner:          And I'm in this job to protect people's rights even though sometimes it

6   makes my job harder, you know, I, you can ask Joel, I consult with him constantly on, on stuff

7   because I want to make sure –

8   Agent Zamora:          Right.  You're, you're –

9   Det. Christner:          – that I'm, I'm following the letter of the law.  And, you know, your

10  questions about the whole search warrant and whether it could be in or out of the building or

11  whatever –

12  Agent Zamora:          Mm hmm.

13  Det. Christner:          There was, I had a case, what was it?  I don't remember now.  I can't

14  remember the specifics.  But I had a case where it was like man, I wish I would have put that in the

15  warrant and I didn't.  I couldn't remember specifics, but I, I can remember thinking that.  And, um,

16  did it hurt the case, I, I, and I don't remember it hurting the case one way or the other.

17  Agent Zamora:          Sure.

18  Det. Christner:          I just remember thinking man, I wish I would've put something on here.

19  Agent Struwe:          Sure, we've all been there, you know, like –

20  Det. Christner:          Uh.

21  Agent Struwe:          – you got on scene and there's a shed and maybe it would've been nice for us

22  to understand that there was a shed there and we put that on the warrant.

23  Det. Christner:          Yeah.

PAGE 116 OF 131

1    Agent Struwe:          So we can go in there.

2    Det. Christner:        Yeah, so, um, you know, I got, that, my goal is always to do what's right

3    through the law ethically and legally.  And I just want that on record, um –

4    Agent Struwe:          So you brought up a 1A issue regarding like –

5    Agent Zamora:          First Amendment.

6    Det. Christner:        Well, just this is a newspaper because I know, I know that there's a lot of

7    stuff, I mean, I guess I don't know that.  But, you know, I, and I know it's movies, but I still know

8    that there's enough, you know, that they, they, they, there's a lot of First Amendment issues that I

9    don't fully understand.  Um, I mean it's kinda silly but, you know, I think I recently watched, uh,

10   The Man Who Shot Liberty Valance, I don't know if you've ever seen that movie but –

11   Agent Zamora:          I don't think I've seen it.

12   Det. Christner:        It's a good movie but, um, there's a guy who runs a newspaper and he talks

13   about, he writes some bad stuff about a bad guy.  And then they come and kill him actually in the

14   end.  But and I think, you know, he talks about Freedom of the Press, Freedom of the Press.  And

15   so I think, you know, that just –

16   Agent Zamora:          Sure.

17   Det. Christner:        – And so I remember being up that issue.

18   Agent Zamora:          Mm hmm.

19   Det. Christner:        And it's not recorded.

20   Agent Zamora:          Uh, no absolutely.

21   Det. Christner:        I think it's documented.  I think I wrote, um, in some documentation

22   somewhere.  It may not be in my report but I had some personal documentation but –

23   Agent Zamora:          If, if you don't mind, I'd love to get that.  You have my email.

1  Det. Christner:        Okay.

2  Agent Zamora:        And with that now, you know, I was gonna say same thing.  So who said,

3  "Nope, it's not First, it's Fourth?"

4  Det. Christner:        Um, I guess I'll have whistle, whistleblower protection, too.  But I want to

5  say it was Sheriff Soyez was one of them.  And I think Cody and Sheriff Soyez were both saying it

6  was for Fourth Amendment.  But I, I, I don't remember exactly.  But I remember getting that

7  response.

8  Agent Zamora:        Okay.

9  Det. Christner:        That it was a Fourth Amendment and not a First Amendment.

10 Agent Struwe:         Somebody higher ranking than you?

11 Det. Christner:        Yes.

12 Agent Zamora:        In the meeting?

13 Det. Christner:        Yes.

14 Agent Zamora:        And then –

15 Det. Christner:        I was –

16 Agent Zamora:        They're all higher ranking than you?

17 Det. Christner:        Exactly.

18 Agent Zamora:        Yeah.  Um.

19 Det. Christner:        Um.

20 Agent Zamora:        What was the consensus of you bringing that up between Sheriff and then

21 Undersheriff, right, and then, uh, Cody, former chief?

22 Det. Christner:        Yeah, well, Larry's pretty quiet.  Undersheriff Larry's pretty quiet unless he

23 feels real strongly about something.

PAGE **118** OF **131**

| | | |
|---|---|---|
| 1 | Agent Zamora: | Mm hmm. |
| 2 | Det. Christner: | So I don't remember him saying anything one way or the other. |
| 3 | Agent Zamora: | Okay. |
| 4 | Det. Christner: | Um, but I think that basic, it, it, it seemed like it was just kind of dismissed. |

And it's like, "Hey, it's a Fourth Amendment issue." And at that point I still, I hadn't fully, and you

can ask any of the guys here. I'm a, I'm a slow, I'm very methodical.

| | | |
|---|---|---|
| 7 | Agent Zamora: | I, I can sense that. |
| 8 | Det. Christner: | And I don't, I don't want to say slow but I'm very methodical. |
| 9 | Agent Zamora: | Yeah, I can sense that. |
| 10 | Det. Christner: | Um, if I don't understand what the law is or if, if there's a violation then I'm |

not gonna, you know, I, I, had a case this week, actually it's just this last couple weeks of

somebody having some targets on a road. And I thought okay, well, it doesn't seem right but is it a

violation of the law. And so I had go find it, okay, yeah, it is actually a violation, um, before I

made any contact. Um, so I'm very methodical. And, um, it took me, it took me several days, I

think it was probably sometime on Thursday before I fully started to buy into, "Okay, we do have

a violation." You know, because the reports I was getting from Cody, the information I was

getting from Cody just didn't, it didn't make sense to me.

| | | |
|---|---|---|
| 18 | Agent Zamora: | Mm hmm. |
| 19 | Det. Christner: | In my mind. Um, so it took me a while to get, I think it was finally, I mean, |

I closed my email already but, it was when I, when they sent me a long detailed, which was kinda

the meat of the search warrant affidavits. That's when I finally, "Oh, okay, now this, now this

makes sense."

| | | |
|---|---|---|
| 23 | Agent Zamora: | Okay. |

PAGE **119** OF **131**

003923

1  Det. Christner:        Right.  Yeah, I remember, yeah, um, that was his report.  And, that, that's

2  what didn't make sense to me.  I don't know if I can pull it up or not with this copying.  Uh.  I don't

3  know, but he had that, he had, oh yes, here it is.  Um, this report.  I know you've probably seen this.

4  No, maybe this isn't it.  Yeah, this.  This just didn't make sense to me when he sent that to me

5  explaining the laws.  It just, that was one of the first things –

6  Agent Zamora:        Uh, yeah, it was, it's was just all of the sudden, it's almost like just

7  statements saying –

8  Det. Christner:        Yes.

9  Agent Zamora:        – this.

10  Det. Christner:        And but, and I didn't see where it was backed up here.

11  Agent zamora:        Mm hmm.

12  Det. Christner:        Um, but, yeah, I do remember him sending an email.  I don't (unintelligible)

13  I saw that now but, yeah, I have him explaining the DPPA and I kept asking him.  I said, "Well, we

14  don't do federal.  If we're gonna do federal we need to get, I got some contacts with the FBI I can

15  contact."  "Well, no, we're, we're okay."  "Okay."  'Cause I mean, we don't do, you know, I mean,

16  I had a case with some migratory birds a while back.  You know, that can go federal in Kansas, or

17  I guess in any state, but, um, you know, I contacted our game warden and he's like, "Oh, well,

18  we're not gonna do federal because I'd have to bring in so and so."  I mean, I've been to trainings

19  that involved federal investigations and, and, AUSAs and so forth, and, um, I, I know there's

20  certain steps you have to take.

21  Agent Zamora:        Mm hmm.

22  Det. Christner:        It's not just –

23  Agent Zamora:        "Hey, here you go."

PAGE 123 OF 131

1  thought process was, well, you know, from my analysis, she was maybe even closer to this than

2  some of the other search warrants.

3  Joel Ensey:          And I don't know if they, what they knew at the time if, if they knew that it

4  had come from, from Pam –

5  Agent Struwe:          Mm hmm.

6  Joel Ensey:          – I mean, from talking to Todd Leeds, that, I mean that this all came from,

7  from her, but I don't know if, I mean, I know that now, but I don't know if, if –

8  Agent Struwe:          It was known then.

9  Agent Zamora:          If they knew it then.

10  Joel Ensey:          – it was known then.

11  Agent Struwe:          Yeah, and some of the affidavits, you know, they cut and paste an email

12  from Herbal that says, "I just got this from Pam Maag."

13  Joel Ensey:          Yeah.

14  Agent Struwe:          And it's pretty clear in the affidavit, you know, a cut and paste email, like

15  well, Herbal got this from Maag.  Yet it goes kind of unaddressed in that affidavit.  And so brand

16  spanking new, I read that affidavit, then go, okay, well, there's not really any follow up onto Maag,

17  right?  So what I since found out recently, there was an attempt to get a search warrant for Maag,

18  that makes some sense to me.  I'm having a hard time making much sense of it being declined in

19  lieu of signing the other three.  I didn't know if you had some insight to that or anything.

20  Agent Zamora:          I mean like what the judge would say not Pam and everybody else.

21  Joel Ensey:          And that was not, she didn't relay anything to me –

22  Agent Zamora:          Okay.

23  Joel Ensey:          – you know, in that regard.

PAGE **16** OF **75**

| | | |
|---|---|---|
| 1 | Joel Ensey: | Right. |
| 2 | Agent Struwe: | – already?  Okay. |
| 3 | Joel Ensey: | And I had, you know, I didn't have a relationship with him, um, prior to this |
| 4 | or anything like that. | |
| 5 | Agent Struwe: | Can you remind me of his name? |
| 6 | Joel Ensey: | Mark Bennett. |
| 7 | Agent Struwe: | And he's, you said he's a District Attorney? |
| 8 | Joel Ensey: | Yeah.  He's the Sedgwick County DA. |
| 9 | Agent Struwe: | Sedgwick County.  Okay.  And he, you and him are not, didn't have a |
| 10 | relationship you said? | |
| 11 | Joel Ensey: | Correct. |
| 12 | Agent Struwe: | You ever talk to him before? |
| 13 | Joel Ensey: | I went and interviewed at his office, um, I think it was three years ago. He |
| 14 | doesn't remember that and I didn't, I never even brought it up to him after, after the fact. | |
| 15 | Agent Struwe: | It's not like you guys are buddies and he's like – |
| 16 | Joel Ensey: | No. |
| 17 | Agent Struwe: | – "Joel," – |
| 18 | Joel Ensey: | No.  Yeah.  He didn't, he doesn't even (unintelligible) didn't have my |
| 19 | number. | |
| 20 | Agent Struwe: | He found your number and he was like – |
| 21 | Joel Ensey: | Yeah.  I didn't know how he – |
| 22 | Agent Struwe: | – "We need to talk about what's going on." |
| 23 | | |

PAGE **29** OF **75**

| | | |
|---|---|---|
| 1 | Joel Ensey: | – found my number.  Um, he brought my attention to like, a, um, Tenth |
| 2 | | Circuit news case. It's about a, a student run newspaper.  The prosecutor ended up losing their, um, |
| 3 | | (unintelligible) and was sued, and was sued personally with that one.  Um, – |
| 4 | Agent Struwe: | It's a press case? |
| 5 | Joel Ensey: | Yeah. |
| 6 | Agent Struwe: | Okay. |
| 7 | Joel Ensey: | Um, it was like, uh, dealing with defamation and, and defamation law on |
| 8 | | their books, and they were trying to charge this person criminally for saying some things against, |
| 9 | | um, a teacher. |
| 10 | Agent Struwe: | Yeah? |
| 11 | Joel Ensey: | Um, I think it was a Colorado, maybe, but brought my attention to that one. |
| 12 | | We talked, um, about the warrants, um, and things.  I was preparing for a, a jury trial, trying to, I |
| 13 | | guess, go back and look at those warrants.  Um, just having a lot going on at – kind of had some |
| 14 | | concerns at that time, um, with 'em, but I didn't do anything about it then.  Um, so worked on my, |
| 15 | | um, trial, preparing for that trial on Monday.  Um, the trial ends up going out. |
| 16 | Agent Struwe: | As in resolving?  Or – |
| 17 | Joel Ensey: | Right. |
| 18 | Agent Struwe: | 'Kay. |
| 19 | Joel Ensey: | Um, come back and, and look at those search warrants again on, on |
| 20 | | Monday.  Um, I, I talked to – don't remember who I talked to on Monday, if I did talk to anybody |
| 21 | | on Monday.  I don't know, I don't know why it's not pullin' up here. |
| 22 | Agent Struwe: | Is there a time when you remember actually reading the warrants?  You |
| 23 | | know, like, okay, grab a highlighter, grab a pen, whatever? |

PAGE **30** OF **75**

1    Joel Ensey:              So I went, I mean on Monday, I did.

2    Agent Struwe:            So, beyond look at 'em, like dig into these things?

3    Joel Ensey:              Yeah.

4    Agent Struwe:            Yeah.  Okay.  So, Monday that'd be 12, the, the 14th maybe?

5    Joel Ensey:              I think that's right.

6    Agent Struwe:            Sound right.

7    Joel Ensey:              Yeah.

8    Agent Struwe:            Okay.  So, Monday the 14th, like sit down, focus, read these things.

9    Joel Ensey:              Yeah.

10   Agent Struwe:            What hap – you know, what, what are your thoughts when you do that?

11   Joel Ensey:              Oh shit.

12   Agent Struwe:            Okay.

13   Joel Ensey:              I mean, –

14   Agent Struwe:            Yeah.

15   Joel Ensey:              Like, It's not good.

16   Agent Struwe:            Yeah.

17   Joel Ensey:              They weren't good.

18   Agent Struwe:            I appreciate your candor.

19   Joel Ensey:              Um, I just didn't think that there was enough there, enough nexus.  You

20   know, I mean, you know, we do, we do search warrants for like child sex cases.  You know, we, we

21   do, we get the, like a cyber tip.  We get those.  You know we, this is so and so's account, so we're

22   doing search warrants on their, on their Gmail accounts, Snap, Snapchat account, trying to figure

23

PAGE **31** OF **75**

1   out who that is, where that happened, and then we're doing search warrants on, on IP addresses.

2   Um, to figure out, you know, where –

3   Agent Struwe:          Account information.

4   Joel Ensey:            –where that happened.  Right.  So, who, who did it and where did they do

5   this at, and then we go in and, and start doing search warrants on if we can nail it down.  Then we

6   start seizing, seizing stuff from, from there.  You know?  Um, and, and that was really, really my

7   thought, my concern that like we didn't, we didn't do that.  You know, it wasn't done.

8   Agent Struwe:          Uh, um, parrot back what I think you're saying, in my words, you were

9   concerned with the nexus to the locations.  'Kay.  So we have this thing going on, and we need to

10  dig into it, but how do we know that that thing occurred at this residence?

11  Joel Ensey:            Right.

12  Agent Struwe:          This newsroom?  This residence?

13  Joel Ensey:            Right.

14  Agent Struwe:          Any thoughts on the underlying crime itself?  Apart from the nexus which I

15  fully get and agree with you.

16  Joel Ensey:            You know, like –

17  Agent Struwe:          You, the, –

18  Joel Ensey:            Like –

19  Agent Struwe:          – you know more of Kansas law that I do.  So, –

20  Joel Ensey:            Like the identity theft, um, I remember Cody sitting here one time, um, and

21  I, I told him, I go, "I don't know that identity theft fits here."

22  Agent Struwe:          Mm.

23

PAGE **32** OF **75**

1    Joel Ensey:              And he said something to the effect of I've looked that statute up and down

2    and, and it fits, you know, and I said, "Well, um okay," um, and I didn't, I didn't push him on it or

3    anything.  I didn't, 'cause I didn't, I didn't really think it fit, but I didn't, I guess, stand my ground so

4    to speak.

5    Agent Struwe:            Was Cody pushing you on it?

6    Joel Ensey:              There really wasn't more of a back and forth than that, so I mean, –

7    Agent Struwe:            Okay.

8    Joel Ensey:              – it wasn't a "No you're wrong," "Yes I am," kinda thing.  I mean, it was that

9    "I don't think that identity theft fits here,." and "I looked the statute up and down and it fits."

10   Agent Struwe:            And you just didn't push back on that.

11   Joel Ensey:              Right.

12   Agent Struwe:            Okay.  Were you aware that Cody had a provisional license, you know, as

13   an officer in the state?

14   Joel Ensey:              No.

15   Agent Struwe:            Did you know anything about, um, Cody's, Gideon Cody's background,

16   agency, where he worked or anything?

17   Joel Ensey:              No.  All I know, um, I talked to Jeff about it, um, like, what Jeff had relayed

18   to me is that, you know, he was, I think, wanting to retire from Kansas City wanting to move to,

19   um, a smaller community.  I think he had applied a couple different places.  Said he applied out in

20   Colorado, but wanting to come somewhere and use what he know, knew from Kansas City and try

21   and make a difference, you know, somewhere.  Um, made some comments about him making, had

22   some, like, had made some money from some businesses or something that he had sold or

23

PAGE **33** OF **75**

1  Joel Ensey:            I was sitting with, with everybody when I dropped the ball that this is all

2  going back and sitting with Cody and he obviously wasn't happy and I don't remember what he

3  said.  And I told him, I was like, "I don't, I'm not gonna lie about anything about what had

4  happened."  I mean, it's, "Well, I'm not asking you to lie."  But it's, "What happened, happened

5  and it sucks."

6  Agent Struwe:           It sucks.  Fail forward though, you know.  Learn, learn from mistakes and

7  our failures teach us a lot.

8  Agent Zamora:          And just real quick, when you said, um, that Cody was pretty upset, what,

9  what was he saying?  What was his, when you're saying, "Nope, sorry, it's" –

10 Joel Ensey:            I mean, I think, you know, we're, like I mean, death threats are coming in,

11 um, from all over the, the country and I don't know if it was the world at that point.  But I mean,

12 you know, it was a pretty intense time I guess, so to speak.

13 Agent Zamora:          A, absolutely.

14 Joel Ensey:            I mean, a very weighty time.

15 Agent Zamora:          Mm hmm.

16 Joel Ensey:            Um, you know, when, and I understand his, his perspective of if we file

17 charges then that vindicates what we've done here.  Um, you know, he was wanting cha, charges to

18 be filed.

19 Agent Struwe:          Yeah, that's a good point.  Did he bring those arrest affidavits to you?

20 Joel Ensey:            I, I, –

21 Agent Struwe:          Or –

22 Joel Ensey:            – I never had an arrest affidavit.

23 Agent Struwe:          Okay.  Did he talk about him coming up with the words here, you know?

PAGE 67 OF 75

1    Joel Ensey:            What do you mean coming up with the words here?

2    Agent Struwe:          So I will, uh, an arrest affidavit for me starts with a Word doc, just the

3    words, and then I format it over into, you know, a search or an arrest affidavit or whatever.  So you

4    usually probably just see the formatted affidavit.

5    Joel Ensey:            Right.

6    Agent Struwe:          Did he ever even show you like, hey, here's my thoughts or here's a Word

7    doc or here's some notes on an application for an arrest warrant?

8    Joel Ensey:            No.  I mean, not on a, an arrest warrant.

9    Agent Struwe:          Okay.

10   Joel Ensey:            No.

11   Agent Struwe:          Did he ever indicate "I want to charge these people?"

12   Joel Ensey:            I mean, yeah.  I mean, that, yeah.  I mean that was why he was doing the

13   search warrants and everything.  That's why.

14   Agent Struwe:          And so, sorry, I think I cut you off but that was sort of where you were at is

15   he's talking about, "Well, you know, if we charge them we can keep going forward," my words,

16   not yours or his.  But if we charge them I think you said that vindicates the search warrant.

17   Joel Ensey:            Yeah.

18   Agent Struwe:          That was your impression of his stance?

19   Joel Ensey:            Yeah.  I mean, I, you know, the, the officers that were in there, um, you

20   know, one of them that, that helped Aaron Christner, he was in there and, you know, I was talking

21   to him.  And I kinda explained the same thing about the, when we're doing search warrants on sex

22   cases because he does the search warrants on the sex cases and, um, like we, we didn't have a

23   nexus there, you know.  Um, we went through the, like I talked to you about, this is how we, how

PAGE 68 OF 75

| | |
|---|---|
| 1 | we do it and how we end up getting in people's houses and how we end up seizing things. Um, you |
| 2 | know, and he's, he agreed but he was, you know, "I'm looking at it as a reasonable person. Does a |
| 3 | reasonable person think that, that these fruits and instrumentalities are going to be, be where we've |
| 4 | described." And I'm like, "Well we just don't the, the particularity there, um, at all." While I was |
| 5 | sitting in there I text, um, Mark Bennett just to have somebody else, I guess, on my side that had |
| 6 | been, reviewed it and maybe an outside, outsider, I don't, to give maybe a differing opinion – |
| 7 | Agent Struwe:        Mm hmm. |
| 8 | Joel Ensey:        – than, than me or the same opinion but kinda different, – |
| 9 | Agent Struwe:        Sure. |
| 10 | Joel Ensey:        – present it a different way. Um, he was in something and then he said, you |
| 11 | know, "Maybe Mattivi would be a better person to, to have talk to them about it." I said, "Okay." |
| 12 | So I, um, I don't remember if I text or called, um, Director Mattivi but then Mattivi got on the |
| 13 | phone there with everybody and, and kind of explained the situation and why, why they weren't |
| 14 | good and told them this is, this is what's happening. Just telling you, telling you what's happening. |
| 15 | Agent Zamora:        And who, what officer were you talking with about that? |
| 16 | Joel Ensey:        So it was – |
| 17 | Agent Zamora:        Christner you said was there? |
| 18 | Joel Ensey:        Yeah. So it was Deputy Christner, uh, Sheriff Soyez, Chief Cody, it was |
| 19 | myself and I think there was somebody else there too that was standing and I don't know if it was |
| 20 | Deputy Regier or not. There was a few of us in Sheriff Soyez's office. |
| 21 | Agent Zamora:        And I guess, then what was the consensus of the law enforcement there? I |
| 22 | mean, because you got, um, you made calls to say, hey, we're explaining to you. What, were they, |
| 23 | all let's say, sheriff, chief, um – |

PAGE 69 OF 75

| | | |
|---|---|---|
| 1 | Joel Ensey: | So I had, I had – |
| 2 | Agent Zamora: | – Christner and them on, were they saying, "Yes, we agree," or, "No, we |
| 3 | | don't," or was it mixed, that you recall? |
| 4 | Joel Ensey: | It was mixed.  I had, I had, um, I had told, um, Sheriff Soyez that that's |
| 5 | | what, I, I had called him the night before and told him that this is what I'm going to do. |
| 6 | Agent Zamora: | Mm hmm. |
| 7 | Joel Ensey: | Um, so he was, he was at least ready for it.  I don't know that he conveyed it |
| 8 | | to any of his, his deputies or not.  So I think he was a little more receptive than probably everybody |
| 9 | | else was because it wasn't quite the, the bombshell. |
| 10 | Agent Zamora: | Okay. |
| 11 | Joel Ensey: | Um, but I think, I think Deputy Christner was more trying to understand |
| 12 | | what was going on and not, um, lodging objections to what was going on.  Just, you know, "We felt |
| 13 | | like we were doing, doing the right thing." |
| 14 | Agent Zamora: | Mm hmm. |
| 15 | Joel Ensey: | "And now you're telling us we're not."  Um, I remember telling him when |
| 16 | | we were sitting in there, I was like, "I did not review them beforehand probably the way that I |
| 17 | | should have."  Um, you know, and Cody, Cody was pissed at me.  Um, and I wasn't gonna kick a |
| 18 | | guy while he was down but I said, you know, I wanted to tell him,  "You know you didn't follow |
| 19 | | the plan," but I kinda digress there. |
| 20 | Agent Struwe: | The plan regarding – |
| 21 | Joel Ensey: | Like with Leeds like doing – |
| 22 | Agent Struwe: | Leeds. |
| 23 | | |

1    Joel Ensey:              – search warrants.  Um, and then Cody walked out of, walked out of there

2    and he told his guys, "Well guys, we just got kicked in the nuts."  And again, I didn't, I felt like it

3    was the right thing to do but you don't necessarily feel good about doing the right thing all the

4    time.

5    Agent Zamora:        You had mentioned, last one, I won't promise, um, that you said, "Hey, I'm,

6    I'm not gonna lie."  He's like, "I'm not asking you to lie."  What was that about?  I guess in

7    conversation I kind of assumed it was getting an, an arrest warrant to validate the search warrants.

8    But I could be wrong.  That's, I just remember you saying that.

9    Joel Ensey:              Right.  Um, I don't really remember what prompted me to, to say that.

10   Because, you know it wasn't like he, him asking me to lie or anything like that.

11   Agent Zamora:        Right.

12   Joel Ensey:              He, that wasn't the, what he had told me before I said that.  I think it, that

13   was after I said, you know, "I did not review these the way that I had, I maybe should have," or

14   something along those lines.  Um, and then something about maybe it look, looking bad on me.

15   And I'm not, I'm not gonna lie about what, what my role was.

16   Agent Zamora:        It is what it is.

17   Joel Ensey:              Right.

18   Agent Zamora:        True, true.  Well hey, we took a lot of your time.  Thank you so much.  We

19   still have a lot of work to do and –

20   Agent Struwe:          Questions for us?

21   Joel Ensey:              Um, and so who, I guess who, was it the attorney general that then got you

22   guys or who?

23

PAGE 71 OF 75

# KANSAS STANDARD OFFENSE REPORT
### FRONT PAGE OPEN PUBLIC RECORD

PAGE 4 OF

| | |
|---|---|
| [X] INITIAL  [ ] DELETE | |
| [ ] MODIFY  [ ] ADD | |
| [ ] ON VIEW  [ ] DISPATCHED | |
| [ ] CITIZEN | |

**NAME OF AGENCY:** Marion Police Department
**KS AGENCY ORI NUMBER:** KS0580200
**CASE NUMBER:** 23-108

**INCIDENT**

| DATE OFFENSE STARTED (MMDDCCYY) | TIME (HHMM) | DATE OFFENSE ENDED (MMDDCCYY) | TIME (HHMM) | DATE OF REPORT (MMDDCCYY) |
|---|---|---|---|---|
| 08/04/2023 | 00:00 | 08/07/2023 | 19:00 | 08/08/2023 |

| EXCEPTIONAL CLEARANCE DATE (MMDDCCYY) | EXCEPTIONAL CLEARANCE | | | |
|---|---|---|---|---|
| | A. [ ] DEATH OF OFFENDER  D. [ ] VICTIM REFUSES TO TESTIFY | B. [ ] PROSECUTION DENIED  E. [ ] JUVENILE - NO CUSTODY | C. [ ] EXTRADITION DENIED  N. [X] NOT APPLICABLE | |

**LOCATION OF OFFENSE:** ████ Marion KS 66861

**REPORT AREA**

| TIME REPORTED | TIME ARRIVED | TIME CLEARED |
|---|---|---|
| 06:10 | 06:10 | 19:00 |

**OFFENSE # 4**

| CHAPTER SECTION SUB 1 SUB 2 | |
|---|---|
| 21-6002(a)(3) | [ ] ATTEMPTED  [X] COMPLETED |
| | AID / ABET [ ] CONSPIRACY  [ ] SOLICITATION |

**DESCRIPTION:** Official misconduct; Using confidential information for personal gain

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY |
|---|---|---|---|---|
| 08 | | 88 | | F. [ ] FORCE  N. [ ] NO FORCE |

**TYPE OF THEFT**
- M. [ ] COIN MACHINE
- N. [ ] FROM BUILDING
- O. [ ] M V PARTS & ACC.
- P. [ ] SHOPLIFTING
- Q. [ ] POCKET-PICKING
- R. [ ] PURSE SNATCHING
- E. [ ] EMBEZZLEMENT
- T. [ ] POSS. STOLEN PROP.
- U. [ ] MOTOR VEHICLE
- V. [ ] THEFT FROM M V
- X. [ ] ALL OTHER
- Z. [ ] NOT APPLICABLE

**TYPE OF FORCE / WEAPON**
- 11. [ ] FIREARM [ ] AUTO
- 12. [ ] HANDGUN [ ] AUTO
- 13. [ ] RIFLE [ ] AUTO
- 14. [ ] SHOTGUN [ ] AUTO
- 15. [ ] OTHER [ ] AUTO FIREARM
- 20. [ ] KNIFE / CUT INSTR.
- 30. [ ] BLUNT OBJECT
- 35. [ ] MOTOR VEHICLE
- 40. [ ] PERSONAL WEAPON
- 50. [ ] POISON
- 60. [ ] EXPLOSIVE
- 65. [ ] FIRE / INCID / DEVICE
- 70. [ ] DRUGS / NARC.
- 85. [ ] ASPHYXIATION
- 90. [ ] OTHER
- 95. [ ] UNKNOWN
- 99. [ ] NONE

**OFFENDER SUSPECTED OF USING (SELECT UP TO 3)**
- A. [ ] ALCOHOL
- C. [ ] COMPUTER EQUIP.
- D. [ ] DRUG / NARCOTICS
- N. [X] NOT APPLICABLE

**TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)**
- B. [ ] BUYING / RECEIVING
- C. [ ] CULT / MANU / PUBL.
- D. [ ] DIST / SELLING
- E. [ ] EXPLOIT. CHILDREN
- O. [ ] OPER/PROMOTE
- P. [ ] POSSESS / CONCEAL
- T. [ ] TRANS/TRANSMIT IMPORT
- U. [ ] USING/CONSUMING
- J. [ ] JUVENILE GANG
- G. [ ] OTHER GANG
- N. [ ] NO GANG INVOLVEMENT

**LOCAL CODE**

**OFFENSE # 5**

| CHAPTER SECTION SUB 1 SUB 2 | |
|---|---|
| 21-6107 | [ ] ATTEMPTED  [X] COMPLETED |
| | AID / ABET [ ] CONSPIRACY  [ ] SOLICITATION |

**DESCRIPTION:** Identity theft

| PREMISE | # OF PREM. | HATE/BIAS | CAMPUS CODE | METHOD OF ENTRY |
|---|---|---|---|---|
| 08 | | 88 | | F. [ ] FORCE  N. [ ] NO FORCE |

**TYPE OF THEFT**
- M. [ ] COIN MACHINE
- N. [ ] FROM BUILDING
- O. [ ] M V PARTS & ACC.
- P. [ ] SHOPLIFTING
- Q. [ ] POCKET-PICKING
- R. [ ] PURSE SNATCHING
- E. [ ] EMBEZZLEMENT
- T. [ ] POSS. STOLEN PROP.
- U. [ ] MOTOR VEHICLE
- V. [ ] THEFT FROM M V
- X. [ ] ALL OTHER
- Z. [ ] NOT APPLICABLE

**TYPE OF FORCE / WEAPON**
- 11. [ ] FIREARM [ ] AUTO
- 12. [ ] HANDGUN [ ] AUTO
- 13. [ ] RIFLE [ ] AUTO
- 14. [ ] SHOTGUN [ ] AUTO
- 15. [ ] OTHER [ ] AUTO FIREARM
- 20. [ ] KNIFE / CUT INSTR.
- 30. [ ] BLUNT OBJECT
- 35. [ ] MOTOR VEHICLE
- 40. [ ] PERSONAL WEAPON
- 50. [ ] POISON
- 60. [ ] EXPLOSIVE
- 65. [ ] FIRE / INCID / DEVICE
- 70. [ ] DRUGS / NARC.
- 85. [ ] ASPHYXIATION
- 90. [ ] OTHER
- 95. [ ] UNKNOWN
- 99. [ ] NONE

**OFFENDER SUSPECTED OF USING (SELECT UP TO 3)**
- A. [ ] ALCOHOL
- C. [ ] COMPUTER EQUIP.
- D. [ ] DRUG / NARCOTICS
- N. [X] NOT APPLICABLE

**TYPE OF CRIMINAL ACTIVITY (SELECT UP TO 3)**
- B. [ ] BUYING / RECEIVING
- C. [ ] CULT / MANU / PUBL.
- D. [ ] DIST / SELLING
- E. [ ] EXPLOIT. CHILDREN
- O. [ ] OPER/PROMOTE
- P. [ ] POSSESS / CONCEAL
- T. [ ] TRANS/TRANSMIT IMPORT
- U. [ ] USING/CONSUMING
- J. [ ] JUVENILE GANG
- G. [ ] OTHER GANG
- N. [ ] NO GANG INVOLVEMENT

**LOCAL CODE**

**VICTIM # 2**

**TYPE OF VICTIM**
- I. [ ] INDIVIDUAL
- B. [ ] BUSINESS
- S. [ ] SOCIETY / PUBLIC
- F. [ ] FINANCIAL INSTITUTION
- R. [ ] RELIGIOUS ORGANIZATION
- G. [X] GOVERNMENT
- O. [ ] OTHER
- U. [ ] UNKNOWN

**VICTIM OF OFFENSE NUMBER:** 1.[ ] 2.[ ] 3.[ ] 4.[X] 5.[ ] 6.[X] 7.[ ] 8.[ ] 9.[ ] 10.[ ]

| NAME: LAST | FIRST | MIDDLE |
|---|---|---|
| | | |

| ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |

| TELEPHONE NUMBER (HOME) | RACE | SEX | ETHNICITY | RES. /N-RES. | AGE | DATE OF BIRTH (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| DRIVERS LICENSE NUMBER | DL STATE | EMPLOYER / SCHOOL |
|---|---|---|
| | | |

| TELEPHONE NUMBER (WORK/SCHOOL) | ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|---|
| | | | | |

**CIRCUM. AGG ASLT/BATTERY (MAX 2)** | **VICTIMS RELATIONSHIP TO CORRESPONDING SUSPECT NUMBER (INDICATE ALL SUSPECTS)** | **TYPE OF INJURY (MAX 5)**

1. 2. | 1. 2. 3. 4. 5. 6. 7. 8. 9. 10. | 1. 2. 3. 4. 5.

| | NAME: LAST | FIRST | MIDDLE | ADDRESS: STREET | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| [ ] RP | | | | | | | |
| [ ] DC | TELEPHONE NUMBER (HOME) | RACE | SEX | ETHNICITY | RES./N-RES. | AGE | DATE OF BIRTH (MMDDCCYY) | HEIGHT | WEIGHT | HAIR | EYES |
| [ ] W | EMPLOYER/SCHOOL | | | ADDRESS: STREET | CITY | STATE | ZIP | TELEPHONE NUMBER (WORK/SCHOOL) |
| [ ] O | | | | | | | | |

**PROP. DESC**

| TYPE LOSS | PROPERTY / DRUG CODE | DESCRIPTION / SUSPECTED DRUG TYPE | ESTIMATED QUANTITY | FRACTION | TYPE DRUG MEASURE | VALUE | DATE RECOVERED |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| REPORTING OFFICER | BADGE # | DATE | COPIES TO | PROPERTY TOTAL |
|---|---|---|---|---|
| G. Cody | 200 | 08/08/2023 | | |

**Ex. A 137**

**Interview of Brogan Jones on 12-06-23**

1    Brogan Jones: So, I don't know how this works for you.  I got this one 8/4/23.  I forwarded --

2    Agent John Zamora:    At what time?  I'm sorry.

3    Brogan Jones: Um, 8/24, does it tell me what time I got this?  Yes, 5:17 p.m. is when I originally

4    received this.

5    Agent John Zamora:    And that would be from?

6    Brogan Jones: That was from Ruth Herbel.

7    Agent John Zamora:    Okay.

8    Brogan Jones: Um --

9    Agent Michael Struwe:        And is it just a screenshot?

10   Brogan Jones: Yeah, it's just a screenshot of the letter.

11   Agent Michael Struwe:        Okay, no subject or --

12   Brogan Jones: No, so the next one came in 8/5.  So, I was gone for that.  That'd been the 4th, I

13   would have been gone.  The next one came in the 5th, on the Saturday.  Um, so technically, I got the

14   picture first.  I didn't see it until Monday.  So, he came in and talked to me on the 7th.

15   Agent Michael Struwe:        Cody?

16   Agent John Zamora:    Okay.

17   Brogan Jones: Cody did.

18   Agent Michael Struwe:        Did he talk to you before you got that email though?

19   Brogan Jones: About, 17, well probably 17 minutes before I saw it because I forwarded it out at

20   8:17 that morning, uh, to him.

21   Agent Michael Struwe:        which morning?

22   Brogan Jones: The, 8/7.

23   Agent Michael Struwe:        Okay.

**PAGE 9 OF 94**

Ex. A 138

**Interview of Brogan Jones on 12-06-23**

1   Brogan Jones: So, this message, find related messages. So, I got it, the first one on 8/5, and –

2   Agent Michael Struwe:        The screenshot?

3   Brogan Jones: The screenshot I got on 8/4.

4   Agent Michael Struwe:        So, that's the first one.

5   Brogan Jones: That's the very first one.

6   Agent Michael Struwe:        Very first one.

7   Brogan Jones: Message saying some other stuff about look into it with the police, that was sent

8   8/5. They were both forwarded to Cody on 8/8 at 4:10, so that's when he would have came in. This

9   day.

10  Agent Michael Struwe:        Okay. But, before you ever received a screenshot, Cody was talking

11  to you about, hey, we think there's an internal –

12  Brogan Jones: Before I saw it on my email.

13  Agent Michael Struwe:        When you first saw it?

14  Brogan Jones: So, technically I got it before –

15  Agent Michael Struwe:        Thank you for clarifying.

16  Brogan Jones: I was gone out of office –

17  Agent Michael Struwe:        Okay.

18  Brogan Jones: He came in very first thing in the morning.

19  Agent Michael Struwe:        Okay.

20  Brogan Jones: On 8/7 and talked about it. I saw it.

21  Agent Michael Struwe:        Perfect, thanks for clarifying. That makes more sense to what I

22  understood.

23  Brogan Jones: Okay, it's (unintelligible).

PAGE **10** OF 94

Ex. A 139

004881

**Interview of Ryan Newell on 12/05/2023**

1    Agent John Zamora:   Zack Collett.  Okay.

2    Ryan Newell:  Yeah, he, he's the one that, that also, I say, had contact with her via text messages

3    and emails privately, because he said, and he personally said to me that he wanted to warn her that

4    Ruth is gonna bring up the issue of her DUI in –

5    Agent John Zamora:   Oh, okay.

6    Ryan Newell:  – um, the council meeting, because since it was up for a vote for that.

7    Other Speaker:          So, what's the timeframe of that compared to, I believe Cody claims that he

8    contacted her on the 7th, I want to say.  August 7th I reached out to her to ask her about this piece

9    of mail, and that does seem to be, at least what's on record, hey, this is law enforcement reaching

10   out to Kari for the first time, or the council member reaching out to Kari for the first time, or would

11   the timeframe be this other council member reaching out to her?

12   Ryan Newell:  Um, I'd have to go back and look at Ruth's email dates to Brogan Jones.  Um, but

13   he, I believe, I believe it was before the 7th.

14   Agent John Zamora:   So, then, when Ruth received it, did you know that she did, in fact, send it to

15   Brogan, or was that just through the media?  How do you know –

16   Ryan Newell:  That's just through the media.

17   Agent John Zamora:   Okay.

18   Ryan Newell:  Through the media from, um, when she admitted it to –

19   Agent John Zamora:   Okay.

20   Ryan Newell:  – everything, well, um, after the raid and stuff.

21   Agent John Zamora:   And then, how do you know about Zack reaching out to –

22   Ryan Newell:  He admits it in, in the city council meeting.

23   Agent John Zamora:   Okay.  So, media, or in a meeting –

PAGE **29** OF **43**

### Interview of Bethanie Popejoy on (DATE)

1    Bethanie Popejoy:       No.

2    Other Speaker:          Full plate, personal stuff going on, didn't do it.

3    Bethanie Popejoy:       Correct.

4    Other Speaker:          Did he clarify or ask you if you had ever reviewed them or what your

5    knowledge of these warrants were?

6    Bethanie Popejoy:       Um, we had this conversation, and at that point, I said, Joel, I still even

7    haven't even see 'em.  I, I don't know what's in these warrants.  I didn't know these warrants were

8    even out there, and it wasn't until the 14th that Todd sent this one for Locust.

9    Other Speaker:          So that's the first time you saw –

10   Bethanie Popejoy:       That's the first time I saw a warrant.

11   Other Speaker:          And then you read, did you review that warrant?

12   Bethanie Popejoy:       I did review that warrant.

13   Other Speaker:          On the 14th?

14   Bethanie Popejoy:       Yes.

15   Other Speaker:          And what did you, what were your impressions?

16   Bethanie Popejoy:       I was, uh, shocked, angry, disappointed, um, disbelief.

17   Other Speaker:          Hmm, okay, so, uh, you were not impressed with the affidavit.

18   Bethanie Popejoy:       I was not.

19   Other Speaker:          To support it.

20   Bethanie Popejoy:       I was not.

21   Other Speaker:          Did you have conversations or did somebody from KBI have conversations

22   with Joel about where do we go from here after having reviewed what happened?

23

PAGE **27** OF **60**

### Interview of Bethanie Popejoy on (DATE)

1  I'm like, well, it's a little fuckin' late now, and, um, you know, the, um, the kid that, the detective

2  was there, um, Chris, Christensen, Chris –

3  Speaker 1:        ~~Krisner~~ Christner –

4  ~~Other Speaker~~ Bethanie Popejoy:        ~~Krisner~~ Christner, he was there, and I said, um, uh, he said

5  something about, uh, they had spent 3 hours at this elderly woman's home, and, um, I said, uh, how

6  many downloads, trying to download the computers.  I said how many downloads have you done.

7  Well, I just got back from training and blah, blah, blah, and I said well, I think we can all agree that,

8  um, a giant media case is not the time to try out your new skills on computer forensic examination.

9  Silence.

10  Other Speaker:        Was this like a speakerphone conversation –

11  Bethanie Popejoy:        This was on my cell phone.

12  Other Speaker:        Okay.  So you're saying he was there.  This was not –

13  Bethanie Popejoy:        He was there.  They, uh, well, he had to have been on speaker on their end –

14  Other Speaker:        They must have been on speaker.

15  Bethanie Popejoy:        Yeah.

16  Other Speaker:        Okay.

17  Bethanie Popejoy:        Yeah.  Had to have been 'cause he could, I could hear both of them.

18  Other Speaker:        Okay.

19  Bethanie Popejoy:        Um, and then that wasn't the answer they all wanted, and it's like ****.

20  Speaker 1:        And then would that have kind of addressed this by somebody when you're saying

21  don't, uh, don't try out your skills that you just learned –

22  Bethanie Popejoy:        I know this came –

23  Speaker 1:        – **** –

PAGE **39** OF **60**

Ex. A 142

**Interview of Kari Newell on 12-07-23**

1    Kari Newell:   - so, it was also that morning that Zach Collette had reached out to me, um, and

2    said, um, and I still have those text messages as well, basically that Ruth Herbel had came up on

3    some information that I had a previous DUI and that she was going to use that information to

4    block, try and block me from getting my liquor license and in retaliation, um, to be removing the

5    newspaper out of my establishment the week before.

6    Agent John Zamora:   Okay, and that was the, the La Turner -

7    Kari Newell:   Yeah, the La Turner, um -

8    Agent John Zamora:   **** Deal let's say.

9    Kari Newell:   - ****.

10   Agent John Zamora:   Yeah.  And then what does, I guess Ruth, why would she have a beef about

11   that?

12   Kari Newell:   Um, she's really good friends with **** them at the paper.

13   Agent John Zamora:   Okay.

14   Kari Newell:   They're, I mean, so, there is a leak that exists between the newspaper and the city.

15   They like to use Ruth as kind of their sounding board, of any time they have got an issue with

16   something that's going on in the city, they're using Ruth to kinda vocalize that and to call to action

17   certain things, in turn Chief's getting feeding them information that are occurring and, in executive

18   session and what not, back to the paper so the paper has it to report on in the, in the name of

19   transparency.

20   Agent John Zamora:   Okay.

21   Kari Newell:   So, there's, the squeaky -

22   Agent John Zamora:   **** -

23   Kari Newell:   - the squeaky wheel is getting greased on both ends -

PAGE **13** OF **125**

**Interview of Kari Newell on 12-07-23**

1   Agent John Zamora:   ****.

2   Kari Newell:   - there so then it's just kind of -

3   Agent John Zamora:   Okay.

4   Kari Newell:   - feeding each other information, um, and I, I absolutely 100 percent believe that

5   this was personal.  This was personal.  This never had anything to, the, the local city government

6   has nothing to do with my ability to get a liquor license, that's a state level.

7   Agent John Zamora:   And that's what we learned.

8   Kari Newell:   Yep.

9   Agent John Zamora:   Yes.

10  Kari Newell:   Um, no, and it, having a DUI in 2008 wasn't going to disqualify me, this was

11  personal on all accounts, from Pam, Ryan, Ruth, it was personal.

12  Agent John Zamora:   And I guess how personal and what ~~to~~ effects.  What were they trying to do

13  -

14  Kari Newell:   Hurt my business.  They were trying to hurt my business.

15  Agent John Zamora:   And, and why?

16  Kari Newell:   Um, well I mean I can only speak to assumption.  Ryan was using it as a grab to get

17  the vehicle back, because the judge had ordered me the vehicle.

18  Agent John Zamora:   Okay.

19  Kari Newell:   Um, he was fully aware I didn't have a driver's license when he bought me that car

20  and the car ~~****~~ <mark>previous</mark>, he was fully aware I didn't have a driver's license when I was driving his

21  daughter in that car, but it didn't become an issue until I left him.

22  Agent John Zamora:   Okay.

23

PAGE **14** OF **125**

**Interview of Kari Newell on 12-07-23**

1   Kari Newell:  - it's, I mean it's such a ~~jungled~~ jumbled mess, there have been thousands of articles

2   come out and so much crap in the last -

3   Agent John Zamora:  ~~Wild~~ While -

4

5   Kari Newell:  - it's been wild, it's been awhile, it's been, it's been a lot, I'm trying to, trying to

6   remember, gosh I wish I could.  I don't remember the exact, it was before the search warrant, so it

7   had to have been before the raid, the newspaper had come out saying something that was, been

8   eluded to the fact that I had, it was so, after it's the meeting, before, that meeting was on Monday,

9   divorce court was on Monday, the paper came out on Wednesday, so, it was that Wednesday when

10  the paper came out, I had seen that there was some misinformation in there that had eluded to the

11  fact that I had had a felony, and I was pissed, I was like I do not have a felony, I've never been

12  investigated for a felony, so I, I called Cody and I was like hey, did you read the paper that came

13  out?  I was like, I am not happy, that's, that's slanderous, it's liable.  He's like, well I haven't seen the

14  paper yet.  I said I grabbed an extra copy.  He goes can you run it by the station real quick?  Zach

15  **** Hudlin met me at the door, um, said when you come in, don't come in here fired up or talking

16  about what's going on, there are other officers here that are not privy to the information yet because

17  we believe that there could be a leak within the police department that was helping Ryan.

18  Agent John Zamora:  Okay, -

19  Kari Newell:  So -

20  Agent John Zamora:  - with your information?

21  Kari Newell:  Yep.  Um, at that time they, he had felt that Dwayne McCarty may had been

22  helping Ryan to pull information on me.  So they, and Dwayne was there doing a bin check.

23  Agent John Zamora:  Okay.

PAGE **30** OF **125**

**Interview of Kari Newell on 12-07-23**

1    Kari Newell:  So he shooed me immediately into Cody's office where Zach, Cody and I sat, um,

2    and I, you know, I was pissed off and he goes well here's the thing, he said that they are very smart

3    in their wording and they said that something along the lines of, they said, if a person has a felony

4    they would be disqualified.  He said he didn't specifically say you have a felony.  So he's putting it

5    out there and making it look -

6    Agent John Zamora:   Okay.

7    Kari Newell:  - as though you have one without saying you have one.

8    Agent John Zamora:   He's playing the words.

9    Kari Newell:  He said that, so that's what he didn't, there was no crime with that, that's not illegal,

10   and he goes but I can see why, why that upset you and at that time, the sheriff's department called

11   him and I only caught like bits and pieces of what they were talking about and he's like, yeah I've

12   got to go over and talk to Joel, um, I've gotta take the evidence over there and then we're gonna see

13   what happens from there, and then he said, hey, look I've gotta cut out, I've gotta go meet with Joel,

14   um, I'm trying to get these warrants and he left, so I came back here.

15   Agent John Zamora:   What, what, what, what day was that prior to ~~you ****~~ to the 11th, that

16   search warrant on Friday -

17   Kari Newell:   That would have been the Wednesday -

18   Agent John Zamora:  - the Wednesday before, okay.

19   Other Speaker:       August 9th?

20   Kari Newell:   Yeah.

21   Other Speaker:       August 9th.

22

23

PAGE **31** OF **125**

Ex. A 146

**Interview of Kari Newell on 12-07-23**

1  Kari Newell:  – uh, this has been done so many times.  Or, you know, your information has been

2  stolen and spread around.  Everything was, like, heavy emphasis, like, a big deal.

3  Other Speaker:        Okay.  So, –

4  Kari Newell:  Nothing was ever presented ****.

5  Other Speaker:        – but he never actually showed you, –

6  Kari Newell:  No, he did not.

7  Other Speaker:        – and so, in his case file, there, there is no documentation from KDOR; so, to

8  this day, I have, I have not seen anything that he got from KDOR, something material, and email, a

9

10  Kari Newell:   Right.

11  Other Speaker:        – PDF, uh, a printout of facts, something that he attached to his case file to

12  show what, what he knew at that time –

13  Kari Newell:   Right.

14  Other Speaker:        – from KDOR.

15  Kari Newell:  Uh, I don't know if it was done via phone, 'cause I know that there is, like, even in

16  some-a the dash cam footage where Hudlin was on the phone with somebody referencing a

17  previous call to another somebody at KDOR, –

18  Other Speaker:        Sure.

19  Kari Newell:  – um, a lotta that could-a occurred by phone.

20  Other Speaker:        Sure.  Just making sure he didn't show you something, 'cause then I'd be –

21  Kari Newell:  I've never seen any of this, period, at all.  I've never seen any of the warrants; I've

22  never seen anything, anything.  I've never seen any of it.

23

PAGE **91** OF **125**

Ex. A 147

Phyllis Zorn:  Um, I could get you an older paper and show where it ran that Cody now refuse to provide them.  But ah, I was surprised he invited me clear back into his office, not just inside the PD –

Agent John Zamora:  Right.

Phyllis Zorn:  – And he started telling me that Eric and Deb ~~Groover~~ Gruver, are ruining the paper and I should start my own paper.  And I just said, I can't afford to do that.  He said well, I know there are people who will invest, I'll invest.

Agent John Zamora:  What timeframe was this?

Phyllis Zorn:  Oh, you know to give you that I'd have to look back because it would have been the day before the first Marion accident reports after Cody showed up in the paper.

Agent John Zamora:  What ~~money~~ month maybe?

Phyllis Zorn:  Maybe late July, again I'd have to look back.

Agent John Zamora:  Absolutely, that's fine. Okay, so he's tellin you, you ought to start your own newspaper and he'd invest in it.

Phyllis Zorn:  Yeah.

Agent John Zamora:  Okay, and -

Phyllis Zorn:  HE said, ~~Eric, Myra~~ Eric Meyer and Deb ~~Groover~~ Gruver,  are trying to ruin that paper.

Agent John Zamora:  Did he say how?

Phyllis Zorn:  I didn't ask and, because I was very uncomfortable with the conversation, and I will tell you that it told me one thing, that I heard those same words from the mayor –

Agent John Zamora:  To you?

Phyllis Zorn:  – many times.  Yes.

Agent John Zamora:  Okay.

Phyllis Zorn:  And, I thought, okay, Mayfield has already infected Cody.

Agent John Zamora:  Um.

Phyllis Zorn:  And I was very uncomfortable with that whole conversation.

24



3:25                    LTE 82

GC
Gideon >

the letter about Kari Newell from the Marion county record

I need a copy of that. That is evidence. What channel and what time. This is important

My wife just sent it to you did you get it?

No. Not yet

It's pretty big and she said it's still going

Have her send me a link. This is another confession!!

I need this

You should get it now she



+    iMessage

Ex. A 149

Jan 24, 2024 1:48:46 PM                     Printed By: 99589 from: SLM

**Received Time:**        Jan 24, 2024 01:37:45 PM   **Source ORI:**              KS0580000

[ ] **View Message Details**

NLT/AM.KS0580000 13:37 01/24/2024 20337 13:37 01/24/2024 48552 COCBI0100 *MRI1446195 TXT

COLORADO BUREAU OF INVESTIGATIONS
ATTN: JOHN ZAMORA

08-08-2023 DRIVERS LICENSE WAS RAN BY BRIDGETTE MELIZA FOR LICENSE CHECK FOR
OFFICER ZACHARIAH HUDLIN

08-10-2023 DRIVERS LICENSE WAS RAN BY BRADLEY SULLIVAN FOR LICENSE CHECK TO USE
FOR III BACKGROUND REQUESTED FOR OFFICER ZACHARIAH HUDLIN

IF ANYTHING FURTHER IS NEEDED, PLEASE DO NO HESITATE TO CONTACT US.

THANKS

MARION COUNTY SHERIFFS OFFICE
PH 620-382-2144 FX 620-382-5654
OPR/309
MRI 8194103 IN: NLETS 35913 AT 13:37 24JAN24
OUT: SLM 117 AT 13:37 24JAN24

Ex. A 150

005969

COLORADO BUREAU OF INVESTIGATION                    2023-0461/33

**SYNOPSIS:**

Interview with former Marion County Deputy Steven Janzen

**ACTION TAKEN:**

On 12/05/23, at about 1243 hours local time (1143 hours MST), Colorado Bureau of Investigation Agent JOHN ZAMORA and I responded to 429 Locust St, Marion, KS, to speak with former Marion County Sheriff's Deputy STEVEN (STEVE) JANZEN. Agent ZAMORA coordinated with STEVE over the phone prior to our arrival. Our conversation was recorded on body-worn camera. This is a summary of our conversation and is not intended to be complete or chronological; for details, see the recording.

STEVE invited us into his residence and confirmed it was still a good time for us to speak. I clarified with STEVE that he was no longer employed by Marion County or the City of Marion. He confirmed that no one was compelling him to speak with us and he understood our conversation was voluntary.

STEVE said he was currently working part-time restoring antique windows and was going to school.

I asked STEVE what his involvement with the search warrants was and he explained that he found out about them that morning (08/11/23). He explained that he was a property crimes detective at the Marion County Sheriff's Office (MNSO) and when he got into work, he was told the Marion Police Department needed some help executing some search warrants. He said it's a small county and law enforcement helps each other, so that was normal. He said he was told there were judges fighting to sign the warrants and the court order was issued. He said the person who was primarily giving him this information was Sheriff JEFF SOYEZ. He said he had not previously met former Chief GIDEON CODY.

STEVE said he knew ZACH HUDLIN pretty well, but not CODY. He said SOYEZ asked him if could help with the warrants and STEVE agreed to. STEVE said he decided when they got on scene that he (STEVE) would be scene security at the door. STEVE said he got along fine with reporters PHYLLIS ZORN and DEB GRUVER, so he figured he would just stay by the door and talk with them. STEVE said it was typical for an officer from an assisting law enforcement agency to take a scene security position while the originating agency did the search and collected evidence.

I asked STEVE if he ever looked at the search warrant and he said he hadn't. I asked if it was typical to look at the warrant or not. He replied, "If it's a signed court order, that, I mean who am I to question a court order? That throws the system into chaos, I guess. Like if they give me an arrest warrant, I'm not going to argue with them about the arrest warrant, I'll just go do it. I just assumed since multiple people had gone through it, that everything was okay like it was supposed to be…" STEVE reiterated that he was on scene only to help with scene security – "be 'the door'" – like he had done many times before. He said small departments who only have 5 officers need to help each other out and this situation was no different.

I asked STEVE if he ever took action during these warrants beyond just scene security. He said at one point PHYLLIS wanted a notepad and pen from her desk and STEVE confirmed that would be okay and then retrieved the items and gave them to PHYLLIS. He said he also tried to keep PHYLLIS and DEB calm outside and offered to let them come inside and hang in the shade. He said they did not want to come into the shade. He said at one point he responded over to RUTH HERBEL's residence and talked with her until someone else got there. He said she kept asking him what this was all about and he kept telling her he did not know because it wasn't his case, but another officer would come explain it to her.

STEVE said the closest thing to a search warrant "briefing" that occurred was in the "squad room" when the officers talked about which locations they were going to. STEVE said, "It was never said, 'This is what's happened, this is what's going on,' like I said, it was just kind of implied that it was an identity theft. That something that happened where there was a computer crime to ac, to, er you know, to, to access something that they weren't supposed to get and the Department of Revenue knew they had a loophole in something or else, like that, uh, but they were fixing the loophole, but it was still illegal whatever was happening." STEVE said JEFF was who was primarily relaying this information. STEVE said he had never really spoken to CODY and had maybe said "two sentences to him in (his) life."

I asked STEVE if once he was on scene at the Marion County Record, did he have any idea what part of that building was going to be searched. He said he did not. I asked him what he recalled about the initial execution of the search warrant. He said they went up to the back door. He did not recall if someone went in and brought them out, or what. He said thinking about it, they may have been outside smoking already. STEVE said he was standing there and CODY said they were there to serve a search warrant. He said CODY was telling people they were going to take their phones and DEB tried to get her phone out and CODY took it from her and went inside. STEVE said he remained outside. He said he eventually got a stool and sat inside in the shade. He said he was trying to get "them" to come inside because it was hot. He said he was telling them, "It's hot out here, this is dumb, let's go inside." He said "they" replied that they couldn't smoke inside and they wanted to stay outside. STEVE said later, "their version" turned into STEVE forcing them to stay outside in the heat. STEVE said the media was putting that version out there.

I asked STEVE if he recalled anything specific about CODY taking DEB's phone. He replied that CODY was "more aggressive than (STEVE) probably would have been." STEVE described himself as close to a "pacifist" and he would rather talk things through. He said DEB was sitting and CODY "just grabbed it and yanked it out of her hand." STEVE said, "...I mean I probably would have approached that slightly different." STEVE did not recall if CODY said anything at the time. He said DEB complained that she was hurt because he "ripped it out of her hand." He said DEB's device was included in the search warrant. STEVE said CODY never spoke with him about the incident or about anything. He said that day was the only time he had ever spoken with CODY.

I asked if CODY said anything during the briefing and STEVE said he did not recall. He said if CODY did say anything, it was along the lines of: this is our search warrant, we appreciate the help. STEVE said that was customary and normal. STEVE said he did not recall CODY going over the search warrant. STEVE agreed it was an informal briefing.

COLORADO BUREAU OF INVESTIGATION                    2023-0461/33

I asked STEVE if he had ever been part of a formal briefing in his career and he said he had. I asked what those typically looked like around Marion. He said those briefings typically involved department heads going through "everything, every scenario, like what could come up, what we're looking for" and who's going to be involved and what assets they have. STEVE said it's not common to have "super formal briefings" unless they call for the assistance of a specialized tactical team because there's a safety concern.

I asked STEVE if, in his experience, these warrants were executed in a way that was typical for the area. He described warrants on sex crimes cases and warrants on drug cases and said in his opinion this was ran more like a drug warrant and was "elevated more than it needed to be." He said it should have been a lot calmer with more conversation. He said, "…just yanking the phone out of her hand, that, all you're doing is escalating things when they don't need to be, there was no reason to escalate it, no one was actively defying you in any way, um and it, I don't know, it just was a mess."

We discussed the difference between seizing a phone as evidence, and temporarily limiting someone's access to their phone so they can't communicate with others who could create a danger and/or destroy evidence. I asked STEVE if those concepts were discussed during any kind of preplanning and he said not that he recalled. STEVE described how ERIC has security cameras at his business that communicate directly with ERIC's residence. STEVE said it was common knowledge in local law enforcement that ERIC's business had cameras that connected to his residence, creating a two-way audio connection. STEVE did not recall any discussion before the warrants were executed that officers needed to limit people's access to their phones because of known safety concerns in this case.

Regarding CODY taking DEB's phone, STEVE said, "(I) Probably would have initially just put my hand out. Seen how that went first." STEVE said there is a point when law enforcement needs to escalate things, but he didn't know if they were at that point when CODY took DEB's phone. STEVE acknowledged that he (STEVE) has been called "overly chill" in the past.

STEVE said his ears may have perked up a little when he heard where the warrants were being executed, but he was not concerned about a newsroom being the target location. He said he was not an attorney and had no idea law enforcement couldn't seize stuff from the press.

STEVE said there is a general attitude in the county that the Marion County Record loves Hillsboro but hates Marion. STEVE said ERIC writes just as many good things about Marion, he just doesn't write anything really harsh about Hillsboro. STEVE said people get a chip on their shoulder about it. He said he doesn't think it's a genuinely contentious situation. He said people just take issue with ERIC's opinion pieces, but ERIC writes editorials so people will read them, and if you make them controversial, people will read them. STEVE said he stays out of it and gets along with ERIC because he is his neighbor.

STEVE said when he was walking out of the back door of the MNSO to execute the warrants, he looked back and Sheriff SOYEZ was not coming with. STEVE said he should have questioned at that time why SOYEZ was not going because normally, if help was needed, everyone would help, including command staff. He said in hindsight, he should have questioned why the sheriff wasn't participating in the warrants himself.

COLORADO BUREAU OF INVESTIGATION          2023-0461/33

STEVE said he had 17 years' experience in law enforcement and this incident made him leave the profession. He said, "…who am I to question a court order? And that put a whole spin on my, like outlook on life in general, because now suddenly I have to question court orders and where they come from and how they got, how they became a court order. And I'm not going to do that, so, I got to do something else."

I asked STEVE aside from CODY grabbing DEB's phone, did he see anything else during the search warrants that concerned him. He said he did not and the scenes were pretty calm. I asked him if there was an after-action debrief and he said about half of the involved officers were at the MNSO later in the day. He said they were booking evidence there and they sat down and started talking about it. He said in his opinion, the officers understood that it didn't go that well. He said they had seized more evidence than they expected because they were hoping to triage the evidence on scene instead of seize everything. He said this was a larger amount of digital evidence seized than is typical for law enforcement in the area.

I asked if anyone in a position of leadership – Chief CODY or Sheriff SOYEZ – did an official debrief. He recalled CODY kind of summarized the events in a positive light. He said CODY was kind of cheerleading the incident.

STEVE said when you give officers a signed court order, officers serve it. He said nobody knew at the time that it was something they shouldn't do.

STEVE said it was implied by SOYEZ that these warrants were supported by the courts. STEVE did not have specifics, but said it was his impression from SOYEZ during the pre-brief that "people are behind this," that "it is highly supported." STEVE added that it was also implied that the KBI was "super supportive." STEVE said, "'The KBI is super supportive of this,' that was kind of the same 'rah-rah time,' like the 'pump up.'" STEVE explained that SOYEZ and CODY made comments even before Friday that the KBI was on board and thought this was a crime. He said afterward, they continued to say that the KBI was still "good with it." STEVE said, "Because people were starting to show concern, like, 'Should we have done this?'" STEVE said he started to question whether he had been "sold a bill of goods." He said he was reassured that KBI was supportive. STEVE said he never spoke directly with anyone from KBI.

STEVE emphasized that if law enforcement is given a court order, they aren't going to question it.

STEVE said he was on scene at ERIC's house the next day when ERIC's mother died. STEVE said Marion PD did not have anyone on duty on Saturdays, so STEVE, as an MNSO deputy, responded to ERIC's house when he heard the ambulance call. He said when EMS was unable to revive ERIC's mother, STEVE told him he was sorry and he knew he (ERIC) did not want him there. STEVE said he explained that he had to stay there until the coroner arrived. STEVE said ERIC replied something like: I don't blame you; this is GIDEON CODY's fault. He said ERIC eventually left to go get cigarettes.

STEVE said he could tell when CODY became chief that "he was posturing because he did simple things like stop giving them (the paper) the press release." STEVE said every week law enforcement would give the paper a press release, but CODY stopped doing that. STEVE didn't know the timeframe when CODY stopped providing it. He said that was the only information he had heard regarding CODY not getting along with the paper. STEVE did not know more about it.

Agt. MICHAEL STRUWE          (Grand Junction / Colorado Bureau of Investigation)          Page 4

Ex. A 154

COLORADO BUREAU OF INVESTIGATION                    2023-461/56

**SYNOPSIS:**
This report will document an interview with (William) David Mayfield and his Attorney Brian Bina.

**ACTION TAKEN:**
On Thursday, December 7, 2023, at approximately 4:25 PM, Colorado Bureau of Investigation Agent Michael Struwe and I interviewed Marion (KS) Mayor David Mayfield at Attorney Bina's office located at 322 N Main St, Unit 201, McPherson, KS.

Upon contact, we introduced ourselves to Attorney Bina and Mayor Mayfield. Attorney Bina told us he was an attorney for the City (of Marion), and that Attorney Jennifer Hill asked that he sit in on the interview with Mayor Mayfield.

I asked Mayor Mayfield if he was Gideon Cody's boss (when Gideon was working as the police chief), and Mayor Mayfield told me the City Administrator (Brogan Jones) was in charge of all departments, and the City Council was in charge of any position that was appointed, which would include the chief of police. Mayor Mayfield added if there were any issues involving the chief of police, that issue would have to go before the entire Council. I asked Mayor Mayfield if he was part of the City Council and he said he was.

I asked Mayor Mayfield to tell us if Gideon, or anyone else, had informed him that there was a potential identity theft involving the Marion County Record, a couple of their employees, and Ruth Herbel. Mayor Mayfield told us on August 8 (2023) he received a phone call from (Marion County) Sheriff Jeff Soyez who asked him to meet with him and Gideon Cody at the (Marion) Police Department. At approximately 2:00 PM – 3:00 PM Mayor Mayfield met with Gideon and Sheriff Soyez at the Marion Police Department. Mayor Mayfield said "So I went in and he set down, *** sat me down and he told me he said I just need to let you know that we're doing a criminal investigation, and he said it involves the Marion County Record, and Eric Meyer, and Phyllis Zorn, and Pam Maag, and, Ruth Herbel who's a council person, and I felt like you needed to know because there's a council person. I said ok, what's this in reference to? And he said it's identity theft, and he said that it was in regards to, a document that was sent to Ruth Herbel, which I was made aware of that before that meeting by, the, City Administrator."

Mayor Mayfield told us that Ruth Herbal has asked for a lot of KORA records that had cost the City (of Marion) a lot of money. Mayor Mayfield said "Two months ago I told, I told Brogan, I want you to, to forward any email she sends to you requesting something be done, because she doesn't have the authority to do that by herself. It's a c...it's a, council decision, it has to be voted on by the council. So he, that's one of the emails he forwarded to the entire council. But that was one that he, of many that he forwarded." I asked Mayor Mayfield what the one email was he (Brogan) forwarded to the council, and Mayor Mayfield said "Well the, the specific one you're going to be interested in is the one where she wanted him to have the police department investigate, Kari Newell. For because she had a DUI and she was applying for a liquor license with the city, and that's not true, she was applying for a liquor license with the state." Mayor Mayfield began to talk about that procedure, and Attorney Bina told Mayor Mayfield he was going off track.

Mayor Mayfield talked about his meeting with Gideon and Sheriff Soyez, saying "I told Cody, and I told Jeff Soyez at that, that day I said I'm not going to micromanage you, that's not my position, I'm the

ZAMORA, JOHN AGT (9801 / GRAND JUNCTION / Colorado Bureau of Investigation – Grand Junction)

Ex. A 155

COLORADO BUREAU OF INVESTIGATION          2023-461/56

Mayor, I don't have that authority. But I am gonna tell you I don't want to know another damn thing about this case. (I asked if Mayor Mayfield did or did not) I don't want to know anything about this case. I said if you interview somebody, I don't want to know who you interviewed, and I don't want to know what they said. And I ***, and I had no knowledge whatsoever, on that investigation after that day, up until…." I asked Mayor Mayfield why he didn't want to know (about what happens with the investigation). Mayor Mayfield said, "Well I'm a former police officer, and I knew what the ramifications could be, and I know Eric Meyer, and I know he's gonna try and pull me into this whole conflab, and I didn't want any part of it." I asked Mayor Mayfield about his concern regarding ramifications. Mayor Mayfield said, "Eric Meyer, just exactly what he's done."

I asked Mayor Mayfield if he was concerned about it being a newspaper; Mayor Mayfield said no. I asked about journalists being involved and Mayor Mayfield responded, "No I didn't, I didn't have any, I didn't have any opinion about any of it. I, I sa..told him you do your job, I'm, I'm out of it. It's not my place as mayor to tell him what he's supposed to do, it's the council's place."

I asked Mayor Mayfield if he (Gideon) had brought up they were getting any assistance from anyone. Mayor Mayfield told me (on August 8, 2023) he had been emailing Gideon regarding Gideon not getting his vacation or sick time, and during that email conversation, Gideon advised Mayor Mayfield that the KBI would be contacting him tomorrow (August 9, 2023). Mayor Mayfield told us he had that information on his phone, and said it was a text message. Mayor Mayfield began looking for the text message, and Attorney Bina suggested he find the text later and we would continue the interview. I provided both Mayor Mayfield and Attorney Bina with my business card and asked that the text message be forwarded to me if he finds it.

I asked Mayor Mayfield if there were emails, or any more text messages, providing him updates on this case, and Mayor Mayfield said "No. I told him I didn't want to know anything about it. One thing I, I'd, **** only other text messages I have is when I suspended him. Because he had deleted some emails between him and, Kari Newell." I asked Mayor Mayfield how he knew that, and he told me Attorney Bina had called him. Mayor Mayfield began to explain his conversation with Attorney Bina and Attorney Bina advised Mayor Mayfield not to talk about their conversation. I told Mayor Mayfield that he learned that information, Mayor Mayfield agreed, saying he was in Wichita at that time, and he called Gideon to suspend him. I asked Mayor Mayfield when that happened, and he found the text messages on his cell phone. I read some of the text messages on the phone, and it was determined Mayor Mayfield would forward the text messages to Attorney Bina, and Attorney Bina would get them to me.

I asked Mayor Mayfield what happened after he had received information Gideon was going to meet with the KBI, and Mayor Mayfield said he received a phone call from a City employee, Margo Yates. Margo asked Mayor Mayfield what was going on because there were many police cars at the Marion County Record, and Mayor Mayfield told Margo all he knew was they (law enforcement) were doing an investigation. Mayor Mayfield said that was when he found out search warrants were being served. I asked Mayor Mayfield what he thought about that, and he told me it was none of his business. Mayor Mayfield began talking about his opinion regarding basically the judge signing the search warrant, and Attorney Bina indicated to Mayor Mayfield he did not need to worry about that.

ZAMORA, JOHN AGT (9801 / GRAND JUNCTION / Colorado Bureau of Investigation – Grand Junction)



*Kansas Bureau of Investigation CMS*
**Investigative Report**

MN-2023MR67:

MNDC case number MN-2023MR67 was the search warrant served at 611 South Freeborn, Marion, KS. MPD Chief Gideon CODY applied for and obtained the search warrant from the 8th Judicial District Honorable District Magistrate Judge Laura VIAR on 08-11-2023 at 9:45am. The search warrant was served on 08-11-2023. The search warrant was returned back to the MNDC on 08-14-2023 at 8:23am. ASAC HARRISON observed the following details relating to the application and search warrant:

The application for search warrant shows a different premise to be searched. ASAC HARRISON observed the charges are different on the application showing Identity Theft pursuant to K.S.A. 21-6107 and Official Misconduct pursuant to K.S.A. 21-6002. ASAC HARRISON observed the charges on the search warrant show Identity Theft pursuant to K.S.A. 21-6107 and Unlawful Acts Concerning Computers pursuant to K.S.A. 21-5839.

The majority of the facts are the same within the application for search warrant except for an email with a screenshot detailed from HERBEL to JONES over the KDOR document. MEYER's article published on 08-09-2023 discusses that a councilwoman, HERBEL, received the information (meaning KDOR document). Chief CODY states "It corroborates a witness statement that Ruth Herbel obtained protected Kansas Department of Revenue information via social networking." However, the information obtained was not protected KDOR information as it was obtained legally on a public website.

Chief CODY included an email from JONES to David MAYFIELD, CITY OF MARION Mayor, and Janet ROBINSON, CITY OF MARION Clerk. The email talks about JONES sharing the KDOR document/information which was received from HERBEL. JONES goes onto state the "Chief/PD will not be looking into this. Secondly the State is the oversight for this and will conduct all this type of research." This is in reference to HERBEL sharing the KDOR document and wanting the information to influence the liquor/caterers' license. JONES continues to explain, "We as a city need to stay out of this "hear say" or whatever else you want to call it. We will go forward like any other individual and or business and let the State handle their business." JONES did want Chief CODY to explore/check out that KARI was convicted of a DUI which was posted on Facebook in the email.

Chief CODY details HERBEL's address according to the KDOR records. ASAC HARRISON observed this is the only information contained about the premise to be searched. There is no information to draw a conclusion HERBEL would have sent this inside her residence, from a computer, or from a cellular telephone device. The screenshot could be inferred it was captured from a cellular telephone device, but could be from another electronic device such as an APPLE iPad or other android device. There is no indication or information HERBEL works from home contained in the facts. ASAC HARRISON observations with all the facts misrepresented within the application and knowledge of known facts collected, Chief CODY did not have probable cause to justify Identity Theft or Fraud pursuant to K.S.A. 21-6107,

## RETURN

I received this warrant on the ___11___ day of ___August___, 20 _23_, at approximately ___945___ o'clock ____.m., and executed the same on the ___11___ day of ___August___, 20 _23_, by seizing the property described on the inventory and receipt attached hereto or shown on the reverse side hereof.

OFFICER SUPERVISING SEARCH

TITLE: Officer Z. Hudlin

Page 3 of 3

| MPD Case # | 23-108 | 611 S Freeborn Marion SW | Chief Gideon Cody |

Ex. A 158



Ex. A 159

Case # 23-442

**SHERIFF**
**Jeffrey T. Soyez**



202 S. 4th
Marion, KS 66861

www.marioncoks.net

**UNDERSHERIFF**
**Larry R. Starkey**

Phone: 620-382-2144
Fax:    620-382-3441

On August 8, 2023, while off duty, I, Detective Aaron Christner, received a phone call from Undersheriff Larry Starkey. He told me that he was with Marion Police Chief Gideon Cody. The Marion Police Department was requesting assistance on a case involving the use of computers and technology. Chief Cody briefed me on the case and sent me an email requesting some preservations that needed to be done.

On August 8, 2023 around 1320 hrs, I submitted a preservation request to Google for rherbelfamily@gmail.com.

On August 9, 2023 around 1304 I submitted a preservation request to Yahoo for phyllis_zorn@yahoo.com. Around 1312 hrs, I faxed a preservation request to CyberLynk Network for accounts Phyllis@MarionCountyRecord.com and Eric Meyers Eric@MarionCountyRecord.com.

On August 9 and 10, 2023 I assisted in writing search warrant applications for several locations in Marion, Marion County, KS.

On August 10, 2023, in preparation for executing the search warrants I modified the osTriage settings to search for items pertaining to the search warrants. I changed the keyword configuration to look for items related to the search warrants and removed the keywords looking for child sexual exploitation material.

On August 11, 2023 around 1056 hrs, I arrived at the Marion Record, 117 S 3rd St in Marion, Marion County, KS to assist Marion Police Department with the execution of a search warrant. I assisted in clearing the building and once secure photographed the premise. I photographed the outside of the building and the inside on the main level.

On the computer that was identified as Phyllis Zorn's I started osTriage around 1111 hrs. it was unlocked.

| Detective A. Christner | Report:  08/21/2023 | Page **1** of **5** |

Ex. A 160

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬    **Me, Cody - 8/5/2023**

M ☐    **Me**                                                    8/5/2023, 8:02 PM
       1790 Upland Rd

Ex. A 161

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬      **Me, Cody - 8/9/2023**

C      **Cody**                                                    8/9/2023, 12:30 PM
        What time are you coming in today

M      **Me**                                                      8/9/2023, 12:31 PM
        Planned on 10 but I can come in earlier if you need me to.

C      **Cody**                                                    8/9/2023, 12:32 PM
        8 would be great. 10 KBI is coming in

M      **Me**                                                      8/9/2023, 12:32 PM
        👍

C      **Cody**                                                    8/9/2023, 6:54 PM
        Everything going well?

M      **Me**                                                      8/9/2023, 6:57 PM
        Yeah. Almost done, just listened to t he council meeting video to see if anything needed added from that.

M      **Me**                                                      8/9/2023, 7:35 PM
        All done. Cleaned up the narrative and the offense reports.

M      **Me**                                                      8/9/2023, 8:38 PM
        Everything is added for Pam Maag.

**Ex. A 162**

**Messages in chronological order** (times are shown in GMT +00:00)

---

 **Me, Cody - 8/10/2023**

**Me**                                                                                    8/10/2023, 3:18 PM

I sent the search warrants for Eric and Ruth to Aaron. Both look good. I added the property description for Ruth.

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬    **Me, Cody - 8/11/2023**

Ⓜ    **Me**                                                                8/11/2023, 12:46 PM
Finally heard from DOR investigations. I got a name and phone number to call when I get to the office.

Ⓒ    **Cody**                                                              8/11/2023, 12:56 PM
Lol. I have been blasting them

Ⓜ    **Me**                                                                 8/11/2023, 7:22 PM
We're going to the office

Ⓜ    **Me**                                                                8/11/2023, 10:58 PM
https://kansasreflector.com/2023/08/11/police-stage-chilling-raid-on-marion-county-newspaper-seizing-computers-records-and-cellphones/

*Attachment: E8011F86-C1AC-455F-B852-EC15FF579536.pluginPayloadAttachment (20 KB)*

*Attachment: 9E67AA04-979A-4CA6-97F2-15035882AA84.pluginPayloadAttachment (136 KB)*

Ⓜ    **Me**                                                                8/11/2023, 10:58 PM

*Attachment: Chris Mercer (142 bytes)*

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬  **Zach Hudlin, Gideon L Cody, Gideon - 8/12/2023**

G 🔲  **Gideon**                                                    8/12/2023, 5:56 PM
      Don't delete any messages. We need them for our files. Even the hateful ones

ZH 🔲  **Zach Hudlin**                                              8/12/2023, 5:57 PM
      Ok.

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬    **Zach Hudlin, Gideon L Cody, Gideon - 8/14/2023**

G    **Gideon**                                                                8/14/2023, 11:38 AM
Call me when you wake up

G    **Gideon**                                                                8/14/2023, 1:30 PM
Text me when you get the return completed

ZH    **Zach Hudlin**                                                          8/14/2023, 1:31 PM
They're done. We just got to the office. Do you want us to take them to district court?

G    **Gideon**                                                                8/14/2023, 1:31 PM
Yes. Text me when they are delivered

ZH    **Zach Hudlin**                                                          8/14/2023, 1:31 PM
👍

ZH    **Zach Hudlin**                                                          8/14/2023, 8:49 PM
Narrative is finally done. Do you want me to send it to Aaron or wait till the morning and will you look it over?

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬 **Zach Hudlin, Gideon L Cody, Gideon - 8/21/2023**

ZH 🔲 **Zach Hudlin**                                      8/21/2023, 10:39 PM
Council meeting was uneventful. A bunch of news cameras but otherwise normal. The same people that always complain we the only ones to complain.

G 🔲 **Gideon**                                           8/21/2023, 10:43 PM
Lol. Wow



*Image: image000005.jpg (123 KB)*



*Image: image000006.jpg (152 KB)*

**G** 🔲 **Gideon**                                                          8/9/2023, 3:29 PM
Text me. Meeting

**K** 🔲 **Kari**                                                            8/9/2023, 3:30 PM
Just saw an officer pull out across the street was just making sure yall didn't need anything.  I'm at the other restaurant for kiwanis.

**G** 🔲 **Gideon**                                                          8/9/2023, 3:30 PM
No. Meeting with KBI

**K** 🔲 **Kari**                                                            8/9/2023, 6:05 PM
I just had a meeting with Mr. Mayfield.

**G** 🔲 **Gideon**                                                          8/9/2023, 7:33 PM
Call me back

**K** 🔲 **Kari**                                                            8/9/2023, 9:03 PM
Qell how did it go with Joel

000001                                                                       **Ex. A 168**

008231

# Computer forensics

Aaron Christner <AChristner@marioncoks.net>
Thu 8/10/2023 15:28
To:Jeff Soyez <JSoyez@marioncoks.net>;Starkey, Larry <LStarkey@marioncoks.net>;Gideon Cody (gcody@marionks.net)
<GCody@marionks.net>

Here is a good resource for digital/computer forensics.  It's in Kansas City.

https://www.rcfl.gov/heart-of-america


**Detective Aaron Christner #128**
**Kansas ICAC Task Force**
**Marion County Sheriff's Office**
202 South 4th Street
Marion, KS 66861
O - 620-382-2144
████████████
F - 620-382-3441
aaron.christner@leo.gov


Email Confidentiality Statement: This message and accompanying documents or attachments are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended for the specified individual(s) only.  This information is confidential in nature and may contain Law Enforcement Sensitive information.  If you are not  the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, copying, or the taking of any action based on the contents of this information is strictly prohibited.  If you have received this communication in error, please notify the sender immediately by E-mail or other means provided above, and delete the original message.

On August 7, 2023, Affiant spoke with Marion City Administrator Brogan Jones.  Mr. Jones stated he was aware of the Kansas Department of Revenue Record (KDOR) record because City Council member, Ruth Herbel, sent him a screenshot via email of the DOR record belonging to Kari Newell.

Ms. Herbel states in the email that she received the KDOR record from Pam Maag.

Mr. Jones stated Ms. Herbel wanted to deny the renewal of Kari's liquor/caterers' license based on the KDOR record and that the license was on the City Council Agenda for a meeting the same afternoon.

The investigation showed that Ms. Newell had not given consent for anyone to have her KDOR record nor had she accessed the information herself.

On August 11, 2023 a search warrant was executed at Ms. Herbel's home, 611 S Freeborn, Marion, Marion County, KS.  After waiving her rights per Miranda, Ms. Herbel stated "Pam Maag sent it to her and she sent it to Brogan (Brogan Jones)".

Ms. Herbal also stated in reference to the KDOR Record "I did this, I passed it to Brogan Jones because of my position on City Council"


I pray the court to find probable cause that Ruth Cornelia Herbel (████████████) did commit Identity Theft in violation of K.S.A. 21-6107(a1)(c1)(A) in that:

1 – Ruth Herbel possessed a document containing and admitted to using personal identifying information of Kari Newell and then disclosed it to the City Administrator.

2 – Ruth Herbel did so with the intent to misrepresent and deprive Kari Newell by deception in order to subject her to economic harm by attempting to have her liquor license renewal revoked

3 – This act occurred on or about August 07, 2023 in Marion County, KS.


I pray the court to find probable cause that Ruth Cornelia Herbel (████████████) did commit Official Misconduct in violation of K.S.A. 21-6102(a3) in that:

1 - Ruth Herbel used confidential information acquired in the course of and related to her official position to intentionally cause harm to another; to deny the renewal of Kari's liquor/caterers' license based on the DOR record

2 – This act occurred on or about August 07, 2023 in Marion County, KS.



I pray the court to find probable cause that Ruth Cornelia Herbel (████████████) did commit Division of Vehicle Records Disclosure in violation of K.S.A. 74-2012 (b) in that:

1 - Ruth Meyer disclosed records relating to diversion agreements for the purpose of KSA 8-1567, KSA 12-4415

2 – Ruth Herbel's use is not permitted under K.S.A 74-2012(b)


I pray the court to find probable cause that Ruth Cornelia Herbel (███████████) did commit Procurement for Unlawful Purpose in violation of 18 U.S. Code § 2722(a) in that:

1 – Ruth Herbel possessed Kari Newell's driver's license information

2 – Ruth Herbel's use is not permitted under 18 U.S. Code § 2721(b)

3 – This act occurred on or about August 07, 2023 in Marion County, KS

On August 1, 2023 around 1500 hrs, Eric Meyer and Phyllis Zorn were requested to leave Kari's Kitchen restaurant in Marion, KS by the owner, Kari Newell.  Mr. Meyer is the editor and publisher of the Marion County Record newspaper.  Ms. Zorn is a reporter for the newspaper.

On August 7, 2023 Marion City Administrator said that had had received a Kansas Department of Revenue (KDOR) record for Kari Newell from Marion City Council Member Ruth Herbel.  Mr. Jones said that Ms. Herbel wanted to deny Ms. Newell's liquor/caterers' license based on the KDOR record.

KDOR was contacted and reported that the names "Phyllis Zorn" and "Kari Newell" had accessed Ms. Newell's records.

The investigation showed that Ms. Newell had not given consent for anyone to have her KDOR record nor had she accessed the information herself.  In a written statement, Ms. Newell stated that Mr. Meyer had told her "if you pursue anything I will print the story and will continue to use anything I can to come at you.  I will own your restaurant".

On August 11, 2023 a search warrant was executed at Eric's residence, 426 Locust, Marion, Marion County, KS.  Mr. Meyer attempted to gather documents from a table in his house and was instructed to leave them.  On the table was a Kansas Driver's License Check document with the name Kari Newell, her date of birth and driver's license number.  The document is timestamped with 8/3/2023 9:54:54 PM.

Mr. Meyer spontaneously uttered "everything she [Kari Newell] contends we did, we have admitted.  We checked on a database the person who did it provided her [Kari Newell] name when she did it".

On August 11, 2023 a search warrant was executed at the Marion County Record, 117 S 3rd St, Marion, Marion County, KS.  Mr. Meyer is the editor and publisher of the Marion County Record.  A Driver's License Check document with the name Kari Newell, her date of birth and driver's license number. Was located on Phyllis Zorn's desk. The document is timestamped with 8/4/2023 3:27:41 PM.

After waiving her rights per Miranda, Ms. Zorn stated the she "pulled the information"


I pray the court to find probable cause that Eric Kent Meyer (███████████) did commit Identity Theft in violation of K.S.A. 21-6107(a1)(c1)(A) in that:

1 – Eric Meyer possessed a document containing and admitted to using personal identifying information of Kari Newell.

2 – Eric Meyer did so with the intent to misrepresent Kari Newell in order to subject her to economic harm by saying "I will own your restaurant".

3 – This act occurred on or about August 11, 2023 in Marion County, KS.


I pray the court to find probable cause that Eric Kent Meyer ███████████) did commit conspiracy to commit Identity Theft in violation of K.S.A. 21-6107(a1)(c1)(A) in that:

1 – Eric Meyer agreed with Phyllis Zorn  to commit Identity Theft

2 – Eric Meyer did so with the intent that Identity Theft be committed

3 – Phyllis Zorn acted in furtherance of the agreement by obtaining the information

4 – This act occurred on or about August 4, 2023 in Marion County, KS.

I pray the court to find probable cause that Eric Kent Meyer ███████████) did commit Intimidation of a victim in violation of K.S.A. 21-5909 (a1)(a2A) in that:

1 – Eric Meyer stated to Kari Newell "if you pursue anything I will print the story and will continue to use anything I can to come at you.  I will own your restaurant"

2 – Eric Meyer did so with the intent dissuade or attempt to dissuade Kari Newell by threatening harm and injury to her reputation and her business

3 – This act occurred on or about August 08, 2023 in Marion County, KS.

I pray the court to find probable cause that Eric Kent Meyer ███████████) did commit Unlawful Acts concerning computers in violation of K.S.A. 21-5839 (a2) in that:

1 -  Eric Meyer used her computer for the purpose of downloading Kari Newell's driving history by falsely and fraudulently inputting information in the KDOR website giving her access

2—This act occurred on or about August 3,2023 in Marion County KS

I pray the court to find probable cause that Eric Kent Meyer (███████████) did commit Procurement for Unlawful Purpose in violation of 18 U.S. Code § 2722(a) in that:

1 – Eric Meyer possessed Kari Newell's driver's license information

2 – Eric Meyer's use is not permitted under 18 U.S. Code § 2721(b)

3 – This act occurred on or about August 11, 2023 in Marion County, KS

On August 1, 2023 around 1500 hrs, Eric Meyer and Phyllis Zorn were requested to leave Kari's Kitchen restaurant in Marion, KS by the owner, Kari Newell.  Mr. Meyer is the editor and publisher of the Marion County Record newspaper.  Ms. Zorn is a reporter for the newspaper.

On August 7, 2023 Marion City Administrator said that had had received a Kansas Department of Revenue (KDOR) record for Kari Newell from Marion City Council Member Ruth Herbel.  Mr. Jones said that Ms. Herbel wanted to deny Ms. Newell's liquor/caterers' license based on the KDOR record.

KDOR was contacted and reported that the names "Phyllis Zorn" and "Kari Newell" had accessed Ms. Newell's records.  The record request were three minutes apart.

The document downloaded contained information notifying Ms. Newell that an "ignition interlock device" must be installed in a vehicle for Ms. Newell to obtain a restricted driver's license.

The investigation showed that Ms. Newell had not given consent for anyone to have her KDOR record nor had she accessed the information herself.  In a written statement, Ms. Newell stated that Mr. Meyer had told her "if you pursue anything I will print the story and will continue to use anything I can to come at you.  I will own your restaurant".

On August 11, 2023 a search warrant was executed at the Marion County Record, 117 S 3rd St, Marion, Marion County, KS.  A Driver's License Check document with the name Kari Newell, her date of birth and driver's license number was located on Phyllis Zorn's desk. The document is timestamped with 8/4/2023 3:27:41 PM.

After waiving her rights per Miranda, Ms. Zorn stated the she "pulled the information" and showed the officers which computer she had used.

While a search warrant was being executed at Eric Meyer's house, 426 Locust, Marion, Marion County, KS, Mr. Meyer spontaneously uttered "everything she [Kari Newell] contends we did, we have admitted. We checked on a database the person who did it provided her [Kari Newell] name when she did it".

I pray the court to find probable cause that Phyllis Jeanette Zorn (███████████) did commit Identity Theft in violation of K.S.A. 21-6107(a1)(c1)(A) in that:

1 – Phyliss Zorn possessed a document containing and admitted to using personal identifying information of Kari Newell.

2 – Phyliss Zorn did so with the intent to deprive Kari Newell of her privacy

3 – This act occurred on or about August 04, 2023 in Marion County, KS.

I pray the court to find probable cause that Phyllis Jeanette Zorn (███████████ did commit conspiracy to commit Identity Theft in violation of K.S.A. 21-6107(a1)(c1)(A) in that:

1 – Phyllis Zorn agreed with Eric Meyer to commit Identity Theft

2 – Phyllis Zorn did so with the intent that Identity Theft be committed

3 – Phyllis Zorn acted in furtherance of the agreement by obtaining the information

4 – This act occurred on or about August 4, 2023 in Marion County, KS.

I pray the court to find probable cause that Phyllis Jeanette Zorn ███████) did commit Identity Fraud of K.S.A. 21-6107(b1) in that:

1 – Phyliss Zorn used or supplied information the person knows to be false in order to obtain a document containing Kari Newell's information

2 – Phyllis Zorn did so with the intent that Identity Fraud be committed

3 – This act occurred on or about August 4, 2023 in Marion County, KS.

I pray the court to find probable cause that Phyllis Jeanette Zorn ███████) did commit Division of Vehicle Records Disclosure in violation of K.S.A. 74-2012 (b) in that:

1-- Phyliss Zorn disclosed records relating to diversion agreements for the purpose of KSA 8-1567, KSA 12-4415

2--Phyliss Zorn's use is not permitted under K.S.A 74-2012(b)

I pray the court to find probable cause that Phyllis Jeanette Zorn ███████) did commit Unlawful Acts concerning computers in violation of K.S.A. 21-5839 (a2) in that:

1 - Phyllis Zorn used her computer for the purpose of downloading Kari Newell's driving history by falsely and fraudulently inputting information in the KDOR website giving her access

2—This act occurred on or about August 4,2023 in Marion County KS

I pray the court to find probable cause that Phyllis Jeanette Zorn (███████ did commit Procurement for Unlawful Purpose in violation of 18 U.S. Code § 2722(a) in that:

1 – Phyliss Zorn possessed Kari Newell's driver's license information

2 – Phyllis Zorn's use is not permitted under 18 U.S. Code § 2721(b)

3 – This act occurred on or about August 04, 2023 in Marion County, KS

Case 2:24-cv-02224-HLT-GEB     Document 53     Filed 12/16/24     Page 178 of 196

**(No subject)**

Gideon Cody <GCody@marionks.net>
Wed 8/16/2023 10:34 AM
To:Jeff Soyez <JSoyez@marioncoks.net>

📎 3 attachments (49 KB)
MPD 23-108 Herbel PC (1).docx; MPD 23-108 PC Eric Meyer (1).docx; MPD 23-108 PC Phyllis Zorn.docx;

030382

**Ex. A 176**



12:24

Gideon Cody

Friday, Aug 11 • 11:42 AM

Deb Gruver went to the county attorneys office claiming you guys are violating their first amendment right. They told them a judge signed the warrant. Then she told them that they object to the warrant being served.

← JEFF SOYEZ

Friday, Aug 11 • 1:03 PM

If you want to start freeing people up when you can the food is here. Your call just lett

← JEFF SOYEZ

Text messa...



030575







**STATE OF COLORADO**                    Zamora - CDPS, John <john.zamora@state.co.us>

## Follow up Questions
1 message

**Jennifer M. Hill** <JHill@mcdonaldtinker.com>                    Thu, Jun 27, 2024 at 7:19 AM
To: "Zamora - CDPS, John" <john.zamora@state.co.us>, Ed Keeley <EKeeley@mcdonaldtinker.com>
Cc: Kim Seiler <kseiler@mcdonaldtinker.com>

Agent Zamora,

Again, thank you for your patience. Just as an FYI, because I know you will hear this through the grapevine the Civil case between Deb Gruver and Gideon Cody has settled and her lawyer has filed the attached Amended Petition naming Joel Ensey and the Sheriff. It is my understanding that Eric Meyer is also going to amend to add Ensey, so there are still a lot of moving pieces and we are trying to evaluate next steps from the civil litigation perspective. I know your work is happening outside of what goes on in civil court but I am kind of in both worlds so I'm just trying to make sure I'm approaching everything correctly.

In circling back to answer the questions you posed about who drafted the search warrants, Cody and I researched what we could and wanted to provide the following information. Your questions as you sent them are in bold

- **Did Gideon complete the search warrants himself, or did Detective Christner and Officer Hudlin (or anyone else) pitch in (specifically the A-M KDOR criteria)?**

The search warrants were primarily physically typed by Christner. Cody does not have a specific memory of typing any portion of the search warrant documents. He gave feedback and possibly made edits and circulated the drafts after his edits. During the investigation, Cody went to the KDOR website and personally viewed the "A-M KDOR criteria" drawing the conclusion from looking at the actual website in question that Zorn would have had to have checked one of those boxes to access the document in question. Cody has a specific recollection of going on to the KDOR site and seeing that menu of options.

- **Did Gideon complete all the research relating to KDOR himself or was he provided that information from someone?  If other LE provided him information, why didn't he document that in the search warrants?**

We are a little unsure of exactly what your use of the term "research" means. Based on our understanding of that term, Cody would state that he did not complete all the research related to KDOR himself. As the documents and witness and information shows, he delegated portions of the investigation to Hudlin who was the first person in the law enforcement team to make contact with KDOR (Monday August 7). He also delegated some of the drafting of the affidavits to Christner based on his belief and understanding that Christner had quite a bit of experience in investigating and working through cyber crimes.

Cody, Hudlin and Christner all shared information in person, on phone calls and on emails related to the various findings they made regarding the facts of the investigation. These in person conversations and calls were not separately documented so as to create a running record of every word and thought exchanged. It was the collective work of the law enforcement individuals together that created the basis for the search warrants and affidavits. Obviously, the search warrant itself does not state "Zach Hudlin called KDOR and told me XYZ information". Instead, the search warrant states near the beginning "During the investigation, your Affiant **has learned and been advised of the following**:"

The purpose of making that statement, which appeared on all four affidavits sent to Joel Ensey on August 10, was to specifically note that Cody was swearing to the truth of the contents but some of the information he used as a basis for the search warrant came from other officers and sources. Further Cody's affidavits specifically point out Christner's involvement and credentials to assist in the investigation and help Cody gather information.

- **If Detective Christner or Officer Hudlin had entered information in the search warrants, did Gideon personally verify that information was correct?**

Again, the term "personally verify" is a little vague. If you're asking, did Cody call KDOR and re ask all of the questions that Hudlin asked the KDOR reps, then the answer is "no". He did not "verify" that Hudlin's report from that phone call was

**Ex. A 182**
047665

correct. Did Cody show Christner his screen shots of going on the KDOR website? No. He did not separately investigate that Kari Newell's representations in the handwritten victim statement were true. He took the information from the witnesses and other officers and relied on the information they gave him.


Cody, Hudlin and Christner shared information and primarily Christner entered that information into the drafts of the search warrants and affidavits. After the drafts were finalized after multiple shares with each other, Cody did read the final version and then sign them. To his best knowledge as of August 10 and 11, everything in the affidavits was true. The entire purpose of conducting the search warrants was to obtain evidence to evaluate whether or not his understanding of the facts was supported by the evidence. Cody was repeatedly advised during that week long investigation that computer evidence can disappear at any time so if they could collect the information from the computers to show illegal searches for private documents, then they should get it when they could because computers could unintentionally delete that data. OR bad actors could intentionally delete that data.


Hopefully these explanations and answers are helpful for your analysis.


Thank you,
Jennifer M. Hill

jhill@mcdonaldtinker.com

 **37-1- Amended Complaint.pdf**
1335K

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬    **Gideon Cody, David Mayfield - 8/9/2023**

DM    **David Mayfield**                                                        8/9/2023, 1:44 AM

Brogan had his little girl at 545 pm.
Tomorrow you will have 2 weeks vacation and 20 days of sick leave added to your account.
I take the blame for this I never notified anyone. Totally forgot about it.

GC    **Gideon Cody**                                                          8/9/2023, 8:57 AM

Thank you for taking care of that. I really appreciate it. KBI is working with us on the case and I meet with them tomorrow
at 1000

DM    **David Mayfield**                                                        8/9/2023, 1:19 PM

No problem it was  totally my fault I forgot to tell anyone. Let me know how it goes with the KBI

**Messages in chronological order** (times are shown in GMT +00:00)

---

💬      **Gideon Cody, David Mayfield - 8/14/2023**

DM🟡  **David Mayfield**                                                                8/14/2023, 3:47 AM
        Listened to channel news tonight and they said when they interviewed councilor Herbel she stated that she received the
        letter about Kari Newell from the Marion county record

GC🟣  **Gideon Cody**                                                                   8/14/2023, 3:49 AM
        I need a copy of that. That is evidence. What channel and what time.  This is important

DM🟡  **David Mayfield**                                                                8/14/2023, 3:55 AM
        My wife just sent it to you did you get it?

GC🟣  **Gideon Cody**                                                                   8/14/2023, 3:56 AM
        No. Not yet

DM🟡  **David Mayfield**                                                                8/14/2023, 3:56 AM
        It□s pretty big and she said it□s still going

GC🟣  **Gideon Cody**                                                                   8/14/2023, 3:57 AM
        Have her send me a link. This is another confession!!

GC🟣  **Gideon Cody**                                                                   8/14/2023, 3:57 AM
        I need this

DM🟡  **David Mayfield**                                                                8/14/2023, 3:58 AM
        You should get it now she said it□s gone let me know it□s the entire story

DM🟡  **David Mayfield**                                                                8/14/2023, 3:58 AM
        We recorded it on her phone

GC🟣  **Gideon Cody**                                                                   8/14/2023, 3:59 AM
        Keep recording it. Anything with Ruth

DM🟡  **David Mayfield**                                                                8/14/2023, 4:02 AM
        I recorded it on my tv

COLORADO BUREAU OF INVESTIGATION                    2023-0461/41

I read ZACH part of what he sent to KARI, which read, "I believe this is her and Eric's attempt to get back at you from last week, again just wanted to give you a head's up in case it comes up tonight." I asked ZACH to explain what he meant. He said a week prior, ZACH heard that KARI had the Marion County Record reporters removed from her business and it was ZACH's understanding that ERIC MYER, the editor, was "livid about that." ZACH said it was his belief that ERIC and RUTH "have a lot of conversations and there's a lot of things that go between RUTH and the newspaper unbeknownst to anybody else and from ERIC to RUTH and show up at council meetings, and they work together on a lot of things." ZACH said he therefore believed RUTH's email was a way to get back at KARI since she had the newspaper removed from her business.

ZACH said he believed BROGAN also forwarded him the screenshot that RUTH sent to BROGAN. ZACH recalled seeing a screenshot of what appeared to be a letter from the state addressed to KARI. I asked ZACH if in his opinion as a council member, was the information about KARI having a prior DUI something that the council needed to be aware of. He said he did not think it was something council should "worry about." He explained that the "check in the box" that the council was responsible for was simply acknowledging that KARI had applied for a liquor license and where the building was physically located within the city. He said at the city level, council's approval does not include any kind of assertion that the city reviewed KARI's background.

I asked ZACH if he was ever contacted by former Chief GIDEON CODY. ZACH said he did not recall if CODY contacted him about these matters or not. ZACH said he was in on the interview process to hire CODY, but prior to that, he did not know him.

I asked ZACH about his relationship with RYAN NEWELL and/or the MAAGs. He shook his head no and said prior to all of this he had never spoken a word to RYAN and he did not know PAM MAAG.

ZACH was asked if KARI ever talked with him about this case after the fact. He said other than the messages they sent, no, KARI did not talk with him about these matters.

ZACH was asked who brought the DUI issue up at the City Council meeting and ZACH said KARI was the one who brought it up. He said it's all on recording, but to his recollection, the DUI issue did not come up when council was voting on KARI's liquor license application. He said the issue was first brought up by KARI afterward during the public comment period.

ZACH was asked if he knew anybody at the Marion County Record and he said he knows of them, but he doesn't have any kind of relationship with any of them.

ZACH was asked if there were any known issues between CODY and the newspaper. ZACH said he was aware that the newspaper was looking into CODY's past in Kansas City. He said that was prior to the search warrants. ZACH said the paper said they received some tips that there were some disciplinary actions in CODY's background, but the paper was not going to publish anything because their sources would not go on the record. ZACH explained that he knew that because during the hiring process for the chief position, the Marion County Record called him asking whether anyone (from council) was looking into CODY's background. He said the paper told him who he should follow up with based on the information the paper was getting. ZACH said later, ERIC called him and told him they weren't going to publish any of it because none of the sources would go on the record.

Agt. MICHAEL STRUWE          (Grand Junction / Colorado Bureau of Investigation)          Ex. A 186 Page 3

COLORADO BUREAU OF INVESTIGATION              2023-0461/41

ZACH added that he believes ERIC would have us believe that there is a conspiracy to "take down the newspaper" between City employees and councilmembers. ZACH said he had nothing to do with the search warrants and he was not involved in any conspiracy. ZACH explained that he and Sheriff JEFF SOYEZ are personal friends and their children go to school together. He said they had a preschool orientation on Thursday night (08/10/23). He said a "bunch of us dads" were standing around talking and got on the topic of the Marion County Record and "the negativity that they have towards our community, and JEFF whispered into my ear, 'I have a search warrant for, um, his business,' um so I knew about it, like technically yes, I knew that there was a search warrant for the Marion County Record, I didn't know that the City had anything to do with that search warrant and I didn't know, I mean it was what, six or seven o'clock the night before, um, I didn't know what it was about or anything else." ZACH said that was the extent of the conversation and JEFF only said he had a search warrant, not what it was about. ZACH said they did not discuss it further and there were others around. ZACH said JEFF probably should not have even told ZACH about it. ZACH clarified that because the Sheriff told him he had a warrant, he thought Marion County was the only entity involved and he had no idea the city was even involved.

I read ZACH one of KARI's messages she sent him, which read, "I'm going to call you after I get out of the meeting, this shit just got big deep." I asked if she called him. He said she did call him and as he recalled, she had found out that the letter that was sent to her (from KDOR) had become public knowledge and that was what she was upset about. ZACH did not recall if KARI told him where she thought the letter originated from. ZACH was asked again if KARI has had additional contact with him about this case and he said she will send him occasional updates about recent articles in the news and such. He said she did ask him to come talk to her one day and she let ZACH know that CODY had asked her to delete text messages and that she had talked to a reporter about that. ZACH said KARI wanted to let him know about it. He said that was in about September. ZACH said she told him she respected him (ZACH) and felt that someone on city council should know. ZACH thought he told her to talk with the City Administrator (BROGAN) about it, or to talk to the mayor (DAVID MAYFIELD) about it because ZACH did not want to be the only person with that information. He could not recall who he told her to tell. ZACH said he did not share that information with anyone, but he thinks KARI told BROGAN or MAFIELD, or both.

I asked ZACH if KARI ever shared with him the content or context of the messages between her and CODY. He replied, "No. Nope. Not that I, not that I remember. No. You mean like the text that she deleted, what they said? No." ZACH said he had no idea what the messages were about.

ZACH said his personal belief is that this case was "small-town drama that boiled over and has blown up into something a lot bigger than that now."

ZACH did not have anything further and we concluded.

**BODY-WORN CAMERA:**

Yes (timestamp on video is in MST)

**ATTACHMENTS:**

- **08/04/2023 – 5:17 PM** – Ruth Herbel <u>emails Brogan</u> Jones Kari Newell's KDOR DL information. (<u>from Brogan Jones account</u>)
- **08/04/2023 – 6:52 PM -** Gideon Cody and Marion County Sheriff Jeff Soyez received an <u>email from Eric Meyer</u> documenting he (Eric Meyer) received (Kari Newell's) KDOR information and alleged possible police misconduct on how the KDOR was received, but also thought it was received by a spouse (Ryan Newell).
- **8/05/2023 – 12:11 PM** – <u>Email from Ruth Herbel</u> to Brogan Jones expressing her concerns regarding Kari Newell's application for a liquor license.
- **08/05/2023 – 8:02 PM Note: Times are shown in GMT +00:00  -** <u>Text</u> from Officer Zach Hudlin (who is now the current Marion Police Chief) to Gideon Cody - narrative reads "1790 Upland Rd" – I cannot find a relationship to this case with this address.
- **08/07/2023 – 7:33 AM** – Gideon Cody forwarded the <u>email</u> from Eric Meyer (dated August 4, 2023) to Brogan Jones and wanted to talk about it.  Brogan Jones then forwards the email to Attorney Brian Bina.
- **08/07/2023 – 7:53 AM** – Brogan Jones <u>forwards Mayor David Mayfield</u> Ruth Herbel's email dated August 4, 2023, at 5:17 PM.  Brogan Jones gave Mayor David Mayfield a heads up on what Ruth Herbel had emailed him.
- **08/07/2023** – 7:59 AM – Brogan Jones <u>forwards Gideon Cody</u> Ruth Herbel's email dated August 4, 2023, at 5:17 PM.
- **08/07/2023** – Gideon Cody reads the email from Eric Meyer and contacts Kari Newell, and Brogan Jones.  Brogan Jones was already aware of the KDOR information, said he received it from Ruth Herbel who received it from Pamela Maag. (<u>Gideon Cody's Incident Narrative Report</u>)
- **08/07/2023 – 9:29 AM** – <u>Text message</u> string from Marion City Councilman Zach Collett to Kari Newell advising Ruth Herbel provided information regarding Kari Newell's past DUI.  Ruth Herbel "is trying to say that we should not issue you a liquor license due to this."  Zach Collett believed a DUI "does not affect ability to get a liquor license."  Zach Collett also stated, "I believe this is her (and Eric's) attempt to get back at you from last week."
- **08/07/2023 – 11:35 AM** – Ruth Herbel <u>emails Brogan Jones</u> expressing she is still concerned about issuing the liquor license and mentioned she had talked with the Division of Alcoholic Beverages Control as a private citizen.  Ruth cites city codes and Kansas State Statutes. Four attachments – <u>01</u>, <u>02</u>, <u>03</u>, <u>04</u>.
- **08/07/2023 – 6:41 PM - NOTE: Times are shown in GMT +00:00.** – <u>Text string</u> between Gideon Cody and Kari Newell beginning on 08/07/2023 to 09/26/2023 relating to this case.
- **08/07/2023 – 2:07 PM** – Officer Zach Hudlin emails Gideon Cody a link to <u>https://www.kansas.gov/ssrv-mvr-ltd/</u> along with an attachment (<u>email</u> and <u>attachment</u>). The attachment came from the KDOR pay site, titled *"Verification*
- *of your eligibility to receive the requested records"* and shows reasons A – M that can be check marked.  I observed letter C is check marked, which reads *"I work for or am acting on the behalf of a government agency and am requesting this information to fulfill the*

049391

*functions of that agency."*  Note: This *"Verification of your eligibility to receive the requested records"* document was used in the 425 Locust Street  and 117 S. 3rd Street search warrants, and I observed nothing from A – M was check marked in those two search warrants.

- **08/07/2023 – 2:14 PM –** Gideon Cody forwards Officer Zach Hudlin the email chain between him and Brogan Jones regarding Eric Meyer's email relating to Kari Newell's driver status.

- **08/07/2023 –** Approximately **2:30 PM** - Officer Zach Hudlin contacts KDOR.  KDOR recorded the full conversation in three separate recordings. (Recording 1, 2, and 3 – Transcripts 1, 2, and 3).  During this call, Officer Zach Hudlin asked initial call taker Blake Benton if someone could obtain Kari's DL information through their online site.  Blake Benton informed if someone knew (Kari Newell's) license number, and had her address, they could print any document that they (KDOR) had mailed to someone off their website.  Officer Zach Hudlin was transferred to KDOR IT Desiree Perry.  Officer Zach Hudlin told Desiree Perry that while he was waiting to be transferred, he obtained a copy of the letter (Kari Newell's DL information), telling Desiree Perry there were boxes and *"I'm doing it for, you know, legal reasons, and it will spit out a copy of that letter."*  Desiree Perry responded "Right."  Officer Zach Hudlin also asked if someone else could have done what he did if they had all of her (Kari Newell's) personal information and Desiree Perry said it would appear that way.  Desiree Perry went through the process with Officer Zach Hudlin, and Officer Zach Hudlin admitted that he himself entered Kari Newell's name where he should have entered his name (as the requester for Kari Newell's DL information).  Desiree Perry acknowledged that they (KDOR) were looking into this because they did not realize how unsecure it was.

Officer Zach Hudlin generated a document titled "Monday KDOR Contact," and it reads: *"On Monday August 7, 2023 I was asked by Chief Cody to contact the Kansas Department of Revenue (KDOR) about how someone would be able to acquire a copy of a letter sent to someone about their driver's license. At or around 1356 hours I made contact with someone at KDOR in their information technology department. The female I spoke with told me that KDOR was aware that there was a loophole or a vulnerability in their system that would allow someone to access another person's private data. She said that she had meetings the next week concerning the loophole. I asked if they would be able to tell who accessed the records and she said they did. I gave her the information for Kari Newell. She told me that on Friday August 4, 2023 the information was accessed by Phyllis Zorn and three minutes later by Kari Newell."*  Reviewing the transcript and recording of Officer Zach Hudlin's conversation with KDOR, I did not read or hear that statement.  I observed in Gideon Cody's search warrant for 611 S. Freeborn Gideon Cody talks about an article generated by the Marion County Record dated August 9, 2023.  Gideon Cody makes a statement *"The article publication reads that a councilwoman received the information.  It corroborates a witness statement that Ruth Herbel obtained protected Kansas Department of Revenue information via social networking."*

049392

- o **Title:** "Eric," and it is the same document he had emailed Attorney Joel Ensey titled "Crimes?"  Gideon Cody also emailed Attorney Brian Bina the same email at **9:48 AM**.
- **08/08/2023 – 10:03 AM –** SA Leeds responds to Gideon Cody informing he would forward his email to KBI SAC Bethanie Popejoy for review.  ([Email])
- **08/08/2023 –** 11:01 AM – [Email] from SAC Bethanie Popejoy to Gideon Cody.
  - o **Title:** RE: Abuse of Power
  - o **Subject:** Identity Theft Case
  - o **Narrative:** Chief Cody – Please send
- **08/08/2023 – 11:20 AM –** Gideon Cody emails SAC Bethanie Popejoy attaching what he sent County Attorney Joel Ensey (on 08/08/2023 at 8:37 AM) and advised he would complete an offense report and send a copy as well.  ([Email])
- **08/08/2023 – 2:02 PM –** [Untitled email] from Officer Zach Hudlin to Gideon Cody with the following statute numbers: 21-5909 – Witness Intimidation; 21-6101 – Breach of Privacy; 21-6107 – Identity Theft; 21-6424 – Unlawful use of Communication Facility; and 21-6002 – Official Misconduct.
- **08/08/2023 – 2:04 PM –** [Email] from Officer Zach Hudlin to Gideon Cody with an attachment that looks to be narrative for either a search or arrest warrant.
- **08/08/2023 – 2:31 PM –** Mayor Mayfield [forwards Gideon Cody] Ruth Herbel's email dated 08/04/2023 at 4:44:28 PM, that she had sent to Brogan Jones.
- **08/08/2023 – 3:50 PM –** [Email] from Detective Aaron Christner to Gideon Cody.
  - o **Title:** "RE: Preservation Warrants."  Detective Aaron Christner responded to Gideon Cody request to obtain preservation warrants.
- **08/08/2023 – 4:03 PM -** Brogan Jones [forwards Gideon Cody] Ruth Herbel's email dated August 4, 2023 at 3:55 PM.
- **08/08/2023 – 4:05 PM -** Brogan Jones [forwards Gideon Cody] Ruth Herbel's email dated August 4, 2023 at 4:28 PM.
- **08/08/2023 – 4:09 PM -** Brogan Jones [forwards Gideon Cody] Ruth Herbel's email dated August 4, 2023 at 5:17 PM
- **08/08/2023 – 4:10 PM –** Brogan Jones [forwards Gideon Cody] Ruth Herbel's email dated August 5, 2023 at 12:11PM.
- **08/08/2023 – 4:18 PM -** Brogan Jones [forwards Gideon Cody] Ruth Herbel's email dated August 4, 2023 at 4:09 PM.
- **08/08/2023 – 4:20 PM –** Brogan Jones [forwards Gideon Cody] his email to Mayor Mayfield dated August 4, 2023 at 4:44 PM.
- **08/08/2023 – 4:21 PM -** Brogan Jones [forwards Gideon Cody] Ruth Herbel's email dated August 4, 2023 at 4:47 PM.
- **08/08/2023 – 4:21 PM -** Brogan Jones [forwards Gideon Cody] his email to Attorney Brian Bina dated August 4, 2023 at 4:49 PM.
- **08/08/2023 – 4:22 PM –** Brogan Jones [forwards Gideon Cody] his email to Mayor David Mayfield regarding Ruth Herbel's email dated August 4, 2023 at 5:1
- 7 PM.

5

- **08/10/2023 – 1:44 PM –** Email notification to Officer Zach Hudlin that the email titled Additional SW for Eric Meyer's residence did not go through to SA Todd Leeds.
- **08/10/2023 – 1:45 PM –** Email from Gideon Cody to Attorney Joel Ensey.
  - **Title:** Search Warrant and Affidavit at 425 Locust.
  - **Narrative:** *After speaking with Jeff Soyez, the sheriff reminded me that Eric Meyer works from home. His computer will be at his residence. I attached a SW and affidavit for his residence.*
  - **Attachment:** *425 Locust SW* (Email and Attachment)
  - NOTE: There is a signature on the signature line that reads: Chief Gideon Cody, Affiant. This signature is not notarized. Compare this signature for "Chief Gideon Cody, Affiant" to the signature on the same warrant that Magistrate Judge Laura Viar signed on August 11, 2023, at 8:57 AM. The signatures look the same. (Search warrant Magistrate Judge Laura Viar signed for 425 Locust Street)
- **08/10/2023 – 3:28 PM –** Email from Detective Aaron Christner to MNSO Sheriff Jeff Soyez, MNSO Undersheriff Larry Starkey, and Gideon Cody titled "Computer forensics." Narrative: *"Here is a good resource for digital/computer forensics. It's in Kansas City."* There is an attached link.
- **08/10/2023 –** Statement from Marion Councilman Zach Collett that Sheriff Jeff Soyez informed him he (Sheriff Jeff Soyez) had a warrant for the Marion County Record. Starts on page 4.
- **08/11/2023 – (Email string provided by SA Todd Leeds between him and Officer Zach Hudlin)**
  - **At 9:09 AM**, SA Leeds received an email from Officer Zach Hudlin.
    - The Subject Line reads: *"Re: Additional SW for Eric Meyer's Residence."*
    - The email reads: *"All 4 search warrants are in the judges' hands. Should be signed any minute."*
  - **At 10:01 AM**, Officer Zach Hudlin emails SA Leeds and Detective Aaron Christner, and CC'd Gideon Cody, and Chad Burr the following email:
    - The Subject Line reads: ***"Signed SW Marion Police Department Case 23-108"***
    - There is no narrative. The email contained the following three attachments:
    - Signed 117 S 3rd.pdf
    - Signed 425 Locust.pdf
    - Signed 611 S Freeborn.pdf
    - (Email from KBI IT with the attachments)
  - **At 10:04 AM**, SA Leeds emails the following response to Officer Zach Hudlin:
    - The Subject Line reads: ***"RE: Additional SW for Eric Meyer's Residence"***
    - The email reads: *"Ya, I had the same problem. I got bounced around a phone tree for about an hour yesterday.*
    - This email documents: "Sent from my iPhone"
- **08/10-11/2023 -** Chief Hudlin provided an email string between him and SA Leeds.

- **08/15/2023 – 9:53 AM –** Email from Officer Zach Hudlin to Gideon Cody.  The narrative reads: "Ruth confession, Hudlin Video 8, 09:38," and "Eric DOR, Hudlin Video 9, 13:35."
  - **Hudlin Video 8** at 09:38 Ruth Herbel tells Officer Zach Hudlin *"I did this, I passed it to Brogan Jones because of my position in the City Council because I thought it needed to be checked out, because we were recommending her for a liquor license.  I was doing my job.  Thank you Zach."*
  - **Hudlin Video 9** at 13:35 showed Officer Zach Hudlin showing Gideon Cody that he found a documents titled Kansas Driver's License Status Check for Kari Newell.
- **08/15/2023 – 12:26 PM –** Email from Gideon Cody to Detective Aaron Christner.
  - **Attachment:** PC Statement
- **08/15/2023 – 12:59 PM –** Gideon Cody emails SAC Bethanie Popejoy a statement regarding this case.
  - **Subject**: Word Document on which PC Statements will be written.
  - NOTE: This statement is similar to the above PC Statement from Gideon Cody to Detective Aaron Christner.  (Email)
- **08/15/2023 – 1:16 PM –** Email from SAC Bethanie Popejoy to Gideon Cody.
  - **Title:** RE: Word Document on which PC Statement will be written.
  - **Narrative:** *"Thanks.  Hold this for furth instruction when we meet tomorrow, please."*
  - **NOTE:** That meeting did not take place per SAC Bethanie Popejoy.
- **08/15/2023 – 3:31 PM –** Email from Detective Aaron Christner to Gideon Cody.
  - **Title:** pc
  - **Narrative:** A draft for the pc for Eric is attached.
  - **Attachment:** MPD 23-108 PC Eric Meyer
- **08/15/2023 – 5:11 PM –** Email from Detective Aaron Christner to Gideon Cody.
  - **Title:** herbel pc
  - **Narrative**: *"I have a pc for herbel attached.  With the information I have, I am not sure it fits any of the crimes we discussed except the US fed code.  Maybe there is something I am missing."*
  - **Attachment:** MPD 23-108 Herbel PC
- **08/15/2023 – 6:52 PM –** Email from Chris Mercer (Fire Investigator) to Officer Zach Hudlin.  Subject: Deleted Items.
  - Attachment: 2023-250-CM-2 Supplement to MPD Search Warrant.
  - Narrative: *"See attached for digital copy of report.  You can still come by Wednesday, and I will have a hard copy report for you."*
- **08/15/2023 – 8:12 PM –** Email from Officer Zach Hudlin to Gideon Cody.  Subject: Sent Items.  Attachment: 2023-250-CM-2 Supplement to MPD Search Warrant.  Officer Zach Hudlin forwarded Chris Mercer's email he had received.
- **08/15/2023 – 9:44 PM –** Email from Attorney Joel Ensey to Sheriff Jeff Soyez and Gideon Cody.
  - **Title:** Meeting

18

- o **Narrative:** *"I would like to have a meeting at the Sheriff's department at 11:30 to discuss matters and where we are moving forward. Please let me know if you cannot make it."*
- **08/16/2023 – 7:20 AM –** Email from Chirs Mercer to Officer Zach Hudlin. Subject: Deleted Items. Attachment: 2023-250-CM-2 Supplement to MPD Search Warrant. Narrative: *"DISREGARD THIS REPORT, I have made a few changes, clarifications. Come see me courthouse for hardcopies."*
- **08/16/2023 – 8:30 AM –** Brogan Jones emails Attorney Brian Bina Ruth Herbel's email with Kari Newell's KDOR information.
- **08/16/2023 – 9:51 AM –** Email from Attorney Joel Ensey to a Karen Selznick. Title: New Press Release. (Email)
- **08/16/2023 – 10:29 AM –** Email from Gideon Cody to SAC Bethanie Popejoy, SA Todd Leeds, and Cc Detective Aaron Christner.
  - o **Title:** Rough Draft PC Affidavits
  - o **Attachments:** MPD 23-108 Herbel PC, MPD 23-108 PC Eric Meyer, MPD 23-108 PC Phyllis Zorn.
- **08/16/2023 – 10:34 AM –** Email from Gideon Cody to Sheriff Jeff Soyez.
  - o **Attachments:** MPD 23-108 Herbel PC, MPD 23-108 PC Eric Meyer, MPD 23-108 PC Phyllis Zorn.
- **08/16/2023 – 12:26 PM –** Media release from KBI Communications Director Melissa Underwood. (Email and Attachment)
- **08/17/2023 – 9:35 AM –** Email from Officer Zach Hudlin to Gideon Cody at Gideon Cody's work and personal email addresses. Officer Zach Hudlin forwards his email communications with SA Todd Leeds regarding the Additional SW for Eric Meyer's residence and trying to contact KDOR.
- **08/17/2023 – 9:35 AM –** Forwarded Email from Officer Zach Hudlin to Gideon Cody and Gideon Cody's work and personal email addresses. This was Officer Zach Hudlin's email to SA Todd Leeds, with Cc Gideon Cody and Chad Burr, regarding "Signed SW Marion Police Department Case 23-108."
- **08/17/2023 – 9:36 AM –** Email from Officer Zach Hudlin to Gideon Cody at Gideon Cody's work and personal email addresses. Officer Zach Hudlin forwarded the email communication with Gideon Cody and KDOR staff.
- **08/17/2023 – 3:14 PM -** Attorneys (for probably all parties) are now involved – Sheriff Jeff Soyez forwarded Marion County Sheriff's Attorney Jeffrey Kuhlman the initial email received from Eric Meyer.
- **08/17/2023 – 9:50 PM –** Email from Deb Gruver to Brogan Jones – KORA request.
- **08/18/2023 – 10:32 AM –** Email from Officer Zach Hudlin to Gideon Cody's personal email.
  - o Attachments: KBI Emails, KDOR Emails, KBI Contact Narrative, Monday KDOR Contact Narrative
- **08/20/2023 – 12:49 PM –** Email from Gideon Cody to a Washington Post reporter.
  - o **Attachment:** "KBI Emails."

# Re: [Marion, KS] Budget approval (Sent by Jeremiah Lange, miahlange@gmail.com)

Wed 8/30/2023 7:36 AM

Sent Items

To: miahlange@gmail.com <miahlange@gmail.com>;

Thanks Jeremiah for your kind words. I'm pretty sure that the budget will pass but Ruth has stated several times already that she will not vote for it and Jerry usually follows her lead. If the city doesn't become proactive instead of reactive we are doomed to go backwards. The reason I ran for mayor was to improve our infrastructure and a lot have been done but there is so much more to be done. I'm confident that Mike powers will do what needs to be done and I hope and pray that Ruth doesn't get re-elected or the city will have to deal with situations we currently deal with. She caused everything that is currently happening to our community by trying to keep Kari Newell from getting her liquor license because she wouldn't let the newspaper in her business. That's my opinion on this whole thing.

David Mayfield

On Aug 29, 2023, at 7:36 PM, Contact form at Marion, KS <cmsmailer@civicplus.com> wrote:

> Caution! This message was sent from outside your organization.     **Block sender**

Hello dmayfield,

Jeremiah Lange (miahlange@gmail.com) has sent you a message via your contact form (https://www.marionks.net/user/341/contact) at Marion, KS.

If you don't want to receive such e-mails, you can change your settings at https://www.marionks.net/user/341/edit.

Message:

Dave,

I attended the budget hearing today but had to leave early to pick my son up from cross country. I was impressed by hearing a forward facing budget presented for our community. I hope the city council will support these needed plans.

Thank you,
Jeremiah Lange